## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JAMES COPPEDGE ON BEHALF OF COPPEDGE REAL ESTATE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No.: 1:08-cv-00289-GMS |
| SAUL EWING, LLP, MICHAEL R. ROBINSON and FRANK LOVE, | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS SAUL EWING, LLP,
## MICHAEL R. ROBINSON AND FRANK LOVE'S
## OPENING BRIEF IN SUPPORT OF THEIR
## <u>MOTION TO DISMISS</u>

Candice Toll Aaron (DE Bar No. 4465)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899-1266
Telephone:(302) 421-6800
Facsimile: (302) 421-6813
Email:    caaron@saul.com
*Counsel for Defendants Saul Ewing,*
*LLP, Michael R. Robinson and Frank*
*Love*

Dated: June 17, 2008

# TABLE OF CONTENTS

                                                                    Page

TABLE OF AUTHORITIES ................................................................ iii

NATURE AND STAGE OF THE PROCEEDINGS ....................................... 1

SUMMARY OF THE ARGUMENT ...................................................... 2

STATEMENT OF RELEVANT FACTS ................................................... 3

ARGUMENT ................................................................................ 6

    I.      THE COMPLAINT MUST BE DISMISSED BECAUSE THIS
           COURT LACKS SUBJECT MATTER JURISDICTION ......................... 6

           A.     Complete Diversity Does Not Exist ............................... 7

           B.     Plaintiff Also Fails to Properly Invoke a Federal Law or
                  Other Constitutional Basis ......................................... 8

    II.     THIS COURT DOES NOT HAVE PERSONAL JURISDICTION
           OVER LOVE .............................................................. 10

    III.    THIS ACTION MUST BE DISMISSED BECAUSE THE
           DISTRICT OF DELAWARE IS AN IMPROPER VENUE ..................... 13

    IV.    THE COMPLAINT MUST BE DISMISSED BECAUSE IT
           FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE
           GRANTED ................................................................. 14

           A.     The Complaint Fails to Allege that By Representing the
                  City and Its Employees in Lawsuits Brought By Coppedge
                  that Defendants Are Tortiously Interfering with any
                  Contracts Under Delaware Law .................................. 15

                  1.     Coppedge has not Pled the Existence of a Contract .......... 16

                  2.     Coppedge has not Pled that Defendants were Aware
                        of any Contracts or Intentionally Interfered with
                        Them Improperly ............................................... 18

                        a.     There is no Tortious Interference where
                              Defendants were Unaware a Contract
                              Existed ................................................... 19

b.    Coppedge has not Demonstrated that
Defendants had a Specific Intent to Interfere ........ 20

c.    Any Purported Interference was Not
Improper and was Justified .................................... 22

3.    Coppedge has not Pled any Injury was Suffered as a
Result of Defendants' Alleged Interference ...................... 25

CONCLUSION ............................................................................................... 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

Anderson v. Wachovia Mortgage Corp., 497 F. Supp. 2d 572 (D. Del. 2007) ...................... 15, 16

Angrisani v. Capital Access Network, Inc., 175 Fed. Appx. 554 (3d Cir. 2006).......................... 20

Binns, P.C. v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773 (E.D. Pa. 2007).................. 23, 24, 25

Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, 832 F. Supp. 585
     (E.D.N.Y. 1993) ............................................................................................................... 20

Borough of West Mifflin v. Lancaster, 45 F.3d 780 (3d Cir. 1995).............................................. 15

Britestarr Homes, Inc. v. Piper Rudnick, LLP, 256 Fed. Appx. 413 (2d Cir. 2007)..................... 18

Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256 (3d Cir. 2006)................................................. 3, 5

Buckley v. O'Hanlon, 2007 WL 956947 (D. Del. Mar. 30, 2007)................................................. 6

Collins v. Johnson County, KS, 2003 WL 42164 (8th Cir. 2002)................................................... 9

Commerce Nat'l Ins. Servs., Inc. v. Buchler, 120 Fed. Appx. 414 (3d Cir. 2004) ........... 20, 21, 22

Coppedge v. Martha Brown, et al., C.A. No. 08-1250 (E.D. Pa. June 12, 2008) .......................... 5

County of Delaware v. Gov't Systems, Inc., 230 F. Supp. 2d 592 (E.D. Pa. 2002)........................ 8

Dalton v. R & W Marine, Inc., 897 F.2d 1359 (5th Cir. 1990) .................................................... 10

EchoStarr Satellite LLC v. Finistar Corp., 515 F.Supp. 447 (D. Del. 2007)............................. 3, 5

Floyd v. Saturn of Newark, 2005 WL 1657119 (D. Del. July 11, 2005) ........................................ 7

Flynn v. Health Advocate, Inc., 2004 WL 51929 (E.D. Pa. Jan. 13, 2004) ................................. 16

Gagliardi v. Clark, 2006 WL 2847409 (W.D. Pa. Sept. 28, 2006)............................................... 14

Hedges v. Musco, 204 F.3d 109 (3d Cir. 2000) .......................................................................... 15

Hishon v. King & Spalding, 467 U.S. 69 (1984)......................................................................... 14

Holmes v. Sopuch, 639 F.2d 431 (8th Cir. 1981)........................................................................... 7

In re Corestates Trust Fee Litig., 837 F. Supp. 104 (E.D. Pa. 1993), aff'd 39 F.3d
     61 (3d Cir. 1994) ................................................................................................................. 6

Innovative Office Products, Inc. v Spaceco, Inc., 2006 WL 1340865 (E.D. Pa. May 15, 2006)....................................................................................................................16

International Shoe Co. v. Washington, 326 U.S. 310 (1945) ..............................................12

James v. Daley, 406 F.Supp. 645 (D. Del. 1976) ..................................................................7

L.A. Airways, Inc. v. Davis, 687 F.2d 321 (9th Cir. 1982)..................................................24

Lane v. Chowning, 610 F.2d 1385 (8th Cir. 1979) ...............................................................18

Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) ................................19, 22

Marcus v. Wilson, 306 N.E.2d 554 (Ill. App. Ct. 1973) .....................................................19

McDonald v. Stewart, 182 N.W.2d 437 (Minn. 1970).........................................................24

McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S. Ct. 780 (1936) .............7

Morse v. Lower Merion Sch. Dist., 132 F.3d 902 (3d Cir. 1997) .......................................14

Nelson v. Fleet Nat'l Bank, 949 F. Supp. 254 (D. Del. 1996) ...............................16, 22, 23

Pennoyer v. Neff, 95 U.S. 714 (1877) ..................................................................................10

Saxton v. Cent. Pa. Teamsters Pension Fund, No. Civ. A. 02-CV-986, 2003 WL 22952101 (E.D. Pa. Dec. 9, 2003)....................................................................................14

Schott v. Glover, 440 N.E.2d 376 (Ill. App. Ct 1982)........................................................18

Schulman v. J.P. Morgan Inv. Mgmt., Inc., 35 F.3d 799 (3d Cir. 1994)...............16, 17, 18

Smith v. Delaware First Fed. Credit Union, 395 F. Supp. 2d 127 (D. Del. 2005) ...............7

Snyder v. GPM2 LLC, C.A. No. 07-66-GMS (D. Del. Jan. 22, 2008) .................................7

Syed v. Hercules Inc., 184 F. Supp. 2d 395 (D. Del. 2002) ...............................................26

Thomas v. Conn. Gen. Life Ins., 2003 WL 22953189 (D. Del. 2003)................................26

Tunnel v. Wiley, 514 F.2d 971 (3d Cir. 1975) .....................................................................14

Tunstall v. Office of Judicial Support, 820 F.2d 631 (3d Cir. 1987) ....................................9

Turicentro, S.A. v. American Airlines Inc., 303 F.3d 293 (3d Cir. 2002) .............................6

U.S. v. Lindsay, 184 F.3d 1138 (10th Cir. 1999) ..................................................................4

United States v. Barker, 19 F.Supp.2d 1380 (S.D. Ga. 1998).........................................9, 10

Windsor Sec., Inc. v. Hartford Life Ins. Co., 986 F.2d 655 (3d Cir. 1993).................................22

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S. Ct. 559, 62 L.
    Ed. 2d 490 (1980) ...........................................................................................................12

## STATE CASES

Allied Capital Corp. v. GC-Sun Holdings, L.P., 2006 WL 4782243 (Del. Ch.
    Nov. 22, 2006).................................................................................................................17

Coppedge v. City of Philadelphia, C.A. No. 07-684-GMS-MPT ..........................................4, 5,16

Coppedge v. Leatherman, C.A. No. 07-763-GMS-MPT......................................................5, 16, 20

Coppedge v. Yurkie, C.A. No. 07-846-GMS-MPT..........................................................4, 5, 16, 20

Goldman v. Pogo.com, Inc., 2002 WL 1358760 (Del. Ch. 2002).................................................25

Griffin Corporate Services, LLC v. Jacobs, 2005 WL 2000775 (Del. Ch. Aug. 11,
    2005)................................................................................................................................17

Lipson v. Anesthesia Services, P.A., 790 A.2d 1261, 1284 (Del. Super. 2001) ..........................17

Strickland v. Univ. of Scranton, 700 A.2d 979 (Pa. Super. 1996) ...............................................15

## FEDERAL STATUTES

28 U.S.C. § 1331 ....................................................................................................................2, 3, 10

28 U.S.C. § 1332 .........................................................................................................................2, 8

28 U.S.C. § 1332(a)........................................................................................................................7

28 U.S.C. § 1391(a)(3)..................................................................................................................13

28 U.S.C. § 1391(b)......................................................................................................................13

42 U.S.C. § 1983 ............................................................................................................................9

## STATE STATUTES

10 Del. C. § 3104(c) ...........................................................................................................2, 11, 12

10 Del. C. § 3104(j)......................................................................................................................12

## RULES

Federal Rules of Civil Procedure Rule 12(b)(1)................................................................2, 6, 8, 10

Federal Rules of Civil Procedure Rule 12(b)(2)................................................................2, 6

Federal Rules of Civil Procedure Rule 12(b)(3)................................................................2, 6

Federal Rules of Civil Procedure Rule 12(b)(6)................................................................2, 3, 6, 14

## CONSTITUTIONAL PROVISIONS

United States Constitution ................................................................................................2, 8, 12, 13

## OTHER AUTHORITIES

Restatement (Second) of Torts § 766 (1979)................................................................15, 16, 20

Restatement (Second) of Torts § 767 ................................................................................22, 24

## NATURE AND STAGE OF THE PROCEEDINGS

This lawsuit is but the latest chapter in the scheme contrived by James Coppedge ("Plaintiff" or "Coppedge") to harass the City of Philadelphia (the "City") and its employees for doing their jobs. This time, however, Coppedge has set his sights on the City's counsel, apparently angered that counsel has been doing its job. Not only has Coppedge been forcing the City to spend valuable time and resources defending itself against his frivolous claims in this Court and elsewhere, now he has forced the City's counsel in those actions to defend itself against his inane tactics and fantastical legal theories.

Coppedge filed this Complaint in the United States District Court for the District of Delaware on May 16, 2008. (D.I. 1). This is now the fifth suit Coppedge has brought in the District of Delaware relating to his grievances with the City's Zoning Board. In each of these cases, Coppedge crafts a novel legal theory – based on fantasy rather than legal authority – pursuant to which he supposedly has claims against the City and its employees. This time, his complaint against the City's counsel is purportedly based on state law claims of tortious interference of contract. Nowhere, however, does he set forth his basis for invoking the jurisdiction of this Court – or even why this Court has personal jurisdiction over one of the Defendants. Nor does he allege anywhere in the Complaint what contracts Defendants have supposedly interfered with – a fundamental requirement to any tortuous interference claim. Moreover, Coppedge's claims run counter to a settled body of law that holds an attorney will not be held liable for tortious interference with a contract when the attorney is acting to serve his client's interest and without any improper motive. For these reasons, and because his "Affidavit" fails to state a claim

under which relief can be granted, his complaint against Saul Ewing LLP, Michael R. Robinson and Frank Love must be dismissed with prejudice.

Contemporaneously herewith, Defendants are filing their Motion to Dismiss (the "Motion") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6) (hereinafter "Rule 12(b)(1)", "Rule 12(b)(2)", "Rule 12(b)(3)", and "Rule 12(b)(6)", respectively). This is Defendants' Opening Brief in Support of their Motion.

## SUMMARY OF THE ARGUMENT

1.    The Complaint fails to allege complete diversity of the parties and thus must be dismissed under Rule 12(b)(2) for failing to avail itself of the Court's diversity jurisdiction under 28 U.S.C. § 1332.

2.    The Complaint fails to allege facts based on the Constitution, laws or treaties of the United States or any other federal question, and thus must be dismissed under Rule 12(b)(2) for failing to avail itself of the Court's federal question jurisdiction under 28 U.S.C. § 1331.

3.    The Complaint fails to allege facts that Frank Love ("Love") has met any of the criteria under the State of Delaware's long-arm statute – 10 Del. C. § 3104(c), and thus must be dismissed against Love under Rule 12(b)(1) for lack of personal jurisdiction. Indeed, the Complaint fails to allege any contacts between Love and the State of Delaware, let alone "minimum contacts", such that this Court's exercise of personal jurisdiction would not violate the due process clause of the United States Constitution, and thus for that reason must be dismissed under Rule 12(b)(1).

4.    The Complaint must be dismissed under Rule 12(b)(3) for failing to allege facts that justify this Court's venue over the subject matter of this controversy. Most of

the events and parties relating to the Complaint are located in the Eastern District of Pennsylvania – not the District of Delaware.

5.    Under 28 U.S.C. § 1331, this Court can only decide state law claims if it has jurisdiction based on diversity or a federal question. The Complaint's allegations consist purely of state law tort claims and there is not complete diversity. Thus, the Complaint must be dismissed as this Court does not have jurisdiction in the first instance, and, so, cannot have pendent or supplemental jurisdiction over state law claims.

6.    Thus, the Complaint fails to state a claim upon which relief can be granted and must be dismissed under Rule 12(b)(6). Not only does the Complaint fail to set forth any facts that would support interference of contract by the Defendants, but the Complaint also fails to set forth the nature of the contract with which Defendants are supposedly interfering.

<u>STATEMENT OF RELEVANT FACTS</u>[1]

Coppedge alleges that his address is in the City of Philadelphia, in the Commonwealth of Pennsylvania. Coppedge Real Estate, LLC is purportedly a Pennsylvania entity. It is not a chartered Delaware business entity nor is it even registered to do business in the State of Delaware.[2] Defendant Saul Ewing LLP ("Saul Ewing") is a Delaware limited liability partnership; Defendant Michael R. Robinson ("Robinson") is a citizen of the State of Delaware; and Defendant Love is a citizen of the Commonwealth of Pennsylvania.

---

[1]    This Statement is based on the Complaint and documents referenced in or attached thereto, which may be considered by the Court in deciding the Motion. <u>EchoStar Satellite LLC v. Finisar Corp.</u>, 515 F.Supp.2d 447, 450 (D. Del. 2007).

[2]    In deciding a motion to dismiss, a Court may consider "items subject to judicial notice [and] matters of public record." <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006).

The controversy between Defendants and Coppedge appears to have begun in 2007 as a dispute between Coppedge and the City's Board of Licenses and Inspection ("Zoning Board"). Although it is difficult to decipher Coppedge's claims, it appears that the Zoning Board issued several Violation Notices to Coppedge for failing to comply with a number of fire and housing code violations.[3] Coppedge responded to these notices by, among other things, submitting to the City an "Affidavit of Specific Negative Averment" and "Bill of Peace" on June 26, 2007 purportedly to secure the admission from the City that it did not have jurisdiction over him and his property because it used capital letters when filling out its Violation Notices and that, in fact, the City and Zoning Board did not legally exist because they wrote their own names in all capital letters.[4]   As a result of the City's failure to respond to this Affidavit and Bill, Coppedge filed a UCC-1 (the "UCC-1") against the City claiming it owed him *One Hundred Billion Dollars*.[5]

On October 1, 2007, the City instituted an action in the Commonwealth of Pennsylvania's Department of State to have a correction statement filed rendering the UCC-1 ineffective.[6]   In response, Coppedge sued the City, a City attorney – Gerald Leatherman, and a City employee – David Yurkie – for failing to answer his initial "Affidavit" and making claims of harassment and some sort of breach of contract (of the

---

[3]     See Coppedge v. City of Philadelphia, C.A. No. 07-684-GMS-MPT (D.I. 1).

[4]     See Coppedge v. City of Philadelphia, C.A. No. 07-684-GMS-MPT (D.I. 1). Notably, courts across the country have dismissed claims brought by plaintiffs who object to the capitalization of proper names as "frivolous." See, e.g., U.S. v. Lindsay, 184 F.3d 1138, 1143-44 (10th Cir. 1999).

[5]     See Coppedge v. City of Philadelphia, C.A. No. 07-684-GMS-MPT (D.I. 1, UCC Financing Statement and Security Agreement).

[6]     See Coppedge v. Yurkie, C.A. No. 07-846-GMS-MPT (D.I. 9, Ex. A).

UCC-1).[7]  Coppedge also filed a similar suit in federal court in the District of Columbia,

which suit was transferred to the Eastern District of Pennsylvania for lack of venue.

Subsequent to its transfer, this suit was dismissed by the Eastern District with prejudice

along with a warning to Coppedge that future suits of similar nature will subject him to

sanctions.[8]

The City hired the law firm of Saul Ewing to defend it and its employees in these

lawsuits.  Saul Ewing associate attorney Robinson entered an appearance and has been

representing the City and its employees in the District of Delaware cases.  Similarly, Saul

Ewing associate attorney Love entered an appearance and has been representing the City

and its employees in the Eastern District of Pennsylvania actions.    According to

Coppedge's Affidavit in this action (the "Action"), Saul Ewing's representation of the

City (through Robinson and Love) interferes with his fictitious (and as yet unenumerated)

contract with the City.[9]  Notably, the Eastern District of Pennsylvania ruled just last week

that no such contract exists.[10]

---

[7]      See Coppedge v. City of Philadelphia, C.A. No. 07-684-GMS-MPT (motion to dismiss
         pending); Coppedge v. Leatherman, C.A. No. 07-763-GMS-MPT (same); Coppedge v.
         Yurkie, C.A. No. 7-846-GMS-MPT (same).    The complaints in these actions were
         incorporated by reference into the Complaint; therefore, the Court may take notice of the
         facts as pled in them herein. EchoStar, 515 F.Supp. at 450.

[8]      True and correct copies of the Complaint and Order in the District of Columbia case are
         attached hereto as **Exhibit A**.  This complaint and order are part of the public record in
         the Commonwealth of Pennsylvania.   In deciding a motion to dismiss, a Court may
         consider "items subject to judicial notice [and] matters of public record." Buck, 452 F.3d
         at 260.

[9]      It is not entirely clear from the Complaint what contract Coppedge believes was
         interfered with, but it appears from the pleadings in the related actions against the City,
         Leatherman and Yurkie that he believes he has the sovereign ability to unilaterally enter
         into contracts and that the UCC-1 was a valid, enforceable "irrevocable" contract
         obligating the City to pay him $100,000,000,000.

[10]     See Coppedge v. Martha Brown, et al., C.A. No. 08-1250 at n.2 (E.D. Pa. June 12, 2008),
         a true and correct copy of which is attached hereto as **Exhibit B**.

## ARGUMENT

Coppedge's Complaint is subject to dismissal under Rules 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6).[11]  Specifically, (i) complete diversity does not exist among the parties and Coppedge fails to properly raise a federal question; (ii) the Court has no personal jurisdiction over Love; (iii) venue is not proper in the District of Delaware; and (iv) the Complaint fails to state a claim upon which relief can be granted.  As set forth below, because of these failures the Complaint must be dismissed.

## I.    THE COMPLAINT MUST BE DISMISSED BECAUSE THIS COURT LACKS SUBJECT MATTER JURISDICTION.

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." In re Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D. Pa. 1993), aff'd 39 F.3d 61 (3d Cir. 1994); Buckley v. O'Hanlon, 2007 WL 956947, at *2 (D. Del. Mar. 30, 2007).[12]  On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court "review[s] only whether the allegations on the face of the [C]omplaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." Turicentro, S.A. v. American Airlines Inc., 303 F.3d 293, 300 (3d Cir. 2002) (quoting Licata v. United States Postal Serv., 33 F.3d 259, 260 (3d Cir. 1994)).  Coppedge has not pled a single jurisdictional fact.  Nonetheless, assuming, arguendo, the Complaint can be read liberally to include such facts, subject matter jurisdiction still does not exist.  "There are two

---

[11]    This is so despite Coppedge's assertion in the Complaint that "Defendants having ignored the default terms listed in the affidavits addressed to the City of Philadelphia, et al. causes the Defendants to waive any rights to use Federal Rules of Civil Procedure 12(b)." D.I. 1 at 2.

[12]    A copy of unreported decisions are alphabetically attached hereto as **Exhibit C**.

primary ways in which a plaintiff may allege subject matter jurisdiction: diversity and federal question." Smith v. Delaware First Fed. Credit Union, 395 F. Supp. 2d 127, 131 (D. Del. 2005). Coppedge's allegations fail to sufficiently allege either basis for this Court's jurisdiction, and, thus, his Complaint against the Defendants must be dismissed.

### A.    Complete Diversity Does Not Exist.

Diversity jurisdiction is implicated when the matter in controversy exceeds $75,000 and the dispute involves a diversity of citizenship between a plaintiff on one side and a defendant on the other. See Floyd v. Saturn of Newark, 2005 WL 1657119, at *2 (D. Del. July 11, 2005); 28 U.S.C. § 1332(a). In order to implicate diversity jurisdiction, a plaintiff must plead facts reflecting diversity of citizenship among the parties based on their domicile at the time the complaint is filed. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 186, 56 S. Ct. 780, 784 (1936) (the burden is on the plaintiff to plead and prove jurisdictional facts); Holmes v. Sopuch, 639 F.2d 431 (8th Cir. 1981). Facts regarding domicile must be set forth in the Complaint itself, with respect to each party. See Snyder v. GPM2 LLC, C.A. No. 07-66-GMS (D. Del. Jan. 22, 2008). Here, Coppedge has not alleged any jurisdictional facts or any other facts reflecting diversity of citizenship among the parties. Thus, the complaint must be dismissed. See James v. Daley, 406 F.Supp. 645 (D. Del. 1976) (dismissing a *pro se* plaintiff's complaint because it failed to allege the citizenship of the defendants and the plaintiffs as required for federal diversity jurisdiction to attach).

Assuming, arguendo, that the addresses listed on the Complaint for Coppedge (18th Street, Philadelphia, Pennsylvania), Saul Ewing and Robinson (222 Delaware Avenue, Wilmington, Delaware) and Love (1500 Market Street, Philadelphia, Pennsylvania) can be considered sufficient to allege the parties are domiciled in those

respective locations, Coppedge still cannot plead facts sufficient to establish diversity of citizenship under 28 U.S.C. § 1332. Under this reading of the Complaint, diversity is destroyed because both Coppedge and Love are domiciled in the same state.[13]  The only way that this Court can have subject matter jurisdiction over this Action is if Coppedge invokes a federal question in the Complaint.

>    **B.    Plaintiff Also Fails to Properly Invoke a Federal Law or Other Constitutional Basis.**

Because there is no complete diversity, Coppedge must invoke a federal question to survive dismissal under Rule 12(b)(1).  For this Court "to assert jurisdiction over a case based on federal question, the Constitution, laws or treaties of the United States must supply an essential element of the plaintiff's cause of action."  County of Delaware v. Gov't Systems, Inc., 230 F. Supp. 2d 592, 596 (E.D. Pa. 2002), citing Gully v. First Nat. Bank in Meridian, 299 U.S. 109, 112, 57 S. Ct. 96, 81 L. Ed. 70 (1936).  Coppedge's Complaint is utterly devoid of any allegations containing an element of a cause of action, let alone an essential element, based on Constitution or the laws or treaties of the United States.

Coppedge states in his Complaint that the basis of this Court's jurisdiction over the Action is "Title 42: 241 and 242" – a statute relating to medical research and studies (D.I. 1 at 1).  There is nothing in these statutes that would confer jurisdiction over the controversy at hand, which appears to involve Defendants' purported "interference" with a nuisance lien filed by Coppedge.

---

[13]    Even if Coppedge could establish that he is a citizen of Delaware, complete diversity would still not exist because Robinson and Saul Ewing are citizens of Delaware.

It is difficult to decipher exactly what federal or Constitutional right Coppedge believes Defendants have violated, even under a generous reading of the Complaint. Such a generous reading of the Complaint still does not save it, in any event. Giving Coppedge the benefit of the doubt and assuming he meant to allege that Defendants' representation of the City and its employees in the related actions interfered with his civil rights, he still cannot raise a federal question. The Complaint nowhere references civil rights or Section 1983 of Title 42 of the United States Code ("Section 1983"), but even if it did, it still would be insufficiently pled. Section 1983 creates a cause of action against anyone who, acting "under color of any statute, ordinance, regulation, custom, or usage, of any State," deprives an individual of rights secured by the Constitution or by federal statute. See 42 U.S.C. § 1983; see also Tunstall v. Office of Judicial Support, 820 F.2d 631, 633 (3d Cir. 1987).

In order to state a claim under Section 1983, a plaintiff must plead more than conclusory allegations arising from state proceedings showing his frustration and reiterating his grievances with such state proceedings. See Collins v. Johnson County, KS, 2003 WL 42164 (10th Cir. 2002). Rather, he must plead "a deprivation of a right guaranteed by the Constitution or the laws of the United States by a defendant acting under color of law." Tunstall, 820 F.2d at 633 (citing Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 155, 98 S.Ct. 1729, 1732-33, 56 L.Ed.2d 185 (1978)). Here, Coppedge has not met this standard. Instead, Coppedge conclusorily states that Defendants "refuse to cease and desist harassment" relating to his purported contracts (i.e., his nuisance lien) [14] with

---

[14]    In U.S. v. Barker, the Southern District of Georgia declared similar nuisance liens filed by inmates against federal employees who had taken positions adverse to the inmates null and void. See, e.g., U.S. v. Barker, 19 F.Supp.2d 1380 (S.D. Ga. 1998) (enjoining future filings without express permission and enjoining party from filing commercial liens

the City (D.I. 1 at 1), but fails to plead a single fact describing how he has been deprived of any right by Defendants.

Thus, even read as generously as possible, the Complaint fails to invoke a federal question and Coppedge has failed to properly invoke this Court's jurisdiction under 28 U.S.C. § 1331. As a result, under Rule 12(b)(1), the Complaint must be dismissed because this Court has no subject matter jurisdiction over the controversy.

## II.  THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER LOVE.

Assuming, _arguendo_, that the Complaint can survive a Rule 12(b)(1) challenge, Coppedge's claims as to Love still must be dismissed because he has not alleged any basis for this Court to exercise personal jurisdiction over non-resident Defendant Love. Because Coppedge is seeking a judgment of money damages against Love, this Court must have personal jurisdiction over Love in order to decide the present controversy. Pennoyer v. Neff, 95 U.S. 714, 720-22 (1877). The starting point for the analysis of personal jurisdiction in federal cases is the "long arm" statute in effect in which the Court is located. Dalton v. R & W Marine, Inc., 897 F.2d 1359, 1361 (5th Cir. 1990). This Court is located in the State of Delaware, whose long-arm statute provides, in relevant part:

>  (c)  As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
>  (1)  Transacts any business or performs any character of work or service in the State;

based on failure to respond to a document against federal employees). Indeed, the Barker court noted that "every court" that has considered the validity of liens filed by disgruntled citizens as "harassment, intimidation and extortion" has held them to be invalid. Barker, 19 F. Supp.2d at 1384.

(2)    Contracts to supply services or things in this State;

(3)    Causes tortious injury in the State by an act or omission in this State;

(4)    Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5)    Has an interest in, uses or possesses real property in the State; or

(6)    Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*  *  *

(j)    When jurisdiction over a person is based solely upon this section, only a cause of action arising from any act enumerated in this section may be asserted against the person.

10 Del. C. § 3104(c). Thus, to exercise long-arm jurisdiction, a plaintiff must satisfy one of the enumerated provisions under section 3104(c), and jurisdiction is effective only as to a "cause of action arising from" those enumerated acts.

Given that the Complaint is completely barren of any reference to how this Court is authorized to assert personal jurisdiction over non-resident Defendant Love, the Complaint cannot establish personal jurisdiction under *any* of the afore-quoted enumerated acts. Put simply, Plaintiff does not allege that Love is (or has ever been) a resident of Delaware; has entered Delaware for any purposes; transacts business; performs services or contracts to supply services in Delaware; owns or insures property in Delaware, and regularly does or solicits business, engages in any other persistent

course of conduct in Delaware or derives substantial revenue from services, or things used or consumed, in the State. Nor has Coppedge alleged that Love committed any tort in Delaware causing injury within the State, or that Love committed a tort outside of Delaware but caused injury in Delaware and "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State." 10 Del. C. § 3104(c). Moreover, Plaintiff does not even attempt to connect his claims to any of the enumerated acts under § 3104(c) as required by Section 3104(j).

Even assuming nonetheless that there is some basis for a Delaware court to assert personal jurisdiction over Love, that exercise of jurisdiction would violate due process. Under the due process clause of the United States Constitution, this Court may exercise jurisdiction over an out-of-state defendant only if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The focus of this inquiry is on the relationship between the defendant, the forum and the litigation, and this Court must determine whether Love engaged in sufficient "minimum contacts" with Delaware to require him to defend himself in the courts of this State consistent with traditional notions of fair play and justice. Generally, a defendant's contacts with the forum State must rise to such a level that she should "reasonably anticipate" being required to defend herself in the courts of that State. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980). The Complaint is completely void of allegations that could establish any contacts by Love, let alone minimum contacts with

the State of Delaware.[15]  Thus, any exercise by this Court of personal jurisdiction against Love would violate longstanding law and the United States Constitution.  Accordingly, this Court should dismiss the Complaint against Love for this reason as well.

**III.    THIS ACTION MUST BE DISMISSED BECAUSE THE DISTRICT OF DELAWARE IS AN IMPROPER VENUE.**

In addition to the reasons set forth above, this Action also must be dismissed because the District of Delaware is not a proper venue in which to review a controversy regarding an alleged interference of a contractual relationship between the City of Philadelphia and one of its citizens.  Venue in cases based upon federal questions is proper in the following judicial districts (and no others): (i) if all defendants reside in the same state, a district where any defendant resides, (ii) a district in which a "substantial part of the events or omissions" on which the claim is based occurred, or a "substantial part of the property" that is the subject of the action is located, or (iii) if there is no district in which the action may otherwise be brought, the district "in which any defendant may be found." 28 U.S.C. § 1391(b).[16]  The Eastern District of Pennsylvania meets the criteria of prong 2.  The dispute between Coppedge and the City began and at all times has been in the Eastern District of Pennsylvania.  The alleged contract was purportedly created and served in the Eastern District of Pennsylvania.  There are no

---

[15]    Given that the four-corners of the Complaint provide no basis for jurisdiction over Love, it is impossible to fathom how notions of fair play and substantial justice would counsel in favor of calling him a non-resident, into this Court, or how any conduct allegedly undertaken by Love put him on notice that he should "reasonably anticipate" being required to defend himself in Delaware.

[16]    Venue for pure diversity cases has similar standards with differences that are not relevant here.  See, e.g., 28 U.S.C. § 1391(a)(3) ("residential venue" exists only where any defendant "is subject to personal jurisdiction at the time the action is commenced.").  As set forth above, there is no diversity in this case. See Section I.A., supra.  Even if there was, however, personal jurisdiction over Love in this action has never existed.  See Section II, supra.

other districts that meet any of these tests, including the District of Delaware. The only possibly relevant act that occurred in Delaware was the entry of appearance and the filing of motions to dismiss by Robinson of Saul Ewing to represent the City and its employees in Coppedge's suits against them in this District. Since prong 2 of the test is already met, prong 3 would not apply. Thus, venue in this District is improper.

## IV.    THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The facts of the subject Complaint should be viewed in a light most favorable to the Plaintiff and must be accepted as true. See Tunnel v. Wiley, 514 F.2d 971, 975 n.6 (3d Cir. 1975); Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). However, the court need not accept "a complaint's bald assertions or legal conclusions," Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997), or unsubstantiated conclusions or factual inferences that are unwarranted. Saxton v. Cent. Pa. Teamsters Pension Fund, No. Civ. A. 02-CV-986, 2003 WL 22952101, at *3 (E.D. Pa. Dec. 9, 2003). While pro se litigants are not held to as stringent a pleading standard as those represented by counsel, a pro se plaintiff "must still plead the essential elements of his or her claim and is not excused from conforming to the standard rules of civil procedure." Gagliardi v. Clark, 2006 WL 2847409, at *3 (W.D. Pa. Sept. 28, 2006) (citing McNeil v. United States, 508 U.S. 106, 113 (1993)). In fact, where a pro se plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck – he has pleaded himself out of court." Gagliardi, 2006 WL 2847409, at *4 (quoting Jefferson v. Ambroz, 90 F.3d 1291, 1296 (7th Cir. 1996)).

A.    **The Complaint Fails to Allege that By Representing the City and Its Employees in Lawsuits Brought By Coppedge that Defendants Are Tortiously Interfering with any Contracts Under Delaware Law.**

As this Court does not have jurisdiction in the first instance, it must decline to address Coppedge's state law claims – whether under the laws of the Commonwealth of Pennsylvania or the State of Delaware. Specifically, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995); see Hedges v. Musco, 204 F.3d 109, 122-24 (3d Cir. 2000). Even if the Court were to find that it does have jurisdiction and this District is a proper venue, however, Coppedge has failed to state a claim for tortious interference of contract. Thus, the Complaint must be dismissed.

A *prima facie* case of tortious interference with a contract exists where an individual "intentionally and improperly" interferes with the performance of a contract between two parties by inducing or otherwise causing one party not to perform the contract. Restatement (Second) of Torts § 766 (1979); see also Anderson v. Wachovia Mortgage Corp., 497 F. Supp. 2d 572, 583 (D. Del. 2007) (Delaware law applies Restatement Section 766 in tortious interference claims).[17] To state a claim for tortious

---

[17]    If this Court were to find that Pennsylvania law applies, the Court's analysis would be substantially similar. Under Pennsylvania law, the elements for tortious interference with a contract are set out by Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. 1997), and are: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's

interference with a contract under Delaware law, a plaintiff must demonstrate the existence of "(1) a contract; (2) about which defendant knew; and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." Anderson v. Wachovia Mortgage Corp., 497 F. Supp. 2d 572, 583 (D. Del. 2007) (citing Irwin v. Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987)). Coppedge's Complaint fails to allege even one of these facts.

### 1.    Coppedge has not Pled the Existence of a Contract.

As an initial matter, Coppedge has failed to plead the existence of a contract – a necessary predicate to a tortious interference claim.  Indeed, the very first element of a tortious interference claim requires that there be a contract.  See Nelson v. Fleet Nat'l Bank, 949 F. Supp. 254, 260 (D. Del. 1996) (citing Irwin v. Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987) (listing the elements of a tortious interference with a contract claim under Restatement § 766); Schulman v. J.P. Morgan Inv. Mgmt., Inc., 35 F.3d 799, 808 (3d Cir. 1994) (applying Pennsylvania law).  Not only does Coppedge fail to allege facts establishing a contractual relationship between himself and the City, as detailed in the City's, Yurkie's and Leatherman's briefs found in the companion cases,[18] and the Eastern District of Pennsylvania's recent decision, no such contract has ever existed.

---

conduct." See also Innovative Office Products, Inc. v Spaceco, Inc., 2006 WL 1340865, at *3 (E.D. Pa. May 15, 2006) (considering the elements when deciding not to bifurcate the case) and Flynn v. Health Advocate, Inc., 2004 WL 51929, at *8 (E.D. Pa. Jan. 13, 2004) (applying the elements and found the plaintiffs had made sufficient allegations to survive a motion to dismiss the claim).

[18]    See Coppedge v. City of Philadelphia, C.A. No. 07-684-GMS-MPT (D.I. 16); Coppedge v. Leatherman, C.A. No. 07-763-GMS-MPT (D.I. 10); Coppedge v. Yurkie, C.A. No. 07-846-GMS-MPT (D.I. 9).

While it is difficult to decipher Coppedge's meaning, he references only twice in his Complaint "contracts" between him and the City. See D.I. 1 at p. 2. This vague, generalized reference is not sufficient to establish the existence of a contract sufficient to make out a claim for tortious interference. Allied Capital Corp. v. GC-Sun Holdings, L.P., 2006 WL 4782243 (Del. Ch. Nov. 22, 2006). Rather, a plaintiff alleging tortious interference must set forth allegations specific enough to identify the agreement purportedly interfered with. Griffin Corporate Services, LLC v. Jacobs, 2005 WL 2000775 (Del. Ch. Aug. 11, 2005). Conclusory allegations that a contract existed will not suffice. Id.

Indeed, Coppedge can under no set of facts or more specific pleading, establish that his nuisance lien against the City constituted a contract as a result of a recent ruling in the Eastern District of Pennsylvania. The Eastern District of Pennsylvania ruled just last week that no such contract exists. See Exhibit B, hereto. Where there is no underlying contract to interfere with, a claim for tortuous interference with it cannot lie. Lipson v. Anesthesia Services, P.A., 790 A.2d 1261, 1284 (Del. Super. 2001).

In any event, even assuming the Complaint's conclusory allegations are sufficient and the Eastern District of Pennsylvania had not dismissed Coppedge's contract claim last week, his Complaint still fails. Coppedge's assertions that the filing of his nuisance lien created a contract with the City are misplaced. A tortious interference claim must fail where there is no mutual assent, and the filing of a nuisance lien is a unilateral act. In Schulman, a plaintiff-tenant claimed that the failure of his landlord's mortgagee to provide him with funding for needed improvements amounted to tortious interference with his lease agreement with the landlord. Noting that no contract exists when only one

party has expressed an intent to be bound, the Third Circuit rejected the tortious

interference claim on the grounds that a binding lease did not exist between the parties

since the landlord had not expressed any intent to be bound during the lease negotiations.

Schulman, 35 F.3d at 808.

As in Schulman, the City's lack of response to Coppedge's "Affidavit of Specific

Negative Averment" sent to the City on June 26, 2007 does not amount to a binding

contract, but more likely demonstrates, a lack of intent to be bound.  Without a contract,

there is no contractual relationship with which Saul Ewing's attorneys could interfere and

therefore, the first required element of a tortious interference claim cannot be met.

Accordingly, the lack of a binding contract between the City and Coppedge necessitates

the dismissal of Coppedge's claim.[19]

### 2.    Coppedge has not Pled that Defendants were Aware of any Contracts or Intentionally Interfered with Them Improperly.

Even assuming there is a valid contract between Coppedge and the City,

Coppedge's Complaint still cannot survive dismissal because it has several additional

fatal flaws.  First, the Complaint contains no allegations that Defendants were aware of

any contract between Coppedge and the City.  Second, the Complaint does not allege

Defendants' purported interference was intentional.  Finally, Coppedge makes no claims

---

[19]    This analysis is equally applicable to dismiss a claim of intentional interference with a contract by attorneys defending their clients.  Courts have held that an attorney cannot be liable for tortious interference when the plaintiff fails to establish that a contract existed at the time of the alleged interference.  See Britestarr Homes, Inc. v. Piper Rudnick, LLP, 256 Fed. Appx. 413, 415 (2d Cir. 2007) (holding that plaintiff failed to state a claim for tortious interference against defendant attorneys because no "business relationship" was identified with which defendants allegedly interfered); Lane v. Chowning, 610 F.2d 1385, 1389-90 (8th Cir. 1979) (rejecting claim that attorney tortiously interfered with a contract between plaintiff and bank where no contract was shown to exist); Schott v. Glover, 440 N.E.2d 376, 379 (Ill. App. Ct 1982) (same).

that Defendants' alleged interference (*i.e.*, their actions to represent their clients) was improper or unjustified.

(a)    **There is no Tortious Interference where Defendants were Unaware a Contract Existed.**

Courts have held that a defendant cannot be liable for interference with a contract of which he or she is unaware. See <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1170 (3d Cir. 1993) (applying New Jersey law) (reasoning that because a plaintiff alleging tortious interference must show that a defendant intended to interfere with the plaintiff's contract, "it is axiomatic that a defendant cannot be liable for interfering with a contract of which he or she was unaware"). Similarly, courts have rejected tortious interference claims against an attorney where the attorney is unaware that his actions interfered with an existing contractual relationship between his client and a third party. See <u>Marcus v. Wilson</u>, 306 N.E.2d 554, 559 (Ill. App. Ct. 1973) (holding that plaintiff failed to sufficiently state a claim for tortious interference where he could not establish that defendant attorney had knowledge of client's contractual relationship with the plaintiff under a note).

Here, the Complaint does not contain a single allegation, or even an implicit inference, that Defendants were aware of a contract between Coppedge and the City.[20] Rather, Coppedge claims that "DEFENDANTS have ignored the default terms listed in the contract affidavits which makes them liable for interfering with these irrevocable terms." (D.I. 1 at 2). Indeed, Defendants' actions on behalf of the City, Leatherman and Yurkie, the facts of which are apparent from a review of the record in the related

---

[20]    Indeed, even *after* reading Coppedge's Complaint numerous times, Defendants are *still* unaware of any contracts between Coppedge and the City of Philadelphia, including the contracts Coppedge claims they interfered with.

actions[21] support the suggestion that Defendants are <u>totally</u> unaware of any contract between the City and Coppedge (which is why they have, on behalf of the City and its employees moved to dismiss his claims against the City and its employees) for breach of contract. Because Coppedge has not pled a single fact demonstrating, let alone merely suggesting that Defendants were aware of any contract between him and the City, his claim for tortious interference must be dismissed.

**(b)      Coppedge has not Demonstrated that Defendants had a Specific Intent to Interfere.**

Even if Defendants were aware of the contracts Coppedge claims Defendants have interfered with, Defendants cannot be held liable for tortious interference unless Coppedge can demonstrate that Defendants "intentionally" interfered.    <u>See, e.g.</u>, Restatement (Second) of Torts § 766 (1979); <u>Commerce Nat'l Ins. Servs., Inc. v. Buchler</u>, 120 Fed. Appx. 414, 416, 418 (3d Cir. 2004) (applying Delaware law); <u>Angrisani v. Capital Access Network, Inc.</u>, 175 Fed. Appx. 554, 557 (3d Cir. 2006) (applying New Jersey law) (rejecting tortious interference claims on grounds that plaintiff failed to demonstrate a specific intent on the part of the defendant to interfere with plaintiff's employment agreement). In this regard; where a plaintiff fails to demonstrate that an attorney intended to interfere with a particular contractual relationship, courts have held that the attorney cannot be liable for tortious interference with a contract. <u>See Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants</u>, 832 F. Supp. 585, 592 (E.D.N.Y. 1993) (dismissing claims against an attorney on grounds that the plaintiff did

---

[21]      <u>Coppedge v. Leatherman</u>, C.A. No. 07-763-GMS-MPT (motion to dismiss pending); <u>Coppedge v. Yurkie</u>, C.A. No. 07-846-GMS-MPT (same).

not establish that the attorney intentionally persuaded his client to breach its contract with plaintiff).

As an initial matter, Coppedge nowhere describes in his Complaint any specific acts or conduct by Defendants. He never alleges, or even uses the word "intent" or "intentional" anywhere in his Complaint in connection with Defendants or their actions. Thus, he has not met this fundamental hurdle to making out a claim against Defendants. Giving him the benefit of the doubt, however, and assuming, based on the context of this Action, that Coppedge meant to assert that Defendants' actions on behalf of their clients in moving to dismiss the related actions against the City, Leatherman and Yurkie constituted intentional interference with a contract between Coppedge and the City, he still cannot plead sufficient facts to survive dismissal.

In Commerce National Insurance Services, Inc. v. Buchler, the Third Circuit affirmed the rejection by the District of Delaware of a tortious interference claim filed by an insurance company against its former employees. Commerce Nat'l Ins. Servs., Inc. v. Buchler, 120 Fed. Appx. 414 (3d Cir. 2004) (applying Delaware law). The insurance company argued that, by sending notices to clients regarding their decision to join a competing insurance brokerage firm, former employees of the plaintiff tortiously interfered with the plaintiff's existing contracts with those clients. Commerce, 120 Fed. Appx. at 415. Upholding the lower court's reasoning that plaintiff's clients were "free 'to choose their insurance representative'" on their own volition, the court held that the plaintiff failed to establish that its former employees acted with the intention of causing the clients to breach their contracts with the plaintiff. Id. at 416, 418.

Similarly, in the present case there is no evidence that Saul Ewing and its attorneys took any action with the specific intent of inducing its client, the City, to breach a contract with Coppedge. Rather, Saul Ewing's attorneys merely acted to represent their client's interests and any "interference" with Coppedge's alleged contracts with the City was merely incidental, as in Commerce, to those actions. Accordingly, no tortious interference with a contract claim against Defendants can lie.

> **(c)    Any Purported Interference was Not Improper and was Justified.**

Not only must an interference with a contract be intentional to be actionable, but it must also be improper and unjustified. In determining whether an interference is "improper," Delaware courts rely on Restatement Section 767, which requires consideration of: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interest of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the societal interests in protecting the freedom of the action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. Nelson v. Fleet Nat'l Bank, 949 F. Supp. 254, 260 (D. Del. 1996). Three of those factors – the actor's motive, the interests sought to be advanced by the actor, and the relations between the parties – are particularly determinative in the courts' analysis. See, e.g., Windsor Sec., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 664-65 (3d Cir. 1993) (applying Pennsylvania law) ("[W]here an actor is motivated by a genuine desire to protect legitimate business interests, this factor weighs heavily against finding an improper interference."); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir. 1993) (applying New Jersey law) (explaining that what is actionable in a tortious interference

claim is the "malicious purpose" of harming another's business); <u>Nelson v. Fleet Nat'l Bank</u>, 949 F. Supp. 254, 261 (D. Del. 1996) (holding that plaintiffs sufficiently stated a claim that defendant's interference with their employment agreements was "improper" where facts revealed that defendant's motivation for interfering was "racial and gender hatred"); <u>Binns, P.C. v. Flaster Greenberg, P.C.</u>, 480 F. Supp. 2d 773, 779-80 (E.D. Pa. 2007).

Applying this guidance here to determine whether Defendants had the requisite improper motive, the Court should consider (i) the motivation of Defendants for interfering with Coppedge's relationship with the City, (ii) the interests sought to be advanced by Defendants in so acting, and (iii) the relations between the City and Coppedge. Although it is not evident from the face of the Complaint, it can be inferred that Defendants' motivation for "interfering" with Coppedge's contracts with the City was merely to advocate on behalf of their clients and in their clients' best interest. The interests sought to be advanced by those actions were not the Defendants' personal interests but those of the Defendants' clients. As far as the relations between Coppedge and the City, they are tenuous at best. Coppedge's relation to the City at this point is nothing more than adversarial in respect to litigation as Coppedge's asserted status as a "creditor" of the City. There is no relationship, and certainly not a contractual relationship between them. Coppedge is merely a disgruntled citizen who is angry for having been on the receiving end of a number of housing and fire code violations and who has retaliated by filing frivolous lawsuits and liens in an attempt to intimidate and harass the City and its employees.

The way courts have applied the above-described factors to claims of improper motive in actions for tortious interference against attorneys is particularly relevant here. Specifically, courts have held that where an attorney lacks a personal motive for interfering with a contract, the attorney will not be liable for tortious interference with a contract when he is merely representing his client's interests. See L.A. Airways, Inc. v. Davis, 687 F.2d 321, 328 (9th Cir. 1982) (applying California law); McDonald v. Stewart, 182 N.W.2d 437, 439 (Minn. 1970) (finding that the absence of "malicious motivation" on the part of an attorney who advised his client to withdraw from a contract with the plaintiff barred liability for tortious interference with a contract). For example, in Los Angeles Airways, Inc. v. Davis, the Court of Appeals for the Ninth Circuit dismissed claims against an attorney for tortious interference with a contract between his client and the plaintiff upon a showing that the attorney's efforts in encouraging his client to breach the contract were intended to serve his client's interests. L.A. Airways, 687 F.2d at 328.

Similarly, in Binns, the Eastern District of Pennsylvania emphasized the significance of an alleged interferer's motives in a case in which an attorney sued another law firm for tortious interference with a contract. Binns, 480 F. Supp. 2d at 776-777. There, the plaintiff, an attorney himself who was asked by the defendant firm to help represent one of the defendant firm's clients, sued the defendant law firm for tortious interference after the defendant firm terminated the plaintiff's involvement in an action on behalf of the client. Id. In evaluating the plaintiff attorney's tortious interference claim, the court focused on the defendant's motives for interference with the relationship between the plaintiff attorney and the client, and explained that an actor may have an "improper motive" under Restatement Section 767 if "he harbors ill will, the motive to

injure another, or the bare desire to interfere with another's contractual relationship." <u>Id.</u> at 779. The court distinguished this sort of motive from that driving the defendant law firm in that case, finding it significant that the defendants were attorneys and reasoning that because it was part of the defendants' job as "legal professionals" to reassess the value of plaintiff's involvement in the defense team, the attorneys at the defendant firm acted with proper motives. <u>Id.</u> at 780. Accordingly, the tortious interference claims were dismissed. The same rationale applies here with equal force, where Defendants merely acted in the best interests of the City and its employees in acting as their counsel in the numerous actions brought by Coppedge. There is no suggestion in the Complaint, or in the context of this and the related actions, of ill will or a desire on the part of Defendants to injure or harm Coppedge. Indeed, there is no evidence of an improper motive on the part of Defendants precisely because they acted as "legal professionals" in defending their client against Coppedge's many unfounded claims, like the <u>Binns</u> defendants. For this additional reason, Coppedge's tortious interference claims must be dismissed.

### 3. Coppedge has not Pled any Injury was Suffered as a Result of Defendants' Alleged Interference.

Along with the requirement that there was a valid contract and that that contract was breached, a claim of tortious interference of contract requires that a plaintiff plead that he was injured by the unlawful act. <u>Goldman v. Pogo.com, Inc.</u>, 2002 WL 1358760, at *4 (Del. Ch. 2002). Here, the Complaint contains no allegation of injury; therefore, Coppedge is lacking this fundamental element of his claim. Moreover, the Complaint contains merely a request for damages and no allegation of injury. D.I. 1 at p. 2.

## CONCLUSION

For the foregoing reasons, Defendants Saul Ewing, LLP, Michael R. Robinson and Frank Love, respectfully request that the Court grant their Motion to Dismiss the Complaint with prejudice. Plaintiff has failed to carry his burden to invoke the jurisdiction of this Court as: (i) complete diversity among the parties does not exist; (ii) Coppedge has presented no allegations supporting a federal question; (iii) Love is not subject to Delaware's long-arm statute or Constitutionally able to be brought to suit in a court in Delaware; and (iv) this District is not the proper venue for the present controversy. Further, for the reasons stated in herein, Coppedge has failed to state a claim upon which relief can be granted by this Court.

Finally, Defendants respectfully request that the Court put Coppedge on formal notice that continued harassment of the City of Philadelphia, its employees and its legal counsel with these frivolous lawsuits may result in sanctions to him.[22]

**SAUL EWING LLP**

Candice Toll Aaron (DE Bar No. 4465)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899-1266
Telephone:     (302) 421-6800
Facsimile:     (302) 421-6813
Email: caaron@saul.com

*Counsel for Defendants Saul Ewing, LLP,*
*Michael R. Robinson and Frank Love*

Dated: June 17, 2008

---

[22]   See Thomas v. Conn. Gen. Life Ins., 2003 WL 22953189, at *3-*9 (D. Del. 2003) (citing Ketchum v. Cruz, 775 F. Supp. 1399, 1403 (D. Colo. 1991), aff'd, 961 F.2d 916 (10th Cir. 1992)); see also Syed v. Hercules Inc., 184 F. Supp. 2d 395, 402 (D. Del. 2002).

# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

February 25, 2008

Plaintiff:
James Coppedge on behalf of
Coppedge Real Estate, LLC / Judgment Creditor                    Pro Per
3742 N. 18th Street
Philadelphia, Pennsylvania [19140]
Phone #: 215-226-0259 or 215-913-1485

Vs.

CIVIL ACTION NO: _O 8  0357_

DEFENDANT/S:

MARTHA BROWN,
CHIEF COUNCIL
DEPARTMENT OF STATE
2601 NORTH THIRD STREET
HARRISBURG, PENNSYLVANIA  17110-2056

RUTH D. DUNNEWOLD, ESQUIRE
HEARING OFFICER
DEPARTMENT OF STATE
2601 NORTH THIRD STREET
HARRISBURG, PENNSYLVANIA  17110-2056

GERALD D. LEATHERMAN, ESQUIRE
DEPUTY CITY SOLICITOR
CITY OF PHILADELPHIA, LAW DEPARTMENT
1515 ARCH STREET, 16TH FLOOR
PHILADELPHIA, PA  19102

PEDRO A. CORTES
SECRETARY OF THE COMMONWEALTH
302 NORTH OFFICE BUILDING
HARRISBURG, PENNSYLVANIA  17105-2649

# COMPLAINT

RE:    **THIS COMPLAINT CONCERNS AFFIDAVITS OF BREACH OF**

   **CONTRACTS, BREACH OF PERFORMANCES, AND BREACH OF**

   **DUTY REGARDING ALL THE ABOVE LISTED DEFENDANTS.**

To the Clerk of US Court:

This complaint is a notice to the Court that this Affidavit is not subjected to FROCP Rule 5 pertaining to the 20 day service because this matter is a contract mutually agreed to previously by default on behalf of the DEFENDANTS: MARTHA BROWN, RUTH DUNNEWOLD, and GERALD LEATHERMAN. I am only having the matter enforced under Title 9 USC 1, 2, 4, 13, 202, 203, 209, 206, 301, 303, 304 and 306 under Title 28 Section 1333. Their failure to following this contract is the sole reason for their liability in this civil case. PEDROS A. CORTES, SECRETARY OF THE COMMONWEALTH is being sued for his failure to recognize and honor the default judgments and non-responses of the above ESQUIRES pertaining to the cancellation of the illegal hearing scheduled on December 6, 2007 before the COMMONWEALTH OF PENNSYLVANIA and affirm the Plaintiff's acknowledged UCC-1.

Whereas since the DEFENDANT/S refuses to cease and desist, threats and harassments of the Secured Party Creditor, a claim has been filed against the CITY OF PHILADELPHIA claim number (07-684) pending and GERALD D. LEATHERMAN, ESQUIRE, claim number (07-763) pending, and to ensure the payment of the judgment debt against the CITY OF PHILADELPHIA for the amount of $10,000,000.00 (Ten Million US Dollars).

PEDRO A. CORTES, SECRETARY OF THE COMMONWEALTH initially reviewed and acknowledged all valid documents for my UCC-1, Financing Statement, but due to the pressure of the lawsuit from his peers involving the CITY'S harassment of the Plaintiff, ATTORNEY CORTES is attempting to illegally withdraw my UCC-1claiming a fraudulent Filing Statement as the reason. He also continues to ignore my Affidavits and claims. As you will see in this Affidavit, no one has ever rebutted any of my Affidavits supporting my claims and contracts of obligation.

Whereas the DEFENDANT/S appear to have circumvented the stipulations by attempting to use illegal methods through its attorneys to unlawfully discriminate against me without due process under color of law for the purpose of depriving the plaintiff of his civil rights and liberties to collect monies under the legal contracts noted in the default stipulations against the CITY OF PHILADELPHIA.

1.  ATTORNEY RUTH DUNNEWOLD served as the hearing officer for the DEPARTMENT OF STATE reference my DEPARTMENT OF STATE acknowledged UCC1 and Certification. This was illegally challenged by the de facto CITY OF PHILADELPHIA. ATTORNEY RUTH DUNNEWOLD ignored most affidavits presented to her in addition to her own non-response affidavit which she failed to answer, which should have dismissed the entire hearing. The following documents were rejected in court:

    a). Certification of non response for RUTH DUNNEWOLD, ESQUIRE hearing officer

2.  ATTORNEY LEATHERMAN represents the CITY OF PHILADELPHIA who refuses to respond to any of the affidavits sent to him on behalf of the CITY OF PHILADELPHIA. Therefore, he participated in an illegal hearing which should have been cancelled.

3.  CHIEF COUNCIL BROWN also refused to respond to any affidavits as overseer. She should have cancelled the hearings herself, but refused to intervene that justice might be carried out. Therefore, CHIEF COUNCIL BROWN is held liable for failure to properly supervise.

4.    PEDROS A. CORTES, SECRETARY OF COMMONWEALTH

is being sued for attempting to enter A FINAL ADJUDICATION

AND ORDER WITHOUT JURISDICTION.  SECRETARY

CORTES IS RETALIATING AGAINST THE PLAINTIFF DUE

TO THE PRESSURE PUT ON HIM BY THE ESQUIRES OF

THE STATE AND THE ESQUIRES OF THE CITY OF

PHILADELPHIA DUE TO THE TEN MILLIION DOLLARS

ADMIRALTY MARITIME IRREVOCABLE CLAIM

CONTRACT AND EACH ATTORNEYS LIABILITY CLAIM

OF ONE HUNDRED THOUSAND DOLLARS EACH.

The following statement/affidavits prove the validity of the complaint:

1).    STATEMENT OF FACTS (NOTICE AND DEMAND TO

ABATE PROSECUTION:  FOR LACK OF IN PERSONAM

JURISDICTION BY WRIT OF MANDAMUS AND

PROHIBITION.

2).    AFFIDAVIT OF SUPPLEMENTAL POINTS AND

AUTHORITIES IN SUPPORT OF PERMANENT INJUNCTION

WITH CEASE AND DESIST ALL CITY & STATE ACTIONS

AGAINST JAMES COPPEDGE OR COPPEDGE REAL

ESTATE, LLC DUE TO WANT OF JURISDICTION.

3).    FINAL ADJUDICATION AND ORDER (PEDRO A. CORTES,

SECRETARY OF THE COMMONWEALTH.

4).    AFFIDAVIT OF INVOLUNTARY FALSE MUSTER INTO

MILITARY AUTHORITY AND MONOTARY LIABILITY OF

THE COMMONWEALTH OF PENNSYLVANIA WITH

MONOTARY LIABILITY OF ESQUIRES DUNNEWOLD AND

LEATHERMAN UMCJ RULE 202 REPRISALS.

5). AFFIDAVIT OF TRUTH (Verifying that I am not in the military and have not been recruited by the military as of December 6, 2007) the hearing should have been dismissed for placing me under military control of a foreign government flag.  Motion was denied.

6). AFFIDAVITS IGNORED BY THE HEARING OFFICER WERE NECESSARY FOR RESPONSE:

    a). AFFIDAVIT OF REBUTTAL FROM MY MOTHER LILLIE COPPEDGE JACKSON (Ref. Son's Birth Certificate).

    b). AFFIDAVIT OF REBUTTAL OF JAMES COPPEDGE TO REDEEM STRAWMAN.

7). AFFIDAVIT OF BREACH OF DEFAULT CONDITIONS DUTY & OBLIGATIONS OF CONTRACT BY NEGLIGENCE & MALPRACTICE THROUGH ARBITRARY CAPRICIOUS ESQURES DUNNEWOLD & LEATHERMAN.

8). AFFIDAVIT OF DEPRIVATION OF CONTRACT RIGHTS PURSUANT TO TITLE 42 1981 (B) MALPRACTICE & BREACH OF  CONTRACT BREACH OF DUTY AND BREACH OF PERFORMANCE OF AGAINST ESQUIRES RUTH D. DUNNEWOLD, and GERALD D. LEATHERMAN, ESQUIRE *must rebut the following facts point for point within 72 hours.* Failure to do so will constitute a financial liability in the amount of $100,000.00 each; and forfeiture of any relief by any other attorney

the facts will stand irrevocable and enforceable under International Laws via the United Nation or any other international body available. (See Facts 1-5).

9).     AFFIDAVIT CLAIM OF SUPPORT OF PROPER JURISDICTION AND VENUE IN DELAWARE.

**Fact One**

James Coppedge is not enlisted into the armed forces as of December 6, 2007 and will swear before congress this fact.

**Fact Two**

James Coppedge was deceived & tricked by the STATE & CITY OF PHILADELPHIA esquires RUTH D. DUNNEWOLD, ESQUIRE and GERALD D. LEATHERMAN, ESQUIRE on December 6, 2007 to enlist into a military court under a military flag red & white blue with yellow fringes. Thereby committing malpractice misusing the adjudication hearing improperly in a military venue unfriendly to civilian populations.

**Fact Three**

James Coppedge has a valid International Irrevocable Contract in which the ESQUIRES of the CITY OF PHILADELPHIA has an obligation to pay $10,000,000.00 (Ten Million US Dollars) according to the affidavits not rebutted by the CITY OF PHILADELPHIA esquires within the time period of the stipulations which has not been carried out to the letter.

**Fact Four**

The Contracts will stand as irrevocable until paid in full by the said esquire appointed to pay the contracts are still un-rebutted and all stipulations attached to the affidavits are factual genuine irrevocable evidence admissible into international laws of contracts via the United Nations if necessary.

Fact Five

Each ESQUIRES who has knowledge of all affidavits sent out dishonored agreements and failed to perform the obligation of contracts. They maliciously & willfully misrepresented the facts of the affidavit contracts by circumventing the factual issues the affidavits stipulated which has caused serious damage to the aggrieved party's collection rights by avoiding the issues of the facts, they cannot contend without implementing themselves thru breaching the oaths they swore to protect.

Whereas the DEFENDANT/S have circumvented the stipulations by attempting to use illegal methods through its attorneys to unlawfully discriminate against me without due process, under the color of law for the purpose of depriving the plaintiff of his civil rights and liberties to collect monies under the legal contracts noted in the default stipulations against the CITY OF PHILADELPHIA.

All statements are true, correct, and factually complete and admissible as evidence, not misleading and true to the best of the undersigned's sincerely held spiritual convictions and creed.

Whereas jurisdiction to collect the damages of Ten Million USD are valid and enforceable under Title 9 USC Sections; 1, 2, 4, 13, 202, 203, 204, 206, 301, 303, 304, & Title 28 USC 1333.

1.    Whereas the above DEFENDANTS are being sued for $100,000.00 (One Hundred Thousand Dollars) each. The defendants are sued because of their failure to rebut my affidavits and comply with the stipulations or withdraw all complaints against the Secure Party. The defendants have all agreed to withdraw all complaints by consent with default judgment by silence in failing to rebut any and all affidavits. They have not done so to date. Wherefore the plaintiff requests the order of the

court to demand enforcement of the Affidavits. Stipulations and the

Monetary Judgments and cancel the complaint of the defendants at the

hearing of December 6, 2007 held at the PA DEPARTMENT OF STATE

for no responses, and to ensure that all harassments, threats and visits

cease and desist with prejudice.

## RELIEF REQUESTED FROM THE COURT:

This is a request to file an Affidavit of Civil Rights Contract Complaint pursuant

to Title 42 U.S.C. 1981 (B) and 1983 and 1986 and $100,000.00 (One Hundred Thousand

US Dollars) for each individual for failure to rebut any and all Affidavits submitted by

the Plaintiff's. In addition to the following:

The Court is asked to do the following:

1). ORDER all Default Judgments against the DEFENDANTS be enforced

2). ORDER the COMMONWEALTH TO cease and desist and expunge the Hearing

on 12-6-2007 and all related records due to want of jurisdiction and failure by

ESQUIRES TO REBUT ALL AFFIDAVITS ETC PRESENTED BY THE

PLAINTIFF.

3). AFFIRM the reclaiming of the Plaintiff's UCC-1 Financing Statement

4). DISMISS referral for prosecution against the Plaintiff

5). ORDER a permanent junction to cease and desist all CITY AND STATE

ACTIONS against **James Coppedge/Coppedge Real Estate, LLC** due to want

of jurisdiction

6). ORDER Writ of Mandamus and Prohibition in favor of the Plaintiff.

Whereas plaintiff is changing the venue under Title 9 USC 204 due to a

BLANTANT conspiracy by the DEFENDANT/S via its agents and attorneys,

because maritime liens/admiralty contracts are enforceable anywhere within the

U.S.

_[signature]_
**James Coppedge**

_[handwritten address:]_
_Address_
_3042 N 28th St_
_Philadelphia, Pennsylvania 19140_
_215-226-2259_

**COMMONWEALTH OF PENNSYLVANIA**

**COUNTY OF PHILADELPHIA**          ss          Jurat

On this _28th_ day of February, 2008, before me, a Notary Public of the Commonwealth of Pennsylvania in and for the County of Philadelphia came, **James Coppedge** before me personally known to be the JUDGMENT CREDITOR who is executing this CIVIL RIGHTS COMPLAINT, and as he acknowledges this execution the same, and his signature is duly affixed by the authority of his Sacred, Risen Savior, Jesus Christ.

_[signature]_ **James Coppedge**

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal of the STATE OF PENNSYLVANIA, COUNTY OF PHILADELPHIA the day and year first above written.

Subscribed and sworn to me at _PHILADELPHIA_ - _PA_ before me this _28th_ day of _FEB_, A.D. 2008.

Notary Public _JOHN T MELVIN_
My Commission Expires: _NOV 15, 2011_
WITNESS my hand and official seal

_[signature]_
Signature

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES COPPEDGE on behalf of COPPEDGE REAL ESTATE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MARTHA BROWN, Chief Counsel, U.S. DEPARTMENT OF STATE, *et al.*,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 08-00357 (ESH) |

**TRANSFER ORDER**

Proceeding *pro se*, plaintiff James Coppedge has filed a breach of contract complaint on

behalf of Coppedge Real Estate LLC.  Defendants consist of two employees at the U.S.

Department of State's office in Harrisburg, Pennsylvania; an employee at the City of

Philadelphia Law Department; and the Secretary of the Commonwealth of Pennsylvania.

Because this district is not the appropriate venue for plaintiff's claims, the Court will transfer the

case to the Eastern District of Pennsylvania.

Section 1391(e) provides that:

> A civil action in which a defendant is an officer or employee of the
> United States or any agency thereof acting in his official capacity
> or under color of legal authority, or an agency of the United States,
> or the United States, may, except as otherwise provided by law, be
> brought in any judicial district in which (1) a defendant in the
> action resides, (2) a substantial part of the events or omissions
> giving rise to the claim occurred, or a substantial part of property
> that is the subject of the action is situated, or (3) the plaintiff
> resides if no real property is involved in the action.

28 U.S.C. § 1391(e).  Under this standard, venue is improper in the District of Columbia.  All of

the defendants are located in Pennsylvania, the events giving rise to the claim occurred in

Pennsylvania, and plaintiff resides in Pennsylvania. The District of Columbia has no connection

with this case. Under § 1391(e), however, venue is proper in the Eastern District of

Pennsylvania because at least one of the defendants resides in that district. Accordingly, it is this

4th day of March 2008,

      **ORDERED** that pursuant to 28 U.S.C. § 1406(a), the case is **TRANSFERRED** to the

United States District Court for the Eastern District of Pennsylvania.

      **SO ORDERED.**

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:  March 4, 2008

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES COPPEDGE, | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| MARTHA BROWN, et al., | : | **No. 08-1250** |
| **Defendants.** | : | |

## ORDER

**AND NOW,** this **12th** day of **June, 2008**, upon consideration of Defendants' Motions to Dismiss, Plaintiff's response thereto,[1] and Defendants' Motion to Strike, it is hereby **ORDERED** that:

1.   Defendants' Brown, Dunnewold, and Cortes Motion to Dismiss (Document No. 15) and Defendant Leatherman's Motion to Dismiss (Document No. 18) are **GRANTED.**[2]

---

[1] Via letter, this Court required Plaintiff to respond to Defendants' motions by June 12, 2008 (Document No. 20). On June 11, 2008, Plaintiff filed a document inappropriately titled "Memorandum to Support Dismissal of All Defendants' Motions" (Document No. 28). Having reviewed this document, the Court concludes that it is Plaintiff's response to Defendants' motions and should be reclassified as such.

[2] In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers and Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). "'[The] [f]actual allegations [in a complaint] must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.'" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1959 (2007). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. *Pro se* complaints should be liberally construed. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).
    Construing Plaintiff's pleadings as liberally as possible, Plaintiff simply does not state any federal claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). Plaintiff appears to bring a breach of contract claim against Defendants, who are the Secretary of the Commonwealth of Pennsylvania, a Pennsylvania Department of State Hearing Examiner, a Deputy City Solicitor, and the Chief Counsel for the Department of State. Prior to filing this lawsuit, Plaintiff obtained a default judgment for the breach of a so-called "admiralty maritime irrevocable claim contract"

2.    Defendants' Brown, Dunnewold, and Cortes Motion to Strike (Document No. 27) is

      **GRANTED**.[3]  Plaintiff's so-called "Affidavit of Breach of Default Conditions Duty

      and Obligations of Contract" (Document No. 24) and "Affidavit of Special Negative

      Averment" (Document No. 25) are **STRICKEN** from the record.

3.    All claims against Defendants Brown, Dunnewold, Cortes, and Leatherman are

      **DISMISSED with prejudice.**  The Clerk of Court is directed to close this case.

      Plaintiff is instructed that he may be subject to sanctions for filing any additional

      materials in this docket.

                              BY THE COURT:

                              _____

                              **Berle M. Schiller, J.**

---

by filing a Uniform Commercial Code financing statement with the Pennsylvania Department of
State.  Following a hearing on this judgment on December 6, 2007 before Defendant Dunnewold,
the financing statement was declared fraudulently filed, the judgment was set aside, and the case
referred to the Office of the Attorney General for potential prosecution.  *See City of Phila. v.
Coppedge Real Estate, LLC,* Department of State, Docket No. 0002-97-07 (Jan. 28, 2008).
Plaintiff was entitled to, and given, thirty days to appeal the adjudication; he did not appeal in
state court, but rather filed the present action.  *Id.*

        Plaintiff's breach of contract claims fail as a matter of law because he has not alleged any
facts indicating that he had any contract with Defendants.  Plaintiff's incomprehensible, obscure,
and bizarre references to, among other things, the City of Philadelphia as a secured party, himself
as a judgment creditor, a supposed "valid International Irrevocable Contract," and Defendants as
"ficticious payee[s]" does not prove or even suggest that Plaintiff and Defendants were ever
parties to any contract.  *See* James Coppedge's Motion for Default Judgment (Document No. 5).
Without a predicate contract, there can be no breach of contract action.  This Court's broadest
reading indicates that permitting Plaintiff to amend his complaint would be futile.  *Phillips v.
County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

        [3] Federal Rule of Civil Procedure 12(f) permits the Court to strike immaterial,
impertinent or scandalous matter.  Plaintiff's so-called "Affidavit of Breach of Default
Conditions Duty and Obligations of Contract" (Document No. 24) and "Affidavit of Special
Negative Averment" (Document No. 25) and the allegations against Defendants and their counsel
are nonsensical and irrelevant to this matter, and do nothing other than clutter the docket.

# Exhibit C

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))

Page 1

**C**

Buckley v. O'Hanlon
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Dennis J. BUCKLEY, as Trustee of the DVI Liquidating Trust Plaintiff,
v.
Michael A. O'HANLON, Steven R. Garfinkel, Richard E. Miller, John P. Boyle, Anthony J. Turek, Raymond D. Fear, William S. Goldberg, Gerald D. Cohn, John E. McHugh, Harry T.J. Roberts, and Nathan Shapiro, Defendants.
No. 04-955GMS.

March 28, 2007.

Francis A. Monaco, Jr., Joseph J. Bodnar, Monzack & Monaco, P.A., Wilmington, DE, for Plaintiff.
Dennis J. Buckley, pro se.
David E. Brand, Prickett, Jones & Elliott, P.A., David A. Felice, Cozen O'Connor, Arthur G. Connolly, Jr., Connolly, Bove, Lodge & Hutz, Joanne Ceballos, Adam L. Balick, Bifferato Gentilotti Biden & Balick, Martin James Weis, Dilworth Paxson LLP, Wilmington, DE, Gregory P. Miller, Michael A. Morse, Miller, Alfano & Raspanti, P.C., Philadelphia, PA, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 The Official Committee of Unsecured Creditors of DVI, Inc. (the "Committee") filed this action on August 19, 2004. The Committee was dissolved, and Dennis J. Buckley was appointed as Trustee for the DVI Liquidating Trust ("Buckley") by order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on November 24, 2004. Buckley was substituted as plaintiff in this action in this court's Order of April 6, 2006. The complaint states claims for breach of fiduciary

duty and deepening insolvency as to the officer defendants (Michael A. O'Hanlon, Steven R. Garfinkel, Richard E. Miller, John P. Boyle, Anthony J. Turek, and Raymond D. Fear) and the director defendants/audit committee members (O'Hanlon, William S. Goldberg, Gerald D. Cohn, John E. McHugh, Harry T.J. Roberts, and Nathan Shapiro). The complaint also includes a claim for fraud as to O'Hanlon, Garfinkel, and Miller. Presently before the court are eight motions to dismiss.

II. LEGAL STANDARD

Pursuant to the motion of a party, a court may dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In making this determination, the court must accept as true all allegations in the complaint, and must draw all reasonable inferences in the light most favorable to the plaintiff. *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). The defendant must show "beyond doubt" that the plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

III. BACKGROUND [FN1]

>    FN1. This section is a summary of facts, taken from the pleadings, and do not constitute findings of fact.

DVI and its subsidiaries are Delaware corporations with principal places of business in Pennsylvania. (D.I.1, ¶ 11.) Prior to filing for bankruptcy, DVI extended lease and loan financing to healthcare providers to facilitate the purchase of sophisticated medical equipment, and extended revolving lines of credit that were secured by liens on accounts receivable generated by that provider's operations. (D.I.1, ¶¶ 13-15.) To raise capital and maintain

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))

Page 2

their lines of credit, DVI used a securitization system, through which financial contracts were pledged as collateral to lenders. (D.I.1, ¶ 33.) Recognizing losses or establishing reserves on underperforming contracts would have negatively affected the securitization system, so although the payment histories of impaired leases and loans worsened in the years leading up to filing, DVI's loss reserves and level of write-offs for bad credit remained fairly static. (D.I.1, ¶ 39.) By 1999, DVI began experiencing shortages of capital, so the defendants used irregular financial practices to make ends meet while at the same time investing large amounts of cash in ill-performing markets and non-core businesses. (D.I.1, ¶ 54.) Defendants O'Hanlon, Garfinkel, and Miller were allegedly the first to implement such practices, as they had access to DVI's record keeping software. Apparently, the other defendants discovered, ignored, or participated in the practices. (D.I.1, ¶¶ 92-100.)

*2 The plaintiff alleges that, to maintain the appearance of solvency, the defendants injured DVI and its creditors by repurchasing delinquent loans and leases without receiving commensurate value, and transferring funds within DVI's subsidiaries and among select borrowers to disguise underperforming accounts. (D.I.1, ¶¶ 60-68.) Other irregular practices that the defendants are alleged to have committed include investing substantial amounts of money in consistently unprofitable or non-core businesses, obtaining otherwise-unavailable lines of credit by pledging the same collateral to several lenders, ignoring internal controls and reporting procedures, and disregarding numerous warnings from DVI's outside auditor and the SEC. (Id.)The independent auditor resigned in June 2003 after refusing to approve DVI's Form 10-Q for the quarterly period ending March 31, 2003. DVI also began defaulting on its loans in June 2003, and ultimately filed for bankruptcy on August 25, 2003. (D.I.1, ¶ 57.)

IV. DISCUSSION

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."*In Re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D.Pa.1993), *aff'd*39 F.3d 61 (3d Cir.1994)."Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation."*National Org. for Women v. Scheidler,* 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). Therefore, the court will address the issue of standing first.

A. Standing

Defendant Roberts posits that the causes of action pursued in the complaint are beyond the scope of the remedies contemplated by the statutory predicates cited in the Motion to Authorize Official Committee of Unsecured Creditors to Investigate and Pursue Causes of Action Against Pre-Petition Officers and Directors. In the May 10, 2004 Order approving that motion, however, the Bankruptcy Court authorized the Debtors to "investigate, and, if appropriate, pursue, *any causes of action* of the Debtors' estates against the Defendants."(D.I.27, Ex. A) (emphasis added). Whether this Order granted to the Committee greater authority than the Committee requested is immaterial; the court had the power to do so. The plain language of the Bankruptcy Court's Order makes clear that Buckley has standing to assert claims on behalf of DVI's debt- ors.

Other defendants argue that Buckley cannot bring claims on behalf of the creditors because the Committee had standing as to the debtors only. In support of their argument, the defendants rely on the Supreme Court's decision in *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), wherein the Court held that a trustee in bankruptcy does not have standing to pursue claims on behalf of creditors of the debtor company's estate. In response, Buckley

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))**

argues that, as trustee, it is empowered to pursue claims on behalf of the debtors' creditors because the Bankruptcy Court confirmed the assignment of the creditors' claims to the trustee under the provisions of the Plan and Confirmation Order, dated November 24, 2004.

**\*3** While the court acknowledges that, in theory, a bankruptcy trustee can pursue claims that the debtors' creditors assigned to it, a plaintiff must have standing to pursue its claims at the time of filing. *See Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union Ry. Co.,* 270 U.S. 580, 586, 46 S.Ct. 402, 70 L.Ed. 743 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought."). Here, the complaint was filed in August 2004 but the trustee did not obtain an assignment of rights from a subset of creditors until four months later, in December 2004, when the Bankruptcy Court's Plan and Confirmation Order became effective. Moreover, since that Order, Buckley has not sought to supplement the existing complaint.

The court will not proceed with claims for which the plaintiff obtained standing after the lawsuit was filed. As Judge Longobardi so aptly stated in *Procter & Gamble Co. v. Paragon Trade Brands, Inc.:*

> As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

917 F.Supp. 305, 310 (D.Del.1995) (*quoted in Gaia Technologies, Inc. v. Reconversion Technologies, Inc.,* 93 F.3d 774, 780 (Fed.Cir.1996), *as amended on rehearing,* 104 F.3d 1296 (Fed.Cir.1996)). The court will dismiss, without prejudice, any claims Buckley asserts on behalf of the debtors' creditors.

**B. Breach of Fiduciary Duty Claim**

Delaware law provides that corporate officers and directors owe the corporation a triad of fiduciary duties: loyalty, good faith, and due care. *McMullin v. Beran,* 765 A.2d 910, 917 (Del.2000). To state a claim for breach of fiduciary duty, a plaintiff may allege that the officers and directors of a company knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result.[FN2] *In re Caremark Intern. Inc. Deriv. Lit.,* 698 A.2d 959, 971 (Del.Ch.1996) (stating that liability may be based upon either an ill-advised or negligent decision, or an unconsidered failure to act when due attention would arguably have prevented the loss). The Court of Chancery later elaborated on what constitutes such an ill-advised decision in *Guttman v. Huang,* 823 A.2d 492, 507 (Del.Ch.2003) (listing as an example "that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation").

> FN2. Delaware law provides that fiduciary duties are owed to a corporation by both officers and directors. *Arnold v. Soc'y for Savings Bancorp, Inc.,* 678 A.2d 533, 539 (Del.1996). Therefore, to the extent that cases cited in this memorandum refer only to one of these groups, the court will consider them as applicable to both.

**\*4** Buckley alleges that the defendants either knew or should have known that violations of law were occurring, that they took no good faith steps to ameliorate the situation, and that DVI and its cred-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))**

Page 4

itors suffered damages. Buckley also alleges that the officer defendants perpetuated an array of irregular accounting practices, of which the director defendants were aware, and which they ignored. All of the director defendants were alleged to be members of DVI's audit committee. Buckley's complaint is consistent with the *Guttman* pleading example, in that it alleges that the officer defendants eliminated the Criticized Asset Reporting system and manipulated delinquent loans and leases to make them appear profitable. Also, as in *Guttman*, Buckley alleges that the audit committee received eleven warning letters over eight years from their independent auditor, and that the auditor resigned after no action was taken in response to the alert. Buckley further avers that a series of inquiries from the SEC were also ignored by both the audit committee and the board of directors.

Several of the defendants have attempted to analogize the facts in this case to those in *Guttman* because the Court of Chancery viewed that plaintiff's allegations as overly conclusory. In *Guttman*, however, the complaint made sweeping accusations regarding accounting irregularities without discussing how management was expected to be aware of the problem, or even the presence of an audit committee. Here, the court finds that the contents of Buckley's complaint dictate a different result.

The defendants also challenge Buckley's claim for breach of fiduciary duty by disputing many of the substantive contentions. For example, several state that they lacked knowledge or notice of the accounting irregularities, that they held their relevant positions for only a portion of the time in which DVI allegedly was put on notice of the irregularities, that they immediately attempted to rectify the situation upon learning of the problem, that the letters sent by DVI's outside auditor or the SEC could not be expected to alert them to the problems, or that the Examiner's Report painted a different picture of the internal workings of DVI. These responses address, however, the substantive merits of Buckley's claim. Because Buckley's allegations are

accepted as true for the purposes of these motions, such factual disputes are not appropriately resolved on motions to dismiss. Rather, the court must focus its consideration on the sufficiency of the complaint.

1. Sufficiency of Pleading

Several of the defendants insist that, because they are not mentioned individually in many of Buckley's allegations, the claims are too broad to proceed. "When group pleading is utilized by a plaintiff 'the identification of the individual sources of statements is unnecessary when the fraud allegations arise from the misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases or other group-published information that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation.' " *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 85 (D.Del.2002) (citations and internal quotations omitted). Therefore, group pleading may be sufficient in some circumstances.

*5 Defendant Roberts argues that breach of fiduciary duty claims must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). Such an assertion is correct when the allegations of breach of fiduciary duty sound in fraud. *ePlus Group v. Panoramic Communications, Inc.,* No. 02-7992, 2003 WL 21512229 at *2 (S.D.N.Y. July 2, 2003). However, in the absence of such allegations, Rule 9(b) does not apply. *In re Fruehauf Trailer Corp.,* 250 B.R. 168, 197 (D.Del.2000) (stating that the heightened pleading requirement generally does not apply to state law claims for breach of fiduciary duty). In *Fruehauf,* Rule 9(b) was not triggered even in the presence of multiple allegations that the defendant knew or should have known that certain representations were false and misleading. Neither was particularized pleading required when the plaintiff's complaint included such statements as "knew or should have known the financial statements ... misrepresented to System One

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))

Page 5

the Division's financial condition."*In re InaCom Corp.*, No. 00-2426, 2001 WL 1819987 at *3 (Bankr.D.Del. Aug.7, 2001) (finding the claim did not sound in fraud).

While not all of Buckley's allegations name the involved defendants individually, Buckley did separate the list of defendants into smaller groups who worked together on various committees and boards. Although Buckley frequently refers simply to "defendants" in the body of the complaint, the parties involved in each alleged practice of bad-faith were identified expressly in the introductory paragraphs of Buckley's complaint, and later, in his factual allegations and claims. (D.I.1, ¶¶ 16-28.) The court accepts that Buckley uses the categories of officers and directors merely as substitutes for listing names, rather than using them as sweeping terms to avoid having to associate specific parties to particularized conduct. Wherein much of the alleged conduct involved collective action and decision making, Buckley has sufficiently identified the small groups within DVI and their roles in approving or participating in each alleged bad-faith practice.

The court rejects Defendant Roberts' assertion that Buckley's allegations sound in fraud. Granted, Buckley describes much of the defendants' conduct as intentional or knowing, however, Buckley's choice of terms, which are also seen in fraud claims, do not transform claims for breach of fiduciary duty into claims based in fraud. In fact, the fiduciary duty claims in Buckley's complaint are very similar in structure to what were deemed acceptable fiduciary duty claims in *Fruehauf* and *InaCom.* Buckley's allegations for breach of fiduciary duty, while they must not be conclusory, need not be pled with the particularity required of fraud claims.

2. Applicability of Business Judgment Rule

The business judgment rule is a presumption that a board's actions are entitled to deference, because it

would be overly harsh to condemn such a decision that only in hindsight was poorly conceived. This presumption is rebutted, however, when a plaintiff pleads particularized facts sufficient to raise a reason to doubt that the action was taken in good faith or on an informed basis. *In re The Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del.Ch.2003). Such doubt is raised when officers and directors fail to be "active monitors of corporate performance," *Caremark,* 698 A.2d at 968 (providing as an example the replacement of a board of directors following the discovery of large losses caused by phantom trades by a prominent trader). Nor may officers and directors consciously disregard visible "red flags." *See Rattner v. Bidzos*, No. 19700, 2003 WL 22284323 at *13 (Del.Ch. Sept.30, 2003). Neither may officers and directors make decisions "so egregious as to constitute corporate waste."*In re Tower Air, Inc. .,* 416 F.3d 229, 238 (3d Cir.2005). The standard for holding officers and directors liable is one of gross negligence. *Smith v. Van Gorkom,* 488 A.2d 858, 873 (Del.1985).

*6 In *Smith,* the decision to approve a proposed merger met that standard because it was made solely on the basis of a twenty-minute presentation. On the other end of the spectrum, gross negligence was not found when directors recommended a merger after consulting financial advisors, meeting several times over a six-week period, and reviewing challenges to the idea. *Rabkin v. Philip A. Hunt Chem. Corp.,* 547 A.2d 963, 970 (Del.Ch.1986) (defining gross negligence as reckless indifference to, or a deliberate disregard of, the stockholders).

Buckley used language similar to that in the above cases in describing defendants' alleged conduct and its results, including allegations of wasting corporate assets, willfully disregarding warnings, and ceasing to review delinquent accounts. Buckley alleges that DVI's officers and directors acted in bad faith, disguising poorly-performing accounts and ignoring the advice of its outside auditor and the inquiries of the SEC. Buckley has satisfied the *Disney* requirement by pleading particularized facts that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))

Page 6

raise doubts as to whether the officers and directors were acting in good faith.

3. Effect of Exculpatory Clause

Several defendants argue that the exculpatory clause in DVI's Certificate of Incorporation, which is based on section 102(b)(7) of the Delaware General Corporation Law, bars the claims against them because it states that no director shall be personally liable to DVI or its stockholders. However, the clause contains exceptions to this protection when a director breaches his duty of loyalty to DVI, or for acts not taken in good faith, involving intentional misconduct, or a knowing violation of law. For example, in *Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins,* such a provision was found not to insulate the directors from liability when they acted with knowing and deliberate indifference by approving a loan program without consideration, deliberation, or advice from an expert. No. 20228, 2004 WL 1949290 at *15 (Del.Ch. Aug.24, 2004). Similarly in *McCall v. Scott,* defendants were not protected by the exculpatory clause when they acted in bad faith by intentionally ignoring "red flags." 250 F.3d 997, 1001 (6th Cir.2001) (finding allegations of "conscious disregard of known risks" to necessarily be conduct undertaken in bad faith).

Buckley's allegations fall into the "bad faith" exception to DVI's Certificate of Incorporation exculpatory clause. Buckley alleges that the defendants here, as was alleged in *Elkins,* acted with "knowing and deliberate indifference," when they stopped examining delinquent accounts. Further, Buckley alleges that the defendants consciously disregarded "red flags," as in *McCall,* when the defendants paid no attention to the warnings allegedly contained in the auditor's and SEC's letters. Buckley has sufficiently pled breach of the duties of loyalty and good faith. As a result, the Certificate of Incorporation cannot operate to insulate the defendants from a breach of fiduciary duty claim. Consequently, the claim will proceed on the merits.

C. Deepening Insolvency Claim

*7 To plead insolvency, a plaintiff must aver facts that establish, for pleading purposes, that the corporation had a deficiency of assets below liabilities with no reasonable prospect that the business will succeed, or that it was unable to meet maturing obligations as they fell due in the ordinary course of business. *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 782 (Del.Ch.2004).

Buckley alleges that financial practices similar to those employed by the debtors in *Production Resources* occurred at DVI. *Id.* at 783-4.Specifically, the complaint avers that DVI had great difficulty raising capital, shuffled delinquent accounts to make them appear healthy, and could only obtain advances from its line of credit by erroneously certifying impaired loans and leases. Buckley expressly alleged that DVI became insolvent in June 2003, when it began defaulting on its loan obligations. Again, here, as in *Production Resources,* it can be reasonably inferred that the officers' and directors' alleged conduct caused the insolvency. The court thus concludes that Buckley has sufficiently pled that DVI was in the "zone of insolvency."

1. Recognition of Deepening Insolvency Claim

The U.S. Bankruptcy Court for the District of Delaware predicted that, in the absence of an opinion by the Delaware Supreme Court and given the Third Circuit's analysis in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* Delaware law would likely recognize a claim for deepening insolvency. *In re Oakwood Homes Corp.,* 340 B.R. 510, 531 (Bankr.D.Del.2006). Although the elements of such a claim have yet to be enunciated, the Third Circuit acknowledged such a claim when a plaintiff alleges "fraudulent expansion of corporate debt and prolongation of corporate life."*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 347 (3d Cir.2001). A successful claim for deepening insolv-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))**

ency requires a showing of harm to the corporation because of such fraud. *Oakwood Homes,* 340 B.R. at 534 (also explaining that fraud requires a representation of material fact, falsity, scienter, reliance, and injury). In *Oakwood Homes,* fraud was found when the defendants, acting as the debtors' fiduciaries, misrepresented the sustainability of the company's finances with the intent to induce the debtors into maintaining the *status quo,* because it could be inferred from the complaint that such misrepresentation was with knowledge.

Here, as in *Oakwood Homes,* Buckley pled that the defendants, placed in positions of trust and control within DVI, knowingly misrepresented the state of DVI's financial health with the intent to cause DVI to continue incurring more liabilities than it could repay. The defendants allegedly disguised failing accounts and misrepresented DVI's creditworthiness without justification. Rather than constituting a valid attempt to restore DVI to solvency, the defendants' conduct is alleged to have fraudulently expanded DVI's corporate debt and prolonged DVI's life. These allegations, as framed, satisfy the pleading standard observed in *Lafferty.*

2. Applicability of *In Pari Delicto* Doctrine

*8 The doctrine of *in pari delicto*[FN3] provides that "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in."*Lafferty,* 267 F.3d at 354 (citations omitted). Under this equitable doctrine, when a plaintiff is "standing in the shoes" of the bankrupt corporation, its claim is barred if the defendants' purported wrongdoing is imputed on the bankrupt corporation itself. *Id.* at 354, 358-59.

    FN3.*In pari delicto* is Latin for "in equal fault." *Black's Law Dictionary* 806 (8th ed.2004).

Whether the *in pari delicto* doctrine applies in this case depends on whether the defendants' conduct can be imputed to the debtors and hence to the

Trust, which, under bankruptcy law, stands in the shoes of the debtors. Imputation refers to the attribution of one person's wrongdoing to another person. Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. *Id.* at 358.

The defendants' argue that *in pari delicto* serves as a bar to Buckley's deepening insolvency claim because Buckley stands in the shoes of the debtor corporations, seeking relief from the defendants for damages purportedly caused by the debtors' allegedly fraudulent conduct. (D.I.29.) To support this argument, Defendants Boyle and Fear state that the allegations buttressing Buckley's deepening insolvency claim satisfy both prongs of the imputation test. In response, Buckley argues that because the *in pari delicto* doctrine is an affirmative defense, the court should not consider the issue on a motion to dismiss. Further, Buckley contends that if the court reached the merits of whether *in pari delicto* is applicable, the court should find imputation inappropriate because the second prong of the imputation test is not met.

It is generally true that an affirmative defense should not be used to dismiss a plaintiff's complaint under Rule 12(b)(6).*In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 277 (3d Cir.2004). That being said, in *Lafferty,* the Third Circuit did affirm a district court's dismissal of a deepening insolvency claim on the basis of the *in pari delicto* doctrine, which the Circuit acknowledged as an affirmative defense. *Lafferty* and *Adams Golf,* however, are not necessarily in conflict. Indeed, dismissal is only appropriate when the plaintiff can prove *no set of facts* that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added). In this case, Buckley disputes that the criteria for imputation is met. Specifically, Buckley invokes the adverse interest exception, which provides that fraudulent conduct will not be imputed to the corporation if the fraud

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))**

Page 8

was not "for the benefit of the corporation."*Lafferty,* 267 F.3d at 359. As Judge Cowen observed in his *Lafferty* dissent, "an equitable doctrine like *in pari delicto* is highly sensitive to the facts and readily adapted to achieve equitable results."*Lafferty,* 267 F.3d at 362. Simply put, the court finds it premature to bar Buckley's deepening insolvency claim on *in pari delicto* grounds. While it may eventually come to pass that the defense will prevail, the determination will be made on further development of the facts. After considering the pleadings and the positions of the parties, the court is not satisfied that Buckley is unable to prove any facts that would entitle the DVI Liquidating Trust to relief for deepening insolvency.

### 3. Applicability of the Business Judgment Rule

*\*9* In Delaware, there is no general duty to liquidate an insolvent company. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168 (Del.Ch.2004). Similar to the application of the business judgment rule in the fiduciary duty context discussed earlier, it would be harsh to judge the actions of corporate officers and directors, in hindsight, for a failed good-faith attempt to bring a company out of insolvency. Allegations of bad faith, however, also make recovery for deepening insolvency possible under Delaware law. *In re RSL COM PRIMECALL USA, Inc.,* Nos. 01-11457 through 01-11469, 03-2176, 2003 WL 22989669 at *8 (Bankr.S.D.N.Y. December 11, 2003). If bad faith is alleged, prolongation of operations would "smack of self-dealing, constitute a breach of fiduciary duty, and open up recovery under the theory of deepening insolvency."*In re Global Service Group LLC,* 316 B.R. 451, 465 (Bankr.S.D.N.Y.2004) (requiring a complaint to allege bad faith or fraudulent intent as opposed to mere bad judgment).

As the court has already concluded, Buckley's complaint makes sufficient allegations of bad faith. Buckley stated that, rather than attempting in good faith to revive DVI and avoid liquidation, the de-

fendants disguised the true nature of DVI's finances to obtain more funding with no expectation that such funding would restore DVI to solvency. (D.I.1, ¶ 68.) One can reasonably infer that such activities extend beyond the mere exercise of poor judgment, deemed insufficient in *Global Service.*The court finds that, based on the pleadings, the business judgment rule does not preclude a deepening insolvency claim against the defendants.

### D. Fraud Claim

To state a claim for fraud, a plaintiff must allege that a defendant made a false statement, knowing or recklessly assuming it to be true, with the intent that plaintiff act or refrain from acting in reliance, that plaintiff justifiably relied, and that plaintiff suffered damages. *Kronenberg v. Katz,* 872 A.2d 568, 585 n. 25 (Del.Ch.2004). Allegations of fraud must be pled with particularity. Fed.R.Civ.P. 9(b). Provided that a plaintiff alleges sufficiently particularized allegations, there is no *per se* rule that group pleading cannot satisfy Rule 9(b); otherwise, "sophisticated defrauders" could easily conceal their wrongdoing. *MBIA Ins. Corp. v. Royal Indem. Co.,* 221 F.R.D. 419, 421 (D.Del.2004). The Third Circuit has stated that plaintiffs must plead the circumstances of the alleged fraud such that defendants may be placed on notice; although stating the "date, place, and time" clearly fulfills this requirement, plaintiffs may use any alternative method of "injecting precision and some measure of substantiation" into the allegations of fraud.*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

In *Asbestemps, Inc. v. Diversified Energy Group, Inc.,* allegations that defendants represented a corporation as fiscally sound to persuade another company to provide labor were not made verbatim, nor were the time and place identified, but the court found that fraud was properly pled. No. 87-2623, 1987 WL 16662 (E.D.Pa. Sept.9, 1987). Plaintiffs need only provide sufficient factual specificity to provide assurance that they have investigated the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.))**

alleged fraud and reasonably believe that a wrong has occurred. *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 54 (D.Del.2002). For example, even absent allegations with respect to the exact factual context or words, a description of the nature and subject matter of the representation was found to be enough in *CFTC v. American Metal Exch.,* 693 F.Supp. 168, 190 (D.N.J.1988).

*10 Buckley sufficiently alleges the elements of fraud: that defendants O'Hanlon, Garfinkel, and Miller knowingly misrepresented DVI's financial situation, with the intent to obtain unjustifiable credit, that DVI and its creditors relied on this misinformation, and that it suffered damages to the extent of bankruptcy. As in *CFTC,* Buckley's complaint describes the nature and subject matter of the alleged fraud by asserting that the three defendants intentionally concealed a number of improper accounting practices, ceased normal account monitoring practices, and diverted millions of dollars from DVI when DVI could least afford it. Although Buckley does not state specific dates and places regarding the allegedly fraudulent actions, as in *Asbestemps,* Buckley sufficiently explained the role each defendant (or in some instances, the three defendants acting together) played in each allegedly fraudulent practice in enough detail to satisfy the "injecting precision" standard enunciated in *Seville.*

## V. CONCLUSION

Buckley does not have standing to pursue any claims on behalf of the creditors. As such the court will grant the defendants' motions to dismiss to the extent that they seek relief on behalf of the creditors. The court will deny the defendants' motions to dismiss claims brought on behalf of the debtors.

## *ORDER*

For the reasons set forth in the court's memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:

1. The Defendants' Motions to Dismiss (D.I. 23, 25, 26, 28, 30, 32, 34, and 36) are hereby GRANTED IN PART and DENIED IN PART.

2. The Plaintiff's Motion for Leave to File an Omnibus Brief (D.I.48) is GRANTED.

D.Del.,2007.
Buckley v. O'Hanlon
Not Reported in F.Supp.2d, 2007 WL 956947 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

56 Fed.Appx. 852                                                                                         Page 1
56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.)))**

**H**
Collins v. Johnson County, KS
C.A.10 (Kan.),2002.
This case was not selected for publication in the
Federal Reporter. Please use FIND to look at the ap-
plicable circuit court rule before citing this opinion.
Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)
United States Court of Appeals, Tenth Circuit.
William P. COLLINS, Plaintiff-Appellant,
v.
JOHNSON COUNTY, KANSAS; State of Kansas;
City of Overland Park, Kansas; Charles Harvey;
Judge Taylor; Melinda Whitman; Kurt Hoover;
Paul Morrison; Judge Mcanany; Brian Porch; Adri-
an Gilby, Individually; Johnson County District At-
torney's Office, Defendants-Appellees.
William P. Collins, Plaintiff-Appellant,
v.
Johnson County, Kansas; State of Kansas; S.M.
School District; Kansas Supreme Court; City of
Olathe, Kansas; Olathe Police Department, Kansas;
Crista Collins; Dick Bryant; Brian Porch; Janet Sut-
ton; Judge Russell; Johnson County District Attor-
ney's Office; Judge Harmon; Linda Voyles; City of
Overland Park, Kansas; Carolyn Bartlett, Johnson
County Court Services, Probation Officer; Lori
Blake, Johnson County Court Services, Child Ser-
vices Officer, Defendants-Appellees.
William P. Collins, Plaintiff-Appellant,
v.
Larry McClain; Crista Collins; Neysa Day; Vance
Preman; Diane Lund; Bruce Beyes; John Gerstle;
Vincent Bates; Paul Morrison; Gary Rulon; Jerry
Elliott; Robert Gernon; Robert Lewis; Joseph Per-
ron; Henry Green; Christel Marquardt; David
Knudson; Carol Beyer; Lee Johnson; Richard Dav-
id; Marshall Whitt; Stanley Bier; Chuck Elliott;
Linda Voyles; City of Overland Park, Kansas;
Overland Park Police Department; Johnson County
District Attorney'S Office, Defendants-Appellees.
William P. Collins, Plaintiff-Appellant,
v.
Paul Morrison; Crista Collins; Neysa Day; Vance

Preman; Erica Froetschner; Vincent Bates; James
Vano; Steve Tatum; City of Overland Park, Kansas;
Overland Park Police Department; Christopher
Redmond; Johnson County District Attorney's Of-
fice, Defendants-Appellees.
**Nos. 01-3336, 02-3049, 02-3212, 02-3250.**

Dec. 16, 2002.

Pro se plaintiff brought several actions, arising
from state court domestic proceedings, against vari-
ous governmental entities and individuals. The
United States District Court for the District of Kan-
sas dismissed actions. Plaintiff appealed. The Court
of Appeals, O'Brien, Circuit Judge, held that: (1)
judicial immunity barred § 1983 claims against
judges; (2) prosecutorial immunity prohibited §
1983 claims against individual district attorneys;
and (3) Eleventh Amendment barred claims against
state.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⊂⟩1376(8)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(8) k. Judges, Courts, and Ju-
dicial Officers. Most Cited Cases
    (Formerly 78k214(8))
Judicial immunity barred § 1983 claims, arising
from state court domestic proceedings, against state
court judges who were acting with jurisdiction. 42
U.S.C.A. § 1983.

**[2] Civil Rights 78 ⊂⟩1376(9)**

78 Civil Rights
    78III Federal Remedies in General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852
56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.)))**

Page 2

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(9) k. Attorney General and Prosecuting Attorneys. Most Cited Cases
   (Formerly 78k214(9))
Prosecutorial immunity prohibited § 1983 claims, arising from state court domestic proceedings, against individual district attorneys for alleged false and malicious prosecution and other similar acts. 42 U.S.C.A. § 1983.

**[3] Federal Courts 170B ☞265**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
         170Bk264 Suits Against States
            170Bk265 k. Eleventh Amendment in General; Immunity. Most Cited Cases

**Federal Courts 170B ☞269**

170B Federal Courts
   170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
         170Bk268 What Are Suits Against States
            170Bk269 k. State Officers or Agencies, Actions Against. Most Cited Cases
Claims under § 1983 against state and its instrumentalities or alter egos, arising from state court domestic proceedings, fell within Eleventh Amendment's bar of actions for damages against state in federal court. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

**[4] Federal Civil Procedure 170A ☞657.5(1)**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings

170Ak657.5(1) k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☞1811**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)4 Particular Actions, Insufficiency of Pleadings in
            170Ak1811 k. Tort Actions in General. Most Cited Cases
Dismissal, for failure to state claim, of claims of slander, kidnaping, defamation, unethical behavior, and fraud arising from state court domestic proceedings was appropriate, where pro se plaintiff made no attempt to comply with local rules and court order intended to insure orderly progress. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞657.5(2)**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(2) k. Civil Rights Proceedings in General. Most Cited Cases

**Federal Civil Procedure 170A ☞1788.6**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)4 Particular Actions, Insufficiency of Pleadings in
            170Ak1788.5 Civil Rights Actions
               170Ak1788.6 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☞1838**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852
56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.)))**

170Ak1837 Effect
    170Ak1838 k. Pleading Over. Most Cited Cases

Dismissal, for failure to state claim, of pro se plaintiff's § 1983 claims arising from state court domestic proceedings was appropriate, where it was patently obvious plaintiff could not prevail on facts alleged, as his conclusory allegations merely reflected his frustration and reiterated his grievances, and plaintiff's litigation history indicated that allowing him to amend his complaint would have been futile. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

*853 Cynthia K. Wallace, The O'Connor Law Firm, P.C., Kansas City, MO, William P. Collins, Overland Park, KS, for Plaintiff-Appellant.

M.J. Willoughby, Scott Bradley Poor, Topeka, KS, Daniel B. Denk, Ryan B. Denk, McAnany, Van Cleave & Phillips, Kansas City, KS, Charles Harvey, Ernest C. Ballweg, Cooke, Johnson, Ballweg, Christlieb, Tuley & Moore, Curtis L. Tideman, Tammy M. Somogye, Lathrop & Gage, Richard T. Merker, Rebecca S. McGinley, Wallace, Saunders, Austin, Brown & Enochs, Crista Collins, Overland Park, KS, James H. Ensz, Ensz & Jester, Kansas City, MO, David P. Madden, Michelle R. Stewart, Fisher, Patterson, Sayler & Smith, Overland Park, KS, Charles H. Stitt, Richard F. Lombardo, Shaffer, Lombardo & Shurin, Kansas City, MO, Neysa L. Day, Kansas City, MO, Vance C. Preman, Shawnee Mission, KS, Stephen S. Brown, Matthew M. Merrill, Niewald, Waldeck & Brown, William Clayton Crawford, Jr., Kirk J. McCabe, Jack W. Green, Jr., Foland & Wickens, Kansas City, MO, for Defendants-Appellees.

Before EBEL, LUCERO, and O'BRIEN, Circuit Judges.

## ORDER AND JUDGMENT[FN*]

    FN* This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.O'BRIEN, Circuit Judge.

**1 After examining the briefs and appellate records, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. *See*Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The cases are therefore ordered submitted without oral argument.

*854 Based on his apparent unhappiness with the outcome and circumstances surrounding his state court domestic proceedings, the Appellant, Mr. William P. Collins, has filed four separate appeals, each arising from the district court's dismissal of the seemingly endless array of pro se filings made by Mr. Collins against various governmental entities and individuals. Mr. Collins now appeals the four district court decisions dismissing his complaints under Fed.R.Civ.P. 12(b)(6). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

We review *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss, applying the same standard as the district court. *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999). "[A]ll well-pleaded factual allegations in the ... complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Id.*"A complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Yousef v. Reno,* 254 F.3d 1214, 1219 (10th Cir.2001) (quotation marks and citation omitted).

*Case No. 01-3336:*

Appeal number 01-3336 arises from Mr. Collins's 42 U.S.C. § 1983 claims and various state law claims alleging unlawful arrest, false and malicious

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852
56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.)))**

Page 4

prosecution, unethical behavior, and malpractice against numerous entities and individuals, including: Johnson County Kansas; the State of Kansas; the City of Overland Park, Kansas; the Johnson County District Attorney's Office; two state court judges; and various individuals, both public and private. The district court granted defendants' motions to dismiss, finding Mr. Collins lacked standing to bring suit because he had filed for bankruptcy and this action had not been abandoned by the bankruptcy trustee. In the alternative, the district court dismissed this complaint on the basis of judicial, prosecutorial, and Eleventh Amendment immunity, as well as Mr. Collins's failure to state a claim against the remaining individual defendants.

[1][2] After reviewing the record and applicable law, we find the district court's alternative reasons for dismissal were correct.[FN1] First, judicial immunity bars Mr. Collins's claims against the state court judges who were acting with jurisdiction. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. 349, 356-57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (quotation marks and citation omitted). Second, prosecutorial immunity prohibits Mr. Collins's claim against the individual district attorneys for alleged false and malicious prosecution and other similar acts.

> FN1. Because the district court's alternative bases are persuasive and unarguably correct, we see no need to address its ruling that Mr. Collins lacked standing because of his pending bankruptcy.

**\*\*2** It is well established that prosecutors are absolutely immune from suit under section 1983 concerning activities "intimately associated with the judicial ... process," such as initiating and pursuing criminal prosecutions. It is also well established that this absolute prosecutorial immunity extends to state attorneys and agency offi-

cials who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings.

**\*855** *Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1489 (10th Cir.1991) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

[3] Third, Mr. Collins's claims against the State of Kansas and its instrumentalities or alter egos are clearly within the Eleventh Amendment's bar of actions for damages "against a state in federal court, even by its own citizens, unless the state waives that immunity." *Sturdevant v. Paulsen,* 218 F.3d 1160, 1164 (10th Cir.2000). This Eleventh Amendment immunity also applies to entities created by state governments which operate as alter egos or instrumentalities of the states. *Id.*

Finally, Mr. Collins's remaining claims were properly dismissed for failure to state a claim upon which relief could be granted. He has failed to show that the private defendants acted under the color of state law[FN2] or sufficiently allege the actions of the remaining defendants amounted to a cognizable claim under state or federal law.[FN3]

> FN2. "Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (citing 42 U.S.C. § 1983).

> FN3. In August 2002, Ms. Cynthia K. Wallace, Esq., made an appearance for Mr. Collins and requested leave to supplement his original brief. Mr. Collins filed his Notice of Appeal in October 2001, and the matter was fully briefed in March 2002. We find that this motion is untimely. We note that Mr. Collins could have retained counsel much earlier in the process, and the motion to supplement states no excuse

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852
56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
(Cite as: 56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.)))

Page 5

for his delay in obtaining counsel. Further, we find the district court's decision was correct, and additional briefing would be of little assistance.

*Case No. 02-3049:*

[4] In appeal number 02-3049, Mr. Collins continues to demonstrate his frustration and displeasure with his state domestic proceedings. He has filed claims for slander, kidnaping, defamation, unethical behavior, and fraud against a wide range of defendants, including: Johnson County; the State of Kansas; the school district; the Kansas Supreme Court; two state court judges; the police department; various other entities; and private and public individuals. The district court granted defendants' motions to dismiss based on Mr. Collins's failure to timely respond to defendants' motions to dismiss, his failure to show cause for failing to timely respond to defendant Crista Collins's motion to dismiss, and the lack of personal and subject matter jurisdiction over defendant Janet Sutton. In this appeal, Mr. Collins merely reiterates his litany of conclusory allegations against these defendants.

After careful review of the record and applicable law, we conclude the district court properly dismissed this case. The district court is not required to continue to manage a case on its docket in which Mr. Collins has made no attempt to comply with the local rules and court order intended to insure orderly progress. The court correctly found further delay would prejudice the defendants. Finally, the district court properly found it lacked jurisdiction over defendant Sutton.

*Case No. 02-3212:*

Appeal number 02-3212 involves Mr. Collins's § 1983 claims against various governmental entities and public and private individuals, including numerous state court judges and prosecutors. The district court granted defendants' motions to dismiss for the same reasons stated in its order dismissing

the complaint forming the basis of appeal number 01-3336, namely, that judicial and prosecutorial immunity barred suit, and Mr. Collins failed to state *856 a claim upon which relief could be granted (he failed to allege the private defendants acted under color of state law and failed to allege a violation of a constitutional or federal right). Therefore, we find appeal 02-3212 without merit for substantially the same reasons as stated for appeal number 01-3336.

*Case No. 02-3250:*

**3 [5] Appeal number 02-3250 also comes to us from a dismissal of Mr. Collins's § 1983 claims against various public and private individuals and governmental entities, again resulting from his state court domestic proceedings. Acting *sua sponte,* the district court found it patently obvious that Mr. Collins could not prevail on the facts alleged and dismissed this complaint for failure to state a claim. We recognize that a pro se litigant's pleadings are to be construed liberally. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991). However, it is not the district court's function "to assume the role of advocate for the pro se litigant"; in fact, the district court may dismiss the complaint "sua sponte when it is patently obvious that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile." *Id.* (quotation marks and citation omitted).

Here, it is patently obvious Mr. Collins could not prevail on the facts alleged, as his conclusory allegations merely reflect his frustration and reiterate his grievances; they fail to even arguably state a violation of federal rights. Guided by history, we conclude that allowing Mr. Collins to amend his complaint would have been futile and a complete waste of time. In each of the four cases, the district court clearly and patiently explained why Mr. Collins could not bring these types of claims against these types of defendants. The courts should not be expected to bear "the spurns [t]hat patient merit of th' unworthy takes...." WILLIAM SHAKESPEARE,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

HAMLET act 3, sc. 1. When reason fails, chaos reigns.

As explained, each of Mr. Collins's four appeals are unfounded, unsupported, and without merit. The district court properly applied the law in dismissing each of these cases. Therefore, we **AFFIRM.** Accordingly, all pending motions are denied as moot.

C.A.10 (Kan.),2002.
Collins v. Johnson County, KS
56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.))**

Page 1

**H**

Floyd v. Saturn of Newark
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Robert T. FLOYD Plaintiff,
v.
SATURN OF NEWARK and General Motors Acceptance Corporation, Defendants.
No. Civ.A. 04-944 JJF.

July 11, 2005.

Robert T. Floyd, Darby, Pennsylvania, Plaintiff, pro se.
Linda Richenderfer, of Saul Ewing, LLP, Wilmington, Delaware, Kimberly A. Manuelides, and Stacey L. Marktin, of Saul Ewing, LLP, Baltimore, Maryland, for Defendant General Motors Acceptance Corporation, of Counsel.
Danielle Yearick, of Tybout, Redfearn & Pell, Wilmington, Delaware, for Defendant Saturn of Newark.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Presently before the Court is the Renewed Motion To Dismiss (D.I.8) filed by Defendant General Motors Acceptance Corporation ("GMAC"). For the reasons discussed, the motion will be granted.

BACKGROUND

I. Factual Background

This lawsuit arises from an automobile lease that Plaintiff Robert T. Floyd entered into in May 2001 with Defendant GMAC, and his subsequent purchase of two automobiles from Defendant Saturn of Newark.

In May 2001, Mr. Floyd leased a red 2001 Saturn automobile from Saturn of Newark, a car dealership located in Newark, Delaware. Mr. Floyd entered into a lease agreement with GMAC, which financed the lease. Pursuant to the terms of the lease agreement, the lease was scheduled to terminate in August 2004 and Mr. Floyd would have an option to purchase the vehicle at that time. Mr. Floyd alleges that, in February 2004, he approached a sales agent at Saturn of Newark with regard to exercising his right to purchase the leased vehicle. The sales agent allegedly told Mr. Floyd that the price was too high. Further, the sales agent allegedly told Mr. Floyd that, when there were five remaining months on the lease, GMAC would send Mr. Floyd a letter excusing the final five lease payments should Mr. Floyd purchase a new automobile. Mr. Floyd further alleges that the sales agent told him that he would not have to worry about paying for excess mileage on the leased vehicle.

On May 27, 2004, Mr. Floyd returned to Saturn of Newark allegedly because only four payments remained on the lease, yet Mr. Floyd had not received the letter from GMAC the sales agent promised. During the May 27 visit, the sales agent convinced Mr. Floyd to purchase a gold 2004 Saturn automobile, which Mr. Floyd financed through a loan with Sun Trust bank. Mr. Floyd turned in the leased 2001 Saturn to Saturn of Newark at that time. The sales agent then told Mr. Floyd that he may have to pay for excess mileage on the leased vehicle.

GMAC subsequently billed Mr. Floyd $3,047 for excess mileage on the leased vehicle. On June 2, 2004, Mr. Floyd sent a letter to GMAC indicating his desire to re-acquire the 2001 leased vehicle and to purchase it at the end of the lease term. On June 3, 2004, Mr. Floyd again wrote to GMAC stating his belief that he had a legal right to possess the leased vehicle until August 2004. On June 10, 2004, GMAC allegedly sent a letter to Mr. Floyd stating that the vehicle had been sold. (D.I. 7 at 3.)

On June 10, 2004, Mr. Floyd returned the gold

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.))**

2004 automobile to Saturn of Newark. Mr. Floyd alleges that he was subsequently denied credit by other dealerships because the new car loan from Sun Trust bank appeared on his credit report. On June 14, 2004, Mr. Floyd returned to Saturn of Newark and purchased a red 2004 Saturn automobile, again financing it through Sun Trust bank. Mr. Floyd alleges that both Sun Trust loans ran concurrently until the loan for the gold 2004 Saturn "fell into late status," damaging Mr. Floyd's credit rating. (D.I. 7 at 3.)

II. Procedural History

*2 On August 16, 2004, Mr. Floyd filed a *pro se* lawsuit against GMAC and Saturn of Newark. The Court construes Mr. Floyd's Complaint (D.I.1) to allege violations of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.,* the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.,* breach of contract, and common law fraud.

On September 7, 2004, GMAC filed a Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (D.I.4). On September 10, 2004, Mr. Floyd filed a "More Definite Statement" (D.I.7) to clarify his claims. In the Statement, Mr. Floyd contends that GMAC is liable to him for breach of contract and fraud, and that Saturn of Network is liable to him for the alleged fraudulent conduct of its sales agent. Mr. Floyd seeks damages of $20,000.

In response to Mr. Floyd's Statement, GMAC filed a Renewed Motion To Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

PARTIES' CONTENTIONS

By its motion, GMAC contends that this lawsuit should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because the court lacks subject matter jurisdiction to hear it. Specifically, GMAC contends that the Court lacks subject matter jurisdiction based on diversity of citizenship be-

cause the amount in controversy is less than $75,000. Further, GMAC contends that the Complaint fails to state a claim under either the Truth in Lending Act or the Equal Credit Opportunity Act and, therefore, the Court lacks federal question subject matter jurisdiction over this matter. GMAC further contends that Mr. Floyd has alleged no facts upon which a claim of fraud may be lodged against GMAC and that the common law fraud claim against it should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Mr. Floyd did not file a response to GMAC's motion.

DISCUSSION

I. Legal Standard

GMAC moves the Court to dismiss Mr. Floyd's claims against it pursuant to Federal Rules 12(b)(1) and 12(b)(6).

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint. The motion should be granted where the asserted claim is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy."*Coxson v. Comm. of Pennsylvania,* 935 F.Supp. 624, 626 (W.D.Pa.1996) (citations omitted). Additionally, a motion to dismiss under 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan,* 549 F.2d 884, 891 (3d Cir.1977). The instant case presents a facial challenge because GMAC does not dispute the existence of the jurisdictional facts alleged in the Complaint. Therefore, the Court must accept the facts alleged in the Complaint as true, and draw all reasonable inferences in favor of Mr. Floyd. *See Zinermon v. Burch,* 494 U.S. 113, 118 (1990); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.))**

Page 3

**\*3** The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Strum v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). In reviewing a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party."*Strum,* 835 F.2d at 1011;*see also*Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994). A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Jordan,* 20 F.3d at 1261.

## II. Whether The Court Has Subject Matter Jurisdiction

### A. *Diversity Of Citizenship*

A federal court has subject matter jurisdiction based on diversity of citizenship when "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States."28 U.S.C. § 1332 (2005).

In his Complaint (D.I.1), Mr. Floyd alleges that he is a citizen of Pennsylvania, Saturn of Newark is a citizen of Delaware, and GMAC is a citizen of Michigan. GMAC does not dispute Mr. Floyd's allegations with regard to the parties' citizenship. Rather, GMAC contends that the Court lacks diversity jurisdiction because the amount in controversy is less than $75,000.

Accepting the facts alleged in the Complaint as true and drawing all reasonable inferences in favor of Mr. Floyd, as the Court must when analyzing a motion to dismiss, the Court concludes that Mr. Floyd has established diversity of citizenship among the parties. However, Mr. Floyd has not satisfied the jurisdictional amount in controversy. In determining the jurisdictional amount, "the sum claimed by plaintiff controls if the claim is apparently made in good faith."*St. Paul Mercury Indemnification Co. v. Red Cab Co.,* 303 U.S. 283, 288 (1938). Dismissal is only appropriate if the court is certain that the jurisdictional amount cannot be met and the claims are insubstantial on their face. *In re LifeUSA Holding Inc.,* 242 F.3d 136, 143 (3d Cir.2001). Once the defendant challenges the plaintiff's allegations regarding the amount in controversy, the plaintiff must produce sufficient evidence to satisfy his or her claims related to the jurisdictional amount. *Suber v. Chrysler Corp.,* 104 F.3d 578, 583 (3d Cir.1997).

In this case, Mr. Floyd alleges that he is entitled to $20,000 in damages. (D.I.7.) Thus, Mr. Floyd has not satisfied the $75,000 threshold to support the exercise of diversity jurisdiction. Further, Mr. Floyd has not responded to GMAC's Renewed Motion To Dismiss, and thus, has failed to come forward with facts necessary to support diversity jurisdiction. Accordingly, the Court concludes that Mr. Floyd's allegations fail to support diversity jurisdiction.

### B. *Federal Question*

**\*4** Pursuant to 28 U.S.C. § 1331, federal courts have federal question jurisdiction over "cases in which a well pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."*Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27-28 (1983).

#### 1. Truth In Lending Act

In his Complaint, Mr. Floyd alleges that "[g]oods leased to consumers are covered by chapter 5 of the Truth in Lending Act and FTC's regulation M...." (D.I. 1 at 2.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.))**

The Consumer Leasing Act ("CLA") was enacted in 1976 as an amendment to the Truth In Lending Act ("TLA"), 15 U.S.C. § 1601. The CLA extends the TLA's credit disclosure requirements to consumer leases; its primary purpose is to "assure a meaningful disclosure of the terms of leases ... so as to enable the lessee to compare more readily the various lease terms available to him."15 U.S.C. § 1601(b). Because lease financing had become an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to "enable comparison of lease terms with credit terms where appropriate."*Id.* The CLA thus requires lessors of personal property to make certain disclosures "in a clear and conspicuous manner" upon entering into a lease. 15 U.S.C. § 1667a. The CLA applies to all leases for the use of "personal property" having a term "exceeding four months" that have a "total contractual obligation not exceeding $25,000."15 U.S.C. § 1667(1). Neither party disputes that the CLA applies to Mr. Floyd's lease. The statute creates a private right of action against lessors who breach the disclosure requirements. *See*15 U.S.C. § 1667d; 15 U.S.C. § 1640.

In passing the CLA, Congress also delegated to the Federal Reserve Board authority "to issue regulations 'to update and clarify the requirements and definitions applicable to lease disclosures" ' and to publish "model disclosure forms to facilitate compliance with [the statute's] requirements." 15 U.S.C. § 1667f(a)(1), (b)(1). Those regulations, collectively referred to as "Regulation M", are codified at 12 C.F.R. § 213. Courts are to defer to these regulations and associated commentary when interpreting the TLA so long as they are "not irrational." *SeeFord Motor Credit Co. v. Milhollin,* 444 U.S. 555, 560 (1980).

In pertinent part, the CLA requires a lessor to disclose in writing at the inception of a lease:

(4) The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability;

(5) A statement of the amount or method of determining the amount of any liabilities the lease imposes upon the lessee at the end of the term and whether or not the lessee has the option to purchase the leased property and at what price and time;

*5 (11) A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termina- tion.

15 U.S.C. § 1667a.

Regulation M states in pertinent part that the lessor shall disclose the following information:

(d) Other charges. The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments....

(g) Early termination-

(1) Conditions and disclosure of charges. A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the lease term; and the amount or a description of the method for determining the amount of any penalty or other charge for early termination, which must be reasonable....

(h) Maintenance and repair-...

(2) Wear and use standard. A statement of the lessor's standards for wear and use (if any), which must be reasonable; and

(3) Notice of wear and use standard. In a motor-vehicle lease, a notice regarding wear and use substantially similar to the following: "Excessive Wear

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.))**

and Use. You may be charged for excessive wear based on our standards for normal use."The notice shall also specify the amount or method for determining any charge for excess mileage.

(i) Purchase option. A statement of whether or not the lessee has the option to purchase the leased property, and:

(1) End of lease term. If at the end of the lease term, the purchase price; and

(2) During lease term. If prior to the end of the lease term, the purchase price or the method for determining the price and when the lessee may exercise this option.

12 CFR § 213.4.

Viewing the Complaint (D.I.1) and the subsequent "More Definite Statement" (D.I.7) in view of the CLA and Regulation M, the Court concludes that Mr. Floyd has failed to state a claim pursuant to the TLA. Nowhere does Mr. Floyd allege that GMAC failed to disclose terms in the lease agreement at the time the parties entered into the lease for the 2001 Saturn. In fact, Mr. Floyd alleges that the lease agreement in Paragraph 20 states that he had a contractual right to purchase the 2001 vehicle "only at scheduled lease end." (D.I. 7 at 2.) The lease was scheduled to end in August 2004. Mr. Floyd alleges that he returned the leased vehicle to Saturn of Newark on May 27, 2004. On June 2, 2004, Mr. Floyd wrote to GMAC expressing his desire to re-acquire the leased vehicle and to purchase it at the end of the lease period. On June 10, 2004, GMAC notified Mr. Floyd that the leased vehicle had been sold. In his "More Definite Statement," Mr. Floyd claims that by selling the vehicle prior to the scheduled expiration of the lease agreement, GMAC breached its contract with Mr. Floyd. (D.I. 7 at 2.)

In the Court's view, Mr. Floyd's claim with regard to the purchase of the 2001 vehicle is contractual in nature. Mr. Floyd has alleged no facts whereby relief could be granted pursuant to the TLA or Regu-

lation M under any set of facts that could be proved consistent with Mr. Floyd's allegations. Accordingly, the Court will dismiss the TLA claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

2. Equal Credit Opportunity Act

*6 The Equal Credit Opportunity Act, 15 U.S.C. § 1691*etseq.* ("ECOA"), makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age."15 U.S.C. § 1691(a). To establish a *primafacie* case under ECOA the class members must show that (1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit. *SeeChiang v. Veneman,* 385 F.3d 256, 259 (3d Cir.2004) (citations omitted).

It is not clear from Mr. Floyd's pleadings whether he is alleging an ECOA violation with regard to the lease agreement with GMAC that he executed in 2001, his attempt to purchase the 2001 vehicle from GMAC in 2004, or the loan transactions with Sun Trust Bank associated with the automobile purchases from Saturn of Newark in 2004. Therefore, the Court will analyze all three transactions.

With regard to the lease agreement that Mr. Floyd entered into with GMAC in 2001, the Court concludes that Mr. Floyd's claim is time barred. Affirmative claims under the ECOA are subject to a two year statute of limitations. *See*15 U.S.C. § 1691e(f). Mr. Floyd signed the lease agreement with GMAC in May 2001. Mr. Floyd filed his Complaint more than three years later, on August 16, 2004. Thus, the Court concludes that Mr. Floyd's ECOA claim with regard to the 2001 GMAC credit transaction is time barred.

With regard to the 2004 credit transactions with Sun Trust bank, the Court concludes that no relief could be granted pursuant to the ECOA under any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.))**

Page 6

set of facts that could be proved consistent with Mr. Floyd's allegations. Mr. Floyd does not allege that Sun Trust bank or Saturn of Newark denied him credit. To the contrary, Mr. Floyd alleges that Sun Trust financed the gold 2004 vehicle he purchased on May 27, 2004 and gave him a second loan for the red 2004 vehicle he purchased on June 14, 2004. The only mention of denial of credit in the pleadings is in reference to non-party automobile dealers that denied Mr. Floyd credit due to the presence on his credit report of the first Sun Trust loan. (D.I. 7 at 3.) Further, Sun Trust bank is not a party to this lawsuit. Thus, the Court concludes that no relief could be granted pursuant to the ECOA with regard to the 2004 financing transactions.

With regard to Mr. Floyd's attempt to purchase the 2001 leased vehicle from GMAC in 2004, the Court concludes that the ECOA is inapplicable. Mr. Floyd does not allege that he applied for any credit in 2004 with regard to the purchase of the 2001 vehicle or that he was denied credit based on his membership in a protected class. Rather, Mr. Floyd alleges that GMAC breached its 2001 contract with him by selling the leased vehicle prior to the expiration of the lease agreement. Thus, the Court concludes that no relief could be granted pursuant to the ECOA with regard to Mr. Floyd's dealings with GMAC in 2004.

### CONCLUSION

\*7 Because the Court concludes that it lacks subject matter jurisdiction to hear this lawsuit,[FN1] the Renewed Motion To Dismiss (D.I.8) filed by Defendant General Motors Acceptance Corporations will be granted and this lawsuit will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

> FN1. Because the Court concludes that it lacks subject matter jurisdiction, the Court will not address GMAC's arguments with regard to the common law fraud claim.

An appropriate Order will be entered.

### ORDER

At Wilmington this *11* day of July 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Renewed Motion To Dismiss (D.I.8) filed by Defendant General Motors Acceptance Corporation is *GRANTED*.

D.Del.,2005.
Floyd v. Saturn of Newark
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)                                    Page 1
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

**H**
Flynn v. Health Advocate, Inc.
E.D.Pa.,2004.
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
    Kevin FLYNN and Healthcare Advocates, Inc.,
                    Plaintiffs,
                        v.
    HEALTH ADVOCATE, INC.; Michael J. Cardillo;
Arthur Liebowitz; Thomas A. Mascri, Jr.; Martin B.
Rosen; David Rocchino; John Peppelman; Gordon
Conwell & Associates, Inc.; and Nancy Conwell,
                    Defendants.
                No. CIV.A. 03-3764.

                 Jan. 13, 2004.

              *MEMORANDUM*

ROBERT F. KELLY, Sr. J.

I. *INTRODUCTION*

*1 On June 23, 2003, Plaintiffs Kevin Flynn
("Flynn") and Healthcare Advocates, Inc. ("HAS,
Inc.") (collectively the "Plaintiffs") filed suit
against Health Advocate, Inc. ("HA"). Plaintiffs
also brought suit against Michael J. Cardillo
("Cardillo"), Arthur Liebowitz ("Liebowitz"),
Thomas A. Masci, Jr. ("Masci"), Martin B. Rosen
("Rosen"), David Rocchino [FN1] ("Rocchino") and
John Peppelman ("Peppelman") (collectively the
"HA Individual Defendants"). Finally, Plaintiffs
brought suit against Gordon Conwell & Associates,
Inc. ("GCA") and Nancy Conwell ("Conwell").
HAS, Inc. provides assistance to people who are
dealing with healthcare insurance companies and
the healthcare industry. Significantly, HA provides
similar services to its clients, and is a rival com-
pany to HAS, Inc. In their Complaint, Plaintiffs al-
lege that HA is liable to Plaintiffs for unfair com-
petition, trademark/service mark infringement, viol-
ations of the Lanham Act (15 U.S.C. § 1125(a)),
breach of contract, unjust enrichment, tortious in-

terference with existing and prospective contractual
relations, conspiracy, fraud, misappropriation of
trade secrets and copyright infringement. While
Plaintiffs include Defendant Peppelman in their
breach of contract claim, none of the other HA In-
dividual Defendants is included in this claim. As
for Plaintiffs' claims against GCA and Conwell,
they include misappropriation of trade secrets,
fraud, unjust enrichment and conspiracy, as well as
a claim against GCA for breach of contract.

        FN1. In their Complaint, Plaintiffs state
        that Rocchino's first name is Davis and
        spell his last name Rochino. However, in
        their supplemental briefs to the Court,
        Plaintiffs, as well as the Defendants call
        him David Rocchino. Therefore, the Court
        will use David Rocchino.

Presently before this Court are the following mo-
tions: 1) GCA and Conwell's Motion to Dismiss all
of Plaintiffs' claims against them and 2) HA and the
HA Individual Defendants' Motion to Dismiss all of
Plaintiffs' claims against them except for the breach
of contract claim against HA. For the following
reasons, the Court will grant in part and deny in
part GCA and Conwell's Motion to Dismiss. Addi-
tionally, the Court will grant in part and deny in
part HA and the HA Individual Defendants' Motion
to Dismiss the claims against them.

II. *FACTUAL BACKGROUND*[FN2]

        FN2. Since the two Motions currently be-
        fore the Court are Motions to Dismiss, all
        factual allegations of the Complaint must
        be accepted as true. *See Rocks v. City of
        Phila.,* 868 F.2d 644, 645 (3d Cir.1989)
        (citations omitted).

According to Plaintiffs' Complaint, Flynn formed
HAS, Inc. in 1996 to provide advice and consulta-
tion services to patients and employers in their
dealings with the healthcare industry. According to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))

Plaintiffs, HAS, Inc. and Flynn developed business strategies and methodologies which would help HAS, Inc. succeed in assisting patients with the healthcare system. Plaintiffs assert that these business strategies and methodologies are novel and have been set forth in a patent application that is currently pending in front of the United States Patent and Trademark Office. The Plaintiffs consider the methodologies and strategies as trade secrets.

According to Plaintiffs, Defendant Peppelman contacted Flynn during the summer of 2001. Peppelman stated to Flynn that he worked for GCA and that some of GCA's clients and employees were interested in HAS, Inc.'s services. Peppelman thereafter requested that Flynn forward HAS, Inc.'s materials to Conwell at GCA who would then transfer the materials to Peppelman. Plaintiffs later learned that Conwell was Peppelman's wife and that she was an office manager with GCA. Through subsequent conversations between Flynn and Peppelman, Plaintiffs state that Peppelman and Flynn formed an oral non-disclosure agreement (hereinafter the "oral non-disclosure agreement"). Thereafter, on August 1, 2001, Flynn forwarded the materials to Peppelman by sending the confidential materials to Conwell at GCA. Plaintiffs allege that the true reason Peppelman requested materials from HAS, Inc. and Flynn was not to benefit GCA, its employees or clients, but rather, to help establish HA so as to compete with HAS, Inc.

Having not heard from Peppelman for over a month, Flynn tried to contact Peppelman at GCA. Instead, Flynn was put in touch with Conwell, who stated that she passed the materials along to her husband. Furthermore, Conwell stated that GCA had no interest in the materials Flynn had sent.

*2 Subsequently, in November, 2001, Flynn received promotional materials being distributed by HA. Peppelman was listed as Vice-President of Sales on these promotional materials. Plaintiffs state that the promotional materials Flynn came into possession of in November, 2001, were substantially similar to the materials Peppelman agreed to

keep confidential in their discussions over the summer.

Flynn thereafter contacted HA to congratulate them on their new business and to find out whether Peppelman had ever actually worked for GCA. Upon making this inquiry, discussions began between HA, the HA Individual Defendants and Flynn about a possible merger and/or co-marketing agreement between HAS, Inc. and HA. These negotiations cumulated on March 8, 2002, where HAS, Inc. and HA agreed to a written non-disclosure agreement (hereinafter, the "written non-disclosure agreement"). HAS, Inc. then forwarded its marketing position, marketing strategies, business strategies, sales and marketing opportunities, business plans and numerous other pieces of information to HA. Plaintiffs state these items were trade secrets. According to Plaintiffs, HA and the HA Individual Defendants never had any intention of merging HAS, Inc. into HA. Plaintiffs allege that the real reason for the merger talks and written non-disclosure agreement was to allow HA to examine and use HAS, Inc.'s trade secrets to compete with HAS, Inc. Plaintiffs allege that HA has changed its marketing strategies and implemented HAS Inc.'s methodologies and business plans. As previously stated, Plaintiffs assert that the methodologies, strategies and plans are confidential trade secrets. Thereafter, on June 23, 2003, Plaintiffs brought suit against the Defendants asserting various federal and state law claims.

III. *STANDARD*

A motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), tests the legal sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A court must determine whether the party making the claim would be entitled to relief under any set of facts that could be established in support of his or her claim. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)(citing *Conley,* 355 U.S. at 45-46);*see also Wisniewski v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

Page 3

*Johns-Manville Corp.,* 759 F.2d 271, 273 (3d Cir.1985). In considering a motion to dismiss, all allegations in the complaint must be accepted as true and viewed in the light most favorable to the non-moving party. *Rocks,* 868 F.2d at 645(citations omitted). However, the United States Court of Appeals for the Third Circuit ("Third Circuit") has stated that "while our standard of review requires us to accept as true all factual allegations in the complaint, we need not accept as true unsupported conclusions and unwarranted inferences."*Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 183-84 (3d Cir.2000)(internal quotation and citations omitted). Furthermore, the Third Circuit has stated that "[c]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable."*Id.* at 184 (internal quotation and citation omitted). With this as a background, the Court will now turn its attention to the two Motions to Dismiss filed by the Defendants.

## IV. *DISCUSSION*

## A. GCA AND CONWELL'S MOTION TO DISMISS

*3 The Court will first examine GCA and Conwell's Motion to Dismiss. Plaintiffs have brought four claims against both GCA and Conwell. The claims being brought against these Defendants are misappropriation of trade secrets, fraud, unjust enrichment and conspiracy. Additionally, Plaintiffs have brought a breach of contract claim against GCA. The Court will analyze each of these claims as they pertain to Conwell and GCA to decide whether they can survive a motion to dismiss.

## 1. Misappropriation of Trade Secrets

The parties are in agreement that Pennsylvania law controls in this case as to the state law claims.

Under Pennsylvania law, the prima facie elements of the tort of misappropriation of a trade secret are derived from the Restatement (First) of Torts § 757. *Van Products Co. v. General Welding & Fabricating Co.,* 419 Pa. 248, 258, 213 A.2d 769, 774 (1965). Those elements are as follows: (1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff.

*Moore v. Kulicke & Soffa Industs., Inc.,* 318 F.3d 561, 567 (3d Cir.2003)(footnotes omitted). The main argument made by Conwell and GCA is that the Plaintiffs have failed to allege that Conwell and GCA used the trade secrets to the detriment of Plaintiffs. The alleged trade secrets at issue in this case are the business strategies and methodologies HAS, Inc. has developed over the past several years.

Defendant Conwell's alleged role in this case was limited to passing the information onto her husband Peppelman. While Plaintiffs allege that the true motivation behind Peppelman's request was purposefully hidden from Flynn, the only allegation in the Complaint regarding Conwell is that she passed the information to Peppelman, as she was supposed to do pursuant to the oral non-disclosure agreement. Plaintiffs' Complaint is lacking as to any allegation that Conwell herself is using or used the business methodologies and strategies. Rather, as will be discussed in *infra* Part IV.B.7, Plaintiffs allege that the trade secrets were used by HA to directly compete with HAS, Inc.

Additionally, it is not alleged that GCA is "using" these trade secrets to further their business enterprise. *See Homenexus, Inc. v. Directweb, Inc.,* No. 99-CV-2316, 1999 WL 959823, at *3-4 (E.D.Pa. Oct.14, 1999)(denying motion to dismiss misappropriation claim where plaintiff has alleged Defendant used trade secrets acquired "to further its own business enterprise"). Unlike *Homenexus,* at no time in Plaintiffs' Complaint do they allege GCA or Conwell ever used Plaintiffs' trade secrets to further

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

Page 4

their own business enterprise. Rather, it is alleged that such trade secrets were used by HA and the HA Individual Defendants to further their own business enterprise. Therefore, the Court will grant GCA and Conwell's Motion to Dismiss the misappropriation claim against them.

2. Fraud

*4 To recover for a fraud claim in Pennsylvania, five elements are required. Specifically, Plaintiffs must show " '1) a misrepresentation; 2) a fraudulent utterance of it; 3) the maker's intent that the recipient be induced to thereby act; 4) the recipient's justifiable reliance on the misrepresentation; and 5) damage to the recipient proximately caused.'"*Trans Penns Wax Corp. v. McCandless,* 50 F.3d 217, 232 (3d Cir.1995)(quoting *Sevin v. Kelshaw,* 417 Pa.Super. 1, 9, 611 A.2d 1232, 1236 (1992)). Additionally, a claim for fraud must be pleaded with particularity pursuant to Rule 9 of the Federal Rules of Civil Procedure.

However, in applying rule 9(b), focusing exclusively on its particularity language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules. The rule's purpose is to give notice to the defendant of the precise misconduct with which she is charged, and to protect her from any spurious charges of fraudulent or immoral behavior. As long as there is some precision and some measure of substantiation in the pleadings, the rule will be satisfied.

*Bristol Township v. Independence Blue Cross,* No. 01-4323, 2001 WL 1231708, at *5 (E.D.Pa. Oct.11, 2001)(internal quotations and citations omitted). Plaintiffs assert the fraud committed by Conwell and GCA was their concealment of the true purpose for requesting the confidential trade secrets from Flynn. (Pls.' Ans. to GCA and Conwell Defs' Mot. to Dismiss, 10). Further, Plaintiffs claim that GCA and Conwell were seeking to obtain the trade secrets to form their own competing business. (*Id.*).

The Court will first examine whether Plaintiffs have stated a claim of fraud against Conwell. According to the Complaint, her role in this action was extremely limited. First, she received the materials Flynn sent to Peppelman and subsequently transferred them to Peppelman. Second, she had a telephone conversation with Flynn in which she stated that GCA had no interest in the materials for its internal needs. In this case, Plaintiffs allege that the true reason Peppelman (Conwell's husband) asked for materials from the Plaintiffs was to help form a rival company. Plaintiffs argue that Peppelman used GCA as a "front" to obtain the materials. According to the Complaint, the Court can find no affirmative misrepresentation made to Plaintiffs by Conwell.

The Court must also consider whether Conwell's alleged failure to state the true reason behind Peppelman's request might constitute an omission or failure to disclose a material fact (the alleged true reason behind Peppelman's request). As the Third Circuit has stated, "[u]nder Pennsylvania law, a fraud claim requires plaintiff to prove *either* a knowing misrepresentation or nonprivileged failure to disclose some existing fact. If, however, the misrepresentation is innocently made, then it is actionable only if it relates to a matter material to the transaction involved."*Hughes v. ConsolPa. Coal Co.,* 945 F.2d 594, 613-14 (3d Cir.1991) (citations and internal quotations omitted). Therefore, the alleged omission by Conwell in her conversation with Flynn might constitute a material omission so as to constitute actionable fraud. Additionally, the Court finds that Plaintiffs have satisfied the other elements of a fraud to at least allow this claim against Conwell to move forward into discovery.

Next, the Court will examine whether Plaintiffs have properly stated a claim of fraud against GCA. Plaintiffs attempt to state a claim for fraud against GCA based on agency principals. Plaintiffs argue that a fraud claim against GCA is proper because Peppelman was acting as an agent of GCA in requesting the materials. However, this argument is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

completely contrary to what is alleged in the Complaint. Plaintiffs argue that the real reason Peppelman requested the materials was to help establish a company to compete with HAS, Inc. Pursuant to the Complaint and Plaintiffs' averments, Peppelman would not have been acting as an agent of GCA, but rather in his individual or capacity as a representative of HA. Therefore, the Court will not allow a claim of fraud against GCA to go forward.[FN3]

> FN3. While Peppelman might have asserted he was representing GCA, the Court must view the case in the way Plaintiffs present it at the Motion to Dismiss stage. As such, since Plaintiffs assert that GCA had no interest in the materials, and since it is alleged that Peppelman was seeking to help establish a company to compete with HAS, Inc., the Court will dismiss the fraud claim against GCA.

### 3. Breach of Contract

*5 Next, Plaintiffs bring a breach a contract claim against GCA. "To plead breach of contract, a plaintiff must allege: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract and (3) resultant damages."*Bristol Township,* 2001 WL 1231708, at *2 (citing *Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 884 (Pa.Super.Ct.2000)). After reviewing Plaintiffs' Complaint, the Court finds that Plaintiffs have failed to allege the existence of a contract between GCA and Plaintiffs. Plaintiffs again try to use agency principles to attach liability to the oral agreement between Peppelman and Plaintiffs. However, as the Court explained in the previous section, such agency arguments would only attach HA to this oral agreement and not GCA. Therefore, the Court will dismiss Plaintiffs' breach of contract claim against GCA.

### 4. Unjust Enrichment

Plaintiffs additionally bring an unjust enrichment claim against both Conwell and GCA. Pleading an unjust enrichment claim requires three elements. Specifically, it is necessary for plaintiff to show that: "(1) a benefit was conferred; (2) there was appreciation of such benefit; and (3) acceptance and retention of such benefit under circumstances making it inequitable for the retaining party to retain the benefit without restitution."*Mill Run Assocs. v. Locke Prop. Co., Inc.,* 282 F.Supp.2d 278, 293 (E.D.Pa.2003). The Court can find no allegation in the Complaint stating that GCA retained the benefits of the trade secrets. Specifically, the Complaint alleges it is HA rather than GCA that is unjustifiably retaining the benefits of the purported trade secrets. Therefore, the Court will dismiss the unjust enrichment claim against GCA.

Plaintiffs also set forth an unjust enrichment claim against Conwell. Plaintiffs state that the trade secrets were at one time in Conwell's possession (because Peppelman requested and Flynn agreed to send the materials to Conwell at GCA). However, there is no allegation that Conwell retained these trade secrets. Plaintiffs do not dispute Conwell's statement to Flynn that she passed all the materials onto Peppelman. Additionally, there is no allegation that Conwell has retained the purported trade secrets such that it would make it inequitable for her to retain the benefit. Again, the unjust enrichment claim is against those Defendants who have used the business methodologies and strategies to Plaintiffs detriment. The only parties alleged by the Plaintiffs that have done so are HA and the HA Individual Defendants. Therefore, the Court will dismiss the unjust enrichment claim against Conwell.

### 5. Conspiracy

*6 The last claim Plaintiffs have brought against Conwell and GCA is a civil conspiracy claim.

To prove a civil conspiracy under Pennsylvania law, a plaintiff must show the following elements: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.

*Doltz v. Harris & Assocs.,* 280 F.Supp.2d 377, 389 (E.D.Pa.2003) (citation omitted). Additionally, the parties are in agreement that GCA cannot conspire with its own employees or agents under Pennsylvania law. *Mill Run Assocs.,* 282 F.Supp.2d at 294 (citations omitted). Thus, to allege a claim for conspiracy against both GCA and Conwell, Plaintiffs have to allege that Conwell and GCA conspired with either HA or the HA Individual Defendants.

The Court will first examine whether Plaintiffs have stated a claim of conspiracy against Conwell. Plaintiffs theory of the case is that HA and the HA Individual Defendants used GCA as a "front" to capture HAS, Inc.'s trade secrets for the purpose of forming a rival company. Conwell was used as a conduit to receive and subsequently pass information onto Peppelman. Therefore, the Court finds that Plaintiffs have successfully alleged a conspiracy claim against Conwell.[FN4]

> FN4. The Court finds that discovery is warranted before the Court will grant Conwell's Motion to Dismiss the conspiracy claim against her. As to the written non-disclosure agreement and Integration Clause signed by HA and the Plaintiffs in March, 2002, the Court is not prepared to use such an agreement to alleviate Conwell from liability at this stage of the litigation. Specifically, Plaintiffs allege that they agreed to a oral non-disclosure agreement with Peppelman with the understanding that GCA would review Plaintiffs' materials to see if their clients and employees would be interested in HAS, Inc.'s services. The Court cannot necessarily state that the oral non-disclosure agreement was subsumed in the March, 2002, Integration Clause signed between HA and Plaintiffs since the oral non-disclosure agreement,

according to Plaintiffs, was made by Peppelman for GCA and not for HA. While the Court recognizes that Plaintiffs subsequently learned that Peppelman was an employee of HA in November, 2002, this does not necessarily mean that the oral non-disclosure agreement falls under the auspices of the Integration Clause.

Regarding Plaintiffs' conspiracy claim against GCA, the Court finds that Plaintiffs have not stated a claim. The reasons the Court dismissed the other claims against GCA also hold true for the conspiracy claim. Peppelman, through Conwell, allegedly used GCA as a "front" to help form a company to rival HAS, Inc. Such actions do not implicate GCA in anyway, but instead allege a conspiracy between Peppelman, acting on behalf of HA, and Conwell. Therefore, the Court will dismiss the conspiracy claim against GCA.

## B. HA AND THE HA INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

Next, the Court will examine the numerous claims brought against HA and the HA Individual Defendants. The claims being brought against these Defendants are unfair competition, trademark/service mark infringement, violations of the Lanham Act, unjust enrichment, tortious interference with existing and prospective contractual relations, conspiracy, fraud, misappropriation of trade secrets and copyright infringement. Additionally, Plaintiffs have brought a breach of contract claim against both HA and Peppelman.

### 1. Unfair Competition, Trademark/Service Mark Infringement, Lanham Act

The parties are in agreement that the elements for these three claims are similar. *See Mateson Chem. Corp. v. Vernon,* No. 96-7914, 2000 WL 680020, at *5 n. 7 (E.D.Pa. May 9, 2000)(citing *Nugget Distribs. Co-Op v. Mr. Nugget, Inc.,* 776 F.Supp. 1012, 1024 (E.D.Pa.1991))(stating "[u]nder Pennsylvania

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

law a common law trademark infringement action is governed by the same standards as an action brought under the Lanham Act"). To successfully state a claim of unfair competition, trademark/service mark infringement or a violation of the Lanham Act, three elements must be satisfied. Plaintiffs must allege (1) a protectable mark; (2) owned by the Plaintiff; and (3) use by the defendants of a similar mark which is likely to cause confusion concerning the source and origin of the goods. *See Opticians Assoc. of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 192 (3d Cir.1990). In this case, the Court finds that Plaintiffs have successfully pled all the requisite elements of these three similar claims. The Court finds it is inappropriate at this stage in the litigation for the Court to classify the mark, since such an issue involves factual considerations that should not be considered in a motion to dismiss. *See Capital Bonding Corp. v. ABC Bail Bonds, Inc.,* 69 F.Supp.2d 691, 699 (E.D.Pa.1999)(denying Defendant's motion to dismiss trademark infringement claim because at motion to dismiss stage, all allegations of complaint are read as true). Therefore, the Court will deny the Motion to Dismiss these claims.

2. Breach of Contract

*7 As mentioned earlier, Plaintiffs have brought a breach of contract claim against HA and Peppelman. Plaintiffs' claim against HA is for breach of the written non-disclosure agreement. HA has not moved to dismiss this claim against it, therefore this claim will remain. However, Defendant Peppelman has moved to dismiss the breach of the oral non-disclosure agreement. Peppelman argues that the oral non-disclosure agreement was merged into or was superceded by the written non-disclosure agreement between HA and the Plaintiffs. *See McGuire v. Schneider, Inc.,* 368 Pa.Super. 344, 349, 534 A.2d 115, 117 (1987), *aff'd,* 519 Pa. 439, 548 A.2d 1223 (1998)(citing *Bardwell v. Willis Co.,* 375 Pa. 503, 507, 100 A.2d 102, 104 (1953)). The written non-disclosure agreement between HA and the Plaintiffs contained an Integration Clause which

stated that, "[t]his Agreement contains the entire agreement and understanding of the parties relating to the subject matter hereof and merges and supercedes all prior discussions, agreements and understandings of every nature between them."(Pls.' Comp., Ex. A, ¶ 10).

Plaintiffs allege that they agreed to the oral nondisclosure agreement with the understanding that the transfer of information to Peppelman through Conwell would be used by, and for, GCA's employees and its clients. While Plaintiffs might have learned in November, 2001, that Peppelman actually worked for HA, the Court is not prepared, at the motion to dismiss stage, to integrate the oral non-disclosure agreement into the written non-disclosure agreement because the two agreements were formed for allegedly different purposes and for different parties. *See Quorum Health Res., Inc. v. Carbon-Schuylkill Cmty. Hosp., Inc.,* 49 F.Supp.2d 430, 433 (E.D.Pa.1999)(stating before applying parol evidence rule to written agreement, court must determine first whether there is an integrated agreement, whether it is partially or completely integrated and whether the asserted prior agreements are within the scope of the integrated agreements). Here, the Court finds that Plaintiffs have successfully pled that the oral non-disclosure agreement was outside the scope of the written nondisclosure agreement because it was allegedly for completely different parties and reasons.[FN5]

> FN5. Peppelman has also moved to dismiss the breach of the written non-disclosure agreement against him. However, as Plaintiffs set forth in their Response, they have not asserted a claim against Peppelman for breaching the written nondisclosure agreement since he was not a party to this written agreement. (Pls.' Ans. to Mot. to Dismiss of Defs. HA, Cardillo, Liebowitz, Masci, Rosen, Rocchino and Peppelman, 19).

3. Unjust Enrichment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 8
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

HA and the HA Individual Defendants argue that the unjust enrichment claim against them should also be dismissed because they do not contest the validity of the written non-disclosure agreement, only whether it has been breached. Specifically, HA and the HA Individual Defendants argue that "under Pennsylvania law, unjust enrichment is inapplicable where the parties' relationship is based on a written agreement."*Benigno v. Flatley,* No. 01-2158, 2001 WL 1132211, at *1 (E.D.Pa. Sept.13, 2001). While Defendants have asserted a correct statement of law, the Court finds that dismissing the unjust enrichment claim is premature. Specifically, the Court finds that "[a] Plaintiff may sue on alternative theories of recovery, including, breach of contract and unjust enrichment."*Id.* (citing *Gonzales v. Old Kent Mortgage Co.,* No. 99-5959, 2000 WL 1469313, at *5 (E.D.Pa. Sept.21, 2000)). Therefore, the Court will deny HA and the HA Individual Defendants Motion to Dismiss the unjust enrichment claim against them.

4. Tortious Interference with Existing and Prospective Contractual Relations

*8 Plaintiffs have brought both a tortious interference with existing contractual relations as well as a tortious interference with prospective contracts claim against HA and the HA Individual Defendants. The Defendants argue that the Plaintiffs have failed to pled the requisite elements of the two tortious interference claims. Additionally, HA and the HA Individual Defendants argue that such tortious interference claims are barred by the economic loss doctrine.

The Court will first examine whether Plaintiffs have successfully pled a claim for tortious interference of existing and prospective contractual relations before it turns to the economic loss argument.

Under Pennsylvania law, the elements of a claim for tortious interference with existing or prospective contractual relations are: "(1) the existence of a contractual, or prospective contractual relation

between the complainant and a third party, (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring, (3) the absence of privilege or justification on the part of the defendant, and (4) the occasioning of actual legal damage as a result of the defendant's con- duct."

*County of Del. v. Gov't Sys., Inc.,* 230 F.Supp.2d 592, 600 (E.D.Pa.2002)(quoting *Strickland v. Univ. of Scranton,* 700 A.2d 979, 985 (Pa.Super.Ct.1997)). The Court finds that the Plaintiffs have sufficiently alleged the requisite elements of these two tort claims to defeat HA and the HA Individual Defendants' Motion to Dismiss.

HA and the HA Individual Defendants additionally argue that Plaintiffs' tortious interference claims are barred by the economic loss doctrine. "The economic loss doctrine precludes recovery in tort for economic losses arising from a breach of contract."*Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.,* 28 F.Supp.2d 947, 951 (W.D.Pa.1998)(citing *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir.1995); *Gen. Pub. Utils. v. Glass Kitchens of Lancaster, Inc.,* 374 Pa.Super. 203, 208-09, 542 A.2d 567, 570 (1988))."Economic losses include damages due to loss of customers, sales and profits."*Valley Forge Convention & Visitors Bureau,* 28 F.Supp.2d at 951(citations omitted). However, the Court finds that Plaintiffs have not merely alleged that HA and the HA Individual Defendants tortiously interfered with existing and prospective contractual relations merely by breaching the written non-disclosure agreement. Rather, Plaintiffs have alleged items outside of a mere breach of the written non-disclosure agreement that could give rise to a tortious interference claim. Therefore, at this stage in the litigation, the Court finds that the economic loss doctrine will not prevent this claim from moving forward into discov- ery.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

5. Conspiracy

*9 HA and the HA Individual Defendants argue that the Court should dismiss the conspiracy claim against them because Plaintiffs have failed to pled the requisite elements of a conspiracy and because a corporation cannot conspire with its own employees. As stated in Part IV.A.5, the Court and the parties recognize that under Pennsylvania law, a corporation cannot conspire with itself or with its officers or employees. *See Mill Run Assocs.,* 282 F.Supp.2d at 294. However, the Court finds that Plaintiffs have successfully alleged a conspiracy between HA and the HA Individual Defendants and Conwell. Plaintiffs allege that Conwell acted as a conduit due to her position with GCA to receive and subsequently transfer information to her husband, Peppelman. This was done for the alleged unlawful purpose of misappropriating HAS, Inc.'s trade secrets to help form a rival company. Therefore, the Court will deny HA and the HA Individual Defendants Motion to Dismiss the conspiracy claim against them.

6. Fraud

HA and the HA Individual Defendants argue that the fraud claim against them should be dismissed under either one of two theories. First, HA and the HA Individual Defendants argue that Plaintiffs have failed to state their claim of fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b). The court finds that Plaintiffs have sufficiently pled their fraud claim against HA and the HA Individual Defendants with the requisite particularity."Although Rule 9(b) ordinarily mandates the pleading of the 'who, what, when, and where' of the alleged fraud, specifics may also be averred by other means; but what is crucial is that the complaint 'inject precision and some measure of substantiation into the allegations fraud.'"*Benigno,* 2001 WL 1132211, at *1 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984)). Here, Plaintiffs allege the misrepresentations made to Flynn in requesting the trade secrets constituted a fraud. Plaintiffs allege that such request was not made for the purpose of GCA's employees or its clients, or for the purpose of a possible merger, but rather, to help establish HA as a rival to compete with HAS, Inc. As such, the Court finds that Plaintiffs have sufficiently pled their fraud claim with the requisite particularity.

HA and the HA Individual Defendants additionally argue that even if the Court finds that Plaintiffs have pled fraud with particularity, a fraud claim should not be allowed to go forward because it is barred by the "gist of the action" doctrine. While the "gist of the action" doctrine has not been recognized by the Pennsylvania Supreme Court, "the Pennsylvania Superior Court and a number of United States District Courts have predicted it would."*Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,* 256 F.Supp.2d 329, 340 (E.D.Pa.2003)(citing *Etoll, Inc. v. Elias/Savion Advers., Inc.,* 811 A.2d 10, 14 (Pa.Super.Ct.2002); *Bash v. Bell Tel. Co. of Pa.,* 411 Pa.Super. 347, 356, 601 A.2d 825, 829 (1992); *Asbury Auto. Group, LLC v. Chrysler Ins. Co.,* No. 01-3319, 2002 WL 15925, at *3 n. 3 (E.D.Pa. Jan.7, 2002); *Caudill Seed & Warehouse Co., Inc. v. Prophet 21, Inc.,* 123 F.Supp.2d 826, 833 n. 11 (E.D.Pa.2000)). This District has described the "gist of the action" doctrine as follows:

[t]he gist of the action doctrine's purpose is to maintain the distinction between the theories of breach of contract and tort, and it precludes plaintiff from recasting ordinary breach of contract claims into tort claims. *Bash,* 601 A.2d at 829. "When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort is maintainable only if the contract is 'collateral' to conduct that is primarily tortious."*Sunquest Info. Sys. v. Dean Witter Reynolds,* 40 F.Supp.2d 644, 651 (W.D.Pa.1999).

*10 *Air Prods. & Chems.,* 256 F.Supp.2d at 340.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

Page 10

However, the courts have appeared to distinguish the doctrine where a plaintiff brings a fraudulent inducement claim. Specifically, the courts have recognized that "[f]raud in the inducement of a contract would not necessarily be covered by [the 'gist of the action'] doctrine because fraud to induce a person to enter a contract is generally collateral to (i.e. not 'interwoven' with) the terms of the contract itself."*Id.* at 341 (quoting *Etoll,* 811 A.2d at 17 (discussing *Foster v. Northwestern Mut. Life,* No. 02-2211, 2002 WL 31991114, at *2-3 (E.D.Pa. July 29, 2002))). Furthermore,

[t]he distinction between fraud in the inducement and fraud in the performance claims with regard to the gist of the action doctrine is crucial. This is because fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists.

*Air Prods. & Chems.,* 256 F.Supp.2d at 341 (citing *Foster,* 2002 WL 31991114, at *2-4). In this case, "the fraud that the Plaintiffs are complaining about is the true purpose of [the Defendants] requests for the information from the Plaintiffs which originated with ... Peppelman."(Pls.' Ans. to Mot. to Dismiss of Defs. HA, Cardillo, Liebowitz, Masci, Rosen, Rocchino & Peppelman, 17). Under Plaintiffs' theory of the case, Peppelman used GCA as a "front" to initially capture Plaintiffs trade secrets and, thereafter, HA and the HA Individual Defendants engaged in merger negotiations to capture additional trade secrets. Thus, the fraud alleged is the misrepresentations that were made to induce Plaintiffs to agree to both an oral non-disclosure agreement with Peppelman and a written non-disclosure agreement with HA. As the Court has already noted, the "gist of the action" doctrine has less applicability where a plaintiff alleges a fraud in the inducement. Therefore, the Court will not apply the "gist of the action" doctrine to the fraud claim against HA and the HA Individual Defendants. HA and the HA Individual Defendants' Motion to Dismiss the fraud claim is denied.

7. Misappropriation of Trade Secrets

**\*11** HA and the HA Individual Defendants also raise the "gist of the action" doctrine in their attempt to dismiss the misappropriation of trade secrets claim levied against them. The Third Circuit has applied the "gist of the action" doctrine to misappropriation of trade secrets claims. *See generally, Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 106-07 (3d Cir.2001). In *Bohler-Uddeholm,* the District Court allowed a misappropriation of trade secret claim to go to the jury. *Id.* However, the parties had an agreement which contractually covered plaintiffs "know-how." *Id.* In applying the "gist of the action" doctrine to this misappropriation claim, the Third Circuit stated, "if the jury's verdict for Uddeholm on the misappropriation of trade secrets and confidential information claim was based on Ellwood's misappropriation of Uddeholm's know-how, the verdict cannot stand."*Id.*

While the "gist of the action" doctrine might block any purported misappropriation of Plaintiffs' trade secrets claim arising from the written non-disclosure agreement between HA and the Plaintiffs, this is not the only misappropriation that Plaintiffs allege in their Complaint. Plaintiffs allege that "the contract [the written non-disclosure agreement] that HA claims is integral to the claims asserted by Plaintiffs was drafted some 7 months after the tort [misappropriation of trade secrets] occurred."(Pls.' Ans. to Mot. Dismiss of Defs. HA, Cardillo, Liebowitz, Masci, Rosen, Rocchino and Peppelman, 11). Specifically, Plaintiffs argue that the misappropriation of trade secrets occurred immediately after the receipt of materials by Peppelman pursuant to the oral non-disclosure agreement, but before the written non-disclosure agreement.

HA and the HA Individual Defendants argue, however, that the oral non-disclosure agreement should be merged into the written non-disclosure agreement because of the Integration Clause. Hence, these Defendants argue that the "gist of the action" doctrine becomes applicable to this tort be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))**

Page 11

cause the receipt of trade secrets by Peppelman would fall under the auspices of the written non-disclosure agreement. At this stage of the litigation, however, the Court is not prepared to merge the two agreements. The Court finds that Plaintiffs have alleged that Peppelman purported to be working for GCA when the oral non-disclosure agreement was made in the summer of 2001. Plaintiffs state Peppelman requested information from Flynn because GCA's clients and its employees were possibly interested in HAS, Inc.'s services when, in actuality, the alleged true reason for the request was to help form a company to rival HAS, Inc. As of November 16, 2001, Plaintiffs learned that Peppelman was an employee of HA. However, without any discovery, the Court is not prepared to merge the oral non-disclosure agreement into the written non-disclosure agreement. Both contracts were for purportedly different parties and different reasons. Thus, at this time, the Court finds that the "gist of the action" doctrine is inapplicable to the misappropriation of trade secrets claim that allegedly occurred prior to the written non-disclosure agreement and which arose from the trade secrets given to Peppelman pursuant to the oral non-disclosure agreement. The Court finds that Plaintiffs have successfully pled a misappropriation of trade secret claim against HA and the HA Individual Defendants so as to defeat their Motion to Dismiss.

8. Copyright Infringement

***12** Finally, HA and the HA Individual Defendants move to dismiss the copyright infringement claim against them. To state a claim for copyright infringement under Federal Rule of Civil Procedure Rule 8, the Complaint must state "which *specific* original work is the subject of the copyright claim, that plaintiff owns the copyright, that the work in question has been registered in compliance with the statute and by what acts and during what time defendant has infringed the copyright."*Gee v. CBS, Inc.,* 471 F.Supp. 600, 643 (E.D.Pa.1979), *aff'd,*612 F.2d 572 (3d Cir.1979)(emphasis added); *see also Pytka v. Van Alen,* No. 92-1610, 1992 WL 129632,

at *3 (E.D.Pa. June 8, 1992)(stating same requirements as set out in *Gee* for properly pleading copyright infringement claim under Federal Rule of Civil Procedure Rule 8). Additionally, "[p]laintiffs must also allege that each work is suitably registered, provide registration numbers and state by what act or acts and on what dates defendants infringed the copyrights."*Id.* at 644. In this case, the Court finds that Plaintiffs have failed to plead in their Complaint what specific original works are the subject of the copyright claim.[FN6]The Court finds that merely alleging that Plaintiffs own certain copyrights and that Defendants have infringed on such copyrights in their written materials is insufficient to meet the Rule 8 requirement of pleading in the Complaint the "specific" original work that is the subject of the copyright claim.[FN7]*See id.* at 643-44. Therefore, the Court will dismiss Plaintiffs copyright claim without prejudice.[FN8]

> FN6. Plaintiffs' Complaint states the following with respect to their copyright claim:
>
> 81. [HAS, Inc.] is the owner of a federal copyright in a collection of works created by [HAS, Inc.] (the "Copyrighted Material").
>
> 82. Plaintiff Kevin Flynn was the original owner of these copyrighta [sic]. On or about March, 17, 2003, all rights, title, and interest in and to said copyrights were transferred to [HAS, Inc.].
>
> 83. The Copyrighted Materials contain a large amount of material wholly original and drafted by Plaintiffs and is copyrighted under the law of the United States.
>
> 84. Plaintiffs have complied in all respects with all laws governing copyright, and secured the exclusive rights and privileges in and to the copyright of said collection of works created by Plaintiffs.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.))

Page 12

85. HA and the HA [Individual] Defendants have infringed Plaintiffs' copyrights by distributing to the public promotional and other written material which were copied from the Copyrighted Materials.

The Court finds that such allegations, while satisfying many of the elements needed to sufficiently state a copyright claim, lack what *specific* original work or works are the subject of Plaintiffs' copyright claim.

FN7. Plaintiffs state that they will forward to Defendants "copies of the applications for copyright protection which are the subject of this Count of Plaintiffs' Complaint."(Pls.' Ans. to Mot. to Dismiss of Defs. HA, Cardillo, Leibowitz, Masci, Rosen, Rocchino & Peppelman, 23). However, such action by the Plaintiffs does not satisfy the Rule 8 requirement of pleading the specific original work that is the subject of the copyright claim in the actual Complaint. Often times, this element is satisfied by attaching the Copyright Registration to the Complaint. *See CRA Mktg., Inc. v. Brandow's Fairway Crhysler-Plymouth-Jeep-Eagle, Inc.,* No. 98-6485, 1999 WL 562755, at * 1 (E.D.Pa. July 27, 1999); *Johnson v. Katz,* No. 94-6693, 1996 WL 107402, at *2 (E.D.Pa. March 7, 1996)(stating plaintiffs attached copyright registrations to their complaint).

FN8. If they choose, Plaintiffs can file a properly alleged copyright claim in an Amended Complaint pursuant to Federal Rule of Civil Procedure 15.

V. *CONCLUSION*

The Court has properly examined the two Motions to Dismiss submitted by the Defendants. The Court will dismiss all claims against GCA pursuant to Federal Rule of Civil Procedure 12(b)(6). Addition-

ally, the Court finds that Plaintiffs have failed to allege a misappropriation of trade secret claim and unjust enrichment claim against Conwell. Thus, these two claims against Conwell are also dismissed pursuant to Rule 12(b)(6). Finally, the Court finds that Plaintiffs have failed to allege what specific original work or works are the subject of their copyright claim against HA and the HA Individual Defendants. Therefore, the Court will dismiss this claim without prejudice.

An appropriate Order follows.

*ORDER*

AND NOW, this 13th day of January, 2004, upon consideration of Defendants Gordon Conwell & Associates, Inc. and Nancy Conwell's Motion to Dismiss (Doc. No. 5) and Health Advocate, Inc, Michael J. Cardillo, Arthur Liebowitz, Thomas A. Mascri, Jr., Martin B. Rosen, David Rocchino and John Peppelman's Motion to Dismiss (Doc. No. 8), together with the Memoranda, Responses and Replies thereto, it is hereby ORDERED that:

1. Counts I (Misappropriation of Trade Secrets), IV (Fraud), V (Breach of Contract), VI (Unjust Enrichment) and VII (Conspiracy) against Gordon Conwell & Associates, Inc. are DISMISSED;

*13 2. Counts I (Misappropriation of Trade Secrets) and VI (Unjust Enrichment) against Nancy Conwell are DISMISSED;

3. Count VIII[sic] (Copyright Infringement) against Healthcare Advocate, Inc., Michael J. Cardillo, Arthur Liebowitz, Thomas A. Mascri, Jr., Martin B. Rosen, David Rocchino and John Peppelman is DISMISSED without prejudice.

E.D.Pa.,2004.
Flynn v. Health Advocate, Inc.
Not Reported in F.Supp.2d, 2004 WL 51929 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

**H**
Gagliardi v. Clark
W.D.Pa.,2006.
Only the Westlaw citation is currently available.
    United States District Court,W.D. Pennsylvania.
    John GAGLIARDI, Soon-Rye Vangelder, Plaintiffs,
v.
    Richard CLARK, Borough Mgr.; Borough of Jef-
    ferson Hills, a municipal corporation; Borough of
    Jefferson Hills Sewer Authority; Pennsylvania
    American Water Company, a Pennsylvania busi-
    ness corporation; all parties sued in both their offi-
    cial and private capacities, Defendants.
**Civil Action No. 06-20.**

Sept. 28, 2006.

John Gagliardi, Jefferson Hills, PA, pro se.
Soon-Rye Vangelder, Clairton, PA, pro se.
John M. Giunta, Rawle & Henderson, Alan T.
Silko, Edward I. Levicoff, Levicoff, Silko & Deem-
er, Pittsburgh, PA, for Defendants.

*MEMORANDUM ORDER*

CONTI, District Judge.
**\*1** Plaintiffs John Gagliardi ("Gagliardi") and
Soon-Rye Vangelder ("Vangelder," and together
with Gagliardi, "plaintiffs") filed this civil action
alleging various federal constitutional claims under
42 U.S.C. § 1983, claims under the Fair Debt Col-
lection Practices Act, 15 U.S.C. § 1692, claims un-
der 18 U.S.C. §§ 1001 and 1341, state constitution-
al claims under the Pennsylvania Constitution, and
contract and tort claims governed by state law.

Pending before the court are motions filed pursuant
to Federal Rule of Civil Procedure 12(b)(6) by de-
fendants Richard Clark, Borough Manager
("Clark"); the Borough of Jefferson Hills (the
"borough"); the Borough of Jefferson Hills Sewer
Authority (the "sewer authority") (collectively, the
"borough defendants") (Doc. No. 3) and by defend-

ant Pennsylvania American Water Company (the
"water company") (Doc. No. 10). Defendants seek
to dismiss plaintiffs' complaint in its entirety for
failure to state a claim. The court finds that with re-
spect to the federal claims, plaintiffs have failed to
state a claim upon which relief may be granted. The
court will dismiss some of these claims without
prejudice to plaintiffs' right to file an amended
complaint within thirty (30) days of the entry of
this order; provided, that plaintiffs can meet the
standards of Rule 8 of the Federal Rules of Civil
Procedure. Plaintiffs if they file an amended com-
plaint must allege facts sufficient to outline the ele-
ments of their claims or to permit inferences to be
drawn that these elements exist and may not rely
upon mere "bald assertions" or "legal conclusions."
*See Morse v. Lower Merion School Dist.,* 132 F.3d
902, 906 (3d Cir.1997) ("[A] court need not credit a
complaint's 'bald assertions' or 'legal conclusions'
when deciding a motion to dismiss."). The court
will dismiss other claims with prejudice because
leave to amend with respect to those claims would
be futile. The court will not address the remaining
state law claims at this time because the court de-
clines to retain jurisdiction over those claims.

### *Facts Accepted as True for the Purpose of Decid-*
### *ing the Motion*

Plaintiff Gagliardi is a Pennsylvania citizen whose
address is located at 191 Wall Road in the USI In-
dustrial Park which he operates in Jefferson Hills
Borough, Allegheny County, Pennsylvania.
Plaintiffs' Complaint ("Comp.") ¶ 1.[FN1] Plaintiff
Vangelder is a permanent United States resident ali-
en of Korean ancestry who resides at 191 Wall
Road. *Id.* ¶ 2. Plaintiff Vangelder receives social
security benefits for her disabled condition. *Id.* De-
fendant Clark is Manager for the borough, which is
a municipal corporation and a political subdivision
of the Commonwealth of Pennsylvania. *Id.* ¶ 3.
Clark, as Manager for the borough, oversees the de-
fendant sewer authority. *Id.* ¶ 4. The sewer author-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

ity is an administrative entity entirely directed by the Borough Municipal Corporation and thus subject to Clark's day-to-day managerial authority. *Id.* ¶ 19.Defendant water company is a private Pennsylvania business corporation. *Id.* ¶ 5.

> FN1. The complaint alleges that Gagliardi's address is at 191 Wall Road, but the complaint and the pleadings in the case do not make clear whether Gagliardi owns this property or the adjacent property at 141 Wall Road, or is otherwise responsible for these properties in some respect. Compl. ¶ 1 ("Gagliardi ... whose address is at 191 Wall Rd., in the USI Industrial Park which he operates...."); Compl. Exhibit ("Ex.")(Doc. No. 1-1) at 16. Indeed, the ownership, subdivision, transfer, and tax liabilities of that property and the adjacent parcel of land appear to be the subject of litigation which was pending, and may be ongoing, in the Allegheny Court of Common Pleas at the time this civil action was commenced. *See* Compl. Ex. (Doc. No. 1-1) at 19-21, 22-28.

*\*2* On December 30, 2005, the Allegheny Court of Common Pleas issued a memorandum opinion and order overruling preliminary objections and directing defendants to answer in a case commenced by Gagliardi against Allegheny County, the borough, and the School District of West Jefferson Hills, Docket No. GD03-3504, concerning certain property descriptions and tax assessments involving the property at issue in this case and the adjacent parcel. *Id.* ¶ 12; Compl., Ex. (Doc. No. 1-1) at 19-21 ("State Memorandum Order"). The state trial court indicated that sorting out the property description would be "cumbersome," and thus the issues in that case would be best addressed through discovery rather than by preliminary objections. State Memorandum Order at 19-21. Plaintiff alleges that within forty-eight hours of receiving the State Memorandum Order, the borough, acting through the sewer authority, caused water utility service to be ter-

minated at 191 Wall Road without any warning or notice. *Id.* ¶ 13.FN2

> FN2. Plaintiffs allege that the water company was contractually obligated to follow the borough's directive. Compl. ¶ 28. The water company in its motion to dismiss agrees with this characterization, noting that it is contractually obligated pursuant to a contract between the water company and the borough which is recorded with and approved by the Pennsylvania Utility Commission pursuant to the laws of the Commonwealth of Pennsylvania. Water company's Mot. to. Dismiss at 2.

On Friday, January 6, 2006, Vangelder discovered that the water pressure flow was virtually nonexistent in Gagliardi's apartment at 191 Wall Road. *Id.* ¶ 14.FN3After determining that the water flow problem was not attributable to problems at 191 Wall Road, plaintiffs notified the water company by telephone about the lack of water pressure and flow. *Id.*

> FN3. Plaintiffs allege that prior to this incident water pressure and flow had been diminishing for months at 191 Wall Road to the extent that it would take half of an hour to refill a flushed toilet. *Id.* ¶ 14.

A water company employee arrived at the property at 191 Wall Road and discovered that the valve controlling water service to the property was almost completely closed. *Id.* ¶ 15.When that water company employee opened the main service valve, the water pressure and flow returned at full force and volume. *Id.* ¶ 16.FN4Plaintiffs, however, allege that within twenty minutes of reporting to the water company that he had re-opened the valve, the employee telephoned Gagliardi and notified Gagliardi that he had been ordered by the water company to shut off the water again. *Id .* ¶ 17.

> FN4. Plaintiffs allege that comparable full force and volume had not been seen for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)

(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))

months at 191 Wall Road. *Id.* ¶ 16.

Gagliardi was alarmed and called the water company. *Id.* ¶ 18.Gagliardi learned that the sewer authority had ordered the water company to shut off the water flow. *Id.* The water company acknowledged to Gagliardi that it normally sent termination notices to its customers but that because the sewer authority had demanded that the water company immediately disconnect service the water company promptly complied without resorting to notice or other procedures.*Id.* ¶ 20.Plaintiffs allege that the crisis was timed to occur early on a Friday afternoon when borough officers, employees, and agents would not be available for meaningful contact by Gagliardi. *Id.* ¶ 21.Plaintiffs allege that Clark and the sewer authority historically have been aware of utility service issues at 191 Wall Road. *Id.* ¶ 22.Plaintiffs allege that Gagliardi learned from a person at the water company that same day that Clark personally had given the water company the order to turn off water service at 191 Wall Road and had ordered that the water service was to remain off. *Id.* ¶ 23.

*3 Plaintiffs allege that Gagliardi made several unsuccessful attempts to contact Clark by telephone concerning the shut-off order. *Id.* ¶ 24.Gagliardi similarly was unsuccessful in his attempts to speak to any other borough officials that day. *Id.* Gagliardi unsuccessfully attempted, for example, to reach the sewer authority manager, but was told the sewer authority manager was on vacation in Florida. *Id.*

Plaintiffs allege that Vangelder is a totally innocent third party to the impasse between Gagliardi, the sewer authority, and the water company; that she is responsible for none of the legal disputes between Gagliardi, the borough, the sewer authority, and the water company; and that she has suffered a total loss of water usage which has compounded her physical ailments. *Id.* ¶ 25.Moreover, both Gagliardi and Vangelder have suffered compound physical ailments including severe headache pain and somatic discomfort and Gagliardi is an elderly person beset with a variety of cardiac, diabetic, and arthritic conditions which are aggravated when accompanied by a denial of access to water. *Id.* ¶¶ 25-26, 51.

### *Standard of Review*

A motion to dismiss tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits. Rather, when considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. V. Higgins,* 281 F.3d 383, 388 (3d Cir.2002)."The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost,* 1 F.3d at 183 (quoting 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d. ed.1990)). A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom, there is no reasonable reading upon which the plaintiff may be entitled to relief. *Vallies v. Sky Bank,* 432 F.3d 493, 494 (3d Cir.2006). Moreover, the court is under a duty to examine the complaint independently to determine if the factual allegations set forth could provide relief under any viable legal theory. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

While this court is mindful that *pro se* plaintiffs are not held to as high of a standard as litigants that are represented by counsel, a *pro se* plaintiff must still plead the essential elements of his or her claim and is not excused from conforming to the standard rules of civil procedure. *McNeil v. United States,* 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel...."); *Haines v. Kerner,* 404 U.S. 519, 520 (1972). Thus,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

plaintiffs, even though they are *pro se,* must set forth sufficient information that would allow the court to infer that, accepting plaintiffs' allegations as true, defendants violated plaintiffs' federal rights. *Kost 1,* F.3d at 183.

*4 The Federal Rules of Civil Procedure do not require the plaintiff to set out in his complaint the specific facts that entitle him to relief, but rather only a "short and plain statement of the claim."FED. RULE CIV. P. 8(a)(2). "Bald assertions" or "legal conclusions," however, are not required to be credited in making the determination as to whether or not there is a set of facts on which to determine that a claim has been stated. *See Morse,* 132 F.3d at 906 ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss .").

Where the plaintiff's complaint pleads facts beyond the requirements of Rule 8, his claim may be subject to dismissal if the specific facts alleged fail to provide relief under any viable legal theory. *Camero v. Kostos,* 253 F.Supp. 331, 338 (D.N.J.1966) (granting motion to dismiss where plaintiff's complaint pled facts demonstrating defendant was subject to immunity). In addition, if the plaintiff's complaint does plead specific facts, those facts, taken as true for purposes of deciding the motion to dismiss, may create a defense to his claim. *Id.; see ALA, Inc. V. CCAir, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); 5 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1226 (3d ed.2004). In fact, where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck-he has pleaded himself out of court."*Jefferson v. Ambroz,* 90 F.3d 1291, 1296 (7th Cir.1996).

Exhibits may be considered in deciding the motion to dismiss because "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case ... may be considered by the district court without converting the motion into one for summary judgment."5B

CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 376, 382-92 (3d ed.2004). Specifically, without converting the motion into a motion for summary judgment, the court may consider "documents which are attached to or submitted with the complaint, as well as legal arguments presented in memorandums or briefs and arguments of counsel,""documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading," and "[d]ocuments that the defendant attaches to the plaintiff's complaint and are central to the claim."*Pryor v. National Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002) ( "Although a district court may not consider matters extraneous to the pleadings, 'a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'") (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)).

### *Discussion*

### *I. Federal Constitutional Claims Under 42 U.S.C. § 1983*

*5 Plaintiffs assert multiple constitutional claims against defendants for violations of 42 U.S.C. § 1983. Section 1983 imposes civil liability upon any person who, while acting under color of state law, deprives another individual of rights, privileges and immunities secured by the Constitution or federal law. *Doe v. Delie,* 257 F.3d 309, 314 (3d Cir.2001).Section 1983"does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere."*Id.* (citing *Baker v. Mc-Collan,* 443 U.S. 137, 144 n. 3 (1979)). To prevail on a claim brought pursuant to section 1983, a plaintiff must show that (1) the defendant or defendants acted under color of law; and (2) their ac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

Page 5

tions deprived the plaintiff of rights secured by the Constitution or federal statutes. *Anderson v. Davila,* 125 F.3d 148, 159 (3d Cir.1997) (citing *Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir.1993)).[FN5]

> FN5. Plaintiffs additionally allege violations of several rights secured by the Pennsylvania Constitution and group these claims along with their federal constitutional claims. Section 1983 provides a remedy for the violation of a *federal* constitutional or statutory rights. *See* 42 U.S.C. § 1983 ("Every person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...."); *see also Doe,* 257 F.3d at 314 (Section 1983 "provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere"); *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006)("Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws.").

In this case, some defendants allege defendant-specific issues concerning the section 1983 claims. The water company, for example, argues that it is not a state actor and could not have acted under color of law and therefore plaintiffs cannot state a claim against it pursuant to section 1983. Clark argues that he is entitled to qualified immunity. The borough argues that it cannot be held liable under a theory of supervisory liability. The court first will address whether plaintiffs generally can state a claim under the various constitutional provisions asserted and the court only if necessary will reach defendant-specific issues such as state action and qualified immunity.[FN6]

> FN6. If the court does not reach these issues because the court dismisses all of plaintiffs' federal constitutional claims on

other grounds, the court is in no way expressing an opinion as to whether these immunities and defenses apply and whether they are meritorious. The court, instead, is seeking to address the multitude of claims and issues raised by plaintiffs' complaint and defendants' motions in the most efficient manner possible.

### A. The Procedural Due Process Claim

Plaintiffs argue that defendants violated their rights to due process secured by the Fifth and the Fourteenth Amendments to the United States Constitution by shutting off their water service without fair notice and an opportunity to defend against the termination of water service. Compl. ¶ 34. Plaintiffs have plead facts showing that defendants are local government entities and officials and a private company. The Fifth Amendment's due process guarantee applies only to the actions of the federal government. Plaintiffs, therefore, cannot state a claim for a violation of procedural due process guaranteed by the Fifth Amendment. Plaintiffs' due process claim, however, can be analyzed pursuant to the Fourteenth Amendment. In response to this allegation of denial of procedural due process, both the borough defendants and the water company argue that plaintiffs cannot state a claim for failure to provide due process largely because plaintiffs failed to avail themselves of processes available under the law or make a showing that they are patently inadequate.

The Fourteenth Amendment to the United States Constitution forbids a state from depriving persons of life, liberty, or property without due process of law. *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir.2000)(citing U.S. CONST. amend. XIV, § 1). To state a claim under section 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." *Hill v. Borough of Kutztown,* 455 F.3d 225, 233-34 (3d Cir.2006)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

(citing *Alvin,* 227 F.3d at 116).

**\*6** The United States Court of Appeals for the Third Circuit has made clear that "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate."*Alvin,* 227 F.3d at 116. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."*Id.* (quoting *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir.1982)(internal quotations omitted) and citing *Bohn v. County of Dakota,* 772 F.2d 1433, 1441 (8th Cir.1985))."A due process violation 'is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.' " *Id.* (quoting *Zinermon v. Burch,* 494 U.S. 113, 126 (1990)). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Id.* (citing *McDaniels v. Flick,* 59 F.3d 446, 460 (3d Cir.1995); *Dwyer v. Regan,* 777 F.2d 825, 834-35 (2d Cir.1985), *modified on other grounds,* 793 F.2d 457 (2d Cir.1986); *Riggins v. Board of Regents,* 790 F.2d 707, 711-12 (8th Cir.1986); *see Hudson v. Palmer,* 468 U.S. 517, 533 (1984)(involved a prison inmate section 1983 lawsuit against a prison guard and held that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause if a meaningful postdeprivation remedy for the loss is available; extending a previous holding concerning negligent deprivations to intentional deprivations of prop- erty).

In *Alvin,* a tenured university professor and two pharmaceutical companies that he operated brought a civil action alleging, among other claims, violations of due process resulting from denial of the benefits of tenure-and ultimately severance of his ten-ure and transfer to another school within the university-as part of an effort to punish him for his entrepreneurial activity which competed with university-related commercial activities. *Alvin,* 227 F.3d at 110. The issues on appeal focused on the plaintiff's compliance with the university grievance process. *Id.* The plaintiff argued that he followed the grievance procedures laid out in the faculty handbook, but was never afforded a hearing. *Id.* The district court granted summary judgment in favor of defendants on the section 1983 procedural due process claim, concluding that the plaintiff had not demonstrated that he had been deprived of a property interest. *Id.* at 111.

The United States Court of Appeals for the Third Circuit did not reach that issue, but affirmed the district court's grant of summary judgment in favor of defendants, holding instead that the plaintiff could not make out a procedural due process violation because he had not taken advantage of the processes available to him, and had not shown them to be patently inadequate. *Id.* at 111, 116-19.

**\*7** The court of appeals explained that this requirement that a plaintiff take advantage of processes made available to assert a claim of denial of procedural due process should be distinguished from exhaustion requirements that exist in other contexts. *See id* .The plaintiff in *Alvin* appeared to the court of appeals to conflate the two, and contended, as an alternative to his claim that he did attempt to use the available procedures, that he need not go through the processes available because of the general rule that there is no exhaustion requirement for section 1983 claims. *Id.* (citing *Patsy v. Board of Regents of Florida,* 457 U.S. 496, 516 (1982); *Hohe v. Casey,* 956 F.2d 399, 408 (3d Cir.1992)). The court of appeals rejected this argument:

However, exhaustion *simpliciter* is analytically distinct from the requirement that the harm alleged has occurred. Under the jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

Page 7

availed himself of those remedies.

*Id.* (citing *Zinermon,* 494 U.S. at 126). The court of appeals held that applying these principles to the plaintiff's case in *Alvin,* and viewing the facts in the light most favorable to the plaintiff in that case, the plaintiff did not avail himself of the procedures provided by the defendant university because he did not follow the university regulations regarding the use of the grievance procedure. *Id.*

In this case too, defendants argue that plaintiffs failed to avail themselves of the available post-deprivation administrative procedures. Defendants point out that the Pennsylvania legislature has provided a process for customers to follow concerning the termination of utility service. *See* 66 PA. CONS. STAT. §§ 1401 *et seq.* Section 1410 provides for the filing of a complaint with the Public Utility Commission (the "PUC"). 66 PA. CONS. STAT. § 1410. Prior to filing a complaint, the statute requires the customers to first contact the public utility to resolve the problem. 66 PA. CONS. STAT. § 1410(1)("The commission shall accept complaints only from customers who affirm that they have first contacted the public utility for the purpose of resolving the problem about which the customer wishes to file a complaint. If the customer has not contacted the public utility, the commission shall direct the customer to the public utility.").

Plaintiffs plead facts showing that, in addition to numerous unsuccessful attempts to contact the borough and Clark directly, they did contact the water company by telephone about the termination of water service at issue in this case. Compl. ¶ 14. Plaintiffs, however, plead facts showing that they did not avail themselves of the full extent of the grievance procedures available under Pennsylvania law, and in particular that they did not file a complaint with PUC as contemplated by the statute. In their response in opposition to the borough defendants' motion to dismiss (Doc. No. 5), plaintiffs "denied that aggrieved persons must avail themselves of whatever administrative framework exists before complaining of a denial of procedural due

process...." Pl.'s Resp. ¶ 3; *see also id.* at ¶ 21-22 (concerning plaintiffs' First Amendment claim: "Merely because the Defendants allege that a Pennsylvania Public Utilities Commission complaint could provide a suitable or meaningful post-deprivation remedy does not obligate your Plaintiffs to pursue an administrative remedy for a problem that is judicial in nature....").[FN7]

FN7. The court may consider the factual averments in plaintiffs' responses and the exhibits incorporated by plaintiffs by reference in deciding the motion to dismiss because "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case ... may be considered by the district court without converting the motion into one for summary judgment." 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 376, 382-92 (3d ed.2004). Specifically, without converting the motion into a motion for summary judgment, the court may consider, among other things, "documents which are attached to or submitted with the complaint." *Pryor v. National Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002).

*8 Plaintiffs further asserted that defendants were required to institute appropriate warning notices before utility services were terminated and that plaintiffs pleaded that they did not do so. *See* Compl. ¶ 20. The briefing on the motion to dismiss, however, includes at least two termination notices apparently sent to plaintiffs concerning the property at issue. *See* Plaintiffs' Praecipe for Inclusion of Pertinent Exhibits (Doc. No. 6), Ex. 6 (April 12, 2006 Notice); Water Company's Mem. In Support of Mot. (Doc. No. 15), Ex. A (April 19, 2005 Notice). One of these notices predates the January 6,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

2006 termination of water service at issue in this lawsuit. Both of these notices explained a procedure to challenge the termination which contemplates grievance procedures including a hearing. *See id.* These notices identically related that water service will be terminated "because of non-payment of sewage fees pursuant to ordinance." *Id.* These exhibits, which can be considered in ruling on a motion to dismiss without converting it into a motion for summary judgment, demonstrate that plaintiffs had some notice prior to the termination that water service would be terminated.

Under the relevant jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies. The court, under *Alvin,* does not even reach the questions whether plaintiffs, who allege they were deprived of water service without due process of law, were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and whether (2) the procedures available to plaintiffs did not provide "due process of law. *See Alvin,* 227 F.3d at 111 (although district court granted summary judgment because it found that the plaintiff had not been deprived of a property interest, and focused largely on the question whether the alleged incidents comprised such a significant erosion of the incidents of his tenure that he was deprived of a property interest, the court of appeals did not reach "this difficult (and interesting) question, however, because, whether or not Alvin has alleged a property deprivation, he has failed to adduce evidence that the defendants infringed upon whatever property right he possessed without due process of law.")

In this case, plaintiffs do not seriously dispute the adequacy of the existing state-law remedies themselves. Plaintiffs do make vague allegations that there is a history of problems with utility service at the location in question, and in particular of problems between Gagliardi and some of the defend-

ants. *See* Com pl. ¶ 21-22, 25. Plaintiffs further allege that the termination was done in part in retaliation for the discovery ruling in the state lawsuit, which could be understood as an oblique allegation that there is some bias or inadequacy in the proceedings as applied to plaintiffs. The court of appeals in *Alvin,* however, rejected a similar argument that futility of proceedings as applied to a particular plaintiff, or allegations of bias, generally relieve a plaintiff of the threshold requirement for making out a procedural due process claim that the plaintiff must first take advantage of existing processes. 227 F.3d at 118-19.

*9 When access to procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim.... However, since Alvin never invoked the second part of the processes available to him, which appear facially adequate, we will not hold that this step would have been unavailing (in procedure, if not in substance), absent concrete evidence supporting such a contention.

*Id.* at 118 (internal citations omitted). The court of appeals in *Alvin* discussed similar holdings in other decisions in which plaintiffs attempted to make a procedural due process claim charging that bias has infected a review of the deprivation without using all of the procedures available to them. *Id.* at 119. The court of appeals held, however, viewing the evidence in a light most favorable to Alvin, that "there is simply insufficient evidence that the formal hearing would not be held in a fair and impartial manner." *Id.* The court of appeals made clear:
The Constitution does not require perfection at every stage of a process; ... Alvin has not used all the processes available, and he cannot convert his difficulties with quickly triggering the informal process into a contention that the entire process, which he has not yet used, is biased.

*Id.* (internal citations omitted). This argument, though not clearly articulated by plaintiffs, would also be unavailing in this case.[FN8]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

FN8. Although *Alvin* was resolved at the summary judgment stage and this case is being addressed at the motion to dismiss stage, the reasoning in *Alvin* still applies to plaintiffs in this case. *See Jefferson,* 90 F.3d at 1296 ("In fact, where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck-he has pleaded himself out of court.").

Plaintiffs here plead facts showing, similar to the plaintiff in *Alvin,* that they did not take advantage of the existing processes made available under state law to challenge the termination of water service. The court, therefore, finds that plaintiffs cannot state a procedural due process claim against any defendant. The court will dismiss this claim with prejudice.

### B. The Substantive Due Process Claim

Plaintiffs allege that defendants violated Vangelder's substantive due process rights guaranteed by the Fourteenth Amendment because depriving her of water shocks the conscience. Compl. ¶ 39. Defendants argue in their motions to dismiss that plaintiffs cannot state a claim for a substantive due process violation because substantive due process protections apply to federal protected rights and the right to water is not such a right.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law."U.S. CONST. amend. XIV. "To prevail on a substantive due process claim, a plaintiff must demonstrate that an arbitrary and capricious act deprived them of a protected property interest."*County Concrete Corp. v. Town of Roxbury,* 442 F.3d 159, 165 (3d Cir.2006)(quoting *Taylor Inv. Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1292 (3d Cir.1993))(internal quotations omitted)."To prevail on a substantive due process claim challenging a state actor's conduct, 'a plaintiff must establish *as a threshold mat-*

*ter* that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.' " *Hill v. Borough of Kutztown,* 455 F.3d 225, 235 n. 12 (3d Cir.2006) (quoting *Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 139-40 (3d Cir.2000) (Alito, J.) (quotation marks and citation omitted))(emphasis added).

**\*10** Whether a property interest is protected for purposes of substantive due process is a question that is not answered by reference to state law. Rather, for a property interest to be protected for purposes of substantive due process, it must be "fundamental" under the United States Constitu- tion.

*Id.* (citing *Nicholas,* 227 F.3d at 142-143) (internal citations omitted). The United States Court of Appeals for the Third Circuit has explicitly held that the provision of water and sewer services, whether by a municipality or private utility company, is not a federally protected right.*Ransom v. Marazzo,* 848 F.2d 398, 412 (3d Cir.1988). In *Ransom,* a class of Philadelphia residents to whom water and sewer service was denied unless they paid the delinquent service charges incurred, but not paid, by the prior customers of water services at their residences sued the City of Philadelphia for, among other things, a denial of due process. *Id.* at 400.The district court granted the City's motion to dismiss the plaintiff's amended complaint.*Id.* The court of appeals affirmed and held that the state and local policies of denying service until charges for services rendered are satisfied was constitutional. *Id.* at 401.

Concerning the plaintiffs' substantive due process claim at issue in that decision-"seeking nothing less than a ruling that the practice and policy of conditioning water and sewer service on the satisfaction of pre-existing charges result in an unconstitutional deprivation of property regardless of the procedural safeguards installed,"-the court of appeals rejected plaintiffs' reliance on a district court opinion affirmed without opinion, *Koger v. Guarino,* 412 F.Supp. 1375 (E.D.Pa.1976), *aff'd,*549 F.2d 795 (3d Cir.1977), and determined that "[s]ubstantive due

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

Page 10

process refers to and protects federal rights."*Id.* at 411."**The provision of water and sewer services, whether by a municipality or by a private utility company, is not,** however, a federally protected right."*Id.* at 412 (citing *Koger,* 412 F.Supp. at 1386) (emphasis added).

The legal fact that, once a municipality (or, for that matter, a private utility company) establishes a utility for its citizens, a citizen's expectation of receiving that service rises to the level of a property interest cognizable under the Due Process Clause ... merely brings that expectation within the compass of the Fourteenth Amendment's procedural protections.... It does not transform that expectation into a substantive guarantee against the state in any circumstance.

*Id.* (internal citations omitted). The court of appeals in *Ransom,* therefore, "reject[ed] the claim that conditioning the receipt of water and sewer service on the satisfaction of past due charges for services rendered to the applicant's residence raises the question of a substantive due process deprivation."*Id.*

This holding that there is no substantive guarantee to utility service that is enforceable under a claim brought pursuant to the Fourteenth Amendment's substantive due process guarantee equally applies here.[FN9] The court, therefore, finds that plaintiffs cannot state a substantive due process claim against any defendant. The court will dismiss this claim with prejudice.

> FN9. Plaintiffs assert that denial of water service to Vangelder "shocks the conscience." Compl. ¶ 39. This language suggests that plaintiffs, who are *pro se,* may be seeking to assert a substantive due process claim under the "state-created danger doctrine" of substantive due process under which a plaintiff must prove "(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the

plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the [harm] to occur."*Estate of Smith v. Marasco,* 430 F.3d 140, 153 (3d Cir.2005) (citing *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.1995). Case law addressing state-created danger invokes the "shocks the conscience standard." Plaintiffs, however, have alleged no facts in support of that kind of claim and have made no arguments in support of that kind of claim. Indeed, plaintiffs pleaded some facts showing that they cannot state a claim under this doctrine.

### C. The Equal Protection Claim

*11 Plaintiffs allege that defendants have violated their rights under the Equal Protection Clause of the Fourteenth Amendment. Compl. ¶ 36. Defendants argue that plaintiffs cannot state a claim. "A plaintiff stating a claim under the Equal Protection Clause must allege that he has been treated differently because of his membership in a suspect class or his exercise of a fundamental right, or that he has been treated differently from similarly-situated others and that this differential treatment was not rationally related to a legitimate state interest."*Young v. New Sewickley Twp.,* 60 Fed.Appx. 263, 267 (3d Cir.2005)(unpublished)(citing *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, (1985)).

As to Vangelder, plaintiffs allege that she is a resident alien of Korean ancestry. This assertion on its own, however, is not sufficient to state a claim under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs here have alleged nothing other than her status as a resident alien of Korean ancestry as a basis for her equal protection claim. "A § 1983 complaint need only satisfy the liberal notice pleading standard of Federal Rule of Civil Procedure 8(a)." Young, 60 Fed.Appx. at 265 (citing *Evancho v. Fisher,* 423 F.3d 347, 353 (3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

Page 11

Cir.2005)).“Nonetheless, a district court is not re-quired to credit a 'bald assertion' when deciding a motion to dismiss under this liberal notice pleading standard, and the plaintiff cannot use allegations of civil rights violations that amount to nothing more than 'conclusory, boilerplate language' to show that he may be entitled to relief under § 1983.”*Id.* (citing *Evancho,* 423 F.3d at 354-55).[FN10]

> FN10.“[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or fu-tile.”*Young v. New Sewickley Twp.,* 60 Fed.Appx. 263, 267 (3d Cir.2005)(unpublished) (citing *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir.2004)).“Moreover, the district court must provide the plaintiff with this oppor-tunity even if the plaintiff does not seek leave to amend.”*Id.*“Accordingly, even when a plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be in-equitable or futile, the court must inform the plaintiff that he has leave to amend the complaint within a set period of time.”*Id.* (citations omitted).“The district court may dismiss the action if the plaintiff does not submit an amended pleading within that time, or if the plaintiff files notice with the district court of his intent to stand on the complaint.”*Id.* (citing *Shane v. Fauver,* 213 F.3d 113, 116 (3d Cir.2000); *Borelli v. City of Reading,* 532 F.2d 950, 951 n. 1 (3d Cir.1976)).

As to Gagliardi, in plaintiffs' response to borough defendants' motion to dismiss, plaintiffs argue that the actions of the defendants were intended to im-pact Gagliardi as a "class of one." *See* Pl.'s Resp. ¶ 11 (responding to municipal defendants' argument that plaintiffs have failed to identify a municipal policy or custom which resulted in the violation of rights under the supervisory liability standard set forth in *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)).[FN11] The “class of one” theory asserted but not argued in any detail by plaintiff was an-nounced in *Village of Willowbrook v. Olech,* 528 U.S. 562(2000) (per curiam).*Hill v. Borough of Kutztown,* 455 F.3d 225, 238 (3d Cir.2006).“According to that theory, a plaintiff states a claim for violation of the Equal Protection clause when he 'alleges that he has been intention-ally treated differently from others similarly situ-ated and that there is no rational basis for the differ-ence in treatment.' “ *Id.* (quoting *Olech,* 528 U.S. at 564).

> FN11. The Supreme Court *Canton* an-nounced the degree of fault required to hold a public entity liable under a theory of supervisory liability for failure to train public employees. *Canton,*489 U.S. at 388-92. The Supreme Court held that only where a public entity's failure to train its employees in a relevant respect reflects a deliberate indifference to the constitutional rights of its inhabitants can such a claim yield liability. *Canton,*489 U.S. at 392; *see Sample v. Diecks,* 885 F.2d 1099 (3d Cir.1999)(interpreting *Canton*).“We hold today that the inadequacy of police train-ing may serve as the basis for § 1983 liab-ility only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact.”*Canton,* 498 at 388 (emphasis added).

The United States Court of Appeals recently in Hill discussed the “class of one” theory:

Our court has not had the opportunity to consider the equal protection “class of one” theory at any length. From the text of *Olech* itself, however, it is clear that, at the very least, to state a claim under that theory, a plaintiff must allege that (1) the de-fendant treated him differently from others simil-arly situated, (2) the defendant did so intentionally,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

and (3) there was no rational basis for the difference in treatment.

*12 *Id.* In *Hill,* the court of appeals determined that the equal protection "class of one" claim by the plaintiff in that case, a professional engineer who worked as a borough manager until he alleged he was constructively discharged and harassed by the mayor of Kutztown, failed because the plaintiff did not allege the existence of similarly situated individuals-i.e., other borough managers-who the mayor treated differently than he treated the plaintiff. *Id.* (citing *Levenstein v. Salafsky,* 414 F.3d 767, 776 (7th Cir.2005)).

Similarly here, as to both the putative Korean ancestry claim and the "class of one" claim, plaintiffs have not alleged that similarly situated individuals were treated differently and that there was no rational basis for the difference in treatment. The court, therefore, finds that plaintiffs have failed to state an Equal Protection claim against all defendants. The court will dismiss these claims without prejudice to plaintiffs' ability to raise them in an amended complaint if plaintiffs can make more than bald conclusions. Plaintiffs are reminded that if they file an amended complaint, they are bound by the requirements of Rule 8 of the Federal Rules of Civil Procedure and must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

### D. The Right to Petition First Amendment Claim

Plaintiffs allege that defendants obstructed plaintiffs' right to petition guaranteed by the First Amendment to the United States Constitution by not providing them with pretermination notice concerning the termination of utility service. Compl. ¶ 29. Defendants argue that under both forms of right to petition recognized by courts-interference with the access to the courts and retaliation for engaging in protected conduct-plaintiffs failed to state a

claim. As to access to the courts, plaintiffs plead no facts showing that their access to the courts was denied. To the contrary, plaintiffs were able to bring this lawsuit without obstacle, and plaintiffs plead facts in their complaint showing that they are in the process, or were in the process, or seeking judicial redress in state court for related issues. Based upon these facts, plaintiffs cannot state a claim for violation of right to petition predicated on access to the courts.

As to retaliation, in the facts plead, and in their response to the borough defendants motion, plaintiffs suggest a claim for retaliation based upon the discovery ruling obtained in the state court action. *See* Compl. ¶ 12; Pl.'s Resp. ¶ 12 (responding to qualified immunity argument by Clark). As a threshold matter, the water company argues that it was not a party to the state court litigation and, therefore, plaintiff cannot state a claim of retaliation against it based upon these facts. The borough, however, was a named defendant in the state court litigation.

*13 Retaliation for the exercise of constitutionally-protected rights is itself a violation of rights secured by the Constitution actionable under section 1983. *White v. Napoleon,* 897 F.2d 103, 111-12 (3d Cir.1990). The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment Rights." *Anderson v. Davila,* 125 F.3d 148, 159 (3d Cir.1997) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)). It is well established that a plaintiff's retaliation claim is subject to a three-step, burden shifting methodology. *Ambrose v. Twp. of Robinson,* 303 F.3d 488, 493 (3d Cir.2002) (citing *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 669, 675 (1996)).

First, a plaintiff must show that his conduct was constitutionally protected. Second, he must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action. Finally, the defendant may defeat the plaintiff's case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))

Page 13

"by showing that it would have taken the same action even in the absence of the protected conduct."

*Id.* (quoting *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 669, 675 (1996)); *see Hill v. Borough of Kutztown* 455 F.3d 225, 241 (3d Cir.2006); *Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir.2005)("*Scranton* ").

In *Scranton,* the United States Court of Appeals for the Third Circuit addressed a lawsuit brought by police officers alleging that the city terminated them not because they failed to comply with a residency ordinance but because they exercised their First Amendment right to petition the government by previously suing the city. *Id .* at 125.In that case, as here, it cannot be seriously contested that the act in question-the filing of grievance lawsuit against government officials-is protected activity. The question whether this lawsuit was a "substantial or motivating factor" in the borough defendants' decision to direct the utility service be terminated, however, and whether defendants could show that they would have taken the same action even in the absence of Gagliardi's lawsuit and the discovery ruling, are case-specific, fact-specific issues. *See id.* at 125 n. 7.

Plaintiffs have plead facts showing that they engaged in protected activity. They have asserted only the barest allegations in support of any retaliatory motive by the borough defendants. The court, however, at this early stage in the litigation, cannot determine as defendants would like that plaintiffs have failed to state a claim and amendments would be futile. The court, therefore, finds that plaintiffs have failed to state a First Amendment claim against all defendants based upon the facts alleged thus far. The court will dismiss this claim without prejudice to plaintiffs' rights to file an amended complaint that complies with Rule 8 of the Federal Rules of Civil Procedure. Plaintiffs are reminded that if they file an amended complaint, they must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald

assertions or legal conclusions.

**E. The Unreasonable Seizure Fourth Amendment Claim**

**\*14** Plaintiffs argue that by terminating water service, defendants violated plaintiffs' rights to be free from unreasonable seizures under the Fourth Amendment to the United States Constitution. "The Fourth Amendment, made applicable to the States by the Fourteenth [Amendment] ... provides in pertinent part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....' " *Soldal v. Cook County, Ill.,* 506 U.S. 56, 61 (1992) (quoting U.S. CONST. amend. XIV). "A 'seizure' of property, we have explained, occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " *Id.* (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)); *see Gardner v. McGroarty,* 68 Fed.Appx. 307, 311 (3d Cir.2003)(same)(unpublished). The Fourth Amendment protects the people from unreasonable searches and seizures of "their persons, houses, papers, and effects." *Id.* at 62 (quoting U.S. CONST. amend. XIV). It, however, "does not protect possessory interests in all *kinds* of property." *Id.* at 63 n. 7 (citing *Oliver v. United States,* 466 U.S. 170, 176-77 (1984))(emphasis added).

Defendants argue that utility service cannot reasonably be construed as a personal effect, and contend that they can locate no decisions to the contrary. In their response to the borough defendants' motion, plaintiffs argue that defendants' view of the Fourth Amendment is too narrow, and that the Fourth Amendment secures the right of the people "to be secure in their **persons"** and that the Bill of Rights, including the Fourth Amendment, is a "collection of declaratory and restrictive phrases enunciated to expressly limit the prerogatives of government oppressors, such as the Defendants and their corporate allies."*See* Pl.'s Resp. ¶ 29 (emphasis in original).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))

Page 14

The court finds that, based upon the facts plead, even drawing all inferences in plaintiffs favor, plaintiffs have not stated a claim that their persons were seized, nor have they stated a claim that their personal effects were seized. As the Supreme Court made clear in *Soldal:* The Fourth Amendment "does not protect possessory interests in all kinds of property."506 U.S. at 63 n. 7 (citing *Oliver v. United States,* 466 U.S. 170, 176-77 (1984)). Access to utility service cannot reasonably be construed as a "personal effect" which is protected by the Fourth Amendment. The court has located no federal case law supporting such a view, although there are decisions in which plaintiffs challenged the termination of utility service subject to the procedural due process protections of the Fourteenth Amendment. *See, e.g., Ransom v. Marazzo,* 848 F.2d 398, 412 (3d Cir.1988); but *see Gardner v. McGroarty,* 68 Fed.Appx. 307, 311 (3d Cir.2003)(unpublished) (holding that the search and seizure of an apartment building without a warrant, the posting of it as unfit for habitation, the evacuation of the tenants, and the discontinuation of utility services did not constitute an unlawful search and seizure under the Fourth Amendment).

**\*15** The court, therefore, finds that based upon the facts plead by plaintiffs that plaintiffs cannot state a Fourth Amendment illegal seizure claim against any defendant. The court will dismiss this claim with prejudice.

**F. The Freedom of Contract and To Be Free From Impairment of Contracts Claim**

Plaintiffs allege that defendants violated plaintiffs' rights to freedom of contract and to be free from impairment of contracts secured by Article I, Section 10, Clause 1 of the United States Constitution, which provides in relevant part: "No State shall ... pass ... any ... law impairing the obligation of contracts...."U.S. CONST. art. I, § 10, cl. 1. Defendants argue that to assert a viable claim under the contracts clause, plaintiffs must allege that a change in the law operates as a substantial impairment of a contractual relationship. *See General Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992). The Supreme Court explained contracts clause claims in *General Motors* as follows:

Generally, we first ask whether the change in state law has "operated as a substantial impairment of a contractual relationship ."....This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.

*Id.* (internal citations omitted). While "[g]overnment regulations that substantially diminish contractual rights may create an unconstitutional impairment of the contract,"*Callaway Community Hosp. v. Sullivan,* 784 F.Supp. 693, 699 (W.D.Mo.1992) (citing *Thorpe v. Housing Auth. of Durham,* 393 U.S. 268, 278-79 (1969)), "[t]he contract clause does not bar all impairments of contract, but, instead, bars only unreasonable, significant impairments."*Id.* (citing *United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 21, 25 (1977)).

The analysis set forth in *Yellow Cab Co. v. City of Chicago,* 3 F.Supp.2d 919, 922-23 (N.D.Ill.1998), is instructive. "A contracting party may invoke the protections of the Contract Clause when there is an exercise of legislative power."*Id.* at 922 (citing *Arriaga v. Members of Bd. of Regents,* 825 F.Supp. 1, 4 (D.Mass.1992))."By its terms, the Contract Clause applies only to state constitutions, constitutional amendments, statutes, ordinances or any instrumentality of state legislated or delegated authority."*Id.* (citations omitted)."However, courts generally recognize that the Contract Clause also applies to the actions of state subdivisions, including city councils."*Id.* (citing *Horwitz-Matthews, Inc. v. City of Chicago,* 78 F.3d 1248, 1251 (7th Cir.1996))."Where a city 'acts through ordinances, then its contractual approvals and repudiations will be embodied in ordinances.' " *Id.* (quoting *Horwitz-Matthews,* 78 F.3d at 1251). "Consequently, a city ordinance may trigger the protections of the Contract Clause." *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

Page 15

*16 Unconstitutional impairment of contracts must be distinguished from ordinary breach of contract. "The protections of the Contract Clause, however, only apply to impairments of contract rights; the Contract Clause does not protect private parties from governmental breaches of contract."*Id.*"The Supreme Court has distinguished between an unconstitutional impairment of a contract obligation and a breach of contract for purposes of claims brought under the Contract Clause."*Id.* (citing *Hays v. Port of Seattle,* 251 U.S. 233, 237 (1920)). The Court recognized that "[t]he distinguishing characteristic between a constitutional impairment and a contractual breach is whether the non-breaching party has an available remedy."*Id.* Therefore,

[i]f a state exercises legislative power in a way that eliminates the availability of a remedy or action for damages by the non-breaching party, the state has impaired the contract. In contrast, if some legislative action announces the state's refusal to perform its contractual obligation, the state has simply breached the contract.

*Id.* (noting that the United States Court of Appeals for the Seventh Circuit held that a state or local law unconstitutionally impairs a contract only when the law provides the state or one of its subdivisions with a complete defense to a breach of contract suit, thereby preventing the other party from obtaining damages for breach of contract).

Plaintiffs make some allegations suggesting a contract for utility service, and these allegations are sufficient to meet the liberal pleading requirements of Federal Rule of Civil Procedure 8 with respect to the existence of a contract. Plaintiffs, however, have not alleged (1) the existence of any ordinance passed by the borough defendants; (2) that any ordinance has impaired any contract that may exist; or (3) that any ordinance has *substantially* impaired any contract. With respect to the water company, plaintiffs cannot state a claim for impairment of contracts because the water company is a private company.

The court, therefore, finds that plaintiffs did not meet the pleading requirement of Rule 8 of the Federal Rules of Civil Procedure and failed to state an impairment of contracts claim against any defendant. The court will dismiss this claim without prejudice with respect to the borough defendants and with prejudice with respect to the water company. Plaintiffs are reminded that if they file an amended complaint with respect to the claims dismissed without prejudice, they are bound by the requirements of Rule 8 of the Federal Rules of Civil Procedure and must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

**G. The Reserved and Unenumerated Rights Under the Ninth Amendment Claim**

Plaintiffs allege that defendants violated their reserved and unenumerated rights under the Ninth Amendment to the United States Constitution. The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."U.S. CONST. amend. IX. Defendants argue plaintiffs cannot state a claim under the Ninth Amendment because the Ninth Amendment does not independently secure any substantive constitutional rights, but rather has been interpreted to be a rule of construction. *See Warcloud v. Horn,* 1998 WL 126917 (E.D.Pa.1998) ("The Ninth Amendment has never been recognized as independently securing any substantive constitutional rights."*Id.* (quoting *Robinson v. Vaughn,* 1993 WL 451495, at * 6 (E.D.Pa.1993)(quoting *Strandberg v. City of Helena,* 791 F .2d 744, 748-49 (9th Cir.1986))) (internal quotations omitted). Indeed, this court previously held that the Ninth Amendment *"states but a rule of construction."Nicolette v. Caruso* 315 F.Supp.2d 710, 718 (W.D.Pa.,2003)(Conti, J.)(quoting THE CONSTITUTION OF THE UNITED STATES OF AMERICA: ANALYSIS AND INTERPRETATION 1412 (Johnny Killiam, ed., 1987) (emphasis added in original))."As such,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

the Ninth Amendment standing alone does not confer substantive rights for purposes of pursuing a constitutional claim." *Id.* (citations omitted)."Specifically, section 1983 civil rights claims premised on the Ninth Amendment 'must fail because there are no constitutional rights secured by that amendment .' " *Id.* (quoting *Charles v. Brown,* 495 F.Supp. 862 (D.C.Ala.1980)).

*17 The court, therefore, finds that plaintiffs cannot state a Ninth Amendment claim against any defendant. The court will dismiss this claim with prejudice.

### II. Fair Debt Collection Act Claims Under 15 U.S.C. § 1692

The Fair Debt Collection Act ("FDCA"), 15 U.S.C. § 1692, "provides a remedy for consumers who have been subjected to abusive, deceptive or unfair debt collection practices by debt collectors." *Piper v. Portnoff Law Associates, Ltd.,* 396 F.3d 227, 232 (3d Cir.2005) (citing *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 400 (3d Cir.2000); *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1167 (3d Cir.1987))."The threshold requirement of the FDCPA is that the prohibited practices are used in an attempt to collect a 'debt.' " *Id.* (internal quotations omitted); *see* 15 U.S.C. §§ 1692e-f.

A "debt" is defined under the FDCA as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). "Consumer" is defined as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3). "Debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, dir-

ectly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

Plaintiffs do not plead facts in their complaint showing that they owe a debt to the defendants or that the defendants acted as "debt collectors" under the meaning set forth in the statute.[FN12] This lawsuit is based upon the act of shutting off water service to plaintiffs, not upon efforts by the borough defendants or the water company to collect a debt.

> FN12. Indeed, supplemental filings demonstrate that plaintiffs dispute any arrearage on the account in question.

The court, therefore, finds that the facts plead show that plaintiffs cannot state a FDCA claim against any defendant. The court will dismiss this claim with prejudice.

### III. Federal Criminal Statutes for Mail Fraud and Federal Fraud and False Statements

The federal mail fraud statute provides for the imposition of criminal liability for using the mail to execute or attempt to execute a fraudulent scheme. *See* 18 U.S.C. § 1341.[FN13] The federal fraud and false statement statute, 18 U.S.C. § 1001, provides for the imposition of criminal liability for the knowing and willful making of material false, fictitious, or fraudulent statements or representations in any matter within the jurisdiction of the executive, legislative, or judicial branch of the federal government. *See* 18 U.S.C. § 1001.[FN14]

> FN13. Section 1341 provides:
>
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))

Page 17

other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341.

FN14.Section 1001 provides:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to-

(1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

(2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

18 U.S.C. § 1001.

Defendants argue that it is well-established that there is no private cause of action under the federal criminal statutes for mail fraud or false statements. The plain text of these statutes reinforces this argu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 18
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

ment because nowhere does the text of either stat-
ute provide for a private cause of action. *See Clem-
ents v. Chapman,* 2006 WL 1739826, *3 (10th
Cir.2006)(citing generally *Diamond v. Charles,* 476
U.S. 54, 64-65 (1986) (noting that private citizens
cannot compel enforcement of criminal law).FN15

> FN15. In *Clements,* the United States
> Court of Appeals made clear that "Section
> 1983 cannot 'fill the gap' for what is
> clearly absent from the federal criminal
> statutes cited by [the plaintiff], i.e., the ex-
> istence of a private right of action to en-
> force those statutes ."*Id.* (citing *Blessing v.
> Freestone,* 520 U.S. 329, 340 (1997)).

*18 In plaintiffs' response to borough defendants'
motion to dismiss, plaintiffs acknowledge that there
is no private cause of action for enforcing these
criminal statutes. *See* Pl.'s Resp. ¶ 29. Plaintiffs
state instead that these two federal criminal statutes
"are pleaded primarily to indicate the bad faith un-
derlying the actions of the governmental Defend-
ants and the individual offenses alleged do not
themselves constitute sources for a private cause of
action."*Id.*

The court, therefore, finds that based upon the facts
plead by plaintiffs, plaintiffs cannot state a claim
under these federal criminal statutes against any de-
fendant. The court will dismiss these claims with
prejudice.

*IV. State Law Claims Under the Pennsylvania
Constitution, Contract and Tort Law*

Where, as here, dismissal of all federal claims is
warranted, this court may decline to exercise sup-
plemental jurisdiction over pendant state law
claims. *See*28 U.S.C. 1367(c)(3); *Queen City Pizza,*
124 F.3d at 444;*Stechney v. Perry,* 101 F.3d 925,
939 (3d Cir.1996); *Growth Horizons, Inc. v.
Delaware County, Pa.,* 983 F.3d 1277, 1284-85 (3d
Cir.1993). This case is at the motion to dismiss
stage and significant resources of the parties and

the judiciary have not yet been expended. Plaintiffs
will have leave to file an amended complaint assert-
ing federal claims that have been dismissed without
prejudice so long as plaintiffs in good faith meet
the pleading standard of Rule 8 of the Federal Rules
of Civil Procedure with respect to those claims.
Plaintiffs if they choose to file an amended com-
plaint may avail themselves of this forum at that
time, or plaintiffs may avail themselves of the ap-
propriate state forum to resolve their state law
claims.

Under these circumstances, the court can find no
compelling reason to retain jurisdiction over
plaintiffs' state law claims at this time and no preju-
dice to plaintiffs from their dismissal. The court de-
clines to exercise supplemental jurisdiction over
plaintiffs' state-law claims-which include multiple
claims under various sections of Article I of the
Pennsylvania Constitution as well as other state law
claims. Those claims are dismissed without preju-
dice. *See*28 U.S.C. § 1367; *Queen City Pizza,* 124
F.3d at 444;*Stehney,* 101 F.3d at 939;*Growth Hori-
zons,* 983 F.2d at 1284-85 (3d Cir.1993).

*Conclusion*

**AND NOW,** this 28th day of September 2006, upon
consideration of defendants' motions to dismiss
plaintiffs' complaint (Doc. Nos.3, 10), IT IS
HEREBY ORDERED defendants motions are
GRANTED.

Plaintiffs' Fourteenth Amendment procedural due
process claim and substantive due process claim,
Fourth Amendment unreasonable seizure claim,
Ninth Amendment reserved and unenumerated
rights claim, FDCA claim, and federal criminal
statutory claims for mail fraud and false statements
are **DISMISSED WITH PREJUDICE** as to all de-
fendants.

Plaintiffs' Article I, Section 10, Clause 1 freedom
of contract claim is **DISMISSED WITH PREJU-
DICE** as to the water company.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.))**

**\*19** Plaintiffs' Fourteenth Amendment equal protection claim, First Amendment right to petition claim, and Pennsylvania state law claims are **DISMISSED WITHOUT PREJUDICE** as to all defendants.

Plaintiffs' Article I, Section 10, Clause 1 freedom of contract claims are **DISMISSED WITHOUT PREJUDICE** as to the borough defendants.

IT IS FURTHER ORDERED that plaintiffs shall have thirty (30) days from the date of the entry of this order to file an amended complaint making curative amendments; provided that plaintiffs can meet the standards of Rule 8 of the Federal Rules of Civil Procedure. Plaintiffs if they file an amended complaint must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist and may not rely upon mere bald assertions or legal conclusions. Plaintiffs are reminded of the requirements of Rule 11 of the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that all other pending motions, including plaintiffs' motion for joinder of additional parties (Doc. No. 11), plaintiffs' motion for declaratory relief (Doc. No. 17), plaintiffs' amended motion for joinder of additional parties (Doc. No. 20), and defendants' motion to strike motion for joinder and motion for declaratory relief (Doc. No. 23), are HEREBY DENIED AS MOOT.

W.D.Pa.,2006.
Gagliardi v. Clark
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1340865 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1340865 (E.D.Pa.))

Page 1

**H**
Innovative Office Products, Inc. v. Spaceco, Inc.
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
INNOVATIVE OFFICE PRODUCTS, INC.,
Plaintiff,
v.
SPACECO, INC., et al., Defendants.
**Civil Action No. 05-04037.**

May 15, 2006.

Samantha Melanie Kameros, Stephen B. Goldman, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, Westfield, NJ, for Plaintiff.
Benjamin E. Leace, Paul F. Prestia, Ratner and Prestia, Valley Forge, PA, John B. Hardaway, III, Nexsen Pruet, Greenville, SC, Kevin Alan Keeling, Ratner Prestia, Berwyn, PA, for Defendants.

### *MEMORANDUM AND ORDER*

STENGEL, J.
**\*1** Innovative Office Products, Inc. ("Innovative") filed this patent infringement action against SpaceCo, Inc. ("SpaceCo") seeking monetary damages as well as injunctive relief. SpaceCo has moved to bifurcate the trial into two phases pursuant to Rule 42(b) of the Federal Rules of Civil Procedure. I will deny this motion because SpaceCo has failed to satisfy its burden of demonstrating that bifurcation would (1) serve judicial economy; (2) avoid inconvenience; and (3) not prejudice any of the parties.

### I. BACKGROUND

Innovative initiated this lawsuit on July 28, 2005 by filing a complaint against defendants SpaceCo and Haworth, Inc.[FN1] for patent infringement. The patents at issue are:

    FN1. Innovative voluntarily dismissed de-

fendant Haworth, Inc. from this case on April 6, 2006.

(1) United States Patent No. 6,505,988, entitled "Tilter for Positioning Electronic Devices" (the "'988 patent"); (2) United States Patent No. 6,719,253, entitled "Channel for an Arm Apparatus for Mounting Devices with Cable Management System" (the " '253 patent"); and (3) United States Patent No. 6,854,698, entitled "Arm Apparatus for Mounting Electronic Devices" (the "'698 patent"). Innovative seeks damages for past infringement and injunctive relief for future infringement of the '988, '253, and '698 patents. SpaceCo has asserted a counterclaim against Innovative, alleging that Innovative tortiously interfered with SpaceCo's contractual relations. Presently before the Court is SpaceCo's motion to bifurcate the trial on the issues of liability and damages.

### II. LEGAL STANDARD

Rule 42(b) of the Federal Rules of Civil Procedure allows a district court to bifurcate a trial in its discretion. Rule 42(b) provides:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

FED. R. CIV. P. 42(b).

Whether to bifurcate a trial is a "matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance."*Sprinturf, Inc. v. Southwest Recreational Indus., Inc.,* No. Civ.A.01-7158, 2004 WL 96751,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1340865 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1340865 (E.D.Pa.))**

Page 2

at *1 (E.D.Pa. Jan. 15, 2004) (quoting *Lis v. Robert Packer Hosp.,* 579 F.2d 819, 824 (3d Cir.1978)). While courts have generally been more willing to bifurcate patent trials than other types of cases, bifurcation in these cases remains the exception rather than the rule.*Sprinturf,* 2004 WL 96751, at *1 (citing *Real v. Bunn-O-Matic Corp.,* 195 F.R.D. 618, 620 (N.D.Ill.2000)). The moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties. *Spectra-Physics Lasers, Inc. v. Uniphase Corp .,* 144 F.R.D. 99, 101 (N.D.Cal.1992).

*2 In Real, 195 F.R.D. at 620-21, the Northern District of Illinois surveyed the federal case law addressing bifurcation and identified a number of factors for courts to consider when deciding whether to bifurcate a trial. The Real court noted that the most important consideration is that of balancing the "competing prejudices" in a given case. *Id.* at 621 (citing *Corrigan v. Methodist Hosp.,* 160 F.R.D. 55, 57-58 (E.D.Pa.1995)). Specifically, courts should balance the prejudice of potential jury confusion on complex questions of liability and damages against the prejudice caused by the considerable delay that results from holding separate trials. Real, 195 F.R.D. at 620-21. The Real court also identified a number of other factors for courts to consider, including: (1) the need to review voluminous documents to resolve damages issues; (2) complex infringement issues; (3) multiple patents, infringing products, claims, counterclaims, or parties; and (4) the probability that the defendant would prevail on the infringement issue. *Id.* at 620.FN2

> FN2. Courts must also consider the Seventh Amendment's guarantee of a fair trial before granting a motion to bifurcate. *See In re Paoli R.R. Yard PCB Lit.,* 113 F.3d 444, 452 n. 5 (3d Cir.1997). In particular, a "separate trial of a particular issue cannot be ordered ... when the issue is so interwoven with the other issues in the case that

it cannot be submitted to the jury independently of the others without confusion and uncertainty that would amount to a denial of a fair trial."CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2391 (2d ed.1995).*See also Paoli,* 113 F.3d at 452 n. 5 ("The Seventh Amendment requires that, when a court bifurcates a case, it must divide issues between separate trials in such a way that the same issue is not reexamined by different juries") (quotations and citations omitted).

## III. DISCUSSION

SpaceCo argues that I should bifurcate this trial on the issues of liability and damages for three primary reasons. First, SpaceCo asserts that bifurcation will promote judicial economy. Specifically, SpaceCo argues that, should a jury find in its favor during the liability phase, the damages phase will become less complicated or even unnecessary. Second, SpaceCo alleges that bifurcation will assist the jury's understanding of the "complex, but unrelated" issues of liability and damages. Finally, SpaceCo argues that bifurcation will not prejudice Innovative. I find that SpaceCo has failed to satisfy its burden to bifurcate this trial for the following reasons.

### A. Judicial Economy

SpaceCo's first argument is mere speculation. "[T]he validation of this type of self-serving argument, without more, would permit all defendants in all cases to sever liability from damages."*Reading Tube Corp. v. Employers Ins. of Wausau,* 944 F.Supp. 398, 404 (E.D.Pa.1996). Such speculative reasoning does not justify bifurcating this trial.

### B. Reducing Jury Confusion

SpaceCo's second argument in favor of bifurcation is equally unconvincing. In *Sprinturf,* Judge Pollack

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1340865 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1340865 (E.D.Pa.))

denied the defendant's motion to bifurcate because, *inter alia,* the defendant failed to (1) indicate why the presentation of damages evidence would be more complex than in a typical patent case; (2) identify which aspects of the damages issue would be particularly difficult for jurors to comprehend; or (3) suggest that the damages trial would require the production and inspection of an extremely large amount of documents.*Sprinturf,* 2004 WL 96751, at *2.

Similarly, Innovative makes a mostly generic argument that a determination of the damages in this case will be "complex." While there are six patents at issue here, they are all closely related to a mechanical monitor extension arm and its components. As Innovative notes in its opposition, each of these patents relates to a relatively simple mechanical device with which many jurors may have personal experience, as opposed to more complex chemical or electrical patents. I have confidence that the jury in this case will be able to effectively and fairly consider both the liability and damages evidence related to these patents in one trial.

*3 Moreover, bifurcation could actually increase jury confusion in this case. SpaceCo has raised a counterclaim of tortious interference with contractual relations. Under Pennsylvania law, that cause of action requires the four following elements:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Crivelli v. Gen. Motors Corp.,* 215 F.3d 386, 394 (quoting *Strickland v. Univ. of Scranton,* 700 A.2d 979, 985 (Pa.Super.Ct.1997)).

If I were to bifurcate this trial, the jury would con-

sider SpaceCo's counterclaim during the liability phase. The final element of tortious interference with contractual relations requires a demonstration of actual damages. The jury would therefore be forced to consider one set of damages during the liability phase (those relating to SpaceCo's counterclaim) and another during the damages phase (those relating to Innovative's patent infringement claim).

**C. Prejudice to Innovative**

Finally, I find that bifurcation of this trial would prejudice Innovative. As I have noted above, prejudice due to jury confusion is not of particular concern in this case. The prejudice of delay inherent in holding two separate trials therefore outweighs the prejudice of possible juror confusion. *See Real,* 195 F.R.D. at 620-21 (holding that federal courts considering bifurcation must balance the competing prejudices in a case). This factor also favors denying SpaceCo's motion to bifurcate.

**IV. CONCLUSION**

For the reasons described above, I will not depart from the general rule of holding a single patent infringement trial in this case. I therefore deny SpaceCo's motion to bifurcate. An appropriate Order follows.

***ORDER***

AND NOW, this 15th day of May, 2006, upon consideration of Defendant SpaceCo's Motion to Bifurcate (Docket No. 33) and Innovative's response thereto (Docket No. 35), it is hereby ORDERED that the motion is DENIED.

E.D.Pa.,2006.
Innovative Office Products, Inc. v. Spaceco, Inc.
Not Reported in F.Supp.2d, 2006 WL 1340865 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

**C**
Saxton v. Central Pennsylvania Teamsters Pension
Fund
E.D.Pa.,2003.

United States District Court,E.D. Pennsylvania.
Drake SAXTON, Jimmy Little, and Thomas C.
Dudley, individually and on behalf of all others
similarly situated, Plaintiffs,
v.
CENTRAL PENNSYLVANIA TEAMSTERS
PENSION FUND; the Central Pennsylvania Team-
sters Pension Fund Trustees-William Shappell,
Keith Noll, Kevin M. Cicak, Tom J. Ventura,
Thomas K. Wotring, and Peter Hassler; and the
Fund Administrator-Joseph J. Samolewicz; Jointly
and Severally, Defendants.
**No. Civ.A. 02-CV-986.**

Dec. 9, 2003.

Alan M. Sandals, Sandals & Associates PC, Phil-
adelphia, PA, Ann Curry Thompson, Kelman, Lor-
ia, Will, Harvey & Thompson, Detroit, MI, for
Plaintiffs.
Paul C. Evans, Morgan, Lewis & Bockius Llp, Phil-
adelphia, PA, for Defendants.

*OPINION AND ORDER*

VANANTWERPEN, J.

### I. Introduction

**\*1** We have before us Defendants' Motion to Dis-
miss Plaintiffs' Amended Complaint for failure to
state cognizable claims pursuant to Fed.R.Civ.P.
12(b)(6). Plaintiffs Drake Saxton, Jimmy Little, and
Thomas C. Dudley, acting on behalf of themselves
and all others similarly situated, allege that Defend-
ants Central Pennsylvania Teamsters Pension Fund,
Trustees, and Fund Administrator violated various
provisions of ERISA, including breach of fiduciary
duty provisions, § 404(a)(1)(A)-(D), 29 U.S.C. §
1104(a)(1)(A)-(D); unlawful reduction of accrued

benefits, § 204(g), 29 U.S.C. § 1054(g); unlawful
forfeiture of accrued benefits, § 203(a), 29 U.S.C. §
1053(a); illegal transfers of plan assets, § 4231, 29
U.S.C. § 1411; and prohibited transactions, §
406(a), 29 U.S.C. § 1106(a). Plaintiffs also assert
violations under the LMRA, § 302, 29 U.S.C. §
186, as well as a violation of collective bargaining
agreements. For the reasons set forth below, the
Defendants' Motion to Dismiss is granted in part
and denied in part.

### II. Jurisdiction

This case arises under ERISA, 29 U.S.C. § 1001 *et
seq.*; thus, we have federal question jurisdiction un-
der 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

### III. Background

We present the relevant facts as Plaintiffs allege
them in their brief. Defendant, the Central
Pennsylvania Teamsters Fund ("Fund" or "Pension
Plan") is a multi-employer pension fund governed
by the Employee Retirement Income Securities Act
("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiffs are
participants in the Fund, which is administered by
three union Trustees, and three employer Trustees,
as well as a Fund Administrator appointed by the
Trustees. The Fund itself, a trust, is comprised of
three distinct pension sub-plans, or sub-trusts, all of
which qualify as separate ERISA benefit plans.
These sub-plans include the Defined Benefit Plan
("DB Plan"), the Retirement Income Plan 1987
("RIP 87 Plan"), and the Retirement Income Plan
2000 ("RIP 2000 Plan"). Each sub-plan is governed
by the Central Pennsylvania Teamster Pension
Fund Trust Agreement, as restated December 9,
1999 ("1999 Trust Agreement" or "Trust Agree-
ment"), as well as by its own plan document. The
DB Plan is a defined benefit plan, whereas the RIP
87 Plan and the RIP 2000 Plan are defined contri-
bution or individual account plans, as defined by
ERISA § 3(34), 29 U.S.C. § 1002(34).[FN1]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

FN1. Defined benefit plans generally provide for fixed benefits payments as provided by the plan's terms. *See* 29 U.S.C. § 1002(35). Defined contribution, or individual account plans, create an individual account for each plan participant. The benefits paid to the participant are based entirely on the amount contributed to the participant's account, "and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

Plaintiffs filed the instant action as a class action lawsuit. Named Plaintiffs Drake Saxton, Jimmy Little, and Thomas C. Dudley are participants in both the DB and RIP 87 Plans. In addition to asserting claims against the Fund, Plaintiffs' Amended Complaint alleges various ERISA violations against the Trustees and the Fund Administrator. Briefly, Count I of the Amended Complaint seeks declaratory and injunctive relief to clarify and enforce Plaintiffs' rights to future benefits under the DB Plan and the RIP 87 Plan upon this Court's resolution of Plaintiffs' remaining statutory based claims. Count II alleges that Defendant Trustees and Defendant Fund Administrator breached their fiduciary duties through various measures. Counts III and IV aver that the plan amendments adopted by Defendant Trustees in 2002 violated the "anti-cut back" rule of ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1) and constituted unlawful forfeitures of Plaintiffs' accrued benefits under § 203(a), 29 U.S.C. § 1053(a), respectively. Count V contends that the Trustees flouted ERISA § 4231(a), 29 U.S.C. § 1411(a) by causing illegal transfers of plan assets without meeting certain specified requirements. Count VI alleges that Defendants breached collective bargaining agreements with employers. The employers' obligations to contribute to the Fund arise from these agreements. Finally, Count VII sets forth claims pursuant to the Labor Management Relations Act ("LMRA") and seeks to hold Defendant Trustees and Defendant Fund Administrator personally liable for committing prohibited transactions in connection with the violations alleged throughout the Amended Complaint.

**\*2** The Fund was created in 1955 by its settlors, the Transport Employers Association ("TEA") and the Teamsters, Chauffeurs, Warehouseman, and Helpers Local Union No. 429 ("Local 429"). Since then, the Fund and its sub-plans have been amended on multiple occasions. In 1986, the Fund documents were amended to phase out the DB Plan over a three year span, and establish a new "Retirement Income Plan," which, after the RIP 2000 plan was created, became known as the RIP 87 Plan. The DB Plan and RIP 87 Plan had overlapping, but not identical participation. As the collective bargaining agreements ("CBA") governing employer contributions into the DB Plan expired during the three-year window, 95% of future employer contributions were directed into the RIP 87 Plan, and the remaining 5% were directed into the old DB Plan. This apportionment of employer contributions between the two plans was made pursuant to a formula set forth the Trust Agreement. The DB Plan was thereafter amended in 1989, effective January 1990, to direct *all* employer contributions into the RIP 87 Plan. The amendment was implemented based on the Trustees' incorrect assumption that the DB Plan was "fully funded" and thus required no further employer contributions to meet its existing benefit obligations to beneficiaries.

By 1999, however, it became evident that the DB Plan was in danger of not meeting ERISA's minimum funding requirements. The Fund's Settlors, TEA and Local 429, therefore amended the Fund's Trust Agreement in 1999. This agreement, known as the 1999 Second Amended and Restated Central Pennsylvania Teamsters Pension Trust Agreement, contained two important amendments. First, the RIP 2000 Plan was spun off from the RIP 87 Plan. The RIP 2000 Plan was established as a separate defined contribution plan for employers who had joined the Fund since 2000 and whose employees had never participated in the DB Plan. Second, to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

ameliorate the DB Plan's funding problems, an amendment allocated a certain amount of future contributions of RIP 87 Employers from the RIP 87 Plan into the DB Plan for the years 2000 to 2005. The quantity of contributions reallocated was calculated from the total forfeitures [FN2] of RIP 87 Plan employees from the previous year. Significantly, the previous year's forfeitures remained in the RIP 87 Plan. The quantity of forfeitures merely served as a guide for determining the portion of future contributions from RIP 87 Employers that would be allocated to the DB Plan. Thus, while the employers' overall contribution obligations did not diminish, a portion of those contributions were directed into the DB Plan. These amendments to the Trust Agreement were signed by both TEA and Local 429, the Fund's settlors.

> FN2. A forfeiture occurs when a RIP 87 Plan participant terminates membership prior to his/her benefits becoming vested.

In another attempt to surmount the DB Plan's underfunding issue, the Trustees announced two proposals to the membership in 2001. The first involved freezing the RIP 87 Plan, and reactivating the DB Plan for receipt of future employer contributions. The second option reallocated a additional percentage of future contributions of RIP 87 Plan employers into the DB Plan pursuant to a formula based on the participant's age and years of service. The Trustees ultimately selected this latter option, deemed Amendment No. 4, effective March 1, 2002.[FN3] Amendment No. 4 also contained a second, separate amendment. The Trustees added to the amendment provisions of the Trust Agreement the statement, "[n]othing in this Trust Agreement shall preclude the Trustees from acting in their Settlor-capacity as appropriate by law."(1999 Trust Agreement, Art. XI, Sec. 11.1.) Amendment No. 4 was signed and issued by the Trustees, without the signatures of Local 429 and the TEA. Several months later, however, the Trustees reversed their position and adopted Amendment No. 6 to the 1999 Second Amended and Restated Trust Agreement.

This amendment, effective January 2003, froze the RIP 87 Plan and allocated all future contributions of RIP 87 Plan employers into the DB Plan.[FN4]Plaintiffs' allegations stem primarily from these amendments.

> FN3. Amendment No. 4 provides in relevant part:
>
> Section 2.3. *Contributions to RIP 1987.*Beginning January 1, 2000, all Contributions paid to the Fund by RIP 87 Employers shall be allocated to RIP 1987, except as otherwise provided in Section 2.4, herein.
>
> Section 2.4. *Contributions to the Defined Benefit Plan.*A portion of the Contributions that each RIP 1987 Employer pays to the Fund will be allocated to the Defined Benefit plan, as follows:
>
> A. *Forfeitures.*Effective January 1, 2000, the Contributions for each RIP 1987 Employer that would otherwise be allocated to RIP 1987 will be reduced by the dollar value of the Forfeitures that its Employees incurred in RIP 1987 as of the first day of each Fund year....
>
> B. In addition to the Contributions allocated to the Defined Benefit Plan under subsection (A) above, a portion of the Contributions to the Fund of each RIP 1987 Employer for hours worked by Participants on and after March 1, 2002, will be allocated to the Defined Benefit Plan in accordance with the following formula ...
>
> (emphasis added).
>
> FN4. Amendment No. 6 provides in pertinent part:
>
> Section 2.3 *Contributions to RIP 1987.*Effective January 1, 2000 until

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

December 31, 2002, all Contributions owed to the Fund by RIP 1987 Employers shall be allocated to RIP 1987, except as otherwise provided in Section 2.4, herein. Effective January 1, 2003, all Contributions to RIP 1987 will cease and all Contributions paid to the Fund by RIP 1987 Employers will be allocated to the Defined Benefit Plan.

### IV. Standard of Review

**\*3** A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), tests the legal sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, an action will be dismissed under 12(b)(6) only when the plaintiff has failed to state a claim upon which relief can be granted. The criteria for deciding whether a plaintiff has met this standard have been clearly established. "In reviewing a motion to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party."*Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). This Court need not credit, however, any conclusory allegations of law, unsubstantiated conclusions, and/or unwarranted factual inferences. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). In addition, a complaint should be dismissed only if it appears to a legal certainty that a plaintiff could prove no set of facts which would entitle him or her to relief. *D.P. Enterprises v. Bucks County Cmty. Coll.,* 725 F.2d 943, 944 (3d Cir.1984).

Generally, a court may not take into account materials extraneous to the pleadings when considering a motion to dismiss. *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). If, however a document is "integral to or explicitly relied upon in the complaint," it may be considered "without converting the motion [to dismiss] into one for summary judgment."*Shaw v. Digital Equip.*

*Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996), *superceded by statute on other grounds,* as noted in *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 197 (1st Cir.1999); *seealsoIn re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (finding district court's reliance on document provided by defendants in ruling on motion to dismiss appropriate because plaintiff's complaint was based on that document, even though complaint did not explicitly refer or cite to it); *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 n .9 (3d Cir.1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document") (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1996)).

Plaintiffs' allegations, as set forth in the Amended Complaint, are heavily based upon the 1999 Trust Agreement, and the February 2002 and December 2002 amendments thereto, the 1999 RIP 1987 Plan Document, the 1994 DB Plan Document, and the collective bargaining agreements governing the named Plaintiffs' employment. These documents are attached as exhibits to both Plaintiffs' and Defendants' supporting Memoranda. The authenticity of these documents is not in dispute. Thus, it is proper for this Court to consider these documents in adjudicating Defendants' Motion to Dismiss. Notably, if the plan documents are unambiguous, we may construe them as a matter of law. *Kemerer v. ICI Americas, Inc.,* 70 F.3d 281, 288-89 (3d Cir.1995).

### V. Discussion

#### A. Count 1

**\*4** Pursuant to 29 U.S.C. § 1132(a)(1)(B), Count 1 of the Plaintiffs' Amended Complaint seeks declaratory relief to clarify and enforce their rights to future benefits under the DB Plan and the RIP 87 Plan. (Am.Compl.¶ 59.) § 1132(a)(1)(B) enables

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))

Page 5

ERISA plan participants or beneficiaries to institute a civil enforcement action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."Before a federal court may entertain a claim under this provision, however, the Third Circuit requires that a plaintiff first exhaust any remedies available under the plan. *Harrow v. Prudential Ins. Co.,* 279 F.3d 244, 252 (3d Cir.2002) (citing *Zipf v. Am. Tel. & Tel.,* 799 F.2d 889, 891 (3d Cir.1986)). The exhaustion requirement applies "to ERISA benefit claims, but not to claims arising from violations of substantive statutory provisions."*Id.* Courts require exhaustion of administrative remedies "to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned."*Id.* at 249 (quoting *Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir.1980)). The exhaustion requirement, however, is not absolute. If a plaintiff can provide a "clear and positive" showing that exhaustion would be futile, the requirement is excused.*Brown v. Cont'l Baking Co.,* 891 F.Supp. 238, 241 (E.D.Pa.1995); see*Berger v. Edgewater Steel Co.,* 911 F.2d 911, 916 (3d Cir.1990) ("Although the exhaustion requirement is strictly enforced, courts have recognized an exception when resort to the administrative process would be futile").

Plaintiffs admit that they have not exhausted their claim. Because the determination and clarification of benefits under the plans depend upon this Court's resolution of Plaintiffs' remaining statutory claims,FN5 they allege that exhaustion under the plans' administrative claim procedures would be futile. (Am.Compl.¶¶ 59, 60.) To support this argument, Plaintiffs characterize Count 1 as a "claim for benefits" not under the current plans' terms, but rather under the terms of the plans as ultimately determined by this Court. This distinction is unavailing because it does not overcome the fundamental nature of the Count as a claim for the clarification and enforcement of future benefits.

FN5. Plaintiffs' Brief explains that Count 1, seeking a declaration of their rights to benefits, becomes relevant only upon this Court's adjudication of their remaining claims: "Hence, the legality under the ERISA statute of the plan terms are first placed in issue under Counts II through VII. It is only after these statutory claims are decided that the parties and the Court can determine the consequences of these rulings for actual benefits entitlements of plaintiffs ..." (Pls.' Br. at 20.)

In essence, Plaintiffs first seek reconstitution of the plans' terms through this Court's adjudication of their remaining statutory-based counts before any resolution of claims for benefits. Thus, in one sense, it would be futile to require Plaintiffs to exhaust any claims for benefits before these statutory issues are resolved, because the changes in the plans' terms constitute the gravamen of the Amended Complaint. But all this means is that Plaintiffs' claim for clarification and enforcement of future benefits is premature. It does not provide a basis to apply the futility exception. Once this Court rules on Plaintiffs' remaining counts, they are then free to exhaust claims for benefits under the reconstituted plans' internal administrative procedures. Because such a claim must first be exhausted through the plans' internal administrative procedures before being brought in federal court, and because the futility exception is inapplicable, Count 1 must be dismissed at this time, without prejudice for Plaintiffs to refile the claim if and when appropriate.

**B. Count II**

**\*5** Count II of the Amended Complaint alleges that Defendant Trustees and Defendant Fund Administrator, acting as "fiduciaries" within the meaning of 29 U.S.C. § 1002(21)(A)(1),FN6 breached their ERISA mandated fiduciary obligations through

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

various measures.

> FN6. This provision provides in relevant part:
>
> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.

To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that the defendant undertook the challenged actions in a fiduciary capacity, and that the action taken constituted a breach of that duty. 29 U.S.C. §§ 1109(a), 1132(a)(3). An ERISA fiduciary, properly identified, must employ within the defined domain "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."29 U.S.C. § 1104(a)(1)(B). The fiduciary should act "solely in the interest of the participants and beneficiaries," and must discharge his duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]."§§ 1104(a)(1)(A), (D).29 U.S.C. § 1109(a) authorizes a beneficiary to bring suit against a fiduciary who has violated any of the fiduciary obligations ERISA imposes.

Specifically, Plaintiffs assert nine separate violations of Defendants' fiduciary duties. (Am.Compl.¶¶ 64(a)-(j).) For purposes of the following analysis, the alleged violations are grouped as follows: (1) inappropriately amending the 1999 Trust Agreement on several occasions in 2002 without the requisite signatures; (2) improperly issuing to retired DB Plan participants the "thirteenth check" through 2000; and (3) failing to prudently and effectively monitor the performance of investment advisors and managers responsible for the investment of plan assets.

1. Trust Amendments

For the reasons set forth below, Plaintiffs' claims relating to Defendants' implementation of the 2002 Amendments to the 1999 Trust Agreement are dismissed with prejudice.

i. Trustees' Failure to Abide by the Amendment Provisions Of The Trust Agreement In Undertaking Amendment 4

Plaintiffs' Amended Complaint asserts that Defendant Trustees and Defendant Fund Administrator:

> [f]ailed to discharge their duties in accordance with the documents and instruments governing the plans by again purporting to amend the 1999 Trust Agreement in February 2002 to arrogate to themselves broad powers to act as settlors in amending the Trust Agreement, again without the authorizing signatures of Fund settlors, Local 429 and TEA, as required by the 1999 Trust Agreement.

(Am.Compl.¶ 64(i).) Specifically, "[a]mendment No. 4 was signed solely by the Fund Trustees, but not by the TEA or by Local 429, as required by the 1999 Restated Trust Agreement, the document purportedly being amended."(Am.Compl.¶ 51.) Thus, Plaintiffs claim that Defendants' failure to comply with the appropriate Trust Agreement amendment procedures in implementing Amendment No. 4 constituted a breach of their fiduciary obligations. For the following reasons, we find that Plaintiffs have failed to state a claim upon which relief can be granted.

*6 Article XI, section 11.1 of the 1999 Trust Agreement gives the power of amendment to the Trustees or Settlors, and explicitly sets forth the appropriate procedures to be employed when the amending party seeks to amend the Agreement:

> The Trustees or the Settlors may amend the Trust Agreement in any manner and at any time, subject to the provisions of the Trust Agreement,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

ERISA and other federal and/or state law; provided, however, that no amendment shall prejudice the rights of any Participant or Beneficiary with respect to claims which have been opened and are in being pursuant to the rules and regulations of the Fund; provided, further, that no amendment shall cause any of the assets of the Fund to revert to any Employer. Any amendment shall be effective as of the date set by resolution of the Trustees. Amendments shall be in written form. Notwithstanding anything to the contrary set forth herein, any amendment to the Trust Agreement which would affect any rights or obligations of the Trustees or of TEA, as a Settlor, or of the Union, as a Settlor, shall not be effective unless approved in writing by the party or parties affected.

(1999 Trust Agreement, Art. XI, Sec. 11.1 (emphasis added).)

Section 402(b)(3) of ERISA requires that every employee benefit plan provide (1) a "procedure for amending [the] plan and (2) "[a procedure] for identifying the persons who have authority to amend the plan."*Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 82, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). So long as these minimal requirements are met, "ERISA [ ] follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level."*Id.* at 84, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94;*see*29 U.S.C. § 1104(a)(1)(D). Thus, a plan sponsor's failure to act in accordance with the amendment procedures of the governing plan document when implementing an amendment constitutes a breach of fiduciary duty possibly warranting judicial annulment of the amendment. *Curtiss-Wright Corp.,* 514 U.S. at 84-85, 115 S.Ct. 1223, 131 L.Ed.2d 94. In the case at bar, Plaintiffs note that the February 2002 (and presumably December 2002) amendments to the Trust Agreement were promulgated without the signatures of TEA or Local 429. As the 1999 Trust

Agreement indicates, however, the Trustees need only obtain the signatures of TEA and Local 429 if the amendment being adopted somehow impacts the rights or obligations of those parties as settlors. Thus, Defendants' adoption of the 2002 amendments without the signatures of either TEA or Local 429 constituted a failure to act in accordance with the Trust Agreement's amendment procedures only if the amendments impacted the settlors as such. Plaintiffs, however, fail to allege that the contested 2002 amendments affected the rights or obligations of TEA and Local 429 as settlors.[FN7]To state a claim for breach of fiduciary duty in this context, it must be alleged that the defendant neglected to administer the plan in accordance with its terms. The absence of any specific allegation that Defendants did not obtain the signatures required by the Trust Agreement *despite* the fact that the 2002 amendments implicated the rights and obligations of TEA and Union as settlors renders Plaintiffs' breach of fiduciary duty claim fatal. This claim of Count II is accordingly dismissed with prejudice for the aforementioned reasons.

> FN7. Plaintiffs' claim that the amendments "severely reduced the accrued benefits of plaintiffs and the members of the Class and their accrual of future benefits under the pre-amendment RIP 87 Plan" (Am.Compl.¶ 64(h)) does not suggest that TEA or Local 429's rights or obligations as settlors were affected by the amendments.

ii. Plan Amendments As A Fiduciary Act

*7 Plaintiffs allege that Defendant Trustees and Defendant Fund Administrator violated their fiduciary duties under ERISA by adopting various amendments to the 1999 Trust Agreement in 2002. ERISA, a comprehensive statutory scheme, is intended to protect employees enrolled in pension and benefit plans. The responsibility of administering a plan in the best interests of its participants and beneficiaries resides with plan trustees, who are obligated under § 404 of ERISA to act in accordance with a standard of fiduciary conduct. 29 U.S.C. §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126

**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

1104(A)-(D). Specifically, Plaintiffs aver that the 2002 amendments to the 1999 Trust Agreement violated ERISA § 404 because the amendments "severely reduc[ed] the accrued benefits of plaintiffs and the members of the class and their accrual of future benefits under the terms of the pre-amendment RIP 87 Plan."(Am.Compl.¶ 64(h).)

Before we may consider whether Plaintiffs have stated a claim for breach of fiduciary duty, we must first decide whether the Trustees' adoption of the 2002 amendments invoked ERISA's fiduciary duty provisions. In urging that we answer this question in the affirmative, Plaintiffs argue that in the context of this multi-employer Pension Plan, the Trustees' actions in implementing amendments which affected the allocation of a finite asset pool constituted administrative and fiduciary functions. Defendants, in turn, counter with the proposition that a plan sponsor acts within its power as a settlor when amending any plan. As the following discussion reveals, the issue is not clear-cut. Upon careful consideration, we find that the Trustees functioned as settlors when amending the Pension Plan.[FN8]They were, consequently, free to amend without the restraints imposed by ERISA § 404.

> FN8. We reach our decision today regardless of the November 2002 Department of Labor Bulletin.

In ascertaining whether plan sponsors act in a settlor or fiduciary capacity when amending ERISA-governed benefit plans, courts have drawn distinctions between multi-employer and single-employer plans, and between those plans that "affect the allocation of a finite plan asset pool" to which each participating employer has contributed. *Musto v. Am. Gen. Corp.,* 861 F.2d 897, 912 (6th Cir.1988), *cert. denied,*490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). Undoubtedly, the general rule is that the ERISA fiduciary obligations do not apply to a plan amendment. But, as the below discussion indicates, by no means has this general rule been unequivocally applied by courts.

Plaintiffs' argument is premised upon the rationale articulated by the Second Circuit in *Siskind v. Sperry Retirement Program, Unisys,* 47 F.3d 498 (2d Cir.1995). Former employees brought suit challenging the defendant corporation's adoption of an amendment to a single-employer pension plan. The plaintiffs argued that the plan amendment, which excluded the plaintiffs from a selective early retirement program, constituted a breach of fiduciary duty to act for the sole benefit of plan participants. *Id.* at 500.In holding that the plan trustees' amendment of the single-employer plan did not invoke ERISA's fiduciary obligations, the Second Circuit explained that "[i]n the single-employer setting, where plan trustees are also corporate officers, their actions must be made in the interest of both the plan's participants and the employer."*Id.* at 506.Because the trustees have dual responsibilities in this regard, subjecting them to fiduciary obligations in their adoption of plan amendments would discourage the creation of benefit plans, a result ERISA intended to prevent. In setting forth its rationale, the Second Circuit distinguished cases where plan amendments were held to be fiduciary functions.FN9 Those cases involved multi-employer pension plans.

> FN9. In *Chambless v. Masters, Mates & Pilots Pension Plan,* 722 F .2d 1032, 1038 (2d Cir.1985), the Second Circuit recognized the existence of a fiduciary breach cause of action against the trustees of a multi-employer pension fund who amended a vested pension plan.

*8 The cases holding plan amendment to be an administrative and fiduciary task concern multiemployer pension plans, jointly administered by trustees representing the employers and trustees appointed by and representing the union. In the multiemployer setting, trustees amending a pension plan "affect the allocation of a finite plan asset pool" to which each participating employer has contributed. For that reason trustees administering a multiemployer plan are expected to act

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

Page 9

solely for the benefit of beneficiaries and are barred from acting on the employers' behalf.

*Id.* (internal citations omitted).

In drawing a distinction between single-employer plans and multi-employer plans implicating a finite plan asset pool, the Second Circuit garnered support from the Sixth Circuit's dicta in *Musto,* 861 F.2d at 912, that "[i]n amending a *multi-employer* plan, where the level of contributions of each participant employer has generally been set by collective bargaining, the trustees 'affect the allocation of a finite plan asset pool between participants' ... and hence act as plan administrators subject to a fiduciary duty."The Sixth Circuit, however, subsequently refused to treat single-employer and multi-employer plans differently in *Pope v. Central States S.E. & S.W. Areas Health and Welfare Fund,* 27 F.3d 211, 213-214 (6th Cir.1994). In *Pope,* the Court of Appeals held that the trustees of a multiemployer welfare-benefit plan were not subject to fiduciary standards in amending a plan to reduce benefits in order to protect its financial stability. The Third Circuit recognized *Pope'* s impact on the fine distinction drawn by *Musto* as well: "*Pope* stands for the proposition that the Sixth Circuit, despite its authorship of *Musto,* is prepared to treat single- and multi-employer plans similarly in the absence of some other salient difference."*Walling v. Brady,* 125 F.3d 114, 118 (3d Cir.1997).

In the aftermath of these decisions, the Supreme Court has had occasion to address the issue of whether ERISA's fiduciary obligations apply to plan sponsors who amend plan agreements. These decisions, however, arose in the context of single-employer plans. *See,e.g.,Lockheed Corp. v. Spink,* 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). In *Lockheed,* the Court counseled that:

Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefit plans ..."[e]mployers or other plan sponsors are generally free under ERISA, for any reason at

any time, to adopt, modify, or terminate welfare plans."When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.

*Id.* at 890, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (citations omitted). This is because " 'only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration,' does a person become a fiduciary under § 3(21)(A)," and ERISA's definition of fiduciary does not include plan design.*Id.* (quoting *Siskind,* 47 F.3d at 505). The Court stated that this reasoning applied to both pension and welfare benefit plans. *Id.* Despite the categorical language characterizing the Supreme Court's pronouncement, the Third Circuit expressly refused to recognize that the rule would apply in all situations.

**\*9** *Lockheed* speaks of "plan sponsors," a term that applies to both single-employer sponsors and multi-employer sponsors under ERISA, and the opinion lacks any hint that single- and multi-employer plans should be analyzed differently. At the same time, the silence of *Lockheed* on this topic could arguably be a result of its subject matter, a single-employer plan. The Court did not mention multiemployer plans nor state that its decision was intended to reach them or to address their particular characteristics.... [W]e do not read *Lockheed* to be the definitive word that there are never valid occasions on which to distinguish between the two types of plans....

*Walling,* 125 F.3d at 117. *Walling* involved an amendment to a multi-employer pension fund that lacked a finite asset pool. In no uncertain terms, the Court of Appeals held that "the simple fact' that the plan at issue is a multiemployer plan is insufficient to cause the fiduciary duty to attach to the Trustees' actions."*Id.* at 120.Nevertheless, the Third Circuit took notice that "[t]he plan feature (a finite asset pool) on which *Siskind* based its deviation from this bright-line rule is not present here" and concluded that "[t]he rationale for having the fiduciary duty of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

loyalty apply is therefore absent, because the Trust-ees have the power to incur unfunded liabilities."*Id.* at 118.Thus, while the Third Circuit's refusal to im-pose fiduciary burdens on the trustees before it was grounded in the logic of *Lockheed,* the underlying analysis reveals the court's reluctance to consider the principle articulated in *Lockheed* to be unequi-vocally independent of the type of plan involved.

Following the *Walling* decision, however, the Su-preme Court reaffirmed the general principle that a plan sponsor's decision to amend a plan concerns the composition or design of the plan itself and thus does not implicate ERISA's fiduciary obligations in *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).*Hughes* clarified that the prior holding in *Lockheed* did not turn on "the type of plan being amended for the simple reason that the plain lan-guage of the statute defining fiduciary makes no distinction."*Id.* Notably, the issue arose before the Supreme Court once again in the context of a single-employer benefit plan. *Id.* Thus, while it does not necessarily diminish the import of *Walling,* it does undermine the notion that the type of plan at issue informs the decision of whether a plan sponsor acts as a fiduciary in undertaking a plan amendment. The Court's textual approach places emphasis on ERISA's definition of fiduciary. Because the term fails to distinguish between vari-ous plan permutations, and because it fails to in-clude plan design as a defined function, a plan sponsor is free to amend any employee benefit plan without beings subject to fiduciary review.*Lock-heed,* 517 U.S. at 890, 116 S.Ct. 1783, 135 L.Ed.2d 153. Indeed, the *Hughes* Court stressed that "[o]ur conclusion applies with equal force to persons exer-cising authority over a contributory plan, a noncon-tributory plan, or any other type of plan ."525 U.S. at 444-45, 119 S.Ct. 755, 142 L.Ed.2d 881. Thus, the Court held that the plaintiffs' fiduciary claims were directly foreclosed "by *Spink's* holding that, *without exception,* '[p]lan sponsors who alter the terms of a plan do not fall into the category of fidu-ciaries." ' *Id.* at 445,525 U.S. 432, 119 S.Ct. 755,

142 L.Ed.2d 881 (emphasis added). Admittedly, the Court's decision in *Hughes* does not directly dis-pose of the issue facing this Court, because the Pen-sion Plan *sub judice* is a multi-employer plan in-volving the allocation of finite plan assets. But the reasons underpinning the Court's decision appear to preclude imposition of fiduciary duties on the Trustees in this instance. To prevail, Plaintiffs must address the definition of "fiduciary" set forth in the statute. Yet it appears that under any plausible read-ing of the term, a plan sponsor's amendments to ERISA governed plans do not fall within its pur-view. Moreover, the Court's analysis appears to foreclose consideration of any policy driven dis-tinctions premised upon the unique features of the particular plan under review. Therefore, we cannot recognize a legal claim for breach of fiduciary duty stemming from Defendants' promulgation of the 2002 amendments.[FN10]

> FN10. We are aware that a strong argu-ment can be made that specific plan fea-tures should inform the fiduciary inquiry, and thus that fiduciary obligations should be imposed on plan sponsors who imple-ment amendments to multi-employer pen-sion funds implicating a finite asset pool. What we do learn from the Supreme Court's pronouncements on this issue is that the critical inquiry lies in determining whether the plan sponsors exercised dis-cretionary authority or control over plan management or administration. While tinkering with plan design does not fall within this definition, the thrust of Plaintiffs' complaint is not simply that the Trustees amended the "form or structure" of the Pension Plan, *Hughes Aircraft,* 525 U.S. at 444, 119 S.Ct. 755, 142 L.Ed.2d 881, but rather that the plan was amended to the detriment of Plaintiffs' present and future accrued benefits. Unlike in the former scenario, a rationale for having fi-duciary duties apply in the latter case is present. Unquestionably, ERISA is inten-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

Page 11

ded to promote the creation of employee benefit plans, and its provisions should be read with this goal in mind. This explains the Supreme Court's reluctance to inflict on single-employer sponsors the burden of fiduciary obligations when such employers undertake to amend a plan that they have no obligation to provide in the first instance. There is, of course, another important competing goal: "to mak[e] sure that if a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it."*Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 375, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); *seegenerally,*29 U.S.C. § 1001. It is important that employees enrolled in a benefit plan not be deprived of compensation that they *reasonably* anticipate under the plan's purported coverage. Indeed, this competing element may at times run up against ERISA's first purpose. As explicated above, the Pension Fund under review is a multi-employer plan that involves a finite asset pool. The fact that a multi-employer pension plan involves a finite asset pool could justify the imposition of fiduciary obligations on trustees that adopt plan amendments because, in this setting, trustees are charged with *administering* allocation of the finite plan asset pool. Consequently, the trustees' decision to amend a plan in such manner as to alter the benefits could be interpreted as a fiduciary exercise of their administrative discretion under ERISA.

Plaintiffs contend that, through various purported amendments, Defendants reallocated employer contributions among several distinct, protected plans, to the immediate disadvantage of plan participants, who partake in the RIP 87

defined contribution plan. Although Defendants diverted *future* RIP 87 employer contributions to the defined benefit plan, Plaintiffs' reasonably anticipated receipt of benefits from these contributions plus their investment returns. This scenario may pose conflicting choices on the part of the Trustee Defendants as to each class of participants in the separate plans, who do not have identical economic interests. An argument can be made that these actions involve administering the allocation of employer contributions and plan assets, and justify imposition of fiduciary obligations. On the other hand, it is the job of sponsors to make difficult choices, not the courts, and as explicated above the Supreme Court's pronouncements on the subject do not leave room for this type of policy-based analysis.

*10 Neither the Third Circuit's decision in *Walling* or the Supreme Court's opinions analyzing this matter directly control the situation where trustees of a multiemployer pension fund reallocate a finite asset pool among various sub-plans through an amendment. Yet an examination of the rationales espoused by the Supreme Court in its teachings on the matter support the view that plan sponsors act as settlors in such setting.[FN11]Thus, we find that the Trustees' promulgation of the 2002 amendments to the Trust Agreement constitutes settlor conduct unrestrained by the obligations set forth in 29 U.S.C. § § 1104(a)(1)(A)-(D). Accordingly, we grant Defendants' Motion on this issue, and dismiss this claim of Count II with prejudice.

FN11. As settlors, the Trustees are "free to make any amendment that [does] not run afoul of relevant ERISA regulations."*Walling,* 125 F.3d at 120. In *Hozier v. Midwest Fasteners, Inc.,* the Third Circuit explained that "an employer's decision to amend or terminate an employ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 12
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

ee benefit plan is unconstrained by the fiduciary duties that ERISA imposes on plan administration. Our conclusion does not imply that an employer has unfettered discretion to amend or terminate plans at will. In the case of pension plans, ERISA's detailed accrual and vesting provisions substantially limit this power."908 F.2d 1155, 1162 (3d Cir.1990). Thus, the Court of Appeals determined that although the defendant could have effected an invalid amendment, he could not have breached any fiduciary duties in deciding to amend the plan because he was simply not acting as an ERISA fiduciary. *Id.*

2. The Thirteenth Check

Plaintiffs assert that, in contrast to the explicit terms of the Trust Agreement, Defendant Trustees and Defendant Fund Administrator paid to DB Plan retirees a "thirteenth check" from 1987 through 2000. (*See* Am. Compl. ¶ 64(a)-(f).) Defendants move to dismiss this allegation on the ground that it fails to state a claim for breach of fiduciary duties. For the following reasons, we find that Plaintiffs have stated a claim for breach of fiduciary duties in this context.

The DB Plan required that its participants be issued an additional benefit check, known as the "thirteenth check" so long as certain funding prerequisites were met. Specifically, the DB Plan provided that:

> For certain retired participants and their Beneficiaries, an additional retirement benefit check in the form of a bonus check shall be paid ... [This benefit] is payable only to those retired Participants ... who are entitled to receive a monthly benefit check for each month of the calendar year with respect to which the thirteenth check is being paid. Notwithstanding the preceding, the "thirteenth check" shall only be payable if the Fund Actuary certifies that the unfunded vested liability of the Fund, as calculated for MPPAA

purposes as of the last day of the calendar year preceding distribution of the Additional Retirement Benefit check, does not exceed $85,000,000.

(1994 DB Plan, Art. IV, Sec. I(1)(j).) (emphasis added).

Plaintiffs, who were not members of the DB Plan at the time and thus never received any of the additional benefits, do not claim that the Fund Actuary failed to make the requisite certifications. Rather, they aver that the Defendant Trustees and Defendant Fund Administrator encouraged and permitted the Fund Actuary "to use outdated and improper 1951 mortality tables to calculate the funding liability of the DB Plan, thereby distorting and concealing the true funding status of the Plan, depriving it of needed and legally required funding, and jeopardizing the security of the accrued pension benefits of plaintiffs and the members of the Class."(Am.Compl.¶ 64(e).) In response, Defendants argue that their decision to issue the check was a settlor decision not falling within the ambit of ERISA's fiduciary duty provisions. (Defs.' Reply Mem. at 22 .) Because the Fund Actuary made the requisite certifications, Defendants assert that the DB Plan term afforded them no choice but to pay to DB participants the additional benefits. (*Id.*)

*11 As noted above, ERISA deems a person to be a fiduciary with respect to a plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets...."29 U.S.C. § 1002(21)(a)(I). Thus, "[f]iduciary obligations can apply to managing, advising, and administering an ERISA plan."*Pegram v. Herdich*, 530 U.S. 211, 223, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) imposes upon fiduciaries the requirement that they discharge their duties solely in the interest of plan participants and beneficiaries and in accordance with plan documents insofar as such documents are consistent with ERISA. These oblig-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

Page 13

ations further include monitoring the plan's solvency and adjusting benefit levels if and when appropriate. *See Dippel v. Joint Bd. Of Trustees of the Operating Engineers Trust Fund,* No. 80-0271, 1982 WL 2085, at *7 (D.D.C. May 6, 1982) ("The Board obviously retains the discretionary authority and indeed the fiduciary obligation to alter existing types and levels of medical benefits available under the Plan when the financial solvency of the Fund so requires.") (dicta); *cf. Baum v. Nolan,* 853 F.2d 1071, 1074-75 n. 2 (2d Cir.1988) (possibility that payment of pension benefits may affect fund's solvency is a matter of fiduciary duty) (dicta).

We find that Plaintiffs' claim passes muster under Rule 12(b)(6). Because Plaintiffs do not allege that Defendants paid out thirteenth checks in the absence of the Fund Actuary's certification, Defendants have technically adhered to a DB Plan term that affords them no discretion. They have complied with a term that demands issuance of the check upon meeting a specified prerequisite-the actuary's certification. Nevertheless we must at this point take as true Plaintiffs' factual allegations in the Amended Complaint that Defendants did exercise improper discretion, and thus acted in a fiduciary capacity, in their effort to ensure that the term's prerequisite was met, despite knowledge that the actual circumstances reflected otherwise. *Cf. Fechter v. Conn. Gen. Life Ins. Co.,* 798 F.Supp. 1120, 1124 (E.D.Pa.1991) ( "[P]laintiffs allege that Connecticut General transcended their usual role as an actuary and became a fiduciary by purposely using an allocation formula that, contrary to the plain language of the Plan, would permit most of the surplus assets to revert to the Company so that the Company would not question Connecticut General's excessively high premium. We have no doubt that if plaintiffs can prove their allegations, then as a matter of law, Connecticut General is an ERISA fiduciary"). Defendants have a fiduciary duty to faithfully administer the terms of the DB Plan, and to act prudently in determining whether the payment of a benefit was in fact authorized. *See Gruby v. Brady,* 838 F.Supp. 820, 829 (S.D.N.Y.1993)

(denying motion to dismiss fiduciary breach claim that trustees maintained benefits at excessive levels in plan that was in financial difficulty despite trustees following dictates of plan documents because "if the benefits levels as set forth in the Fund's governing plan documents are excessive, the Trustee Defendants may not avoid their fiduciary duties to Members by hiding behind documents which are inconsistent with ERISA"). Permitting or encouraging the Fund Actuary to use an improper assumption in calculating the unfunded vested liability of the DB Plan in order to satisfy the term's prerequisite which subsequently necessitates a certain result, all with the knowledge that continued payments were imprudent and would put the entire Fund in financial jeopardy, states a claim for breach of fiduciary duty.[FN12]

> FN12. Dicta contained in *Concrete Pipe and Products of California v. Construction Laborers Pension Trust For Southern California,* 508 U.S. 602, 633 n. 19, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) buttresses our finding that Plaintiffs' allegations state a cognizable breach of fiduciary duty claim. In the context of holding that the MPPAA's presumptions in favor of multi-employer plans did not deny employer access to an impartial decision maker and thus did not violate due process rights, the Supreme Court noted that:
>
> we know of no [case] in which a plan sponsor was found to have replaced an actuary's actuarial methods or assumptions with different ones of its own. Although we express no view on the question whether a plan sponsor must adopt the assumptions used by the actuary, we note that the legislative history of § 1082, which was enacted as part of ERISA in 1974, suggests that the actuarial [sic] assumptions must be "independently determined by an actuary," and that it is "inappropriate for an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

employer to substitute his judgment ... for that of a qualified actuary" with respect to these assumptions.

*Id.* (quoting S.Rep. No. 93-383, p. 70 (1973)).

**\*12** Defendants may not avoid their fiduciary obligations by circumventing a term that purportedly provides them with no discretion. Accordingly, Defendants' Motion to Dismiss this claim of Count II is denied.

3. Imprudent Investment of Plan Assets

Plaintiffs' last breach of fiduciary duty claim is premised on the allegation that Defendant Trustees and Defendant Fund Administrator:

> [f]ailed to prudently and effectively monitor and oversee the performance of the investment advisors and managers who were responsible for the investment of plan assets, and instead continued to employ the services of the same investment advisors and managers despite their unusually poor results from 1998-2000, thereby causing a significant loss of assets to the plans, further jeopardizing the funding of the DB Plan and diminishing the values of the individual accounts of plaintiffs and the members of the Class in the RIP 87 Plan itself and as transferred into the reformulated DB Plan.

(Am.Compl.¶ 64(g).) As explained below, we find that Plaintiffs have adequately alleged a breach of fiduciary duty claim.

Specifically, Plaintiffs assert that the DB Plan and RIP 87 Plan performed poorly because of mismanagement of plan assets by the Trustee appointed investment managers. During this same period, however, other similar multi-employer pension funds experienced a rapid growth in the values of assets held and invested. (Am.Compl.¶ 41.) Although "[t]his sub-par performance and mismanagement was either known to the Trustees and Fund

Administrator, or would have been discovered by them had they made prudent and proper efforts to monitor and supervise the performance of the managers who had been engaged to invest plan assets,"(*Id.*), Defendants "did not investigate, consider pursuing, or pursue a legal cause of action or other remedies either against the plans' investment advisors or managers ... or against the current and former Trustees who failed to take prudent action...." (Am.Compl.¶ 42.) Defendants' Motion to Dismiss challenges whether Plaintiffs have met the liberal pleading requirements of Fed.R.Civ.P. 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."A complaint that "contains only conclusory allegations and lack[s] any factual assertions for support fails even the liberal standard of Federal Rule of Civil Procedure 12(b)(6)."*Crowley v. Corning, Inc.,* 234 F.Supp.2d 222, 230 (W.D.N.Y.2002).

Few cases discuss the adequacy of pleading a breach of fiduciary duty claim in this specific context. Indisputably, Defendants' investment conduct is governed by ERISA's fiduciary provisions. *See*29 U.S.C. §§ 1104(a)(1)(B)-(C).[FN13] With respect to the Defendants' fiduciary duties when they retain outside professional assistance, the Third Circuit has stated:

> FN13.29 U.S.C. §§ 1104(a)(1)(B)-(C) provide in pertinent part:
>
> > (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> >
> > (C) by diversifying the investments of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

the plan so as to minimize the risk of large losses, unless under the circumstances if is clearly prudent not to do so.

While we would encourage fiduciaries to retain the services of consultants when they need outside assistance to make prudent investments and do not expect fiduciaries to duplicate their advisers' investigative efforts, we believe that ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary.

*13 *In re Unisys Corp. Sav. Plan Litig.,* 74 F.3d 420, 435 (3d Cir.1996).

We find that Plaintiffs' breach of fiduciary duty claim, as alleged in the Amended Complaint, satisfies the pleading requirements of Fed.R.Civ.P. 8. The essential elements of the claim are alleged. In addition to alleging the fiduciary status of Defendants, the Amended Complaint sets forth Defendants' fiduciary duties and specifies the Defendants' involvement in breaching those duties. (*See* Am. Compl. ¶¶ 41-42, 64(g).) As summarized above, the Amended Complaint rests on more than mere conclusory allegations. Defendants' reliance on *Crowley* is inapposite. Unlike the situation confronting the district court in *Crowley,* the crux of Plaintiffs' claim here is that if Defendants were actually unaware of the Fund's poor investment performance, they would have been aware had they done the type of investigation and oversight that the Third Circuit demands of fiduciaries who employ outside consultants. If, on the other hand, Defendants did possess knowledge of the Fund's inadequate performance, and yet failed to take any remedial measures, this too constitutes a breach of fiduciary duty. Because Plaintiffs set forth sufficient facts under which relief could be granted, Defendants' Motion to Dismiss this claim of Count II is denied.[FN14]

FN14. Defendants further argue that, as a matter of law, a breach of fiduciary duty claim cannot arise from a fund's poor investment performance over a short period of time. Defendants' Reply Memorandum references two cases in support of this proposition. (*See* Defs.' Reply Mem. at 23 (citing *Lalonde v. Textron, Inc.,* 270 F.Supp.2d 272, 280 (D.R.I.2003); *Wright v. Or. Metallurgical Corp.,* 222 F.Supp.2d 1224, 1234 (D.Or.2002)).) Defendants, however, fail to note that both decisions adjudicated the validity of plaintiffs' breach of fiduciary duty claims in the context of an ESOP plan. These plans, unlike other ERISA benefit plans, involve unique considerations. Indeed, "ESOPs are unlike other benefit plans, because they have competing purposes which, at times, can be in tension with one another. Any allegation of breach of a fiduciary duty must be considered in light of the special natures of ESOPs."*Textron,* 270 F.Supp.2d at 278.

Accordingly, we find with respect to Count II that Plaintiffs (1) have failed to state a claim for breach of fiduciary duty for Defendants' alleged inappropriate amendments to the 1999 Trust Agreement; and (2) have successfully stated a claim for breach of fiduciary duty for (a) Defendants' alleged improper issuance of the "thirteenth check," and (b) Defendants' alleged failure to prudently and effectively monitor the performance of investment advisors and managers responsible for the investment of plan assets.

### C. *Count III*

Count III of Plaintiffs' Amended Complaint alleges that Defendants unlawfully reduced accrued benefits in the RIP 87 Plan through their amendment of the 1999 Trust Agreement. For this claim, Plaintiffs rely on § 204(g)(1) of the ERISA statute, which prohibits the reduction of accrued benefits by amendment of an employee pension plan. *See*29 U.S.C. § 1054(g)(1). Defendants counter that while the amendments to the RIP 87 Plan impact future employer contributions, they do not in any way af-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 16
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

fect accrued benefits. Thus the issue before us in Count III is whether the amendments to the plan constituted a reduction in "accrued benefits."

ERISA defines "accrued benefit" in an individual account plan as "the balance of the individual's account."29 U.S.C. § 1002(23)(B). Neither party here has identified cases that are particularly helpful in establishing how the term "accrued benefit" has been interpreted in practice. However, we believe the Third Circuit's discussion of an "accrued benefit" in *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,* 756 F.2d 977 (3d Cir.1985), though written in the context of a defined benefit plan dispute, is instructive. *Hoover* contains an extensive discussion of ERISA's legislative history. Of particular note is the court's citation of language in the Congressional Report accompanying the ERISA bill, which highlights the purpose behind its accrued benefit and vesting protections. The Report states:

*14 Unless an employee's rights to his accrued pension benefits are nonforfeitable, he has no assurance that he will ultimately receive a pension. Thus, pension rights which have slowly been stockpiled over many years may suddenly be lost if the employee leaves or loses his job prior to retirement. Quite apart from the resulting hardships, ... such losses of pension rights are inequitable, since the pension contributions previously made on behalf of the employee may have been made in lieu of additional compensation or some other benefit which he would have received.

*Hoover* at 987, citing S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad. News 4890, 4930.

This language indicates that when Congress included § 204(g)(1) in ERISA, it intended to ensure that employees would receive the funds that employers had already set aside for their retirement, not to guarantee a certain amount of future employer contributions. Such a provision reflects the balance Congress undoubtedly sought to achieve

between protecting employees' retirement funds and maintaining private pension plans as an attractive option for employers. That ERISA was meant to protect contributions that had already been made on behalf of employees is further substantiated in the Act's "Congressional findings and declaration of policy."*See*29 U.S.C. § 1001. This Section establishes the means by which Congress intended to protect employees' retirement income. Specifically, it sought to do so

by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).

Nowhere in this section or in subsequent portions does the Act *require* employers to make contributions on behalf of employees. Rather, it simply seeks to make employee benefit plans more transparent and predictable and to preserve their integrity and financial well-being when employers *choose* to contribute to them. This goal has been realized through the decisions of courts which have focused on enforcing the terms of pension plan documents, as can be seen from the cases discussed below.

*Hoover* illustrates how ERISA's protections work in practice when applied to a defined benefit pension plan, where the employer agrees to make regular payments to participants of a fixed amount upon reaching retirement. In *Hoover,* the court held that the employer reduced employees' accrued benefits when it lowered the "unit multiplier" it used to calculate the amount of benefits that employees accrued each year. *Id.* at 980.Under the Internal Revenue Code, 26 U.S.C. § 411(a), an employer is required to state the formula by which accrued benefits are calculated in a defined benefit plan each year. *Id.* Since this formula "represents the interest

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))

Page 17

in a retirement benefit that a participant earns each year," it "enables a worker to mark his or her progress toward the full pension benefit due at retirement."*Id.* Thus when the employer in *Hoover* lowered the multiplier from $25.00 to $6.00, it diminished by seventy-five percent the amount of funds that had already been theoretically set aside by the employer under the formula it created. *Id.* at 986.By finding the employer in violation of ERISA, the court held it liable for the level of funds it had voluntarily agreed to set aside for employees. In keeping with the purposes and principles of ERISA, the court's decision turned on the terms of the Plan documents, which obligated the employer to utilize a certain formula for calculating the benefits accrued thus far. In so doing, it effectively defined "accrued benefits" as the product of the formula set out by the employer in Plan documents, which is dependant on the amount of time *thus* served by employees. Courts have offered a comparable analysis when protecting accrued benefits in defined contribution plans by similarly focusing on the terms of Plan documents. In *Izarelli v. Rexene Products Corp.,* 24 F.3d 1506 (5th Cir.1994), the plaintiffs argued that their accrued benefits were unlawfully reduced when their employer initially contributed 101,794 shares of stock to the Plan one year, but, after amending the Plan, ultimately allocated a much smaller amount to the individual accounts of Plan participants. *Izarelli,* 24 F.3d at 1509-16. While the district court held that the act of contributing the shares to the Plan created an accrued benefit, the Fifth Circuit reversed, drawing a distinction between contributions to the Plan and allocations to individual accounts. *Id.* at 1515.The court drew this distinction from the Plan document itself, which stated that "contributions initially are held in the 'Unprorated Fund,' i.e. 'that portion of the assets or property in the [Plan] ... which at any particular time, has not been allocated to a particular Member's Account." *Id.* at 1516.Additionally, the court noted that the Plan gave the employer " 'complete discretion' to control the 'time and manner of allocating Stock among [participants'] Accounts." ' *Id.* Thus the court held that the district

court had clearly erred in finding the 101,794 share contribution an accrued benefit because the Plan specified that contributions were not the same as allocations. *Id.* at 1518.In so doing, the court declined to protect what it deemed were *expected* contributions to the individual accounts.

**\*15** The First Circuit's approach to defining "accrued benefits" comports with those of the Third and Fifth Circuits. In *Campbell v.. BankBoston,* 327 F.3d 1 (1st Cir.2003), the plaintiff sued his former employer for making amendments that converted its defined benefit plan to a cash balance system because they ultimately resulted in a reduction in his retirement benefits.*Campbell,* 326 F.3d at 2. In implementing the amendments, the employer placed participants' accrued benefits, in other words, the amount that had been earned up until the conversion, into an account which was guaranteed a certain level of interest under the new cash balance plan. *Id.* at 4-5.In exchange for the guaranteed level of interest under the cash balance plan, the accounts ceased to accrue benefits under the old defined benefit plan. *Id.* Had the plaintiff been able to continue accruing benefits under the old plan, he would have eventually been entitled to an annual retirement benefit of $31,882.12. *Id.* However, as a result of the conversion, his benefits were reduced by approximately $3,000 per year. *Id.* The court held that this was not a reduction in the plaintiff's *accrued* benefits, but a reduction in his *expected* benefits. *Id.* at 8-9.The employer had not reduced the amount of benefits accrued by the employee, it simply chose to guarantee a certain interest rate, in lieu of future accruals. The court concluded that the employer was within its rights under the Plan and the law to modify or eliminate future benefits, since ERISA does not offer protection for "expected benefits." *Id.*

Plaintiffs' reliance on *John Blair Communications, Inc. v. Telemundo Group, Inc.,* 26 F.3d 360, 367 (2d Cir.1994), is not particularly helpful to this discussion or even applicable when determining when an accrued benefit has been reduced. We discuss it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))

Page 18

merely to explain why we do not rely on it here. The case concerned an alleged violation of ERISA § 208, which states that assets cannot be transferred to a new plan unless participants are entitled to receive a benefit that is equal to or greater to what they were entitled to under the old plan. 29 U.S.C. § 1058. The plaintiff argued that it received decreased benefits under the new plan because there was a three and a half month delay between the valuation of benefits under the old plan and when the benefits were actually transferred to the new plan. *John Blair,* 26 F.3d at 363-64. In spite of the fact that the funds under the old plan were appreciating and earning interest during the three and a half month period before they were actually transferred, the plaintiff's account was never credited for this increase in value. *Id.* The court held that the trustee had violated § 208 because the individuals' accounts post-transfer of plan assets "did not reflect the gains occurring during the interim period before the actual transfer."*Id.* at 366.

As stated above, we believe that the holding in this case is too abstract to be applied to the instant case, particularly since it concerns an unrelated section of ERISA. However, even if we were to attempt to apply it to this analysis, it would not be inconsistent with our discussion of accrued benefits thus far. *John Blair* stands for the proposition that trustees must acknowledge and credit appreciation and interest earned in defined contribution accounts. As in *Hoover, Izarelli,* and *Campbell,* the court interpreted ERISA to protect benefits as they existed prior to any alteration of the plan. Thus the participants in the plan in *John Blair* were entitled to any gains (and losses) that occurred up until the point of the actual transfer. We fail to see then how the holding in *John Blair* can be interpreted as offering protection for anything beyond the appreciation and interest earned on funds in a defined contribution plan. Since this case does not concern appreciation and interest earned in a defined contribution plan, we do not find it is an appropriate precedent.

*16 Applying the foregoing discussion to the case at hand, we find that the Defendants did not reduce accrued benefits in the RIP 87 Plan. Accepting Plaintiffs' facts as true, Defendants made several amendments to the RIP 87 Plan which adversely affected its future growth. The first amendment, effective January 1, 2000, caused a portion of employer contributions intended for the RIP 87, in the amount of forfeitures incurred by employees in that fund year, to be invested into the DB Plan. The second amendment resulted in an additional portion of the funds intended for the RIP 87 Plan by employers to be diverted to the DB Plan, according to a formula based on the number of hours worked by participants after March 1, 2002. The final amendment, Amendment No. 6, caused all contributions intended for the RIP 87 to be made to the DB Plan, of which all RIP 87 Plan participants became members.

Although these amendments undeniably reduced and eventually stopped future employer contributions to the RIP 87 Plan, they did not reduce the existing balances of members' individual accounts. Plaintiffs' own brief supports this conclusion. Plaintiffs described the initial reduction in contributions as a "derogation of the *expectation* [emphasis added] and agreement that contributions on their behalf would be made to the defined contribution RIP Plan and used to earn income to increase their individual account balances."(Pls' Br. at 11.) As to the final amendment, in Plaintiffs' own words, it "froze the RIP 87 Plan for all future accruals of benefits after January 1, 2003 (other than those gains or losses from future investment performance), and directed all employer contributions made on behalf of all RIP 87 Plan participants on and after January 1, 2003 into the DB Plan."(*Id.* at 12.)These characterizations of the amendments strongly support Defendants' claim that Plaintiffs have failed to state a claim upon which relief can be granted. However, even if Plaintiffs had not made these apparent admissions, the foregoing discussion of relevant case law leads us to the same conclusion. In each of the cases discussed above, the court looked to see if the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))

Page 19

alterations or amendments to the employers' pension plans impacted benefits retroactively or just future benefits. In *Hoover*, the application of a new formula to benefits already earned by employees was considered a reduction of accrued benefits. In *Izzarelli*, however, a decision not to allocate the full amount of stock contributed to a plan was not considered a reduction in accrued benefits because the stock had not actually been applied to members' accounts and thus there was no deduction of benefits from participants' existing balances. Nor did the court in *Campbell* consider it a reduction in benefits when the employer decided to stop benefits from continuing to accrue, and instead replaced accruals with a guaranteed interest rate. In each of these cases, the court determined whether the amendments impacted benefits retroactively or prospectively. Only where the amendments were considered retroactive did the court find them in violation of ERISA because, as the court found in *Campbell*, ERISA does not protect *expected* benefits.

*17 The Defendants here made a decision to reduce employer contributions to the RIP 87 Plan and eventually eliminate them altogether. However, it did not in any way alter the balances of the individual accounts that had accrued in the RIP 87 Plan. Plaintiffs' facts do not dispute this. Nor did the Defendants act inconsistently with Plan documents by diverting employer contributions to the DB plan, which Plaintiffs allege, had already accrued to the RIP 87 Plan. Plaintiffs argue that since Plan documents mandate direct contribution to the RIP 87 Plan, any diversion of contributions to the DB Plan is a reduction in accrued benefit. However, as correctly quoted in Plaintiffs' own brief, the Second Amended and Restated Central Pennsylvania Teamsters Pension Trust Agreement counters the notion that RIP 87 Employers contributions are deposited directly and fully to the RIP 87 Plan. Specifically, it states that "Contributions paid to the Fund by RIP 1987 Employers shall be paid to RIP 1987, except as otherwise provided in Section 2.4, herein [emphasis added]." (*See* Art. II, Sec. 2.3.) In other words, contributions made by RIP 87 employers to the Fund are to be paid to the RIP 87 Plan, but only in accordance with the terms of Section 2.4, which initially reduced contributions to RIP 87 and then, as amended, stopped them altogether.

Other portions of the Second Amended Trust Agreement controvert Plaintiffs' contention that RIP 87 employer contributions directly accrued to the RIP 87 Plan, rather than the Fund. For example, the preamble to the Second Amended Trust Agreement makes it clear that employers make contributions to the "Fund," not to individual pension plans or individual accounts. It notes that employers "pay contributions to the Fund on behalf of their employees who were participants of the Fund."Furthermore, Section 7.1 of Article VII states that "[N]o Employer, Employee, Union, Local Union or other party shall have any right, title or interest in or to the Fund or any part thereof."The relevant collective bargaining agreements conform to this principal by stating that employers obligate themselves to contribute to the Fund and not specific plans under the Fund. (*See* Art. 65 of the National Master United Parcel Service Agreement and Art. 50 of the National Master Freight Agreement.) Thus we find as a matter of law that employer contributions were to the Fund and not directly to the RIP 87 Plan. As such, the diversion of employer contributions to the DB Plan prior to their allocation to the RIP 87 Plan cannot be considered a reduction of accrued benefits in the RIP 87 Plan.

The only way in which we could conceive of Plaintiffs making a claim upon which relief could be granted here is if Plaintiffs had alleged that the balances in participants' accounts were reduced so that they no longer reflected the rate of accrual set out in Plan documents as of the time they were amended. For example, if the balance at the time of amendment was recalculated using a monthly contribution amount for the year 1997 that was less than the amount promised under the case of the National Master United Parcel Service Agreement ($737.52), that would seem to constitute a reduction

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))

in accrued benefits. However, Plaintiffs have not made such an allegation. As such, we must conclude that with regard to Count III, Plaintiffs have failed to state a claim upon which relief can be granted and the Motion to Dismiss Count III must therefore be granted. Plaintiffs' Count III claim is dismissed with prejudice.

### D. Count IV

**\*18** Plaintiffs' Count IV claim appears to be a variation of Count III, though we confess we had some difficulty understanding the basis for the claim. It relies on section § 203(a) of ERISA, which states that "each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age."29 U.S.C. § 1053(a). Plaintiffs appear to argue from this, and their collective bargaining agreements, that they are entitled to "a nonforfeitable right to accrue and to ultimately receive payment of the pension benefits purchased by these employer contributions on their behalf."

We do not believe that Plaintiffs have stated a claim upon which relief can be granted in Count IV. A claim under § 203(a) of ERISA is only valid if accrued benefits have been withdrawn from participants' accounts. *SeeHughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 441, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). It is not a guarantee that employers will make future contributions to pension plans. Since we have already found in Count III that Defendants' amendments to the pension plan did not reduce Plaintiffs' accrued benefits, we find that none of Plaintiffs' accrued benefits have been forfeited under § 203(a). Therefore Count IV must be dismissed with prejudice.

### E. Count V

Count V of the Amended Complaint, asserted against Defendant Trustees and Defendant Fund Administrator, alleges illegal transfers of plan assets in violation of ERISA § 4231, 29 U.S.C. §

1411(a).[FN15] Specifically, Plaintiffs claim that the following five transactions constituted unlawful transfers of assets:

> FN15.29 U.S.C. § 1411 is part of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461. The MPPAA was enacted as an amendment to ERISA, and is referenced as "Subtitle E-Special Provisions for Multiemployer Plans."

29 U.S.C. § 1411(a) provides that:

Unless otherwise provided in regulations prescribed by the corporation, a plan sponsor may not cause a multiemployer plan to merge with one or more multiemployer plans, or engage in a transfer of assets and liabilities to or from another multiemployer plan, unless such merger or transfer satisfies the requirements of subsection (b) of this section.

29 U.S.C. § 1411(b) provides in pertinent part:

A merger or transfer satisfies the requirements of this section if-

(1) in accordance with the regulations of the corporation, the plan sponsor of a multiemployer plan notifies the corporation of a merger with or transfer of plan assets or liabilities to another multiemployer plan at least 120 days before the effective date of the merger or transfer;

(2) no participant's or beneficiary's accrued benefit will be lower immediately after the effective date of the merger or transfer than the benefit immediately before that date;

(4) an actuarial valuation of the assets and liabilities of each of the affected plans has been performed during the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 21
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

plan year preceding the effective date of the merger or transfer, based upon the most recent data available as of the day before the start of that plan year, or other valuation of such assets and liabilities performed under such standards and procedures as the corporation may prescribe by regulation.

[D]efendant Trustees and Defendant Fund Administrator did not comply with the notice requirements of Section 4231(b)(1) or the valuation requirements of Section 4231(b)(4) when they (a) diverted employer contributions to and plan assets of the RIP 87 Plan to the DB Plan; (b) diverted participant forfeitures and plan assets of the RIP 87 Plan to the DB Plan; (c) transferred the RIP 2000 participants and associated assets out of the RIP 87 Plan; (d) diverted assets of the RIP 87 Plan into the DB Plan in March 2002 under Option 2; or (e) transferred all RIP 87 Plan participants and associated assets into the DB Plan in January 2003.

(Am.Compl.¶ 79.) As a result, "the accrued benefits of RIP 87 Plan participants were lower immediately following each of these transfers and diversions of plan assets, in violation of Section 4231(b)(2)." (Am.Compl.¶ 80.) Significantly, all of Plaintiffs' contentions arise out of transfers from a defined contribution plan into either a defined benefit or a second defined contribution plan. Because we determine that § 4231 of ERISA does not apply to transfers of assets to or from a defined contribution plan, Plaintiffs cannot prove any set of facts warranting relief.

Section 4231 of ERISA is contained within title IV of the statute, 29 U.S.C. § 1301 *etseq.*29 U.S.C. § 1321(a), located in title IV, subchapter III, subtitle B, enumerates the specific plan types that title IV does and does not encompass:

*19 "(a) Plans covered Except as provided in subsection (b) of this section, this subchapter applies to any plan...."

Subsection (b) of § 1321 then states:
"This section does not apply to any plan (1) which is an individual account plan, as defined in paragraph (34) of section 1002 of this title...."

Plaintiffs do not dispute that the RIP 87 and RIP 2000 Plans are defined contribution plans, as that term is delineated by § 1002(34):
The term, "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participants's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

Defendants correctly posit that these definitions govern 29 U.S.C. § 1411, because this section is set forth in title IV, subchapter III, subtitle E of ERISA. Consequently, as title IV expressly excludes defined contribution plans from its domain, § 1411 does not regulate transfers of assets and liabilities between defined contribution plans, or between a defined contribution and a defined benefit plan. Bolstering this interpretation is a regulation promulgated by the Pension Benefit Guarantee Corporation ("PBGC"), an administrative agency within the United States Department of Labor charged with interpreting the MPPAA. The following regulation is applicable to part 2 of subsection E of ERISA, which includes 29 U.S.C. §§ 1411-1415.

(a) Purpose. The purpose of this part is to prescribe notice requirements under section 4231 of ERISA for mergers and transfers of assets or liabilities among multiemployer pension plans....

(b) Scope. This part applies to mergers and transfers among multiemployer plans where all of the plans immediately before and immediately after the transaction are multiemployer plans covered by title IV of ERISA.

29 C.F.R. § 4231.1 (emphasis added). The PBGC's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

interpretations of MPPAA provisions, while not binding, are entitled to substantial deference. *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 169 (3d Cir.2002). We believe that the PBGC's reading of these inter-related statutory provisions represents sound stat-utory interpretation. See*Local 1115 Pension Fund v. Local 144 Hosp. Pension Fund,* 876 F.Supp. 39, 40-41 (S.D.N.Y.1994) (deferring to analogous PBGC regulation in holding that subtitle E of title IV of ERISA does not apply to multiemployer plans that are defined contribution plans). Accordingly, we defer to it. Plaintiffs do not allege that unlawful transfers of assets occurred between defined benefit plans. Instead, they allege unlawful asset transfers from a defined contribution plan into either a defined benefit or second defined contribution plan. Section 4231 is simply not implicated in the latter scenario because, "all of the plans immediately be-fore and immediately after the transaction" are *not*"multiemployer plans covered by title IV of ERISA."29 C.F.R. § 4231.1. Plaintiffs can adduce no set of facts to substantiate a claim under § 4231 of ERISA. Defendants' Motion to Dismiss this claim is thus granted, and Plaintiffs' Count V claim is dismissed with prejudice.

*F. Prohibited Transaction Claims*

**\*20** In Counts II, V, and VII of the Amended Com-plaint, Plaintiffs have alleged that Defendant Trust-ees and Defendant Fund Administrator engaged in various transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).[FN16] Congress enacted this section "to bar categorically a transaction that [is] likely to injure the pension plan."*Comm'r v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 160, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993). To effectuate this purpose, § 406(a)(1) "plac[es] certain transactions outside the scope of their [plan fiduciaries'] lawful authority."*Lockheed v. Spink,* 517 U.S. 882, 888, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).

FN16.29 U.S.C. § 1106(a)(1)(D) states in

pertinent part that:

(a) Transactions between plan and party in interest

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect-

(D) transfer to, or use by or for the bene-fit of a party in interest, of any assets of the plan.

To sustain an alleged transgression of § 406(a)(1)(D),[FN17] the Third Circuit requires that five elements be satisfied:

FN17. ERISA § 408 lists specific excep-tions to the per se prohibitions in § 406. See29 U.S.C. § 1108(b). Plaintiffs do not allege that any of these exceptions apply.

(1) the person or entity is "[a] fiduciary with re-spect to [the] plan"; (2) the fiduciary "cause[s]" the plan to engage in the transaction at issue; (3) the transaction "use[s]" plan assets; (4) the trans-action's use of the assets is "for the benefit of" a party in interest; and (5) the fiduciary "knows or should know" that elements three and four are satisfied.

*Reich v. Compton,* 57 F.3d 270, 278 (3d Cir.1995) (quoting 29 U.S.C. § 1106(a)(1)(D)). When a fidu-ciary runs afoul of the rules promulgated in § 406(a)(1), ERISA § 409, 29 U.S.C. § 1109(a)[FN18] renders him/her personally liable for, *inter alia,* any losses the plan incurred as a result of the breach.

FN18. Section 409(a) provides:

Any person who is a fiduciary with re-spect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))

Page 23

make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which has been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Specifically, Count II of the Amended Complaint states that the Defendants:

Entered into, or enabled or allowed, a series of per se prohibited transactions using plan assets, as more fully specified in this Complaint, including paying to the DB Plan retirees a "thirteenth check" in violation of the established minimum funding requirements for such payments and the terms of the Plan, and diverting contributions which had been allocated to and/or received by the RIP 87 Plan and hence were assets of that plan into the separate DB Plan.

(Am.Compl.¶ 64(d).)

Although we found that Plaintiffs have successfully alleged a breach of fiduciary duty claim stemming from Defendants' issuance of the "thirteenth check," *see* discussion *infra* Part V.B., we find that they have failed to adequately plead a claim for breach of § 406(a)(1)(D). The Amended Complaint does allege elements one, two and three of the § 406(a)(1)(D) claim-namely that Defendants acted in a fiduciary capacity when they issued the thirteenth check, that Defendants, as fiduciaries, caused the challenged transaction to occur, and that the transaction used plan assets. (Am.Compl.¶¶ 37, 38, 62, 64(a).) As noted above, however, element four of the five element test requires that the challenged transaction employ plan assets "for the benefit of" a party in interest. The Third Circuit has held that this factor requires manifestation of a subjective intent to benefit a party in interest. *Compton,* 57 F.3d at 279. In other words, it encompasses more than merely having "the *effect* of benefitting" a party in

interest. *Id.* (emphasis added). Plaintiffs do assert that the Trustees

*21 on a continuing basis encouraged and allowed the Fund actuaries to improperly use outdated 1951 mortality tables ... to calculate the unfunded vested liability of the DB Plan in order to justify their conclusion that the DB Plan was 'fully funded,' that it required no additional employer contributions to satisfy its benefits obligations to participants and their beneficiaries, and that the continued payment of the 'thirteenth check' to retirees of the DB Plan was permissible under the terms of the DB Plan.

(Am.Compl.¶ 38.) We fail to recognize how this allegation can be construed as identifying the party in interest that was benefitted by the Defendants' issuance of the thirteenth check-a benefit paid to DB Plan participants. Certainly the allegation suggests that the employers benefitted as a result of Defendants' actions in ensuring that the Fund appeared to be fully funded. It does not allege or even insinuate, however, that a party in interest benefitted through the Defendants' decision to continue to pay bonus benefits to the DB Plan participants. Plaintiffs' failure to allege this element of a § 406(a)(1)(D) renders their claim fatal. As such, this prohibited transaction claim of Count II is dismissed without prejudice to Plaintiffs' right to file a Second Amended Complaint.

The second portion of the above quoted Amended Complaint also fails to state a claim warranting relief. (*See* Am. Compl. ¶ 64(d).) Plaintiffs contend that the 2002 amendments to the 1999 Trust Agreement, that "divert[ed] contributions which had been allocated to and/or received by the RIP 87 Plan ... into the separate DB Plan,"(*Id.*), constituted a prohibited transaction under ERISA § 406(a)(1)(D).29 U.S.C. § 1106(a)(1)(D) mandates that fiduciary status must exist for a transaction to constitute a prohibited one. *See*29 U.S.C. § 1106(a)(1)(D). As explicated in Part V.B.2. of this opinion, the 2002 amendments to the 1999 Trust Agreement were instituted by Defendants in their settlor capacity. *See*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 24

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

discussion *infra* Part V.B.2. Thus, § 406(a)(1)'s requirement of fiduciary status is not met. *SeeLockheed,* 517 U.S. at 891, 116 S.Ct. 1783, 135 L.Ed.2d 153. As a matter of law then, Plaintiffs cannot prove any set of facts with respect to the challenged plan amendments that would justify relief under § 406(a)(1)(D). This prohibited transaction claim of Count II is thus dismissed with prejudice.

Next, Count V of the Amended Complaint alleges that:

> Inasmuch as defendant Trustees and defendant Fund Administrator did not comply with the requirements of Section 4231(a) and (b), the transfers constitute prohibited transactions under ERISA Section 406(a), 29 U.S.C. § 1106(a), pursuant to Section 4231(c).

(Am.Compl.¶ 81.) As Part V.E. of this opinion explains, ERISA § 4231 is not applicable to the circumstances presently confronting this Court. Moreover, as described above, the purported transfers were the product of Trust Amendments that we found the Defendants to have instituted in their settlor capacity. In addition, we found as a matter of law in Part V.C. of this opinion that the Trust documents provide for employer contributions into the Fund, as opposed to any of the individual plans that comprise the Fund. The Fund then distributes these employer contributions-plan assets-among the participating plans pursuant to the allocation formula set forth in the Trust Agreement. The various amendments to this Agreement reallocated a percentage of *future* RIP 87 employer contributions into the Fund to the DB Plan. Consequently, we determined that the existing assets of the RIP 87 Plan, a defined contribution plan, were never transferred to another plan. As discussed above, a prohibited transaction claim under § 406(a)(1)(D) requires there to be a transfer of plan assets. The unambiguous language of the plan documents precludes a finding that, by virtue of the Trust Amendments, plan assets were transferred out of the RIP 87 Plan. Accordingly, Plaintiffs have failed to state a prohibited transaction claim with respect to the supposed

illegal transfer of plan assets. As such, this prohibited transaction claim of Count V is dismissed with prejudice.

**\*22** Finally, Plaintiffs allege in Count VII of the Amended Complaint that:

> Defendant Trustees and defendant Fund Administrator engaged in a series of prohibited transactions by, inter alia, paying the DB retirees a "thirteenth check" in violation of the established minimum funding requirements for such benefit.

(Am.Compl.¶ 87.) For the reasons set forth in the above discussion regarding the "thirteenth check,", we find that Plaintiffs have failed to successfully state a claim for violation of ERISA § 406(a)(1)(D). Count VII continues:

> In addition, defendant Trustees' and defendant Fund Administrator's agreement to accept, and their acceptance of, employer contributions made on behalf of RIP 87 Plan participants but then to divert those plan assets into the different DB Plan, for the benefit of the DB Plan, violates ... ERISA Section 406, because such payments are not for the sole and exclusive benefit of the employees for whom such contributions were made and received.... Such payments and diversions are also prohibited transactions under ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), because they constitute a direct or indirect use and transfer of assets of one plan (the RIP 87 Plan) to benefit employers who are parties in interest to that plan by reducing their independent funding obligations to another plan (the DB Plan).

(Am.Compl.¶ 88.) Once again, for the reasons reiterated above, this claim must be dismissed with prejudice.

For the foregoing reasons, Plaintiffs' prohibited transaction claims are dismissed.

### G. *Count VI*

Count VI of Plaintiffs' Amended Complaint ad-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

vances the claim that Defendant Trustees and Defendant Fund Administrator breached relevant Collective Bargaining Agreements by amending the Trust Agreement so as to reallocate employer contributions from the RIP 87 Plan to the DB Plan. Specifically, Plaintiffs aver that:

Plaintiffs and other similarly situated Class members have contractual rights under their respective CBA's to employer contributions, which are made on their behalf in consideration of their current services to the employers, to be directed into their RIP 87 Plan accounts. Insofar as the CBA's define the employees' rights to pension benefits and contributions with respect to the RIP 87 Plan, the CBA's constitute documents and instruments governing the RIP 87 Plan. In violation of those rights under the Plan, defendant Trustees have purported to amend the Trust Agreement, and defendant Trustees and defendant Fund Administrator have acted, so as to divert all employer contributions from the RIP 87 Plan to the DB Plan without obtaining the necessary and corollary amendments of the relevant CBA's. In so doing, these defendants have violated the CBA instruments governing the RIP 87 Plan and breached their strict fiduciary duty to act in accordance with the CBA's.

(Am.Compl.¶ 83.) The CBAs relevant to the named Plaintiffs' participation in the Fund include the National Master Freight and Central Pennsylvania Supplemental Agreement, and the 1997 and 2002 National Master United Parcel Service agreement and Central Pennsylvania Supplemental Agreement. (*See* Defs.' Mem. at 29.) These CBAs unequivocally provide that employer contributions be made to the Central Pennsylvania Teamsters Pension Fund in accordance with the terms of the Trust Agreement and Pension Plan.[FN19] Although it thus appears that the relevant CBAs do not require that participating employers' contributions be allocated specifically to the RIP 87 Plan, nonetheless we accept as true at this stage of litigation Plaintiffs' assertion that "[a]t all times following 1989, the

CBA's pursuant to which employer contributions are owed to the Fund and the plan have directed that these employer contributions in varying amounts must be made into plaintiffs' and other Class members' accounts in the RIP 87 Plan."(Am.Compl.¶ 54.) We hesitate to construe the CBAs as a matter of law despite the unambiguous language of the above-referenced CBAs only because Plaintiffs allude to other possibly relevant CBAs and employer participation agreements that they claim support their allegation, but which they have not yet received through discovery.

FN19. Article 50(a) of the National Master Freight Agreement provides in relevant part:

"The Employer agrees to make the following contributions to the Central Pennsylvania Teamsters Pension Fund for each eligible employee, probationary and casual covered by this Agreement, *in accordance with the terms of the Trust Agreement.*"

(emphasis added).

In addition, Article 50(c) states that "[a]ll contributions shall be made at such a time and in such a manner as the Trustees require ..."

Similarly, Article 65(1)(a) of the relevant UPS Agreements provided:

The Employer hereby agrees to contribute to the Central Pennsylvania Teamsters Pension Fund the following monthly contributions, in accordance with the terms of the Trust Agreement and Pension Plan executed by the Employer, subject to the qualifications hereinafter specified: ... In addition, allocations between the Defined Benefit Plan and the Retirement Income Plan shall be made by the Joint Supplemental Area

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))

Committee in the manner determined by the Settlers [sic] of the Central Pennsylvania Teamster Pension Fund, or, to the extent lawful, the Trustees of the Central Pennsylvania Teamsters Pension Fund.

**\*23** Significantly, Plaintiffs' claim rests on the presupposition that the Trust Agreement does not conflict with the provisions in the CBAs that allegedly require employer contributions to be routed directly into the RIP 87 Plan. (*See* Pls.' Br. at 54 ("[n]othing in the provisions of the CBA's *in this case,* which expressly require that the employer contributions be paid to the RIP '87 or to the RIP 2000, in any way conflicts with the terms of the Trust Agreement.... In total, they require direction of employer contributions into particular plans and the Trustees do not have the discretion to do otherwise").) We found as a matter of law, however, that the Trust Agreement has at all times explicitly mandated that employer contributions be paid to the Fund, and then allocated to the various sub-plans comprising the Fund as provided by the Trust Agreement's allocation formula. *See* discussion *infra* Part V.C. Thus, contrary to Plaintiffs' assumption, there exists an apparent conflict between the Trust Agreement and the CBAs, as interpreted by Plaintiffs.

This conflict is pertinent because, in the absence of any provision in the Trust Agreement to the contrary, the Trust Agreement term will prevail over the conflicting CBA term. *SeeSinai Hosp. of Balt.v. Nat'l Benefit Fund for Hosp. & Health Care Employees,* 697 F.2d 562, 567 (4th Cir.1982) (holding that "[l]abor-management contracting parties ... cannot control expenditures from funds already vested in a trust entity where the trust instrument reposes that authority solely with the trustees. Likewise, neither an employer nor a union, singly or together, can alter the terms of a trust instrument such as the one involved in this case unless the power to do so was reserved when the trust was created or properly amended"); *seealsoHale v. Trustees of United Mine Workers Health & Ret. Funds,* 23 F.3d

899, 902 (4th Cir.1994) (holding that collective bargaining agreement is not enforceable against trustees of pension fund); *Cent. States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc.,* 779 F.Supp. 947, 951 (N.D.Ill.1991) (noting that trustees of multiemployer pension fund are not bound to arbitration provision in a collective bargaining agreement of a participating employer and its union). In short, the Trustees are bound only by the terms of the Trust Agreement. Consequently, they cannot be held liable for breaching a conflicting term in a CBA.

Nothing in the 1999 Trust Agreement indicates that the provisions of any CBA prevail over the terms of the Trust. As this Court has previously noted, " '[t]he provisions of the trust agreement provide the framework with which a court should analyze an employer's obligation to a ... fund." ' *Cent. Pa. Teamsters Pension Fund v. W & L Sales, Inc.,* 778 F.Supp. 820, 829 (E.D.Pa.1991) (quoting *Ind. State Council of Roofers v. Adams Roofing,* 753 F.2d 561, 564 (7th Cir.1985)). The Trust Agreement itself belies Plaintiffs' argument that the Trust Agreement obligates the Trustees to comply with the terms of the CBAs insofar as the employers' contribution obligations are concerned. Indeed, the Trust Agreement sets forth the exact opposite proposition:

**\*24** Each Employer shall make prompt contributions or payments to the Fund in such amount and pursuant to the terms and conditions set forth in this Agreement and the Collective Bargaining Agreement in effect from time to time between the Employer or his bargaining representative and the Local Union.... A Collective Bargaining Agreement or other written document that provides for Contributions to the Fund in an amount or in a manner that is not in accord with or does not comply with the Trust Agreement or with any rules promulgated by the Trustees ... is null and void to the extent of such inconsistency.

(1999 Trust Agreement, Art IV, Sec. 4.1(A).) This Court employed a similar analysis in *W & L Sales*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 27
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

to reach the same conclusion that the trust agreement, rather than the conflicting CBA, controlled determination of pension eligibility. 778 F.Supp. at 829-30.

Unless the Trust Agreement expresses otherwise, and we find that it does not, Defendants cannot be held liable for breaching a CBA term that conflicts with the unambiguous provisions of Trust Agreement. Accordingly, Count VI which contains Plaintiffs' claim for violation of collective bargaining documents must be dismissed with prejudice.

### H. *Count VII*

Defendants move to dismiss Plaintiffs' claim for violation of § 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186.[FN20] Specifically, Plaintiffs contend that the Fund provisions providing for the allocation of contributions from participating RIP 87 Plan employers into the DB Plan violated §§ 302(b) and (c)(5) of the LMRA because such payments were not undertaken for the "sole and exclusive benefit of the [RIP 87 Plan] employees for whom such contributions were made and received."(Am.Compl.¶ 88.) In response, Defendants assert that § 302(e) of the LMRA does not create a private cause of action for purported violations of §§ 302(b) and (c)(5).[FN21] Additionally, Defendants argue that even if this Court had jurisdiction, no such transgression occurred because employer contributions to a multi-employer pension plan need only be used to benefit the Fund's beneficiaries, as opposed to the particular employee on whose behalf the employer contributed. (*See* Defs.' Mem. at 41-42.)

> FN20. § 302(a) prohibits an employer, or association of employers, from, *inter alia,* rendering payments to any representative of its employees. This provision provides in part:
>
> > "(a) ... It shall be unlawful for any employer or association of employers ... to

pay, lend, or deliver ... any money or other thing of value-

(1) to any representative of any of his employees, who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer ...;"

§ 302(b)(1) prohibits employee representatives from receiving the payments proscribed by subsection (a). This provision provides:

"(b) ... (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."

§ 302(c) then enumerates exceptions to the broad prohibitions contained in subsections (a) and (b). This provision provides in pertinent part:

"(c) ... The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

Page 28

hospital care, pensions on retirement or death of employees, ...; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund ...; and (c) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; ..."

FN21. § 302(e) states:

"(e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of title 28 (relating to notice to opposing party) to restrain violations of this section, without regard to the provisions of section 17 of title 15 and section 52 of this title, and the provisions of chapter 6 of this title."

Plaintiffs failed to adequately reply to this part of Defendants' Motion to Dismiss.[FN22] Therefore, we dismiss Plaintiffs' LMRA claim against Defendants pursuant to Local Rule of Civil Procedure 7.1(c). *See Toth v. Bristol Township,* 215 F.Supp.2d 595, 598 (E.D.Pa.2002) (dismissing plaintiff's claim on Motion to Dismiss under Local Rule 7.1 because plaintiff did not respond to portion of defendants' motion discussing claim); *Smith v. Nat'l Flood Ins. Program,* 156 F.Supp.2d 520, 522 (E.D.Pa.2001) ("[B]ecause plaintiffs failed to address defendants' motion to dismiss with respect to defendants' argument that costs, interest, and attorneys' fees are not recoverable under the National Flood Insurance Act, the court will grant this aspect of the defendants' motion to dismiss as unopposed"). We suppose that, given their lack of re-

sponse, Plaintiffs do not challenge this dismissal.

FN22. Plaintiffs' Brief In Opposition discusses the prohibited transaction claims comprising Count VII, but fails to assert any arguments in support of Count VII's LMRA claims. Plaintiffs merely state that, "[t]his [prohibited transaction claim] is true whether or not LMRA Section 302(b), 29 U.S.C. § 186(b), confers an independent basis of jurisdiction."(Pls.' Br. at 58.)

*25 Even if we were to undertake a cursory examination of the claim, however, we would find that we do not have jurisdiction to adjudicate it. Plaintiffs' claim contests Defendant Trustees and Defendant Fund Administrator's administration of the Fund's assets. (*See* Am. Compl. ¶ 88.) Such a claim is permissibly brought, and indeed has been brought, under, *inter alia,* the fiduciary duty provisions of ERISA. (*See generally* Am. Compl.) The Supreme Court has made clear that an attack on the actual administration of trust funds cannot be properly brought under §§ 302(b) and (c)(5) of the LMRA, because these provisions are directed towards policing the *purposes* for which a trust fund is established.

We hold today that § 302(e) does not provide authority for a federal court to issue an injunction against a trust fund or its trustees requiring the trust funds to be administered in the manner described in § 302(c)(5). By its unmistakable language, § 302(e) provides district courts with jurisdiction "to restrain violations of this section." A "violation" of § 302 occurs when the substantive restrictions in §§ 302(a) and (b) are disobeyed, which happens, not when funds are administered by the trust fund, but when they are "pa[id], len[t], or deliver[ed]" to the trust fund, § 302(a), or when they are "receive [d], or accept[ed]" by the trust fund, or "request[ed], [or] demand[ed]" for the trust fund, § 302(b)(1). And the exception to violation set forth in paragraph (c)(5) relates, not to the purpose for which the trust fund is in fact used (an unrestricted fund that happens to be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.))**

used "for the sole and exclusive benefit of the employees" does not qualify); but rather to the purpose for which the trust fund is "established," § 302(c)(5), and for which the payments are "held in trust," § 302(c)(5)(A). The trustees' failure to *comply* with these latter purposes may be a breach of their contractual or fiduciary obligations and may subject them to suit for such breach; but it is no violation of § 302.

*Local 144 Nursing Home Pension Fund v. Demisay,* 508 U.S. 581, 587-89, 113 S.Ct. 2252, 124 L.Ed.2d 522 (1993). Accordingly, Count VII which contains Plaintiffs' allegation under the LMRA would be dismissed with prejudice pursuant to Fed.R.Civ.P. 12(b)(6) had we not already dismissed this claim under Local Rule of Civil Procedure 7.1(c).

### VI. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. An appropriate order follows.

E.D.Pa.,2003.
Saxton v. Central Pennsylvania Teamsters Pension Fund
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.))**

**H**
Thomas v. Connecticut General Life Ins. Co.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Clara J. THOMAS, Plaintiff,
v.
CONNECTICUT GENERAL LIFE INSURANCE
COMPANY, Defendant.
No. Civ.A. 02-MC-136.

Dec. 12, 2003.

Clara A. Thomas, pro se, Hudson, FL, Plaintiff.
Linda Richenderfer, Saul Ewing LLP, Wilmington,
DE, for Defendant.

*MEMORANDUM ORDER*

JORDAN, J.

I. INTRODUCTION

*1 One of the greatest aspects of our judicial sys-
tem is that it provides all citizens broad access to
the courts. Yet when a litigant uses the limited re-
sources of the judicial system as a conduit for a
campaign of harassment, she must be stopped. As
set forth in more detail below, "the time has come
where this court can no longer tolerate [Clara
Thomas's] abuse of the judicial system," and an in-
junction will be entered to limit her future access to
the federal courts. *See Armstrong v. School District
of Philadelphia, et al.,* 1999 U.S. Dist. LEXIS
14918 at *7 (E.D.Pa. Sept. 29, 1999).

II. BACKGROUND

Ms. Thomas's saga begins in Florida. On July 2,
1991, after a bench trial, the United States District
Court for the Southern District of Florida entered
final judgment in Ms. Thomas' favor, and against
defendant, Connecticut General Life Insurance
Company ("CGLIC"), regarding her claim for bene-

fits pursuant to the Employee Retirement Income
Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*
(D.I.1.) CGLIC was ordered to pay all past-due be-
nefits [FN1] to Ms. Thomas, and to act "in accord-
ance with the terms of the [CGLIC] policy" in the
future. (*Id.*) In 1995, CGLIC twice requested med-
ical evidence of Ms. Thomas's ongoing medical dis-
ability, which she failed to provide. (D.I. 17, Exh. 1
¶¶ 43-45.) This prompted CGLIC to terminate Ms.
Thomas' benefit payments on August 30, 1995, and
she again sued CGLIC, this time in the United
States District Court for the Middle District of Flor-
ida. (D.I. 17 at 4.) On April 7, 1997, after another
bench trial, the Middle District of Florida entered
judgment in CGLIC's favor, finding that Ms.
Thomas' claim that her benefits were improperly
terminated in August 1995 was "without merit as
plaintiff failed to comply with repeated requests to
furnish proof of continued disability."(*Id.,* Exh. 1 at
18.) Ms. Thomas appealed this judgment to the
United States Court of Appeals for the Eleventh
Circuit, and it was affirmed on May 28, 1998. (*Id.,*
Exh. 5.)

> FN1. A notice of satisfaction of this judg-
> ment was entered in the Southern District
> of Florida on July 9, 1993. (D.I.17, Exh. 11.)

However, Ms. Thomas refuses to accept that her
claims against CGLIC have been fully adjudicated.
In 1998, she filed a "Motion [To Relieve] Plaintiff
from Judgment" in the Middle District of Florida,
which was denied on August 4, 1998. (*Id.,* Exh. 6.)
She appealed that decision, but her appeal was dis-
missed by the Eleventh Circuit on November 18,
1999 for want of prosecution. (*Id.,* Exh. 7.) While
that appeal was pending, Ms. Thomas filed a
"Motion to Set Aside Judgment for Fraud Upon the
Court" in the Middle District of Florida, which was
denied on October 19, 1999. (*Id.,* Exh. 8.) On July
19, 1999, Ms. Thomas moved the Southern District
of Florida for an order holding CGLIC in contempt,
which was denied on July 24, 1999, as was her mo-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.))**

Page 2

tion for reconsideration on August 18, 1999. (*Id.,* Exh. 9, 10, 11.)

Apparently undeterred by these adverse decisions, Ms. Thomas filed another complaint against CGLIC in the Middle District of Florida on November 19, 2001, which the court dismissed *sua sponte* on November 21, 2001. (*Id.,* Exh. 12, 13.) On September 20, 2002, Ms. Thomas filed a Motion for Relief of Judgment in the Middle District of Florida. (*Id.,* Exh. 14.) The court denied the Motion, and required Ms. Thomas to show cause why it should not impose sanctions upon her, pursuant to Federal Rule of Civil Procedure 11. (*Id.,* Exh. 15.) On February 4, 2003, the court sanctioned Ms. Thomas $250.00, to be paid to CGLIC within sixty days. (*Id.,* Exh. 16.) Ms. Thomas has not paid any portion of that amount to CGLIC. (*Id.* at 7.)

*2 Meanwhile, Ms. Thomas filed a "Motion for Writ of Execution" in the Southern District of Florida on September 20, 2002. (*Id.,* Exh. 17.) Even though that motion was denied on September 30, 2002, (*id.,* Exh. 18), Ms. Thomas filed yet another Motion for Writ of Execution in the Southern District of Florida on October 7, 2002 (*id.,* Exh. 19), which was also denied (*id.,* Exh. 20).

On February 13, 2003, Ms. Thomas filed a Notice of her intention to appeal the Middle District of Florida's February 4 Order imposing sanctions, and simultaneously requested leave to proceed *in forma pauperis* on appeal. (*Id.,* Exh. 21.) Her request was denied on March 13, 2003, together with the observation that "the appeal ... reflects the Plaintiff's growing history of bringing unmeritorious litigation against [CGLIC]."(*Id.,* Exh. 22.) The Eleventh Circuit also noted that Ms. Thomas' "appeal [was] frivolous" and denied her motion for leave to proceed *in forma pauperis* on May 29, 2003. (D.I.21.)

Ms. Thomas came to this court in December 2002, and, without providing any information about her past proceedings in Florida, registered the 1991 judgment here and instituted garnishment proceedings against Deutsche Bankers Trust Co. Delaware

("Deutsche Bank"), which she apparently believed had custody of funds belonging to CGLIC. (*See* D.I. 1, 4.) She then sought default judgment against Deutsche Bank. (D.I.14.)

Once CGLIC became aware of the proceedings against Deutsche Bank, it filed a Motion to Vacate Judgment, to Quash Writ of Execution, Deny Motion for Default Judgment and to Show Cause Why Plaintiff Should Not be Sanctioned. (D.I.16.) On November 4, 2003, I granted CGLIC's Motion in all respects and found that Ms. Thomas is abusing the judicial system by continuing to file frivolous motions. (D.I. 24 at 3.) I also ordered Ms. Thomas and CGLIC to appear at a hearing on December 8, 2003 regarding CGLIC's Motion to Show Cause Why Plaintiff Should Not Be Sanctioned. (*Id.*) During a December 3, 2003 teleconference with the court, plaintiff stated that she would not appear at the December 8th hearing, despite warnings that her failure to appear could result in the imposition of sanctions. Based on plaintiff's representations, CGLIC stated that it would forego a hearing and was content to rest on its Memorandum of Law in Anticipation of Hearing on Sanctions (D.I.29). For the reasons that follow, I will enter an Injunction to prevent Ms. Thomas from burdening the judicial system and CGLIC with frivolous filings in the future, and impose sanctions upon Ms. Thomas for her vexatious conduct.

III. DISCUSSION

Federal courts are invested with the equitable power to issue an injunction when such is necessary to effectuate orders of the court and to avoid relitigation of identical or similar issues. *In re Packer Ave. Assoc.,* 884 F.2d 745, 47 (3d Cir.1989). The All Writs Act, which codifies this equitable power, provides, in pertinent part, that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of the law."28 U.S.C. § 1651(a) (2003).Section 1651(a) therefore authorizes district courts to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.))**

Page 3

issue an injunction restricting the access to the federal courts of parties who repeatedly file frivolous litigation. *Abdul-Akbar v. Watson,* 901 F.2d 329, 332 (3d Cir.1990). Moreover, "federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions."*In re Martin-Trigona,* 737 F.2d 1254, 1261 (2d Cir.1984).*Pro se* litigants do not have license to abuse the judicial process. *Armstrong,* 1999 U.S. Dist. LEXIS 14918 at *6 (citations omitted). The court therefore has broad discretion to protect its jurisdiction. *Lysiak v. Comm. of Internal Revenue,* 816 F.2d 311, 313 (7th Cir.1987). Enjoining a plaintiff from filing additional papers is an appropriate sanction to curb frivolous litigation. *Id.*

**\*3** CGLIC argues that a nationwide injunction should issue against plaintiff to restrict her future access to the courts. (D.I. 29 at 3 .) On the basis of Ms. Thomas' past conduct, it seems she is "likely to continue to abuse the judicial process," and I agree that an injunction is appropriate. *See Safir v. U.S. Lines, Inc.,* 792 F.2d 19, 24 (2d Cir.1986). I will enjoin plaintiff from filing any action in federal court against CGLIC without prior leave of court.

There is no question that Ms. Thomas has harassed CGLIC with her frivolous filings and needlessly increased the costs of this litigation, which was adjudicated over twelve years ago. *See*Fed.R.Civ.P. 11(b)(1), (b)(2), (b)(3). She has also vexatiously and unreasonably multiplied the proceedings associated with her dispute with CGLIC. *See*28 U.S.C. § 1927 (2003). Therefore, I find that Ms. Thomas has violated Federal Rule of Civil Procedure 11(b) and 28 U.S.C. § 1927. "Both [Rule 11(c) and 28 U.S.C. § 1927] provide courts with the power to sanction abusive *pro se* litigants."*Ketchum v. Cruz,* 775 F.Supp. 1399, 1403 (D.Colo.1991), *aff'd,*961 F.2d 916 (10th Cir.1992). Imposing sanctions upon Ms. Thomas is not only proper in this case, but also necessary to deter her from engaging in the same conduct in the future.

CGLIC has provided a detailed accounting of the attorney's fees, costs, and expenses associated with its counsel's work on this matter. (D.I. 29 at 9, Exhs. B and C.) Through October 2003, CGLIC has paid the law firm of Saul Ewing LLP $6,533.00 in fees and $618.83 in costs and expenses associated with responding to Ms. Thomas' filings in this court.FN2Ms. Thomas will be sanctioned in the amount of $7151.83, to be paid to CGLIC.

> FN2. CGLIC estimates that its attorney's fees through November 2003 will be approximately $1,104.00. (D.I. 29 at 9.) This estimate is unsubstantiated and I decline to add this amount to the sanctions I now impose.

Accordingly, it is hereby ORDERED that, to protect the integrity of the courts, and to protect defendant CGLIC and others from the harassment of further frivolous litigation initiated by Ms. Thomas:

1. The court ENJOINS Ms. Thomas, or any entity acting on her behalf, from filing any action or proceeding in any federal court, including any action or proceeding against the defendant named in the instant action, without first obtaining leave of the court in which she intends to file the action or proceeding. The court ORDERS Ms. Thomas to attach a copy of this Memorandum Order and Injunction to any such petition for leave of court.

2. The court ENJOINS Ms. Thomas from filing any further papers in any case, either pending or terminated, in the District of Delaware, without first obtaining leave of this court. Leave of court shall be forthcoming upon Ms. Thomas' demonstrating through a properly filed petition, that the proposed filing: (1) can survive a challenge under Federal Rule of Civil Procedure 12; (2) is not barred by principles of *res judicata* or collateral estoppel; (3) is not repetitive or violative of a court order; and (4) is in compliance with Federal Rule of Civil Procedure 11.

The court further ORDERS the clerk of court of the District of Delaware to refuse to accept any submis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.))**

Page 4

sions for filing from Ms. Thomas except petitions for leave of court, unless such submissions for filing are accompanied by an order of this court granting leave. In the event that Ms. Thomas succeeds in filing papers in the District of Delaware without first obtaining leave of this court, the clerk of court shall, under authority of this court's Order, immediately and summarily strike the pleadings or filings.

*4 The court ORDERS the clerk of court for the District of Delaware to provide a copy of this Memorandum Order to the clerks of court for the Southern District of Florida and the Middle District of Florida.

The court ORDERS Ms. Thomas to pay sanctions in the amount of $7,151.83 to Connecticut General Life Insurance Company within ninety (90) days of the date of this Order.

D.Del.,2003.
Thomas v. Connecticut General Life Ins. Co.
Not Reported in F.Supp.2d, 2003 WL 22953189 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

Allied Capital Corp. v. GC-Sun Holdings, L.P
Del.Ch.,2006.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware,New Castle County.
ALLIED CAPITAL CORPORATION, a Maryland
corporation, Plaintiff,
v.
GC-SUN HOLDINGS, L.P, a Delaware limited
partnership, GC-Sun G.P., Inc., a Delaware corpor-
ation; GC-Sun Holdings II, L.P., a Delaware lim-
ited Partnership; GC-Sun G.P. II, Inc., a Delaware
corporation; GC-Sun Frontier Investors, LLC, f/k/a/
Brafasco Investors, LLC, a Delaware limited liabil-
ity company; Brafasco Holdings II, Inc., a
Delaware corporation; Glencoe Capital Partners II,
L.P., a Delaware limited partnership; Glencoe Cap-
ital, LLC, an Illinois limited liability company; and
John Does 1-10, Defendants.
No. 1954-N.

Submitted: Sept. 18, 2006.
Decided: Nov. 22, 2006.

Daniel B. Rath, Esquire, Rebecca L. Butcher, Es-
quire, James S. Green, Jr., Esquire, Landis Rath &
Cobb LLP, Wilmington, Delaware; Daniel M. Litt,
Esquire, Jeffrey Rhodes, Esquire, Addy Schmitt,
Esquire, Dickstein Shapiro Morin & Oshinsky LLP,
Washington D.C., Attorneys for Plaintiffs.
Raymond J. DiCamillo, Esquire, Elizabeth C. Tuck-
er, Esquire, Richards, Layton & Finger, P.A.,
Wilmington, Delaware; Janet Malloy Link, Esquire,
B. John Casey, Esquire, Meghan H. Sullivan, Es-
quire, Latham & Watkins LLP, Chicago, Illinois,
Attorneys for Defendants.

OPINION

STRINE, Vice Chancellor.

*I. Introduction*

*1 The plaintiff, Allied Capital Corporation
("Allied"), brought this case in an effort to collect
on a promissory note. Allied claims that the insolv-
ent debtor, GC-Sun Holdings, L.P. ("Sun I"), a
Delaware limited partnership, would have had the
wherewithal to either repay the note in full, or at
least the principal amount, had Sun I's general part-
ner- a controlled affiliate of defendant Glencoe
Capital Partners II, L.P. ("Glencoe") - not em-
barked on a scheme by which Allied's claim on the
note was subordinated to a new equity investment
made by an affiliate formed by Glencoe for the pur-
pose of making that investment. Allied has mounted
a jurisprudentially-intergalactic campaign to recov-
er on the note. It has sued all of the affiliated entit-
ies of Glencoe that were possibly involved in the
disputed equity investment as well as the unidenti-
fied human beings who served those affiliated entit-
ies as officers and directors. Allied's causes of ac-
tion are numerous, and include counts for breach of
contract, breach of the implied covenant of good
faith, tortious interference with contract, breach of
fiduciary duty, aiding and abetting breach of fidu-
ciary duty, fraudulent conveyance, civil conspiracy,
and unjust enrichment.

The numerous defendants have moved to dismiss
certain discrete aspects of Allied's bounteous plead-
ing for failure to state a claim upon which relief can
be granted. This opinion resolves that motion.

First, the decision addresses the counts in Allied's
complaint pleading breach of contract, breach of
the implied covenant of good faith and fair dealing,
and tortious interference with contract claims. Al-
lied premises those claims on the notion that the
note prohibited Glencoe and any of its affiliates
from making the disputed equity investment. But
there is a fundamental flaw in Allied's theory. By
its express terms, the note only prohibited Sun I or
its subsidiaries from incurring any "indebtedness
for borrowed money" to Glencoe or its affiliates.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 2

The new equity investment is plainly not "indebtedness for borrowed money." Despite all of its assertions in the complaint that it had extracted a contractual prohibition on any form of investment by Glencoe and its affiliates that was superior to or equal in priority to the note held by Allied, Allied cannot escape the plain and unambiguous language of the note itself. That language clearly proscribed Glencoe and its affiliates from making a debt investment in Sun I or any of its subsidiaries. Had the sophisticated parties to the note meant to preclude Glencoe from making "equity" investments in those entities, they would have said so. Instead, they chose to restrict only "indebtedness for borrowed money." Although other legal doctrines - such as equitable principles of fiduciary duty or statutes addressing fraudulent conveyances - might condemn the equity investment if its terms were unfairly advantageous to Glencoe, the plain terms of the note preclude the notion that the note itself forbade that investment.

This is another in a long line of cases in which a plaintiff has tried, unsuccessfully, to argue that the implied covenant grants it a substantive right that it did not extract during negotiation. The promissory note explicitly addressed what types of investment were forbidden, and thus also impliedly addressed the types of investment were not subject to contractual restriction. Accordingly, Allied's implied covenant claim, like the claims of plaintiffs before it that have implored this court to award new contract rights, fails. Allied's theory- that the note's explicit prohibition of "indebtedness for borrowed money" constituted an implicit ban on any equity investment in Sun I or its subsidiaries that would have the same "practical effect" as a debt investment - is contrary to Delaware's law of contracts. Restrictive covenants in contracts, like promissory notes, that limit the commercial freedom otherwise available to the parties cannot reasonably be read in the squishy and uncertain manner Allied suggests. When an issuer negotiates an agreement that only precludes it - as a matter of contract - from making a discrete form of investment, it is entitled to rely

upon the words of the contract. To rule otherwise would turn the contractual relationship on its head, forcing the issuer to prove that its apparently unrestricted right to make equity investments was not implicitly precluded by the note's limited explicit prohibition on "indebtedness for borrowed money." Restrictive covenants are carefully negotiated and our law requires that their unambiguous terms be given effect. When a noteholder is only able to obtain a contractual restriction on "indebtedness for borrowed money," it is stuck with that, and cannot, as an "oh by the way," claim that it never occurred to it to argue for a broader restriction on equity investments in subsidiaries - especially when any reasonable negotiator would have recognized that the words "indebtedness for borrowed money" entirely fail to address equity investments. To permit the noteholder to claim that the issuer breached an implied covenant, and to grant it a right that it clearly did not obtain at the bargaining table, would involve a judicial rewriting of the contract and would disrupt the value that flows from interpreting clear contracts as written.

**\*2** Because Allied's tortious interference claim depends on the viability of its breach of contract claim, that claim also fails.

The second major issue on appeal is whether a claim can be pled against Glencoe and its affiliated entities for civil conspiracy. The defendants contend, with little explanation, that, as a result of their corporate relatedness, they cannot, as a matter of law, conspire with one another. The issue presented implicates a muddy area of Anglo-American jurisprudence and the parties have done little to help clear the murk.

Because of the lack of clarity, I have approached the question presented with caution. At this stage, I hold only that a conspiracy claim can be pled on the unique facts of this case, where Allied (in simple terms) has alleged that a parent entity (Glencoe) concocted, in bad faith, a scheme whereby one of its controlled, first-tier subsidiaries was rendered unable to pay its debts because Glencoe, the first-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 3

tier subsidiary, and a second-tier subsidiary permit-
ted Glencoe's newly formed affiliate to obtain an
equity interest in a third-tier subsidiary for an un-
fair value. Before the new equity infusion, the
third-tier subsidiary's equity was entirely owned by
the second-tier subsidiary, whose equity was en-
tirely owned by the first-tier subsidiary. The con-
tention is therefore that, through concerted action,
the parent and its affiliated entities consciously
caused a dilutive injury to the first-tier subsidiary,
knowing that the impoverishment of the first-tier
subsidiary would enable the diversion of value from
the creditors of the first-tier subsidiary to a newly-
formed affiliate of the parent. This scenario is far
removed from situations where a parent and subsi-
diary are privileged to consult, such as when a par-
ent expects that a solvent subsidiary will itself be
better off if it commits an "efficient breach of a
contract" and pays the injured party contractual
damages. Here, the parent and the newly formed af-
filiate allegedly schemed with the first-tier subsidi-
ary to implement a transaction that would render
the first-tier subsidiary insolvent and unable to pay
its bills by enabling the newly formed affiliate to
dilute the first-tier subsidiary's indirect equity own-
ership of the third-tier subsidiary.

To preclude a conspiracy claim on the argument
that the parent and the subsidiaries were one and
the same person with identical objectives, and
could not, as a matter of law, conspire, is not imme-
diately convincing - especially when the parent is
not offering to make the injured creditor whole us-
ing any of its assets or those held by the affiliates
involved in the challenged transaction. The state of
the briefing is such that I cannot confidently say
that Delaware law should embrace a black-letter
rule that wholly-owned affiliates of a parent entity
cannot conspire with a parent. In other circum-
stances involving similar considerations - i.e., the
questions of whether a parent can tortiously inter-
fere with the contracts of its subsidiary or can aid
and abet breaches of fiduciary duty by a subsidiary
- our courts have refused to hold that the mere fact
of common ownership requires treating the com-

monly-owned entities as a single legal person.
Rather, to ensure that such entities may engage in
the expected legitimate collaboration, without sub-
jecting each other to joint and several responsibility
for any action taken after collaboration, our law has
set a high bar that permits such claims to proceed
only when facts are pled that suggest that the parent
acted with scienter, in the sense that it knowingly
assisted the affiliate in committing a wrongful act
against another. Facts of that type have been pled
here.

II. *Factual Background*[FN1]

FN1. The following facts, as required by
Court of Chancery Rule 12(b)(6), are taken
from Allied's complaint.

A. *The Parties*

*3 Sun I is a holding company that owns only one
asset: a 100% equity interest in a single wholly-
owned subsidiary, defendant GC-Sun Holdings II,
L.P. ("Sun II"). Before the events described herein,
Sun II, through various subsidiaries, operated a Ca-
nadian industrial supply business under the trade
name Brafasco. Sun II was highly leveraged and
owed a debt of approximately $37.5 million to
Massachusetts Mutual Life Insurance Company and
its affiliated entities (the "Mass Mutual Debt"). By
2002, Sun II was in default on the Mass Mutual
Debt. Both Sun I and Sun II were insolvent at all
times relevant to this case.

In May 2002, Allied's predecessor in interest, Sun-
Sub Holdings, LLC ("SunSub"), a former limited
partner in Sun I, transferred its equity interest back
to Sun I in exchange for a $10 million promissory
note (the "$10 Million Note"), which was subordin-
ated to the Mass Mutual Debt. As a result of this
transaction, Sun I became a wholly-owned subsidi-
ary of defendant Glencoe, an entity that is allegedly
controlled by defendant Glencoe Capital, LLC.[FN2]
Glencoe exerted effective control over both Sun I
and Sun II via its ownership of 100% of the limited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 4

Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)

**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

partnership units of Sun I, and its ownership, directly or indirectly, of 100% of the stock of the general partners of Sun I and Sun II, defendants GC-Sun G.P., Inc. ("Sun I GP") and GC-Sun G.P. II, Inc. ("Sun II GP").

> FN2. The pleadings are imprecise in describing the relationship between Glencoe Capital, LLC and Glencoe Capital Partners II, L.P., which I have defined as "Glencoe." The precise relationship between the two entities is not relevant for purposes of this motion. Therefore, to avoid adding to the confusion of the corporate structure described in this opinion, I refer to the two entities collectively as "Glencoe."

The $10 Million Note, which, by its terms, became due and payable immediately upon the payoff of the Mass Mutual Debt, was later transferred to Allied. The $10 Million Note contained a restrictive covenant, under which Sun I and its subsidiaries were prohibited from "incur[ring] any indebtedness for borrowed money [other than permitted indebtedness] to [Glencoe or its affiliates] ... unless such indebtedness is subordinated to [the $10 Million Note]" (the "Insider Debt Restriction"). The $10 Million Note also contained a provision - a "Permitted Indebtedness Carve-Out" - that entitled Glencoe to make a $2 million debt investment in the Brafasco enterprise (the "Glencoe Permitted Debt") that would have a higher priority than the $10 Million Note. Glencoe exercised this right by loaning $2 million to Sun II at an interest rate of 30% - a rate that is very high, but explicitly permissible under the $10 Million Note. That high interest rate highlights Brafasco's undisputed financial distress.

Close attention to the complexity of the corporate structure behind the Brafasco enterprise is necessary to resolve this motion. To recap: Glencoe (the ultimate parent entity) owned 100% of Sun I's equity. Sun I owed a $10 million debt to Allied and owned 100% of Sun II's equity. Sun II owed $37.5

million in senior debt to Mass Mutual, as well as the $2 million Glencoe Permitted Debt, and owned, via various subsidiaries, the Brafasco assets. Because Sun I's claim on the Brafasco assets was through its equity interest in Sun II, the debt at the Sun I level (Allied's $10 Million Note) was structurally subordinated to both the Mass Mutual Debt and the Glencoe Permitted Debt.

*4 Because Sun I owned 100% of the equity of Sun II, the entity that owned the Brafasco assets, Allied, as a creditor of Sun I, held an indirect claim on the full value of those assets. Its claim was third in line behind the Mass Mutual Debt and the Glencoe Permitted Debt. Thus, Allied alleges that to the extent the Brafasco assets were worth more than $39.5 million, it expected to recover that residual value up to the full amount of the $10 Million Note. Under the terms of the $10 Million Note, Allied expected this position to be protected by the Insider Debt Restriction such that any new money injected into the entities owning Brafasco would either be subordinate to Allied's claim, or would be provided by third-parties, and not affiliates of Glencoe, after arms-length negotiation, and would thus be fair to Allied and not jeopardize its ability to collect on the $10 Million Note.

### B. *The Restructuring Transaction*

By November 2004, Glencoe, Sun I, and Sun II had to restructure the Mass Mutual Debt. The resulting transaction (the "Restructuring") is the impetus for this lawsuit. Mass Mutual was demanding immediate payment of at least some of the accrued interest on the Mass Mutual Debt, and because Sun II had little cash, Sun I could not meet that demand without a new capital infusion. In other words, in order to prevent Mass Mutual from exercising its remedies as a creditor, the Brafasco enterprise needed to raise new capital. Allied does not dispute that this need was genuine. What it disputes is the method used to satisfy that exigency.

Glencoe looked to an affiliate to make the needed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 5

investment. In the Restructuring, Glencoe and its affiliates were necessarily confronted with the $10 Million Note's Insider Debt Restriction, and they took care not to offend its literal language. Sun II contributed the Brafasco operating assets to a newly-formed entity, defendant Brafasco Holdings II, Inc. ("BH II") in exchange for 25% of the equity in that entity. Simultaneously, Glencoe and its affiliates formed another new entity, defendant GC-Sun Frontier Investors, LLC ("Investors"), to contribute $5 million to BH II in return for the other 75% of BH II's equity (the "Equity Investment").[FN3] As part of the Restructuring, BH II assumed the Mass Mutual Debt owed by Sun II. The $5 million cash contribution and some other cash was paid directly to Mass Mutual, and Mass Mutual also took a preferred stock interest in BH II. The end result was that Mass Mutual now had a claim of approximately $25 million against BH II's assets, and Investors and Sun II shared whatever was left 75% - 25%. Sun II's 25% share would go first to pay the Glencoe Permitted Debt and various administrative and management fees. Whatever was then left, if anything, would go to Sun I to pay Allied on the $10 Million Note.

> FN3. The pleadings are not entirely clear on the precise nature of the relationship between Investors and Glencoe. Without the benefit of discovery, Allied has been unable to determine the precise identity of Investors' shareholders. The defendants do not dispute that Investors is an "affiliate" of Glencoe or that the Insider Debt Restriction would prohibit Sun I or its subsidiaries from incurring any indebtedness for borrowed money to Investors.

In structuring this transaction, Glencoe and its affiliates did with equity what they were explicitly not permitted to do with "indebtedness for borrowed money" - they made an investment in the Brafasco enterprise that was not subordinated to the $10 Million Note. Although Investors bought equity, which is generally thought of as having a lower liquida-

tion priority than debt, the Equity Investment was made at Sun I's third-tier subsidiary, BH II. As a result, Investors, who now owned 75% of BH II's equity, was on the same level as Sun I, to which Allied had to look for payment on the $10 Million Note. But Sun I now had only an indirect 25% equity interest in BH II.[FN4] In Allied's simplified terms, Allied went from having a $10 million claim on 100% of the residual value of the Brafasco assets to having a claim on only 25% of that value. Investors - an affiliate of Glencoe - acquired the other 75% for $5 million.

> FN4. The Equity Investment would have shared equal priority with the $10 Million Note even if Investors had contributed the $5 million to Sun II in return for an equity interest in Sun II. It appears that Sun II dropped the Brafasco assets down to the lower level BH II subsidiary so that the new investment would take priority over the Glencoe Permitted Debt, which was at the Sun II level.

**\*5** What Allied finds most problematic about the Equity Investment is that it was not the product of arms-length bargaining. Glencoe, by virtue of its control over Sun I and Sun II was bargaining with itself, and could have given its affiliate, Investors, as big or as little a share of BH II's equity as it wanted. Allied, who, before the Restructuring, held the residual claim on the Brafasco assets, had no voice during the negotiations and no representation in Sun I or Sun II's management. Allied claims that this conflict of interest resulted in Investors not giving reasonably equivalent value in exchange for the 75% equity interest in BH II that it acquired. In other words, Allied contends that 75% of BH II's equity was worth far more than $5 million at the time of the Restructuring. Allied claims that, as a result, the Restructuring was an unfair self-dealing transaction that was specifically designed to harm Sun II, and its parent Sun I, so that Glencoe and its affiliates could usurp the residual value of the Brafasco business without paying anything to Allied,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

who could only look to Sun I, now stripped of all valuable assets, to collect on the $10 Million Note.

### C. The Home Depot Transaction

As it turns out, Investors, in fact, made themselves a mighty fine investment. On June 30, 2005, only six months after the Restructuring, the Brafasco business was sold to Home Depot (the "Home Depot Transaction") for a total purchase price of approximately $50 million,[FN5] subject to a holdback of about $12.75 million.[FN6]

> FN5. The Home Depot Transaction was done in Canadian dollars. The exact purchase price was CDN $59,450,000 with a CDN $15,000,000 holdback. The conversion ratio from Canadian to American dollars fluctuated from about .81 to .89 during the time periods relevant to the transaction. For purposes of this opinion, I have split the difference and assumed a constant conversion ratio of .85. As a result, the numbers used herein are very rough approximations, but are sufficiently accurate for purposes of this opinion.

> FN6. The holdback amount was to be dispersed in two approximately equal amounts on the first and second anniversaries of the June 30, 2005 closing date.

At closing, the Mass Mutual Debt was paid in full, and assuming Home Depot pays the entire holdback amount, that leaves $25 million to be split 75%-25% between Investors and Sun II. Investors doubled its money in six months, and will nearly double it again when the final holdback payment is received. Meanwhile, after Sun II repays the Glencoe Permitted Debt (with accrued interest at 30%), and the management and administrative fees, little, if anything, will be left of the cash that came to it as its 25% share of the Home Depot Transaction proceeds. Thus, Sun II will have trivial funds to pay up

to Sun I. As a result, Allied expects to recover only pennies on the dollar of the $10 Million Note.

### III. The Counts In Allied's Complaint That Are Under Attack As Facially Deficient

**\*6** The motion to dismiss challenges four counts in Allied's complaint. Count II seeks recovery under the express terms of the $10 Million Note. Count III argues that the form of the Restructuring breached the implied covenant of good faith and fair dealing in the $10 Million Note. Count IV asserts a related tortious interference with contract claim. Count VIII alleges a civil conspiracy among the myriad of Glencoe affiliated entities involved in the Restructuring.

The first two challenged counts actually assert an identical argument. Count II alleges that the fact that Glencoe's affiliate, Investors, made the Equity Investment in the Brafasco enterprise that shared equal priority with the $10 Million Note violated the express terms of the $10 Million Note's Insider Debt Restriction. As will be seen, that contention is obviously wrong and therefore Allied buttresses it by arguing that because the Equity Investment in BH II had, in Allied's view, the same subordinating effect as a loan of money to Sun I, the Equity Investment was therefore forbidden by the Insider Debt Restriction. In other words, Allied is premising its argument that the Equity Investment breached the literal terms of the Insider Debt Restriction on the notion that the literal terms implicitly incorporated other terms. Properly conceived, this argument is therefore identical to that made in Count III of the complaint, which argues that the Equity Investment violated the implied covenant of good faith and fair dealing in the $10 Million Note by offending the goal and spirit of the Insider Debt Restriction, which Allied claims was to prevent Glencoe or its affiliates from making any investment at all in the Brafasco enterprise that was not subordinate to the $10 Million Note. Count IV, which claims tortious interference against all of the entities other than Sun I, is based on the same argu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

ment. That count's viability turns in the first instance on whether Allied has pled a breach of contract claim.

The other counts in Allied's complaint are not contractual and all have their essence in the contention that Glencoe knew that the Restructuring was not fair to Allied. They involve allegations that Glencoe intentionally enriched itself, through its affiliate, Investors, at Allied's expense by making a fraudulent and unfair transfer of the BH II equity to Investors (1) with the purpose of rendering Sun I unable to pay the $10 Million Note, and (2) in disregard of the fiduciary duties of care and loyalty that Allied was owed by virtue of its position as a creditor of an insolvent Delaware entity, Sun I.

As one of these non-contractual claims, Allied asserts, as Count VIII, a civil conspiracy cause of action, alleging that Glencoe, its subsidiaries and affiliates, and the officers and directors of Sun I and Sun II (whose identities are allegedly unknown to Allied, and, as a result, are identified as John Does 1-10 in Allied's complaint) all acted in concert and agreed upon a malevolent plan to enrich themselves at Allied's expense. This is the only non-contractual cause of action that the defendants have moved to dismiss.

I will address the challenges to the complaint in the following order. Initially, I will analyze whether the complaint states a claim for breach of, or tortious interference with, the Insider Debt Restriction in the $10 Million Note. Then, I will examine whether the civil conspiracy count in the complaint is vi- able.

## IV. *The Procedural Standard*

*7 The defendants' motion to dismiss for failure to state a claim is governed by the familiar Rule 12(b)(6) standard, which requires me to accept all well-pled allegations of fact as true and draw all reasonable inferences in Allied's favor.[FN7] I need not, however, accept as true conclusory assertions

unsupported by specific factual allegations.[FN8] If, after these principles are applied, I conclude that the facts fail to support a cause of action, the motion to dismiss must be granted.[FN9]

> FN7. *E.g., In re Lukens, Inc. Shareholders Litig.,* 757 A.2d 720, 727 (Del.Ch.1999).

> FN8. *E.g., H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 139 (Del.Ch.2003).

> FN9. *E.g., Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000).

## V. *Does The Complaint State A Claim For Breach Of The $10 Million Note?*

### A. *The Governing Principles Of Contract Interpretation*

Under Delaware law, the proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language.[FN10] When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning.[FN11] Only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.[FN12]

> FN10. *E.g., OSI Systems, Inc. v. Instrumentarium Corp.,* 892 A.2d 1086, 1090 (Del.Ch.2006).

> FN11. *E.g., Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992).

> FN12. *E.g., Citadel Holding Corp., v. Roven,* 603 A.2d 818, 822 (Del.1992); *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 8

In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning.[FN13] Absent some ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it.[FN14] When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented.[FN15] By such judicial action, the reliability of written contracts is undermined, thus diminishing the wealth-creating potential of voluntary agreements.[FN16]

> FN13. *E.g., Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del.2006).
>
> FN14. *Id.*
>
> FN15. *Id.*
>
> FN16. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir.1982) (noting that creating uncertainty with respect to the meaning of ordinary contract provisions decreases the inherent value of similar contracts).

### B. Allied's Express Contract Claim

Despite the $10 Million Note's failure to restrict any equity investments by Glencoe or its affiliates in Sun I or its subsidiaries, Allied initially contends that the Restructuring violated the express terms of the $10 Million Note because it involved an investment by a Glencoe affiliate that shared equal priority with the $10 Million Note. But, as noted above, the Insider Debt Restriction only prohibited Sun I or its subsidiaries from incurring any "indebtedness for borrowed money" to Glencoe or its affiliates. Allied's argument that the Equity Investment violated the express terms of the $10 Million Note is, therefore, frivolous.

Allied does not base its argument on any reasonable interpretation of the contract language. Rather, Allied falls back on what it asserts is a basic principle of capital structuring - that debt naturally takes liquidation priority over equity. Allied contends that because the $10 Million Note prohibited an unsubordinated debt investment in Sun I or its subsidiaries, it must also have prohibited the unsubordinated Equity Investment because equity by its very nature has a lower priority than debt. Allied argues that if debt provided by Investors could not share priority with the $10 Million Note, the Equity Investment should not be able to either. It claims that to interpret the Insider Debt Restriction otherwise would render it meaningless because such interpretation would too easily allow Glencoe to avoid the restriction but still accomplish the prohibited result by doing just what it did - making the new Equity Investment in a downstream subsidiary.

But by relying on one fundamental difference between debt and equity to bolster its argument, Allied merely highlights that debt and equity are, as a general matter, two distinct concepts. Allied's argument boils down to the assertion that when the parties to the $10 Million Note used the words "indebtedness for borrowed money," they meant to preclude both debt and garden variety equity investments. That argument is, to put it mildly, unconvincing. Admittedly, at the edges, it can be difficult in some cases to distinguish between a loan of money and an equity investment. The ingenuity of the marketplace and the flexibility afforded by the Delaware General Corporation Law have given rise to a variety of investment securities that blur the line between debt and equity. But this does not mean that equity and debt do not remain importantly distinct categories.[FN17] Here, the Equity Investment was well clear of any blurry part of the border between the categories. Investors contributed $5 Million to BH II and took back plain vanilla common equity - not debt.

> FN17. For example, with respect to voting rights, the General Corporation Law provides that unless the certificate of in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 9

corporation provides otherwise, a stock-holder is entitled to one vote for each share that he holds, even if that "stock" has sub-stantial debt-like qualities. 8 *Del. C.* § 212. By contrast, a debt holder has no voting rights unless the certificate of incorpora-tion expressly provides for them. 8 *Del. C.* § 221; *see also Harbinger Master Fund Capital Partners I, Ltd. v. Granite Broad-casting Corp.,* 906 A.2d 218, 224-25 (Del.Ch.2006) (illustrating that the distinc-tion between a debt and equity investment is meaningful and holding that mandatorily redeemable preferred stock was equity rather than debt, and thus a holder of the "stock" did not have standing to bring claims as a "creditor" of the issuer); *Cede & Co. v. JRC Acquisition Corp.,* 2004 WL 286963 at *7 (Del.Ch.2004) (discussing debt-to-equity ratio, a concept that would be nonsensical if there were no distinction between debt and equity).

**\*8** The words "indebtedness for borrowed money" are clear and unambiguous terms that must be inter-preted according to their ordinary and usual mean-ing.[FN18] Allied's contention - that the Insider Debt Restriction was concerned not with the type of in-vestment that was prohibited but with the priority of the investment - is belied by the specificity with which the provision describes the prohibited invest-ment. "[I]ndebtedness for borrowed money" simply does not connote an "equity investment." I cannot twist and torture the unambiguous terms of the $10 Million Note under the guise of construing them to give Allied a right for which it did not bargain.[FN19] Accordingly, I hold that the Equity Investment complied with the express terms of the $10 Million Note, and dismiss Count II for failure to state a claim.

FN18. *E.g., Lorillard Tobacco Co.,* 903 A.2d at 739.

FN19. *See id.*

### C. *Allied's Implied Covenant Claim*

Allied next contends that even if the Restructuring did not offend the express terms of the $10 Million Note, it violated the implied covenant of good faith and fair dealing by frustrating Allied's reasonable commercial expectation that Glencoe and its affili-ates would not make any investment in the Brafasco enterprise that had priority over the $10 Million Note.[FN20] Allied admits that Delaware courts apply the implied covenant rarely, and only in narrow cir-cumstances.[FN21] It asserts, however, that enforce-ment of the implied covenant is necessary here to protect it from the defendants' intentional evasion of the Insider Debt Restriction, and to ensure that it receives the "fruits of its bargain" - which Allied claims include preventing Glencoe from creating a transaction structure in which it had the potential to self-deal.

FN20. *See Cincinnati SMSA, Ltd. Partner-ship v. Cincinnati Bell Cellular Systems Co.,* 708 A.2d 989, 992 (Del.1998) (noting that occasionally it is necessary for a court to imply terms into an agreement so as to honor the parties reasonable commercial expectations).

FN21. *See id.* (explaining that application of the implied covenant "should be rare and fact-intensive, turning on issues of compel-ling fairness").

The implied covenant of good faith and fair dealing embodies the law's expectation that "each party to a contract will act with good faith toward the other with respect to the subject matter of the contract."[FN22] Delaware jurisprudence on the im-plied covenant has, from time to time, stated the test thusly: "is it clear from what was expressly agreed upon that the parties who negotiated the ex-press terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith - had they thought to negotiate with respect to the matter"?[FN23]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)

**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

Page 10

FN22.*Katz v. Oak Industries, Inc.,* 508 A.2d 873, 880 (Del.Ch.1986).

FN23.*Id.; see also Moore Business Forms, Inc. v. Cordant Holdings Corp.,* 1995 WL 662685 (Del.Ch.1995) ("implied contractual obligations are terms that 'clearly would have been included [in the contract] had the parties negotiated with respect to them' ") (quoting *Price Organization, Inc. v. Universal Computer Consulting, Inc.,* 1993 WL 400152, at *6 (Del.Ch.1993)).

Courts must be careful however not to overestimate the circumstances when it is appropriate to employ this intrinsically counterfactual and hindsight-bias prone test. When Chancellor Allen formulated it in *Oak Industries,* he did not intend to alter the fundamental rule of contract interpretation that Delaware courts will not look to extrinsic circumstances to ascertain the meaning of unambiguous contract language that covers a topic. Instead, implied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand, and only when the court finds that the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them.FN24Chancellor Allen's own jurisprudence makes this clear by emphasizing that courts will not rewrite contractual language covering particular topics just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process.FN25

FN24. At oral argument, Allied argued that if the court determined that the contract language itself did not prohibit the Equity Investment made by Investors, the implied covenant required that Allied be permitted to take discovery into the actual intent of the parties in drafting the Insider Debt Restriction. Such a proposition misunderstands the relevant inquiry. The test is whether it is *clear from what was expressly agreed upon* that the parties meant to pro-

hibit the conduct at issue. As with any analysis of a breach of contract claim, the implied covenant inquiry initially focuses on the four corners of the contact itself, and parol evidence is only admissible when an ambiguity arises from the text. To allow discovery into the intent of the original parties to the $10 Million Note would be to ignore the teachings of cases like *Citadel Holding Corp. v. Roven,* 603 A.2d 818 (Del.1992), and gut the parol evidence rule.

FN25.*See, e.g., Shenandoah Life Ins. Co. v. Valero Energy Corp.,* 1988 WL 63491, at *8 (Del.Ch.1988) (noting that where "a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation of a different kind that has been breached")(Allen, C.).

**\*9** Here, Allied argues that because the $10 Million Note is silent as to Glencoe's ability to make the unsubordinated Equity Investment in Sun I or its subsidiaries, we must attempt to ascertain what the intent of the original parties might have been had they thought to negotiate over the matter. Allied claims that because the parties explicitly prohibited an unsubordinated debt investment in Sun I or it subsidiaries, they clearly would also have prohibited the unsubordinated Equity Investment had they thought to address that issue because equity is generally thought of as being subordinate to debt.

Allied's approach to contractual interpretation is the polar opposite of that required by Delaware law. Under our law, the fact that two parties to a contract explicitly restricted a particular type of investment - "indebtedness for borrowed money" - by a parent or its affiliates, not only in the issuer, Sun I, but in any subsidiary of the issuer, implies, by omission, that the controller was free to make equity investments in the issuer or the issuer's sub-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

sidiaries. Why? For starters, the highly-negotiated provisions of notes and debentures that restrict the commercial freedom that issuers otherwise enjoy under default law are traditionally interpreted strictly, precisely because they involve specifically extracted limitations on ordinary economic liberties.[FN26] That a note restricts a highly specific form of investment does not mean that the parties were using that form as an exemplar to illustrate a capacious range of like conduct that was impliedly precluded, and discoverable by use of a thesaurus. The use of a precise term does not imply a "gap," but instead explicitly indicates that the parties were proceeding carefully to only delimit the issuer's freedom in a discrete manner. When a note is written in such a manner, as is the case here, there is no role for the judiciary to imply other terms.

> FN26. *See Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1515 (S.D.N.Y.1989) (noting that ordinary negative covenants in a bond indenture are strictly construed according to their terms because uniformity of interpretation is required for the efficient working of capital markets); *Automodular Assemblies (DE), Inc. v. PNC Bank, Delaware,* 2004 WL 1859828, at *7 n. 7 (Del.Ch.2004) (stating with respect to a financial covenant in a loan agreement: "For a [party] to rely upon the plain language of the contractual protections it has extracted is no violation of any implied term; to find otherwise would be to supplant the plain language of the agreement. Our law does not permit the use of the implied covenant of good faith for this purpose."); *Morgan Stanley & Co. v. Archer Daniels Midland Co.,* 570 F.Supp. 1529, 1541-42 (S.D.N.Y.1983) (choosing the narrower of two possible interpretations of a protective covenant in a bond indenture); *see also* Houman B. Shadab, Note, *Interpreting Indentures: How Disequilibrium Economics and Financial Asset Specificity Support Narrow*

*Interpretation,* 75 S. CAL. L. REV. 763, 782-83 (noting that protective covenants in bond indentures are typically interpreted to govern as little conduct as possible, and arguing that such an approach is most conducive to entrepreneurial behavior and, therefore, wealth creation).

The express terms of the Insider Debt Restriction illustrate why that is properly the case. Although Allied claims to be shocked by the Equity Investment, its surprise bespeaks a faux naivete. Remember that the Insider Debt Restriction did not simply limit the ability of Glencoe and its affiliates to make debt investments in Sun I. By its plain terms, the Insider Debt Restriction also prohibited Glencoe and its affiliates from making a debt investment at any subsidiary of Sun I. That is, Allied clearly recognized that if Glencoe loaned money that was secured by the assets of a Sun I subsidiary, it could find the $10 Million Note subordinated. Yet, it now claims that it somehow did not realize that there was the potential that an equity investment made in one of Sun I's subsidiaries could have the effect of reducing Sun I's ownership of those subsidiaries in a manner that might affect Allied's ability to collect on the $10 Million Note. Even if that implausible contention is correct, it does not aid Allied. The unambiguous terms of the Insider Debt Restriction plainly provide only for a very specific limitation on Glencoe's ability to infuse capital into Sun I or its subsidiaries - a limitation only on "indebtedness for borrowed money." Any reasonable contracting party would have recognized that such a discrete limitation on a particular type of investment that applied to Sun I and its subsidiaries would not have the effect of impliedly precluding other types of investments in those entities.

Contrary to Allied's argument, it is by no means absurd to think that the parties who negotiated the terms of the $10 Million Note might distinguish between equity investments and loans.[FN27] But even if it were, speculation on the intention of the original parties is only appropriate when a contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

is silent with respect to the subject matter at issue. Here, the parties directly addressed Glencoe's ability to make future investments in the Brafasco enterprise and specifically prohibited only unsubordinated debt investments. Application of the implied covenant of good faith and fair dealing to add to the explicit restrictions of a promissory note is not proper under our law because the restrictive covenants between debtors and creditors define, by omission, the freedom of action that the debtor retains. The $10 Million Note expressly contemplated the need to restructure the Mass Mutual Debt.[FN28] To sustain Allied's implied covenant claim would narrow the contractual freedom left open to Glencoe and the Sun entities in structuring a transaction that all of the parties knew could occur. The form of judicial reformation Allied seeks does not implement any clear interstitial intent discernible from the language in the $10 Million Note, but instead grants Allied additional contractual protections that the original noteholder, SunSub, plainly did not extract through negotiation.[FN29]

FN27. For example, debt investors, but not equity investors, have affirmative legal rights to enforce remedies against the assets of a business. *See* R. FRANKLIN BALOTTI & JESSE A. FINKLESTEIN, THE DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 5.2 (3d ed. 2006). The parties may have wanted to prevent Glencoe from being able to exercise those creditors' rights unless the rights were subordinate to the $10 Million Note. This concern would not exist with respect to an equity investment because an equity investor has no right to enforce any claim against the assets of the business. *See id.*

FN28. The note provides that "[t]he holders of Senior Indebtedness may extend, renew, modify, restate or amend the terms of Senior Indebtedness or any security therefor, in accordance with the terms hereof, and release, sell or exchange such security and otherwise deal freely with Maker or any of its subsidiaries, all without affecting the liabilities and obligations of Maker or Holder."

FN29. *Aspen Advisors LLC v. United Artists Theatre Co.,* 843 A.2d 697, 707 (Del.Ch.2004); *see also Moore Business Forms, Inc. v. Cordant Holdings Corp.,* 1995 WL 662685, at *8 (Del.Ch.1995) (" '[C]ourts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong,' yet does not provide for the obligation that is claimed to arise by implication.") (quoting *Abex, Inc. v. Koll Real Estate Group, Inc.,* 1994 WL 728827, at *12 (Del.Ch.1994)).

*10 Furthermore, courts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.[FN30] The original parties to the $10 Million Note were sophisticated players who had experience in negotiating the particulars of a debtor-creditor relationship.

FN30. *Harris Trust and Savings Bank v. E-II Holdings, Inc.,* 926 F.2d 636, 644 (7th Cir.1991) ("Implying the covenant requested by the Trustees would also be 'troublesome' in view of the fact that the Indentures could easily have been drafted to incorporate expressly the terms the Trustees now urge this court to imply.")(internal quotations omitted).

At oral argument, Allied conceded the obvious: that SunSub, the original creditor on the $10 Million Note, used a large law firm to negotiate the detailed 15-page single-spaced promissory note. Had SunSub wanted a protection against insider equity investments, it easily could have (and should have) suggested that language to that effect be added to the $10 Million Note to see whether and on what

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 13

terms Glencoe would accede to that additional restriction on its freedom to further capitalize the cash-strapped Brafasco business. SunSub failed to extract anything other than a discrete limitation that does not apply to equity investments. Allied cannot use the implied covenant of good faith and fair dealing to avoid the consequences of the plain language of the contract.[FN31] The implied covenant is not a fall-back position to be argued when you now wish your predecessor-in-interest had done a better job of negotiating the contract in the first place.

> FN31. *See Metropolitan Life Insurance Co.,* 716 F.Supp. at 1517 ("[A]n implied covenant derives its substance directly from the language of the Indenture, and cannot give the holders of Debentures any rights inconsistent with those set out in the Indenture.") (internal quotations omitted).

Finally, it bears mentioning that the failure of the $10 Million Note to preclude the Equity Investment did not render Allied entirely without protection. Given the fiduciary relationship Glencoe bore to Sun I, and given the statutory prohibitions against fraudulent transfers, the mere fact that Glencoe was under no contractual inhibition from making equity investments in Sun I and its subsidiaries did not grant it a license to do so on terms that were unfair to Sun I, to the detriment of Sun I's creditors. Rather, by making such an investment, Glencoe placed itself in the precarious circumstance of facing potential liability for breach of fiduciary duty or a fraudulent transfer, especially given Sun I's shaky finances and Glencoe's control over it. Allied's non-contractual claims illustrate that the absence of a flat contractual prohibition on equity investments by Glencoe in Sun I and its subsidiaries did not render Allied defenseless. Given this reality, it is by no means absurd to think that the parties to the $10 Million Note would have left Glencoe's right to make equity investments contractually unrestricted because these other legal strictures would serve to create an incentive for Glencoe to do so only on terms that were fair to Sun I and its subsidiaries.

Allied admits that the Brafasco enterprise had no choice other than to address Mass Mutual's demand for some form of payment, lest Mass Mutual simply foreclose on all of Brafasco's assets. Investors put $5 million in new funds at risk to help stave off immediate foreclosure. That the Restructuring was implemented in a contractually unrestricted way that gave Investors 75% of BH II's equity and Sun I only 25% is not unconscionable in itself. The question of whether Glencoe acted inappropriately really depends on the economics of the Equity Investment: was $5 million a fair payment for 75% of BH II's equity?

*11 Allied has a chance to pursue claims that are based on a negative answer to that question. What it is not free to do is to press a claim that the $10 Million Note explicitly or impliedly barred the Equity Investment.

### D. *Allied's Tortious Interference Claim*

Allied asserts a tortious interference with contract claim against all of the defendants other than Sun I, the debtor on the $10 Million Note, alleging that, by directing and/or participating in the Restructuring, they wrongfully induced Sun I to breach its contractual obligations. To state a tortious interference claim, a plaintiff must properly allege an underlying breach of contract.[FN32] Because Allied has not done so, its tortious interference claim fails.

> FN32. *See Goldman v. Pogo.com, Inc.,* 2002 WL 1358760, at *4 (Del.Ch.2002) ("A claim of tortious interference with a contractual right requires [among other things] ... a contract, a breach of that contract, and an injury."); *Boyer v. Wilmington Materials,* 1997 WL 382979, at *10 (Del.Ch.1997) ("The court has not found that the shareholders' agreement was breached, so there is no breach of contract upon which to ground the tortious interfer-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

ence claim.").

### VI. *Has Allied Pled A Civil Conspiracy Claim?*

In Count VIII, Allied attempts to set forth a claim for civil conspiracy. Named in that count are a myriad of Glencoe-controlled affiliates as well as the "John Does" who served as those entities' directors and officers. The defendants have moved to dismiss this count for failure to state a claim upon which relief can be granted.

Under Delaware law, to state a claim for civil conspiracy, a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.[FN33]The benefit to a plaintiff of establishing a civil conspiracy claim is that all conspirators will be vicariously liable for the acts of co-conspirators in furtherance of the conspiracy.[FN34]Allied contends that all of the Glencoe affiliates in this case acted in concert to implement a malevolent plan (the Restructuring) to usurp the value of the Brafasco business for the benefit of Investors and at Allied's expense. Allied claims that all of the affiliated entities are culpable, and all should be held accountable for the harm the Restructuring caused to Allied.

> FN33.*Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987).

> FN34.*Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* 372 A.2d 168, 170 (Del.1976).

For starters, I grant the defendants' motion to the extent it contends that the complaint fails to state a conspiracy claim against the unidentified John Does. Allied has no idea who the directors and officers are or what they did. Had Allied simply indicated in the complaint that it sought to hold individuals responsible at some later date when it identified who they were and what they did, that might

have been acceptable. It cannot pretend, however, that its complaint actually alleges facts supporting a conspiracy claim against the unknown when the complaint is entirely devoid of facts regarding the role of particular individuals, even by title.[FN35]

> FN35. My decision to dismiss the civil conspiracy claims against the John Doe defendants is in accord with the decisions of other jurisdictions, which have held that such allegations cannot withstand a motion to dismiss when the complaint does not attempt to describe the role the John Does played in the conspiracy. *See Morris v. First Union National Bank,* 2002 WL 47961, at *6 (E.D.Pa.2002) (dismissing a civil conspiracy claim against John Doe defendants for failure to allege sufficient facts); *Southwest Materials Handling Co. v. Nissan Motors Co., Ltd.,* 2000 WL 1664160, at *6 (N.D.Tex.2000) (stating with respect to civil conspiracy allegations against John Doe defendants: "This Court is not in the position of channeling or divining potential co-conspirators who are presently as tangible as Santa Claus, the Easter [B]unny or the Tooth Fairy").

With that distraction to the side, I dig into the main issue presented by this aspect of the defendants' motion, which is largely based on one central and simple argument: the defendants contend that Delaware law does not permit the prosecution of a civil conspiracy claim against business entities under common control. In particular, they argue that a parent entity cannot, as a matter of law, conspire with its wholly-owned subsidiary.

***12** By this argument, the defendants would have me render a bright-line ruling in an area of American jurisprudence that, both inside and outside of Delaware, is more characterized by confusion than clarity.[FN36]Not only that, the defendants do not offer up briefing on this issue anywhere close in seriousness and depth to provide confidence that a ruling in their favor on this issue is justified.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 15

FN36.*Compare* Thomas J. Leach, *Civil Conspiracy: What's The Use?*, 54 U. MIAMI L. REV. 1, 1 (1999) (suggesting that for all its doctrinal complexity, civil conspiracy is useful in relatively few circumstances) *with* Martin H. Pritikin, *Toward Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule*, 84 NEB. L. REV. 1, 3 (2005) (suggesting that civil conspiracy can be a potent and socially useful weapon in a plaintiff's arsenal, but that courts have yet to delineate a coherent, principled approach to applying the doctrine in an intracorporate context).

I refuse to use this motion as a basis for holding that, as a per se matter, commonly-controlled or even owned business entities cannot conspire with one another and be held liable for acting in concert to pursue unlawful activity that causes damage.FN37Although I could, as seasoned readers of this court's opinions know, spend fifty pages explaining why, I will do so more tersely and only return to the issue in later stages of the case if it becomes essential and if the defendants devote more attention to the issue.

FN37. To the extent that a prior decision of this court has previously held that a parent is incapable of conspiring with its wholly-owned subsidiary, *see Transamerica Airlines, Inc. v. Akande*, 2006 WL 587846, at *6-7 (Del.Ch.2006), I respectfully disagree. In *Akande*, the court devoted little attention to the question, which came up in a motion to dismiss what the court seemed to regard as a very weak pleading.*Akande*, which is the only instance in which this court has addressed this issue, cites *Amaysing Tech. Corp. v. Cyberair Communications, Inc.*, 2005 WL 578972, at *7 (Del.Ch.2005), which held that a corporation is incapable of conspiring with its officers and directors, in support of its con-

clusion. But, as I discuss later in n.64, the question presented by *Amaysing Tech.* is different from the question presented in *Akande* and in this case. Moreover, to the extent that, in cases like *Amaysing Tech.*, courts respect the separate legal dignity of the corporation by disallowing claims that corporate managers conspired among themselves and with their corporate employer, consistency counsels in favor of respecting the presumptive separateness of parent and subsidiary in examining whether those entities can conspire. Bright minds have looked at these issues and their failure to come up with clearly persuasive approaches to addressing them suggests that the problems raised are not simple ones. An invariable parent-subsidiary privilege to conspire is not the generally accepted rule that *Akande* described it to be. *See Outdoor Tech., Inc. v. Allfirst Financial, Inc.*, 2000 WL 141275, at *6 (Del.Super.2000) (noting that Delaware law had yet to address the issue, and refusing to hold that a parent cannot conspire with its subsidiary).

As an initial matter, I note that Delaware law has, in analogous areas, refused to hold that commonly-owned entities cannot be subject to other common law causes of action that recognize their separate legal dignity. This, of course, should be of little surprise given that our corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected - even when those separate corporate entities are under common ownership and control.FN38

FN38.*See, e.g., Stauffer v. Standard Brands, Inc.*, 178 A.2d 311, 316 (Del.Ch.1962) ("In the absence of fraud, the separate entity of a corporation is to be recognized.").

Therefore, it is uncontroversial for parent corporations to be subjected to claims for aiding and abet-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 16

ting breaches of fiduciary duty committed by directors of their subsidiaries.[FN39]In fact, this court has, on facts very similar to those in this case, held an affiliate of a limited partnership's general partner liable for aiding and abetting the general partner's breach of fiduciary duty by doing just what Investors did here - participating in a transaction that enriched the affiliate at the expense of the partnership.[FN40]

> FN39.*See, e.g., Universal Studios, Inc. v. Viacom, Inc.,* 705 A.2d 579 (Del.Ch.1997) (parent held liable for aiding and abetting its wholly-owned subsidiary's fiduciary breach).

> FN40.*In re Nantucket Island Associates, Ltd. Partnership Unitholders Litig.,* 810 A.2d 351 (Del.Ch.2002). In *Nantucket,* the plaintiffs alleged that the general partner concocted a scheme whereby it deceived the limited partners into allowing a new entity formed by, and affiliated with, the general partner to make an unfairly favorable preferred equity investment in the partnership, which had the effect of usurping the partnership's value for the benefit of the new affiliate and at the limited partners' expense. On those facts, this court had no difficulty concluding that the plaintiffs had properly alleged the affiliate's knowing participation in the general partner's deception, and that they had pled a valid cause of action against the affiliate for aiding and abetting breach of fiduciary duty. *Id.* at 375-76.

Indeed, our state courts have noted that in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.[FN41]Like the test for civil conspiracy, the test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter - a plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation

in that breach by the non-fiduciary.[FN42]In this case, Allied has pled an aiding and abetting claim against all defendants other than Sun I GP and that entity's officers and directors (against whom they have pled simple breach of fiduciary duty claims). The defendants have not moved to dismiss the aiding and abetting claim. The functional identity of that claim and the conspiracy claim render this motion therefore almost without real-world purpose. But for now, the more important point is that this state's acceptance of claims for aiding and abetting breaches of fiduciary duty brought against parent corporations and their affiliates, including subsidiaries, belies any outright rejection of the proposition that wholly-owned and/or commonly-controlled entities cannot be held responsible for each other's acts when those acts result from concerted unlawful activity.

> FN41.*See Weinberger v. Rio Grande Industries, Inc.,* 519 A.2d 116, 131 (Del.Ch.1986) (stating that a claim for civil conspiracy involving breaches of fiduciary duty is sometimes called "aiding and abetting"); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984) (defining a civil conspiracy claim using the traditional elements associated with aiding and abetting breach of fiduciary duty), *aff'd,*575 A.2d 1131 (Del.1990); *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* 1995 WL 694397, at *15 n. 11 (Del.Ch.1995) (noting that this court has analyzed the knowing participation requirement of aiding and abetting breach of fiduciary duty by reference to the elements of a civil conspiracy claim); *Malpiede v. Townson,* 780 A.2d 1075, 1098 n. 82 (Del.2001) (stating, in a breach of fiduciary duty case, that "[a]lthough there is a distinction between civil conspiracy and aiding and abetting, we do not find that distinction meaningful here").

> FN42.*In re Santa Fe Pacific Corp. Share-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

*holder Litig.,* 669 A.2d 59, 72 (Del.1995).

Another body of analogous Delaware law also undercuts the defendants' argument. In *Shearin v. E.F. Hutton Group, Inc.,*[FN43] Chancellor Allen held that a parent corporation can be held liable for tortiously interfering with its subsidiaries' contracts when a plaintiff proves that the parent was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises.[FN44] In so holding, Chancellor Allen acknowledged that the test for holding a parent corporation liable for tortious interference had to be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases. He also feared that the option of efficient breach - the conscious decision to breach a contract and pay the required damages because of the potential for profit even after the payment of those damages - would be chilled by holding the parent responsible in tort. For these reasons, Chancellor Allen indicated that plaintiffs could only hold a parent corporation liable for tortious interference under a stringent bad faith standard. At the same time, he rejected a flat-out prohibition on such a theory, noting that to adopt such a rule would be inconsistent with Delaware law's recognition of the presumptively separate legal dignities of parent and subsidiary.[FN45]

FN43. 652 A.2d 578 (Del.Ch.1994).

FN44. *Id.* at 591.

FN45. *Id.* at 590 n. 13 (explaining that the limited privilege for contractual consultation is "more consistent with the traditional respect accorded to the corporate form by Delaware law," and that "it does not ignore that a parent and subsidiary are separate entities").

**\*13** In this case, there is no doubt that the complaint pleads facts that satisfy not only the accepted test for civil conspiracy,[FN46] but also the test for aiding and abetting a breach of fiduciary duty and the bad faith standard articulated in Shearin. Glencoe is alleged to have caused Sun II to drop all of its operating assets down to BH II, and to have caused Sun I to assent to accept only an indirect 25% equity interest in BH II, for the express purpose of enabling Glencoe, through its newly-formed affiliate, Investors, to obtain 75% of BH II's equity at an unfairly low price. By this means, Sun I was, it is alleged, intentionally rendered unable to repay the $10 Million Note, while Investors stood to reap an unreasonably high return on the Equity Investment. Put simply, Glencoe is alleged to have purposely injured Sun I and Sun II so as to enable Glencoe's newly-created affiliate, Investors, to reap gain. Sun I, Sun II, and their general partner entities stood in a position to prevent the unfair Equity Investment, but, ignoring the obligations owed to Allied, instead facilitated it. By injuring Sun I, Glencoe and the affiliates who participated and acquiesced in the Restructuring injured Allied, Sun I's creditor.

FN46. In a separate argument, the defendants contend that even if Allied's civil conspiracy claim is not barred by the defendants' corporate relatedness, Allied has failed to plead its claim with the particularity required by Court of Chancery Rule 9(b). I question the extent to which Rule 9(b), which applies a heightened pleading standard for claims involving fraud, is applicable to claims of civil conspiracy not involving fraud. *See* 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1233 (3d ed. 2004) ("The pleadings in a civil action for conspiracy must comply with the general requirement in Federal Rule 8 that the complaint contain a direct, simple, and concise statement that demonstrates the pleader is entitled to relief."). The defendants cite *Tracinda Corp. v. Daimler Chrysler AG,* 197 F. Supp. 2d 42, 74 (D.Del.2002), which asserts that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Delaware imposes a heightened pleading standard on all civil conspiracy claims. But Rule 9(b), by its terms, applies only to claims involving "fraud or mistake," and no Delaware decision has held a civil conspiracy claim solely involving breach of fiduciary duty to the Rule 9(b) standard. *See Greenfield v. Tele-Communications, Inc.,* 1989 WL 48738, at *3 (Del.Ch.1989) ("[C]onspiracies are secret agreements and the law cannot expect a plaintiff, in order to state a non-dismissible claim, to plead evidentiary matter which, if true, would establish the conspiracy.") (Allen, C.); *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 WL 583828, at *7 n. 29 (Del.Ch.2005) (stating in a breach of fiduciary duty case involving civil conspiracy claims: "Because [the plaintiff] does not separately allege fraud as a count upon which it claims relief, I question the extent to which Rule 9(b) should apply to this circumstance"). The frequent assertion that civil conspiracy claims require particularized allegations of fact may simply stem from the fact that civil conspiracy claims often do involve fraud. *See Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1521 (N.D.Cal.1990) ("This insistence upon a higher level of specificity may result from the frequent presence of fraud as part of plaintiff's claim, which brings the complaint under Fed. R. Civ. P. § 9(b) that the circumstances constituting fraud be stated with particularity.") (quotations omitted). Because this is not a fraud or a mistake case, Allied is not required by Rule 9(b) to plead its civil conspiracy claim with particularity. But even if Allied was subjected to the higher pleading standard, it has met that burden here.

This scenario is widely divergent from those commonly used to exemplify a legitimate concern about applying conspiracy doctrine to commonly-con-

trolled entities. The bona fide concern is that every breach of contract, tort or other case involving a controlled subsidiary will become a vehicle to sue controllers. Where the decision to cause a subsidiary to act in a certain manner originated at the parent level, plaintiffs would often be able to contend that the parent and subsidiary acted in concert with one another, and that the parent should be vicariously liable for the subsidiary's acts. That would increase litigation costs and deter the use of subsidiaries, even when there is a legitimate purpose for doing so and there is no wrong to others in being forced to look only to the subsidiary for relief. But the examples often pointed to as "privileging" concerted activity between wholly-owned entities show that that concern does not so easily apply to this case and why it is arguable that crafting context-specific exceptions to the general rule upholding the separate existence of the parent and subsidiary might be a better approach than invariably ignoring that separate existence with respect to all intra-enterprise conspiracy claims.

One traditional example, in which a parent is generally incapable of conspiring with its subsidiary, arises in the antitrust context and involves common pricing strategies by wholly-owned subsidiaries of a parent corporation. In *Copperweld Corp. v. Independence Tube Corp.,*[FN47] The United States Supreme Court refused to consider such a strategy to be a conspiracy in restraint of trade under § 1 of the Sherman Act. There is an obvious reason for the Supreme Court's decision to treat such pricing strategies as those of one entity. Otherwise, large businesses could not take legitimate advantage of the liability-insulating effects and other benefits of using multiple subsidiaries.[FN48] By doing so, a large business would subject itself to price-fixing claims simply by engaging in enterprise-wide pricing strategies. Section 1 of the Sherman Act was not intended to address such activity. Notably, however, by allowing such pricing activity to escape the reach of § 1, the Supreme Court was not insulating the behavior of large enterprises from the reach of the antitrust laws. Rather, by so ruling, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 19
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

Supreme Court was implicitly holding that § 2 of the Sherman Act, which constrains unilateral monopoly behavior, was the appropriate framework to determine whether a large enterprise, acting through a variety of wholly-owned subsidiaries, was illegally injuring the interests of consumers. Put simply, the import of *Copperweld* for the question of whether the commonly-controlled Glencoe entities can be held responsible for conspiring to transfer value from Sun I to Investors in order to enrich the Glencoe corporate family at Allied's expense is insubstantial. [FN49]

> FN47.467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).
>
> FN48.*Id.* at 772-73 ("[A] corporation may adopt the subsidiary form of organization for valid management and related purposes. Separate incorporation may improve management, avoid special tax problems arising from multistate operations, or serve other legitimate interests [such as facilitating compliance with regulatory or reporting laws].").
>
> FN49.*See Shared Comm. Serv. Of 1800-80 JFK Blvd., Inc. v. Bell Atlantic Properties, Inc.,* 692 A.2d 570, 573-74 (Pa. Super. Ct. 1997) ("Unique treatment of... separate entities may be justified in the antitrust context because, as the Supreme Court stated, 'there is nothing inherently anticompetitive about a corporation's decision to create a subsidiary.' We find no compelling reason, however, to justify a similar *per se* rule ignoring legal corporate form in the common law conspiracy context.") (internal citations omitted).

**\*14** Likewise, this case does not involve the classic efficient breach scenario that underlies the limited privilege in the tortious interference context.[FN50]In that scenario, a solvent subsidiary, after consultation with the parent, knowingly breaches a contract on the premise that the subsidi-

ary will be better off, even after paying the injured party damages for breach. Society's interest in protecting such an option is markedly different than in protecting the freedom of a parent corporation to structure a transaction with a subsidiary that will impoverish the subsidiary at the expense of the subsidiary's other constituencies, while enabling the parent to reap profit through another newly created affiliate.[FN51]

> FN50.*See Shearin,* 652 A.2d at 591 ("If one is privileged by reason of a recognized relationship to discuss the financial welfare of an affiliated party, one may in good faith suggest that a termination of a contract, and the assumption of any resulting liability, would be beneficial to that party. Thus, in my opinion, where corporations affiliated through joint ownership confer with respect to a contract to which one of them is a party and a breach of that contract follows, there can be no non-contractual liability to the affiliated corporation.").
>
> FN51.*Id.* (permitting a tortious interference claim when the interfering party "was not pursuing in good faith the legitimate profit-seeking activities of the affiliated enterprises").

Rather, this case more generally lacks the factual foundation often assumed in circumstances when commonly-owned entities are subjected to claims for concerted action. That factual foundation is that the parent and subsidiary share common economic interests.[FN52]Here, that common economic interest is markedly absent. Although Glencoe held all of Sun I's equity, it concedes that Sun I was either insolvent or nearly so. Allied, the holder of the $10 Million Note, arguably had a much greater interest in Sun I's solvency than Glencoe. It was precisely because of this reality that Glencoe had a plausible motive to injure Sun I by diverting value from Sun I to BH II and then to Investors. The potential for a controller to use its control of a subsidiary, not to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 20

enrich the subsidiary, but to divert value from the subsidiary to itself in a bad faith manner, is what motivated *Shearin's* bad faith test and our state's long-standing recognition of aiding and abetting liability. As a result, it is difficult to see why our law should flatly proscribe Allied's conspiracy claim in these circumstances, except on the grounds that it is redundant of Allied's aiding and abetting claim.

> FN52.*E.g., Wallace v. Wood,* 752 A.2d 1175, 1183 (Del.Ch.1999) ( "[W]holly owned affiliates ... share the commonality of economic interests which under[lies] the creation of [a tortious] interference privilege.") (quoting *Shearin,* 652 A.2d at 590-91 n. 14) (bracketed material added).

As a penultimate consideration, I acknowledge that some non-Delaware decisions have held that the recognition of a civil conspiracy claim would undermine the supposedly better settled and clearer tests used for veil piercing and alter ego liability.[FN53]Would it were that veil piercing doctrine was in such an enviable state! But, frankly, legal doctrine in that area is rightfully criticized for its ambiguity and randomness.[FN54]As distinguished scholars have noted, the tests used to determine whether a corporate veil should be pierced, or an entity should be considered a "mere alter ego," yield few predictable results.[FN55]Further, veil-piercing doctrine, which originally developed in the context of finding individual (human) shareholders liable for corporate debts, is not well equipped to sort out the different question of parent and subsidiary liability in modern, sophisticated corporate groups.[FN56]Many of the factors frequently employed in veil piercing analysis are irrelevant to the question of whether, in all fairness, a parent corporation should be forced to answer for the acts of its subsidiary.[FN57] It is thus arguable that the use of rigorous tests of conspiracy, aiding and abetting, and tortious interference would produce more certainty and strike the correct balance.FN58Those tests only hold affiliates liable for concerted activity that the affiliates know to be

unlawful. Under Delaware law, those tests do not permit the court to hold the affiliates liable for mere negligence; rather, scienter is required, causing the liability of a parent to turn on the more appropriate notion of the parent's own culpability for the harm caused to a plaintiff.[FN59]

> FN53.*See, e.g., Pizza Management, Inc. v. Pizza Hut, Inc.,* 737 F.Supp. 1154, 1166 (D.Kan.1990) (noting that "where the alleged harm and motives are mostly economic in nature and the overt acts primarily attributable to the wholly-owned subsidiary, a civil conspiracy claim in almost all circumstances would [otherwise] also exist against the parent corporation," and that if a court were to allow such a result, "the stricter burdens governing the alter ego doctrine and the policy value reflected in those burdens would be readily circumvented").

> FN54. As early as 1926, Benjamin Cardozo referred to this area of the law as being "enveloped in the mists of metaphor."*Berkey v. Third Ave. Ry. Co.,* 244 N.Y. 84, 94, 155 N.E. 58 (1926). Commentators have been even more critical in recent years. *See generally Stephen M. Bainbridge, Abolishing Veil Piercing,* 26 J. CORP. L. 479, 507 (2001)."Legal writers have described judicial decisions to pierce the veil as 'irreconcilable and not entirely comprehensible,' 'defying any attempt at rational explanation,' and occurring 'freakishly.' " Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study,* 76 CORNELL L. REV. 1036, 1036-37 (*quoting* PHILLIP I. BLUMBERG, THE LAW OF CORPORATE GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS 8 (1983), Jonathan M. Landers, *A Unified Approach to Parent, Subsidiary & Affiliate Questions*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))

Page 21

*in Bankruptcy,* 42 U. CHI. L. REV. 589, 620 (1975), and Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability & the Corporation,* 52 U. CHI. L. REV. 89, 89 (1985), respectively).

FN55.*See generally* Thompson, 76 COR-NELL L. REV. 1036 (finding, after an exhaustive empirical survey, that the same general facts often appear in cases providing relief and cases denying relief, and that fundamental assumptions that most lawyers make with respect to veil piercing - i.e. that it is easier to pierce in tort cases than contract cases, and that it is easier to pierce the veil of a wholly-owned subsidiary - were not reflected in the study's results).

FN56.*See* Phillip I. Blumberg, *The Corporate Entity in an Era of Multinational Corporations,* 15 DEL. J. CORP. L. 283,328 (1990) ("[T]he much criticized, irreconcilable, and unpredictable nature of [veil piercing] decisions should leave no doubt as to the fundamental inadequacy of traditional entity law to deal with the problems presented by the new corporate world.").

FN57.*See* Bainbridge, 26 J. CORP. L. at 513, 524 (noting that a well counseled shareholder can often prevent veil piercing by following various corporate formalities, and that when courts focus on those traditional factors, they obscure the real issue of whether the shareholder-parent is itself culpable with respect to the harm caused to the plaintiff who is seeking to pierce the veil); David Millon, *Piercing the Corporate Veil, Financial Responsibility, and the Limits of Limited Liability* 3 and 25 (Washington & Lee Public Legal Studies Research Paper Series, Working Paper no. 2006-08), *available at* http:// ssrn.com/abstract=932959) [hereinafter *Mil-*

*lon Paper*] (stating that the law should not permit shareholders to use limited liability to opportunistically extract value from creditors, and that without regard to corporate formalities, undercapitalization, and other traditional veil piercing factors, "[t]he question ought to be whether the controlling shareholders have somehow used their powers of control illegitimately"); RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 407 (4th ed. 1992) (criticizing the veil piercing doctrine's focus on corporate formalities, undercapitalization, and the agency character of the corporation).

FN58.*See Bainbridge,* 26 J. CORP. L. at 535 ("[J]udicial analysis [should focus on whether] the defendant-shareholder [did] anything for which he or she should be held directly liable. Did the shareholder commit fraud, which led a creditor to forgo contractual protections? Did the shareholder use fraudulent transfers or insider preferences to siphon funds out of the corporation?").

FN59. Professor Bainbridge has argued that it is more defensible to hold all the constituent elements of an "enterprise" operated through subsidiaries liable for harm committed by one of its constituent parts through "enterprise liability" than to hold the ultimate set of stockholders of the parent liable through veil piercing. As I understand the tests for enterprise liability used in some states, they are not markedly more certain than the traditional veil piercing or alter ego inquiries. *See Pan Pacific Sash & Door Co. v. Greendale Park, Inc.,* 166 Cal.App.2d 652, 333 P.2d 802, 806 (Cal. Dist. Ct. App. 1958) (setting forth a basic standard for invoking enterprise liability that requires a two pronged showing similar to veil piercing tests: (1) such a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

Page 22

high degree of unity of interest between two entities that their separate existence had de facto ceased; and (2) treating the two entities as separate would promote injustice. Professor Bainbridge indeed admits that using "enterprise liability" as the operative doctrine would not solve the problem of the unpredictability of veil piercing analysis in the parent-subsidiary context. What *is* more certain and predictable is that scienter-based doctrines like civil conspiracy require a showing that a parent or affiliate was itself a knowing participant in unlawful conduct. As a result, such doctrines comport with Bainbridge's more general recommendation of focusing the liability inquiry on each defendant's own conduct and culpability for the underlying wrong.

*15 Finally, I refuse to rest a ruling on anthropomorphic grounds and to analogize business entities to humans. That is, I disagree with *Copperweld* and its progeny to the extent that those cases conclude that a parent and its subsidiary cannot conspire with one another because they don't possess "two separate corporate consciousnesses" (i.e. that they have only a single mind) and are thus incapable of "agreement."[FN60]The fact that a corporation owns all of the equity of another corporation and that both corporations have the same directors and officers does not mean the separate corporations cannot collaborate on a common illegal scheme. It is precisely because the corporations have, as a presumptive matter, a separate legal existence irrespective of their common control, that doctrines like conspiracy and aiding and abetting may have a policy purpose. Moreover, as already noted, the idea that the economic interests of a parent and subsidiary are always aligned when the parent owns all the equity of the subsidiary is, if accepted as an unvarying natural law, wrong. As important, even in criminal conspiracies involving more than one human, it is not uncommon for one of the participants to have a dominating relationship towards the oth-

ers. That does not render the others less legally culpable for their own decisions to participate in the common plan. The fact that affiliated entities are directed by common persons does not self-evidently render those entities - as societally chartered persons with separate legal status - obviously immune for their own actions in aid of an illegal plan that causes harm. There are principled reasons for cabining the situations when conspiracy claims can lie against commonly-owned entities. That they are conceived of as having one hypothetical "brain" is not one of them.[FN61]And under the confused jurisprudence of "alter ego" liability, a defense argument of that kind amounts to an argument in favor of disrespecting their separate corporate forms and holding the parent liable. [FN62]

> FN60.*See Copperweld,* 467 U.S. at 771.

> FN61. As one commentator has recently put it, the search for a corporation's own "will" is absurd. *Millon Paper* at 23. "No corporation in the world has a mind of its own; they are fictitious entities. People control corporations."Franklin A. Gevurtz, *Piercing Piercing: An Attempt to Lift the Veil of Confusion Surrounding the Doctrine of Piercing the Corporate Veil,* 76 OR. L. REV. 853, 864 (1997).

> FN62.*See, e.g., Albert v. Alex. Brown Management Services, Inc.,* 2005 WL 2130607, at *9 (Del.Ch.2005) ("The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent."). Allied's complaint in fact pleads a count based on alter ego liability, and the defendants have denied Allied's alter ego allegations. This, of course, is in tension with their contention that they should be treated as a single legal actor for conspiracy purposes.

In sum, Allied's complaint pleads facts that satisfy the elements of a cause of action for civil conspiracy as articulated by our Supreme Court. The de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

fendants' argument - that entities with common equity ownership can never conspire illegally with one another is not one that convinces me.[FN63] Therefore, their motion to dismiss Count VIII is denied except with respect to the civil conspiracy claims asserted against the John Doe defendants.

FN63. I need not address the question of whether corporate managers can be held civilly liable for conspiring among themselves and with their own corporation. That is a separate question from the one presented in this case. *See* Kathleen F. Brickey, *Conspiracy, Group Danger and the Corporate Defendant,* 52 U. CIN. L. REV. 431, 432-33 (1983). Most courts suggest a negative answer to this separate question unless the corporate agents were acting for their own personal financial gain rather than for the benefit of the corporation. *Amaysing Tech.,* 2005 WL 578972, at *7; *Elliot v. Tilton,* 89 F.3d 260, 265 (5th Cir.1996); *see also Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108, 110 (7th Cir.1990) (noting that when the managers of a corporation act within the scope of their employment, the corporation and its managers are "considered as one person in law") (quoting William Blackstone, 1 *Commentaries on the Laws of England* 456 (1st ed. 1765)); *but cf. Wallace,* 752 A.2d at 1184 (refusing to dismiss a claim that the officers and directors of a corporate general partner entity aided and abetted the corporate general partner's breach of fiduciary duty); *and* Restatement (Third) of Agency § 7.01 ("An agent is subject to liability to a third party harmed by the agent's tortious conduct. Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment."). That rule is not inconsistent with the general rule that multiple agents of a single corporation can constitute a plurality of actors for criminal conspiracy purposes. Criminal law, unlike civil conspiracy theory, is not concerned with who will be liable (in the sense of who must pay money to compensate) for a harm. Instead, criminal law punishes a mere agreement to commit an illegal act, regardless of whether it is carried out or a harm is caused, because the mere involvement of two or more persons in a criminal plan is thought to present such risks to society that punishment is warranted. *See* Sarah N. Welling, *Intracorporate Plurality in Criminal Conspiracy Law,* 33 HASTINGS L.J. 1155, 1179 (1982). This "group danger" punishment rationale has been universally rejected with respect to civil conspiracies. Leach, 54 U. MIAMI L. REV. at 15-16. When corporations commit intentional torts or breaches of contract, they obviously do so at the behest of some human agent and often more than one. Therefore, if corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could also regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally. In this respect, the problem presented is somewhat the opposite of whether commonly-owned entities can conspire. In the case of holding managers civilly liable for conspiring with each other to cause illegal action by the corporation, the law would deny the presumptively independent existence of the corporation by invariably holding its managers liable for the corporation's acts by "conspiring with themselves and it." In the question of whether commonly-owned entities can conspire, the law would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.))**

Page 24

deny the separate status by *refusing* to al-
low the conspiracy claim.

### VII. *Conclusion*

**\*16** For the reasons stated above, the defendants'
motion to dismiss is granted as to Allied's breach of
contract, implied covenant, and tortious interfer-
ence claims (Counts II-IV of Allied's complaint),
and as to Allied's civil conspiracy claim (Count
VIII) to the extent it is asserted against the John
Doe defendants.

The remainder of the motion is denied.

IT IS SO ORDERED.

Del.Ch.,2006.
Allied Capital Corp. v. GC-Sun Holdings, L.P
Not Reported in A.2d, 2006 WL 4782243 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)                                    Page 1
**(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))**

**H**
Goldman v. Pogo.com, Inc.
Del.Ch.,2002.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
GOLDMAN
v.
POGO.COM INC., et al.
**No. CIV.A. 18532-NC.**

Submitted: March 12, 2002.
June 14, 2002.

John L. Reed, Esquire, Duane Morris, LLP, Wilmington.
William M. Lafferty, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington.
NOBLE, Vice Chancellor.
**\*1** Dear Counsel:

Before the Court is Defendants' motion, under Court of Chancery Rule 12(b)(6), to dismiss the remaining counts of Plaintiff's Second Amended Complaint (the "Complaint").[FN1] At oral argument on March 12, 2002, I dismissed the first two counts of the Complaint. In this letter opinion, I conclude that certain claims alleging violations of the fiduciary duty of loyalty and violations of the directors' related duty of disclosure survive the motion to dismiss. I also conclude that other fiduciary duty claims and a tortious interference with contract claim should be dismissed.

> FN1. Also pending is Plaintiff's Motion to Strike Defendants' Revised Motion to Dismiss the Second Amended Complaint, which challenges the belated effort of the individual defendants to challenge this Court's power to exercise personal jurisdiction over them in the context of Plaintiff's claim of tortious interference with con-

tract. For reasons set forth below, this motion is denied as moot.

I. Background [FN2]

> FN2. The background facts set forth herein are based on the well-pled allegations of the Complaint and are accepted as true for the purposes of Defendants' motion to dismiss. *See White v. Panic,* 783 A.2d 543, 548 n. 5 (Del.2001).

In 1991, Plaintiff Daniel Goldman (the "Plaintiff") founded Planet Optigon, Inc., which, in 1995, merged with Outland, Inc. forming the company that came to be known as Defendant Pogo.com Inc. (the "Company"). The 1995 merger is alleged to have taken place at the instigation of Kleiner Perkins Caufield & Byers ("Kleiner Perkins"), a venture capital firm that purchased an equity interest in the Company. The Company designed and provided internet gaming content.

After the 1995 merger, Plaintiff served as the Company's President and Chief Executive Officer and as Chairman of its Board of Directors. He was also the Company's largest equity holder, owning shares in different classes which, collectively, amounted to approximately 29% of the Company's voting shares.[FN3]

> FN3. The Complaint alleges that as of the time of the merger, "Plaintiff owned one million (out of 2,250,000 shares) of the A-2 Stock (A-2 Stock was issued to former Optigon and Outland employees); 1.8 million shares (out of 1.8 million shares) of the Series A Stock; and 600,000 shares (out of 3,437,709 shares) of common stock (issued to former Optigon and Outland employees as well as to the venture capital firms, Kleiner Perkins and Berkman Associates)." Compl. ¶ 22.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 2

Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)

**(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))**

The Company's directors during the times relevant to the events alleged in the Complaint were Erick Hachenburg ("Hachenburg"), David King ("King"), Russell Siegelman ("Siegelman"), Charles Wu ("Wu"), Gilman Louie ("Louie"), Jack Heistand ("Heistand"), Vinod Khosla ("Khosla"), Arthur Kern ("Kern"), Randy Komisar ("Komisar"), and Townsend Ziebold ("Ziebold") (collectively, the "Defendants," the "Director Defendants," or the "Board").

In March 1996, the Director Defendants began a campaign of pressuring Plaintiff to resign as the head of the Company which, according to the Complaint, led to his resignation as President and Chief Executive Officer the following month. In January of 1997, Plaintiff terminated his other employment with the Company due to the hostile environment allegedly fostered by the Defendants against him. After months of numerous threats and pressure by Defendants urging Plaintiff to forfeit portions of his holdings and/or to subordinate his preferred A-2 Stock, "[i]t became clear to Plaintiff ... that the Board was concerned with one matter only: enhancing the position of the Director-Investors and the investing companies they represented (and ultimately taking control of the Company) in willful disregard of the rights of the shareholders generally, including Plaintiff."[FN4] Plaintiff resigned from the Company's Board of Directors on or about June 4, 1997.

> FN4. *Id.* ¶ 33.

The Complaint suggests that the Company, as with other internet companies, experienced substantial financial problems due to its continuing need for capital. The Board, after consideration of various financial options, eventually settled on a plan to "restructure the Company based on a bridge loan which provided the investors with preferred rights of conversion to an equity position."[FN5] As part of this strategy, the Company approved the first of three "Bridge Loans" on June 11, 1997 [FN6] with a group of existing investors, followed by the Second Bridge Loan in July of that year and the Third

Bridge Loan in January of 1998. The Bridge Loans were secured by short term promissory notes that were "ultimately convertible to preferred shares ... which were to be issued subsequent to a restructuring of the Company ...."[FN7] On June 18, 1998, the Director Defendants approved a reverse stock split (the "Reverse Stock Split") which automatically triggered the conversion of the three Bridge Loans. The Reverse Stock Split applied to all of the Company's stock with the exception of the Company's A-2 Stock which would have required Plaintiff's approval and had the effect of restructuring the Company's stock at a ratio of 250 to 1.[FN8] Plaintiff alleges that "[a]s a result of the Reverse Stock Split ..., [his] equity interest in the Company was reduced from over 13.2% to 0.1%."[FN9]

> FN5. *Id.* ¶ 34.
>
> FN6. About a week prior to the Board's approval of the First Bridge Loan, Plaintiff was notified by Heistand, on behalf of the Company, that " 'the [C]ompany [was] contemplating a restructuring of its equity interest that would be dilutive to existing shareholders.' " *Id.* ¶ 37.
>
> FN7. *Id.* ¶ 42.
>
> FN8. The Reverse Stock Split is alleged to have required the approval of two-thirds of the preferred shares which were "held principally by the Director-Investors" and a majority of the Company's common shareholders. *Id.* ¶ 43.
>
> FN9. *Id.* The Reverse Stock Split, as such, merely reduced the number of Plaintiff's shares on a pro rata basis. Plaintiff's objection is not to the split, but instead to the conversion of debt (the Bridge Loans) into equity that was triggered by the split and, thus, reduced his percentage of equity ownership.

**\*2** On August 23, 1999, Plaintiff requested that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))

Company redeem his A-2 Stock, as provided for in the Company's Amended and Restated Certificate of Incorporation (the "Certificate"). Plaintiff's renewed request on December 29, 1999 was rejected by the Company, which claimed a lack of sufficient cash to honor Plaintiff's demand. On March 19, 2001, the Company "finally" redeemed Plaintiff's A-2 Stock in connection with the sale of the Company.

Plaintiff filed his initial complaint on December 4, 2000, and his First Amended Complaint on April 16, 2001. After Defendants moved to dismiss Plaintiff's First Amended Complaint, Plaintiff, invoking Chancery Court Rule 15(a), filed the Complaint on August 2, 2001. The Defendants renewed their motion to dismiss on August 16, 2001; that motion frames the issues now before the Court.

The remaining counts of the Complaint [FN10] allege that the Director Defendants (1) breached their fiduciary duties of loyalty and due care by approving the Bridge Loans and the Reverse Stock Split; (2) tortiously interfered with Plaintiff's contractual rights under the Company's charter by, among other things, failing timely to redeem his A-2 Stock; and (3) breached their duty of disclosure and candor by failing to disclose to Plaintiff all material information relating to the now challenged transactions. My analysis of Defendants' motion to dismiss each of these claims follows.

> FN10. As stated above, Counts I and II of the Complaint were dismissed at the March 12, 2002 hearing. Those counts alleged that the Company breached its duties under the Certificate by failing to pay Plaintiff (i) interest accruing from prior demands for redemption and (ii) accumulated dividends at the time of the March 14, 2001 redemption of his stock.

## II. ANALYSIS

### A. Applicable Standard

In considering Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), I must assume as true the allegations in the Complaint.[FN11] Viewing the factual allegations of the Complaint in the light most favorable to the Plaintiff, I may "dismiss a complaint under Rule 12(b)(6) only [if I] determine[ ] with 'reasonable certainty' that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint."[FN12]

> FN11. *Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del.2001); *Orman v. Cullman,* 794 A.2d 5, 15 (Del. Ch.2002).

> FN12. *Malpiede v. Townson,* 780 A.2d at 1082-83.

### B. Fiduciary Duty Claims

Plaintiff alleges in Count III of the Complaint that the Director Defendants breached their fiduciary duties by having failed to exercise valid business judgment in approving each of the three bridge loans, in addition to the Reverse Stock Split. Plaintiff additionally alleges that "[t]aken together, the series of transactions establish the Board's continuing mismanagement, self-dealing and other breaches of their fiduciary duty."[FN13]

> FN13. Compl. ¶ 71.

The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[FN14] Only upon a showing by a challenger that raises a reasonable doubt as to the independence and/or disinterestedness of a majority of a company's directors who approved the challenged transaction will the presumption of director fealty which lies at the core of the business judgment rule be rebutted.[FN15] Thus, viewing all of the allegations contained in the Complaint as true for the purposes of Defendants' motion to dismiss, I turn to my analysis of the indi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))**

Page 4

vidual directors.[FN16]

FN14.*Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).

FN15.*Id.;Orman v. Cullman,* 794 A.2d at 19-20.

FN16. Defendants assert that Plaintiff's challenges arising under the First and Second Bridge Loans (which were consummated more than three years before Plaintiff filed his initial complaint here) are barred either by the applicable statute of limitations or by the doctrine of laches. While it is true that alleged breaches of fiduciary duties are, in general, deemed to be subject to a three-year statute of limitations, where, as here, a plaintiff alleges that several related transactions were part of a common scheme that, itself, contravened the defendants' duties, "[t]he disclosure of one component of th[e] transaction cannot [necessarily] operate to put the stockholders on notice of a claim that the entire transaction constituted a[ ] breach of duty."*Gibralt Capital Corp. v. Smith,* Del. Ch., C.A. No. 17442, mem. op. at 28-29, Jacobs, V.C. (May 8, 2001). I note Defendants' attempt to distinguish *Gibralt* on its facts. Factual differences aside, however, the concerns motivating the Court's decision in *Gibralt* are equally present here. Considering that I must, for the purposes of this motion, take as true Plaintiff's allegations that the First and Second Bridge Loans were part of a greater scheme to dilute his interests, whether the Plaintiff knew of or should have discovered the breaches of duties he alleges have befallen him implicates a fact intensive question which I am unable and unwilling to resolve on a motion to dismiss. For the same reasons, I further find that the Defendants' doctrine of laches defense, in the context of this case, cannot be resolved on this mo-

tion.

### 1. The First Bridge Loan [FN17]

FN17. Plaintiff alleges that the Board's approvals of the three Bridge Loans and the Reverse Stock Split constitute one continuous scheme and, thus, questions whether each of the discrete transactions must be analyzed separately for director independence or disinterestedness. Although some directors participated in authorizing all four events, the composition of the Board varied from transaction to transaction. Because the key component of Plaintiff's loyalty challenge is an inquiry into whether approvals were conferred by an independent and disinterested majority of the Board, the Court cannot forego that analysis for each of the several discrete approvals. Even if some of the directors sought to pursue the scheme that Plaintiff alleges, it does not follow, even when those allegations are judged under the plaintiff-friendly standard of Rule 12(b)(6), that their plan tainted the impartial judgment of the other directors. That is the consequence of the principle that directors are presumed to have discharged their duties faithfully unless and until a plaintiff has made contextually sufficient allegations to raise a reasonable doubt as to their independence or disinterestedness.

**\*3** The four directors who considered the First Bridge Loan each voted in favor of that transaction. Those directors were Khosla, Wu, Komisar, and Heistand. Because I believe that there is a reasonable doubt as to whether the First Bridge Loan was approved by a majority of disinterested and/or independent directors, I find that Plaintiff's allegations on this claim state a claim upon which relief can be granted.

The Defendants do not seriously argue that Directors Khosla and Wu are disinterested for purposes of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))**

Page 5

this motion.[FN18]A director is interested for purposes of this inquiry when his loyalties to the corporation and its shareholders are divided.[FN19]Director Khosla is alleged to have represented Kleiner Perkins, one of the largest investors in the First Bridge Loan. Director Wu is similarly alleged to have represented Vertex, another large investor in that transaction. The Complaint alleges that Khosla and Wu were each nominated to their directorships by Kleiner Perkins and Vertex respectively. Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, are both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the First Bridge Loan.[FN20]

> FN18. Defendants' Opening Brief in Support of their Motion to Dismiss the Complaint at 37-38.

> FN19.*Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984), *overruled on other grounds*Brehm v. Eisner, 746 A.2d 244 (Del.2000); *Aronson v. Lewis,* 473 A.2d at 12;*Orman v. Cullman,* 794 A.2d at 25 n. 50.

> FN20. I further note that Khosla and Wu perhaps may also be lacking of independence from Kleiner Perkins and Vertex. *See Telxon Corp. v. Meyerson,* Del.Supr., No. 328, 2001, slip. op. at 15, Walsh, J. (June 7, 2002); *Orman v. Cullman,* 794 A.2d at 25 n .50.

With respect to Komisar, the Complaint alleges facts that, taken as true, raise a reasonable doubt as to his independence from Kleiner Perkins, which, as discussed above, was financially interested in the First Bridge Loan.

"Independence" .... involves an inquiry into whether the director's decision resulted from that director being *controlled* by another. A director can be controlled by another if in fact he is *dominated* by that other party [or] if the challenged director is *beholden* to the allegedly controlling entity. A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.[FN21]

> FN21.*Id.* (emphasis in original); *see also In re Western Nat'l Corp. S'holders Litig.,* Del. Ch., C.A. No. 15927, mem. op. at 28, Chandler, C. (May 22, 2000).

That the Complaint alleges that Komisar had an ongoing business relationship with Kleiner Perkins (*i.e.,* "connections that run deep") is, without more, insufficient for finding that Komisar could not exercise independent business judgment. However, Plaintiff's allegations that Komisar had previously served on the board of directors of at least two other Kleiner Perkins companies, coupled with the allegation that Kleiner Perkins used him as a short-term high-ranking executive in companies in which Kleiner Perkins invested, suffice for purposes of Rule 12(b)(6)'s measurement of a reasonable doubt showing.

*\*4 Because I find that there is a reasonable doubt as to either the independence or disinterestedness of at least three of the four directors who approved the First Bridge Loan transaction,[FN22] Defendants' 12(b)(6) motion to dismiss Plaintiff's challenge to the First Bridge Loan is denied.

> FN22. Thus, I need not determine if Plaintiff's allegations regarding Heistand raise a reasonable doubt about either his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))

Page 6

independence or disinterestedness.

2. The Second Bridge Loan

The Second Bridge Loan was approved by Directors Khosla, Wu, Komisar, Kern, Louie, Heistand, and King. Because I find a reasonable doubt as to the independence and/or disinterestedness of at least five of these directors, Defendants' motion to dismiss this claim is denied as well.

As with the First Bridge Loan, Khosla and Wu's respective representation of Kleiner Perkins and Vertex, who were also significant investors in the Second Bridge Loan, creates enough of a doubt as to their disinterestedness for the purposes of Rule 12(b)(6). Again, the Defendants do not seriously contest the disqualification of Khosla and Wu for purposes of this motion. I similarly find for the reasons set forth in my discussion of the First Bridge Loan that the Complaint's allegations about Komisar's relationship and dealings with Kleiner Perkins raise a reasonable doubt as to his independence for purposes of the Second Bridge Loan as well.

Turning to director Kern, the Complaint alleges that he, like Khosla and Wu, represented an investor in the Second Bridge Loan (i.e., that he was an investor in his capacity as trustee of the Arthur Kern Revocable Trust which held Series B Stock that was affected directly by this transaction).[FN23] The Defendants point to Plaintiff's concession that the trust does not appear in the Company's minutes as an investor in the Second Bridge Loan as support for their contention that the Complaint alleges insufficient facts calling into question Kern's impartiality. While the Plaintiff pleads the trust's stock ownership or interest at his peril, I must for the purposes of this motion take the allegations of the Complaint as true. As such, I find Kern to be interested for purposes of Defendants' motion to dismiss as it relates to the Second Bridge Loan.

FN23. Compl. ¶ 19.

The Complaint further alleges that director Louie's positions as Chairman and Chief Executive Officer of Spectrum Holobyte, Inc. raise a reasonable doubt as to his independence from Khosla and/or Kleiner Perkins (whose interests, as discussed above, are sufficiently aligned). The Complaint also sets forth Kleiner Perkins's status as a dominant investor in Spectrum and that Spectrum and the Company were business partners. The Complaint, in addition, alleges that Louie was dominated and controlled by Khosla because, among other things, Khosla "sav[ed] his career." [FN24] Viewed collectively, these allegations, taken as true, provide the necessary nexus between Khosla/Kleiner Perkins and Louie to infer that Louie cannot act independently of Kleiner Perkins and/or Khosla.

FN24. Id. ¶ 16.

Having found that the Complaint alleges facts raising a reasonable doubt as to the independence and/or disinterestedness of at least five of the seven directors who voted to approve the Second Bridge Loan Transaction, Defendants' motion to dismiss this claim is also denied.[FN25]

FN25. Thus, it is unnecessary for me to consider whether Heistand or King are interested and/or not independent for purposes of this transaction based on the allegations set forth in the Complaint.

3. The Third Bridge Loan

*5 The Third Bridge Loan was approved by Directors Khosla, Wu, Komisar, Hachenburg, Kern, Ziebold, Heistand, and King. As set forth above, the Plaintiff must allege facts in the Complaint raising a reasonable doubt as to whether this transaction was approved by a majority of disinterested and independent directors in order to withstand Defendants' motion to dismiss this claim. For the reasons set forth below, I conclude that the Complaint only alleges facts raising the requisite amount of doubt as to three of the eight directors voting to approve the Third Bridge Loan. Accordingly, Defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))
Page 7

ants' motion to dismiss this claim is granted.

Because Kleiner Perkins and Vertex also invested significantly in the Third Bridge Loan, Directors Khosla and Wu, as their representatives, are rendered interested for the purposes of Defendants' motion on this claim. The Complaint's allegations as to Director Komisar's connections and relationship with Kleiner Perkins, as discussed above, create a reasonable doubt as to his independence. The Complaint, however, fails to set forth sufficient facts to justify an inference that one of the remaining five directors who voted in favor of the Third Bridge Loan was either interested or not independent.

The Complaint alleges that Kern was interested for the purposes of the Third Bridge Loan because of his disqualifying interest in the Second Bridge Loan. Specifically, Plaintiff argues that even though Kern did not represent any investor in the Third Bridge Loan, the fact that he had invested in the previous transaction (namely the Second Bridge Loan) gave him a clear financial incentive to approve that transaction which was "inextricably linked to the then future restructuring." While it must be accepted as true for this motion that "an investment in the previous Bridge Loans was valuable only in the event of a restructuring and conversion of the Bridge Loan debt into post-restructuring equity," that assertion does not support an inference that the Company's restructuring was conditioned to any extent on the happening of the Third Bridge Loan. Stated differently, there is nothing in the Complaint from which it may reasonably be inferred that the occurrence of the Reverse Stock Split (and the financial benefits that would be realized from investment in the previous bridge loans thereby) was contingent on the Third Bridge Loan.FN26 As such, I am unwilling to find based on the allegations set forth in the Complaint that Kern's interest in the Second Bridge Loan renders him interested in this one.

> FN26. Indeed, Plaintiff's Answering Brief in Opposition to Defendants' Motion to

Dismiss the Second Amended Complaint ("Plaintiff's Answering Brief") (at 39) refutes this very notion: "Defendants cannot deny, and have submitted documents demonstrating, that *by the time* the Third Bridge Loan was approved the restructuring and conversion were guaranteed to occur."(emphasis added). If as Plaintiff states, the inevitability of the conversion had been established before the Third Bridge Loan, the benefits flowing to investors in the First and Second Bridge Loans from the conversion were not dependent on approval of the Third Bridge Loan.

I also find for similar reasons that the Complaint's allegations as to Ziebold fail to raise a reasonable doubt as to his independence and/or disinterestedness. The Complaint alleges that Ziebold, who became a director of the Company after the Second Bridge Loan, was interested because he was the representative of Wasserstein Perella, an entity that had invested in the First and Second Bridge Loans. As stated in my discussion of director Kern, Plaintiff would have this Court find that Ziebold's representation of an investor in the First and Second Bridge Loans gives him a clear financial incentive to approve the Third Bridge Loan which was "inextricably linked to the then future restructuring."Again, this reasoning misses the point. Absent an allegation that the Third Bridge Loan was a necessary predicate to the occurrence of the Reverse Stock Split (which, Plaintiff alleges, rendered investments in the previous Bridge Loans valuable by way of the conversion rights triggered thereby), there is no nexus linking an allegedly interested director in the First and Second Bridge Loans to the Third. Accordingly, Plaintiff's allegations fail to rebut the presumption that Ziebold acted independently and disinterestedly when he voted to approve the Third Bridge Loan.

*6 The Complaint alleges that immediately before the First Bridge Loan, the Company forgave ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))

proximately $240,000 of debt that Director Heistand owed to the Company. Plaintiff argues that "had the Company not received the financing [from the First Bridge Loan], forgiveness of a $240,000 debt ... would not [have been] prudent or possible" and reasons that, as a result of the debt forgiveness, it can be inferred that "Heistand had a clear interest in the transaction because its anticipated approval was the basis for enabling the company to forgive his debt."[FN27]Plaintiff then argues that "Defendant Heistand was interested in the Third Bridge Loan because the Bridge Loan financing enabled Heistand to have his $240,000 debt to the Company forgiven."Assuming solely for the purposes of the Third Bridge Loan that the Company's forgiveness of Heistand's debt rendered him interested or beholden to other Directors for the First Bridge Loan, this assumption does not raise a reasonable doubt about his capacity to evaluate impartially the merits of the Third Bridge Loan. As set forth above, the Complaint must allege facts raising a reasonable doubt as to whether each transaction was approved by a majority of independent and disinterested board members. I have expressed in my analysis of the status of Kern and Ziebold a fundamental uneasiness with the line of reasoning advanced by Plaintiff that a given board member's disqualifying interest or association in one transaction will *ipso facto* render that board member disqualified in perpetuity for future transactions. Because the Complaint alleges nothing more than Heistand's debt forgiveness prior to the First Bridge Loan, I find as a matter of law that Plaintiff has failed to set forth sufficient facts rebutting the presumption that Heistand acted independently and disinterestedly in approving the Third Bridge Loan.

FN27.*Id.* at 32.

With respect to directors King and Hachenburg, the Plaintiff apparently concedes their independence and disinterestedness for the purposes of the Third Bridge Loan.[FN28]The Complaint is devoid of any allegation that King or Hachenburg represented investors in the Third Bridge Loan. Moreover, the fact that they are alleged to have been granted options by the Company prior to the Reverse Stock Split does not support the inference that they were so beholden to the interested members of the Board that their partiality in approving the Third Bridge Loan may be called into question. First, the options were granted to King and Hachenburg after the Third Bridge Loan which occurred in January 1998 (King allegedly received his stock options on March 11, 1998 and Hachenburg his on May 14, 1998). Second, there is no allegation suggesting that the options were given to these directors in exchange for their promises to vote in favor of this transaction. As such, I am satisfied that the allegations in the Complaint fail to raise a reasonable doubt as to the impartiality of both King or Hachenburg.

FN28.*Id.* at 38-40.

*7 Because the Complaint only sets forth facts raising a reasonable doubt as to the independence and/or disinterestedness of three of the eight directors approving the Third Bridge Loan, Plaintiff has failed to rebut the presumption that the Board duly exercised its business judgment in approving this transaction and Defendants' motion to dismiss this claim is granted.

4. The Reverse Stock Split

The Reverse Stock Split (which triggered the conversion to equity under the Bridge Loans) was unanimously approved by the Company's nine directors on June 18, 1998. The directors voting in favor of the transaction were Khosla, Wu, Komisar, Kern, King, Ziebold, Hachenburg, Louie, and Heistand. Because I find that the Complaint alleges facts that raise a reasonable doubt as to whether this transaction was approved by a majority of independent and disinterested directors, Defendants' motion to dismiss this claim is denied.

As discussed above, the Complaint's allegations as to Khosla and Wu's respective representation of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))**

Kleiner Perkins and Vertex raise a reasonable doubt as to whether those directors were capable of exercising impartial judgment in having voted in favor of each of the three Bridge Loan Transactions. Because the Reverse Stock Split triggered the conversion of the Bridge Loans into post-restructuring common stock, the direct interests of Kleiner Perkins and Vertex here render Khosla and Wu interested for Rule 12(b)(6)'s purposes in this transaction as well. So too do I find, for similar reasons, that Kern, who was interested in the Second Bridge Loan as a result of his alleged status as an investor in the Company through the Arthur Kern Revocable Trust, was interested for the purposes of Defendants' motion to dismiss as to this transaction. I moreover find that, as a result of Kleiner Perkins' financial interest in the Reverse Stock Split, the contacts rebutting the presumption of Komisar's independence and disinterestedness in supporting the first three Bridge Loans rendered him partial for the purposes of the Reverse Stock Split.

The Complaint alleges that Hachenburg and King were granted options prior to the Reverse Stock Split. Because those options are alleged to have been exercisable and effective only upon the approval of the Reverse Stock Split, Hachenburg and King are also deemed to have been interested in this transaction.

Having found that the Complaint raises a reasonable doubt as to the independence and/or disinterestedness of at least six of the nine directors voting to approve the Reverse Stock Split, Defendants' Rule 12(b)(6) motion to dismiss this claim is denied.[FN29]

> FN29. Plaintiff has failed to allege sufficient facts to state a claim that the Defendants breached their duty of due care. As a preliminary matter, any attempt by the Defendants to rely on 8 Del. C. § 102(b)(7) is misplaced because my finding that the core of Plaintiff's loyalty claims survives renders that provision inapplicable at this stage. *Malpiede v. Townson,* 780 A.2d at

1094-95. The duty of care commands that "in making business decisions, directors must consider all material information reasonably available, and the directors' process is only actionable if grossly negligent."*Brehm v. Eisner,* 746 A.2d at 259. Plaintiff alleges in a conclusory fashion that the Defendants "fail[ed] to commission a third party valuation or fairness opinion,""fail[ed] to have the transactions ratified by an independent or special committee of the Board," and "fail [ed] to consider alternative methods of raising capital."Compl. ¶ 72(d), (e), (i). These allegations, without more, however, do not demonstrate (or support the inference) that the Defendants acted in a "grossly negligent" manner. Accordingly, to the extent that Plaintiff contends that Defendants contravened this duty-an argument that was hardly addressed by Plaintiff either in his papers or at oral argument-this claim is dismissed.

**B. Tortious Interference with Contract**

Plaintiff alleges in Count IV of the Complaint that the Director Defendants tortiously interfered with his contractual rights under the Certificate. Specifically, Plaintiff claims that the Director Defendants tortiously interfered with his contractual rights by: (1) failing to redeem automatically Plaintiff's A-2 Stock pursuant to Article Fourth, Subsection 3 of the Certificate; (2) refusing to redeem timely Plaintiff's A-2 Stock when demand was made pursuant to Article Fourth, Subsection 5 of the Certificate; (3) attempting to pressure Plaintiff to forfeit all or part of his equity in the Company without consideration; and (4) virtually eliminating Plaintiff's equity in the Company through the Reverse Stock Split and conversion of the Bridge Loans.

**\*8** In order to state a claim for tortious interference with contractual rights, a plaintiff must allege the existence of "(1) a contract; (2) about which De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))**

Page 10

fendant knew and (3) an intentional act that is a sig-
nificant factor in causing the breach of such con-
tract (4) without justification (5) which causes in-
jury."[FN30] Moreover, it is also generally accepted
that "officer[s] or director[s] may be held person-
ally liable for tortious interference with a contract
of the corporation if and only if [they] exceed the
scope of [their] agency in so doing."[FN31] Against
this backdrop, I turn to the allegations set forth in
the Complaint.

> FN30. *Irwin & Leighton, Inc. v. W.M. An-
> derson Co.*, 532 A.2d 983, 992 (Del.
> Ch.1987).

> FN31. *Local Union 42 v. Absolute Envtl.
> Servs., Inc.*, 814 F.Supp. 392, 400
> (D.Del.1993); *see also Grand Ventures,
> Inc. v. Paoli's Rest., Inc.*, Del.Super., C.A.
> No. 95C-03-013, Graves, J. (Jan. 4, 1996)
> (citing with approval the holding of *Local
> Union 42* ).

Plaintiff alleges that the Director Defendants' fail-
ure to redeem automatically his A-2 Stock pursuant
to Article Fourth, Subsection 3 of the Certificate
renders them liable for tortiously interfering with
his contractual rights. Plaintiff cannot set forth a
cognizable claim on this argument as a con-
sequence of the Court's determination as a matter of
law at the March 12, 2002 hearing that the Defend-
ants, as alleged in Count I of the Complaint, did not
breach the provisions of Article Fourth, Subsection
3. Because I also dismissed Count II of the Com-
plaint at the March 12, 2002 argument, having
found that Plaintiff failed to set forth a claim that
the Company breached the Certificate in having re-
fused to redeem timely Plaintiff's A-2 Stock upon
demand, I similarly find that Plaintiff's argument
that the Defendants tortiously interfered with
Plaintiff's contractual rights under Article Fourth,
Subsection 5 fails.

Plaintiff next argues that the Director Defendants
tortiously interfered with his contractual rights by
having attempted to pressure Plaintiff into forfeit-

ing all or part of his equity interest in the Company
for either zero or inadequate consideration. A claim
of tortious interference with a contractual right re-
quires, *inter alia*, a contract, a breach of that con-
tract, and an injury. While Plaintiff points to allega-
tions set forth in the Complaint asserting that he
was pressured by the Defendants to forfeit his
shares, he fails to allege either that the Defendants'
actions contravened a specific provision of the Cer-
tificate or that he was injured in any way as a result
of the Defendants' supposed coerciveness. If any-
thing, Plaintiff alleges that he consistently rejected
the requests of the Director Defendants that he for-
feit his equity interest and, consequently, he cannot
establish that he was injured as a result of the De-
fendants' alleged conduct.

Plaintiff's final argument in support of his theory
that the Director Defendants tortiously interfered
with his contractual rights under the Certificate is
premised on his claim that the Defendants virtually
eliminated Plaintiff's equity interest in the Com-
pany through the Reverse Stock Split and conver-
sion of the Bridge Loans. Plaintiff once again fails
to point to a specific contractual provision in the
Certificate that would warrant such a finding. The
Complaint may allege that the Director Defendants
breached their duties of loyalty and fair dealing
with respect to the alleged scheme that was de-
signed to squeeze Plaintiff out, but an alleged
breach of the directors' fiduciary duties, in the ab-
sence of allegations that those directors breached
specific duties set forth in the corporate charter,
does not automatically translate into a tortious in-
terference with contract claim against the corpora-
tion's board members.

*9 I further note the absence of any allegation in
the Complaint to justify an inference that the direct-
ors acted outside the scope of their authority. The
Complaint raises questions as to whether the direct-
ors breached their fiduciary duty of loyalty. Merely
because directors are alleged to have acted in part
with adverse motives does not necessarily lead to
the conclusion that they acted outside the scope of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))

their authority for the purposes of holding directors personally liable in tort for interfering with the contractual rights of a shareholder.[FN32]To hold otherwise would create a substantial risk that many directors who are alleged to have breached their fiduciary duties would be exposed to this companion tort based on the directors' allegedly causing the corporation to default on some obligation owed to its shareholders through the corporate charter. As such, I find that the Complaint fails to set forth sufficient allegations giving rise to a claim for tortious interference with contractual rights.

> FN32.*Wallace v. Wood,* 752 A.2d 1175, 1182-83 (Del. Ch.1999).

Thus, Defendants' motion to dismiss Count IV under Court of Chancery Rule 12(b)(6) is granted.FN33

> FN33. The Director Defendants have sought to amend their motion to dismiss under Rule 12(b)(6) to include defenses of lack of personal jurisdiction and insufficiency of process and service of process under Court of Chancery Rules 12(b)(2), 12(b)(4), and 12(b)(5) with respect to the Plaintiff's tortious interference with contract claim. In light of my decision to dismiss the tortious interference with contract claims, I need not consider whether Defendants should be allowed to revise their motion to dismiss to include these defenses or whether these defenses have been waived. Because Defendants' application to revise their motion to assert these defenses has not been granted, the question of whether this Court has personal jurisdiction over the Director Defendants for purposes of this claim is not pending. Thus, I need not address the personal jurisdiction question, which typically must be addressed before the merits of the substantive dispute.

C. Disclosure

Plaintiff, as his final claim, asserts that the Director Defendants breached their duty of disclosure and candor by having failed to disclose to Plaintiff the ramifications that would allegedly befall him if he declined his invitation to participate in the First Bridge Loan. Specifically, Plaintiff alleges that "none of the documentation provided to plaintiff for his consideration in deciding whether to participate in the [F]irst Bridge Loan financing made any mention of a restructuring of the Company that would effectively wipe out his shares if he did not participate in the [F]irst Bridge Loan financing."[FN34]He further alleges that the Director Defendants, at the time Plaintiff was solicited to participate in the First Bridge Loan, knew that the "ultimate conversion of the Bridge Loans" would "effectively eliminate Plaintiff's shareholdings."[FN35]Finally, Plaintiff asserts that these omissions were material to his decision on whether to participate in the bridge loan transactions.

> FN34. Compl. ¶ 92.

> FN35.*Id.* ¶ 95.

As support for his disclosure claim, Plaintiff cites *Malone v. Brincat*[FN36] and argues that "[e]ven in the absence of stockholder action, a Board is under a duty to disclose all material information to stockholders pertaining to corporate matters affecting stockholder interests."[FN37]Thus, Plaintiff argues the Defendants were under a duty to disclose fully and fairly their alleged plans to engage in a series of Bridge Loans and to effectuate the conversion of the Bridge Loans with the concomitant dilution of Plaintiff's equity position as the result of the Reverse Stock Split.

> FN36.722 A.2d 5 (Del.1998).

> FN37. Plaintiff's Answering Brief at 45.

"In properly discharging their fiduciary responsibilities, directors of Delaware corporations must exercise due care, good faith and loyalty whenever they communicate with shareholders about the corpora-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))

Page 12

tion's affairs."[FN38] Thus, when making disclosures to shareholders in the context of a request for shareholder action,[FN39] the "[d]irectors are required to provide shareholders with all information that is material to the action being requested and to provide a balanced, truthful account of all matters disclosed in the communications with shareholders."[FN40] Here, Plaintiff does not claim that the disclosures were false; instead, he asserts that the Director Defendants failed to deliver the necessary information to him in order to make a decision on whether to invest in the First Bridge Loan. "In order for a plaintiff to state properly a claim for breach of a disclosure duty by omission, he must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the [disclosure] materials ."[FN41] The critical factor in this analysis is frequently materiality. An omission will be deemed material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the shareholder.[FN42]

> FN38. *McMullin v. Beran,* 765 A.2d 910, 925 (Del.2000).

> FN39. When Plaintiff was afforded the opportunity to participate in the First Bridge Loan, the Director Defendants were not asking him to exercise a right inherent in his status as shareholder, such as the right to vote, or to refrain from exercising a shareholder right, such as a preemptive right to invest in any subsequent offering. However, Plaintiff was afforded the opportunity to participate in recognition of the potential that his equity interest in the Company might ultimately be diluted. The potential impact on his equity holding directly implicated rights then held by him as a stockholder. Thus, the opportunity to invest in the First Bridge Loan was a corporate event in which the Director Defendants

provided him the opportunity to choose whether or not to invest. As such, their offer constituted a request for shareholder action. *See Malone v. Brincat,* 722 A.2d at 10 ("The duty of disclosure obligates directors to provide the stockholders with accurate and complete information material to a transaction *or other corporate event that is being presented to them for action.*") (emphasis added).

> FN40. *Id.* at 12.

> FN41. *Orman v. Cullman,* 794 A.2d at 31 (internal quotations and citations omitted).

> FN42. *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985).

*10 The Complaint alleges that the Director Defendants failed to disclose fully the contemplated restructuring that would result from the conversion of the various bridge loans. In substance, Plaintiff claims that he was not fairly apprised of the extent to which his equity position in the Company would likely be diluted. As noted, in assessing a disclosure claim, the Court must look to the "total mix" of information available to the shareholder. Here, the Company specifically warned Plaintiff in advance of the First Bridge Loan that the contemplated restructuring "would be dilutive to existing shareholders."[FN43] In addition, the transaction documents for the First Bridge Loan were delivered to Plaintiff's counsel. From those documents, it appears, and Plaintiff does not argue otherwise, that a dilution of his equity interest could result. Plaintiff, however, was not informed of the magnitude of the potential dilution.

> FN43. *See supra* note 6.

Plaintiff argues that if he had received a more detailed projection, he might have exercised his option to invest in the First Bridge Loan and, thus, protected, at least to some extent, his equity position. Without this additional information, he could

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))

Page 13

not, so he argues, make an informed decision on whether to participate in the First Bridge Loan.

From the Complaint it is clear that Plaintiff was on notice of the general, potential consequences of the First Bridge Loan. His equity position might be adversely affected. By investing in the First Bridge Loan, he could reduce the risk of dilution. Moreover, the possibility of additional loans was made known to him. The Director Defendants, however, knew (or so it is alleged) that the planned borrowing program with the foreseeable and intended conversion of debt to equity would have grave consequences for Plaintiff's equity position in the Company. With that knowledge, withheld from him as it was, Plaintiff could have and might reasonably have decided to remain a significant participant in the Company's future by participating in the First Bridge Loan. For purposes of review under Court of Chancery Rule 12(b)(6), I am satisfied that the Complaint adequately alleges that the Director Defendant failed to disclose to Plaintiff material information that was known to them. Accordingly, Defendants' Motion to Dismiss Count V of the Complaint is denied.[FN44]

> FN44. Defendants argue that the disclosure claim is barred by the statute of limitations or the doctrine of laches. Although the disclosures associated with the First Bridge Loan occurred more than three years before the original complaint was filed, I decline Defendants' invitation to dismiss this claim for the same reasons supporting denial of the time-barred motion addressed to other alleged breaches of fiduciary duty associated with the First and Second Bridge Loan. *See supra* note 16.

### III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss Count IV of the Complaint under Court of Chancery Rule 12(b)(6) is granted. Defendants' motion to dismiss is also granted as it applies to the Board's approval of the Third Bridge Loan and the

alleged breach of the duty of care as set forth in Count III. Defendants' motion to dismiss Count V of the Complaint is denied. Finally, I find that the remaining fiduciary duty allegations advanced by Plaintiff in Count III of the Complaint with respect to the First and Second Bridge Loans and the Reverse Stock Split survive Defendants' motion to dismiss. An order will be entered in accordance with this letter opinion.

### ORDER

**\*11** AND NOW, this 14th day of June, 2002, IT IS HEREBY ORDERED:

1. For the reasons set forth on the record at the conclusion of oral argument on March 12, 2002, that, pursuant to Court of Chancery Rule 12(b)(6), Count I and Count II of Plaintiff's Second Amended Complaint be, and the same hereby are, dismissed.

2. For the reasons set forth in the Court's Letter Opinion of June 14, 2002, that:

(a) pursuant to Court of Chancery Rule 12(b)(6), that portion of Count III relating to the so-called third bridge loan and Count IV of Plaintiff's Second Amended Complaint be, and the same hereby are, dismissed;

(b) pursuant to Court of Chancery Rule 12(b)(6), Plaintiff's allegations that the individual Defendants breached their fiduciary duty of care be, and the same hereby are, dismissed;

(c) otherwise, Defendants' Revised Motion to Dismiss the Second Amended Complaint be, and the same hereby is, denied; and

(d) Plaintiff's Motion to Strike Defendants' Revised Motion to Dismiss the Second Amended Complaint be, and the same hereby is, denied, without prejudice, as moot.

Del.Ch.,2002.
Goldman v. Pogo.com, Inc.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)

**(Cite as: Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.))**

Not Reported in A.2d, 2002 WL 1358760 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))

Page 1

**H**
Griffin Corporate Services, LLC v. Jacobs
Del.Ch.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
GRIFFIN CORPORATE SERVICES, LLC, Plaintiff,
v.
Francis JACOBS, Joan Dobrzynski, Gordon Stewart, and Stewart Management Company, Defendants and Counterclaim Plaintiffs,
v.
CORPORATION SERVICE COMPANY, Entity Services Group, LLC, Robert Campbell, David Eppes, and Griffin Corporate Services, LLC, Counterclaim Defendants.
**No. Civ.A. 396-N.**

Submitted June 30, 2005.
Decided Aug. 11, 2005.

Kathleen Furey McDonough, Kevin R. Shannon, Melony R. Anderson, Potter Anderson & Corroon LLP, Wilmington, Delaware, for Plaintiff and Counterclaim Defendants.
James S. Green, George H. Seitz, III, Kevin A. Guerke, Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware, for Defendants and Counterclaim Plaintiffs.

MEMORANDUM OPINION

PARSONS, Vice Chancellor.
*1 Corporation Service Company ("CSC"), Entity Services Group, LLC ("Entity"), Robert Campbell and David Eppes (collectively referred to as "Counterclaim Defendants") and Plaintiff, Griffin Corporate Services, LLC ("Griffin"), seek to dismiss the counterclaims brought by Francis Jacobs, Joan Dobrzynski, Gordon Stewart and Stewart Management Company ("SMC") (collectively re-

ferred to as "Counterclaim Plaintiffs").

Counterclaim Plaintiffs assert that Griffin and Counterclaim Defendants interfered with their existing contract and prospective business relationships and engaged in common law and statutory unfair trade practices. Additionally, they assert that Griffin breached the confidentiality agreement with SMC, made fraudulent misrepresentations to SMC and that Dobrzynski and Jacobs are entitled to indemnification from Griffin. Griffin and Counterclaim Defendants have moved for dismissal of all counterclaims based on a failure to state a claim under Rule 12(b)(6) and failure to plead fraud with particularity as required by Rule 9(b).

For the reasons stated below, Griffin and Counterclaim Defendants' motion to dismiss is granted in part and denied in part.

I. FACTS [FN1]

> FN1. The facts set forth herein are based on the well-pleaded allegations of the Counterclaim and are accepted as true for the purposes of Griffin and Counterclaim Defendants' motion to dismiss.

A. Parties and Background

Griffin is a limited liability company that provides commercial domicile services to special purpose entities ("SPEs"). Before April 2004, Griffin was a wholly-owned subsidiary of Wachovia Bank, N.A. ("Wachovia"). Its competitors in the commercial domicile services industry included SMC and Entity. Stewart is a principal of SMC. Campbell and Eppes are officers and shareholders of Entity. Jacobs and Dobrzynski are former employees of Griffin. Through Griffin, Jacobs and Dobrzynski served as directors, officers, or employees ("Delaware Employees") of many of Griffin's SPE clients and had separate employment agreements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 2
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

with the SPEs.

In December 2003, Wachovia initiated a closed bid-
ding process for the sale of Griffin and invited
SMC and Entity to participate.[FN2] To participate in
the bidding process, Wachovia required the bidders
to enter into a confidentiality agreement (the
"Confidentiality Agreement") concerning the dis-
closure of information obtained through the bidding
process. A proposed non-solicitation provision con-
tained in the Confidentiality Agreement, however,
was unacceptable to SMC. Stewart negotiated a
change in that provision that allowed SMC to hire
Griffin employees who contacted SMC on their
own initiative.

> FN2. Entity participated through its major-
> ity shareholder, CSC. For the sake of sim-
> plicity, I will refer to CSC's actions taken
> on behalf of Entity during this bidding pro-
> cess as Entity's actions.

On April 1, 2004, after two bids by SMC,
Wachovia sold Griffin to Entity. Counterclaim
Plaintiffs allege that SMC's sixteen million dollar
bid was the highest bid, but that Griffin never re-
sponded to it. They claim that this bid was at least
one million dollars more than Entity agreed to pay.
Additionally, they claim that "[t]here was essen-
tially no confidential information provided to SMC
by Wachovia that generally would not be available
to any of Wachovia's shareholders or upon the ex-
amination of the public disclosures Wachovia was
required to make as a publicly traded company or
as a bank" during the bidding process.[FN3] Based on
these allegations, Counterclaim Plaintiffs allege
that the bidding process was a pretext to "tie the
hands" of Griffin's competitors by inducing them to
sign the Confidentiality Agreement and thereby
agree to a non-solicitation provision.[FN4] They al-
lege that Wachovia acted fraudulently and in bad
faith by misrepresenting to SMC that they were
seeking bids to sell Griffin when they already had
selected Entity as the purchaser.

> FN3. Countercl. ¶ 104.

> FN4. *Id.* ¶¶ 141, 145.

*2 During the first week after Entity assumed con-
trol of Griffin, Entity had Griffin employees call
the SPEs to advise them of the sale and assure them
that "no changes" were to occur because of the
sale.[FN5] Counterclaim Plaintiffs allege that this was
a misrepresentation because Entity intended to
move offices, add officers, and require the re-
execution of all client contracts. Entity also presen-
ted Griffin employees with a letter imposing addi-
tional terms on their continued employment, includ-
ing entering into a noncompete agreement.

> FN5. *Id.* ¶ 109.

During the second week after Entity assumed con-
trol of Griffin, Jacobs and Dobrzynski learned of
the specific terms of the noncompete agreement.
Jacobs and Dobrzynski believed that those terms
were onerous and would force them to change ca-
reers if they left the new Entity-controlled Griffin
after signing the noncompete. They also understood
that signing the noncompete agreement by April 16,
2004, the end of the second week, was a "take it or
leave it" mandatory condition of continued employ-
ment at Entity/Griffin.[FN6] Consequently, they initi-
ated a search for alternative employment opportun-
ities and, on or about April 13 and 14, 2004, Jacobs
and Dobrzynski agreed to employment terms with
SMC upon their resignation from Griffin.

> FN6. *Id.* ¶ 117.

On April 16, 2004, Jacobs and Dobrzynski resigned
from Griffin. Following their resignation, they at-
tempted to recall email addresses of their contacts
at the SPEs for which they served as Delaware Em-
ployees. They sent the SPEs emails to notify them
of the termination of their relationship with Entity/
Griffin. Additionally, forms were created to allow
the SPEs to request that Jacobs and Dobrzynski
continue to serve as their Delaware Employee, and
select SMC as their commercial domicile services
provider. Counterclaim Plaintiffs claim that these
forms were sent only to SPEs that contacted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 3
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

Dobrzynski and Jacobs and indicated that they wished to receive such forms.

On or about April 19, 2004, Entity/Griffin had ten or more members of their staff begin a calling campaign to as many of the SPEs that had employment agreements with Dobrzynski and Jacobs, or for which they served as Delaware Employees, as possible. Counterclaim Plaintiffs allege that during these phone calls Griffin and Counterclaim Defendants told the SPEs that they needed to replace Dobrzynski and Jacobs in order to continue functioning and failed to inform the SPEs of their option to retain Dobrzynski and Jacobs, refused to accurately inform, or misinformed, the SPEs of where and how to contact Jacobs and Dobrzynski, and misrepresented SMC's fees, professional abilities and business practices.

On April 22, 2004, the Court issued a temporary restraining order preventing Defendants from, *inter alia,* soliciting Griffin's SPE clients because of Defendants' (Counterclaim Plaintiffs') improper actions. On May 7, 2004, after discovery and a hearing, the Court granted Griffin's motion for a preliminary injunction finding that Griffin had demonstrated a reasonable probability of success on the merits as to its claims for breach of fiduciary duties, deceptive trade practices, tortious interference with contractual relations, and aiding and abetting breaches of fiduciary duties. At the close of the preliminary injunction hearing, the Court extended the prohibition against Defendants' solicitation of Griffin's clients until May 17, 2004.

**\*3** Counterclaim Plaintiffs allege that through at least May 17, 2004, Griffin and Counterclaim Defendants made various misrepresentations to the SPEs including, but not limited to, misrepresentations of the cost of doing business with SMC versus Entity/Griffin, of Jacobs and Dobrzynski's availability and willingness to continue to serve as their Delaware Employees, and that their leases were expiring on June 30, 2004, in order to force the SPEs to decide to stay with Entity/Griffin. Counterclaim Plaintiffs also allege that Griffin and Counterclaim

Defendants misrepresented that they had authority to act on behalf of former clients to third parties and maintained a misleading internet website that misrepresented the employment status of an SMC employee.

Counterclaim Defendants have moved to dismiss the counterclaims on several grounds. Argument on Counterclaim Defendants' motion was held on April 28, 2005. Counterclaim Plaintiffs filed a supplemental letter on June 28, 2005. Counterclaim Defendants responded to that letter on June 30, 2005. This memorandum opinion addresses the remaining grounds for Counterclaim Defendants' motion to dismiss.[FN7]

> FN7. Griffin and Counterclaim Defendants' motion to dismiss based on a lack of personal jurisdiction and insufficiency of process, or service of process, under Court of Chancery Rules 12(b)(2), (4) and (5) were denied on the record at argument. *See* Tr. at 10-11. Additionally, after argument, Counterclaim Plaintiffs dismissed their claim for tortious interference as it related to Ms. Linda Bubcacz. *See* Stipulation of Dismissal dated July 1, 2005.

## II. ANALYSIS

Counterclaim Plaintiffs assert that Griffin and Counterclaim Defendants interfered with their existing contractual and prospective business relationships and engaged in common law and statutory unfair trade practices. Additionally, they assert that Griffin breached the Confidentiality Agreement, made fraudulent misrepresentations to SMC and that Dobrzynski and Jacobs are entitled to indemnification from Griffin for all or part of what Griffin may recover from them in the course of this litigation. Griffin and Counterclaim Defendants have moved for dismissal of all of the counterclaims based on a failure to state a claim under Court of Chancery Rule 12(b)(6), and failure to plead fraud with particularity as required by Rule 9(b). I address each of Griffin and Counterclaim Defendants'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))

Page 4

arguments for dismissal below.

### A. Dismissal of the Counterclaims for Failure to State a Claim

#### 1. Standard for dismissal under Rule 12(b)(6)

Though the parties strenuously debate its finer points, the standard for dismissal of a claim under Rule 12(b)(6) is well settled. A claim may be dismissed under Rule 12(b)(6) where "allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[FN8] In other words, a motion to dismiss under Rule 12(b)(6) will be granted only if a "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[FN9]

> FN8. *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001).

> FN9. *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 611 (Del.2003) (quoting *Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.,* 654 A.2d 403, 406 (Del.1995)). *See also McMullin v. Beran,* 765 A.2d 910, 916 (Del.2000); *Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

"[W]hen evaluating a motion to dismiss for failure to state a claim, the truthfulness of all well-pleaded allegations in the complaint is to be assumed,"[FN10] and the pleader is given "the benefit of all reasonable inferences that can be drawn from its pleading."[FN11] "An allegation, though vague or lacking in detail, is nevertheless 'well-pleaded' if it puts the opposing party on notice of the claim being brought against it."[FN12] "Conclusions of law or fact, however, will not be assumed to be true without specific allegations of fact which support the conclusion."[FN13]

> FN10. *Solomon v. Pathe Communications Corp.,* 672 A.2d 35, 38 (Del.1996).

> FN11. *In re USACafes, L.P. Litig.,* 600 A.2d 43, 47 (Del. Ch.1991).

> FN12. *VLIW Tech.,* 840 A.2d at 611.

> FN13. *Haber v. Bell,* 465 A.2d 353, 357 (Del. Ch.1983).

*4 Though the parties agree that Delaware has adopted a notice pleading standard in order to withstand a motion to dismiss,[FN14] they disagree about whether Counterclaim Plaintiffs have met their "burden to plead facts, not conclusions."[FN15]

> FN14. *See, e.g., VLIW Tech.,* 840 A.2d at 611 ("[U]nder Delaware's judicial system of notice pleading, a plaintiff need not plead evidence. Rather, the plaintiff need only allege facts that, if true, state a claim upon which relief can be granted."); *Rabkin,* 498 A.2d at 1104 ("A complaint need only give general notice of the claim asserted and will not be dismissed unless it is clearly without merit, either as a matter of law or fact.").

> FN15. *Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 893 (Del. Ch.1999).

#### 2. Tortious interference with existing contracts and prospective business relationships

Counterclaim Plaintiffs allege that Griffin and Counterclaim Defendants intentionally interfered with: a) the employment agreements between Dobrzynski or Jacobs and Griffin's SPE clients, b) Counterclaim Plaintiffs' prospective business relations with the SPEs, and c) the legal practice of Stewart by "attempting to undermine the attorney-client relationship Stewart has with many SPEs that have elected Entity/Griffin as its commercial domicile provider."[FN16] In response, Griffin and Counterclaim Defendants argue that these claims should be dismissed for failure to plead *"any facts* suggest-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))

ing that [they] engaged in improper conduct" as well as a failure to plead facts that establish the requisite elements of a claim for tortious interference.FN17

FN16. Countercl. ¶¶ 131, 133, 134.

FN17. Counterclaim Defs.' Opening Br. in Supp. of their Mot. to Dismiss the Countercl. ("DOB") at 10.

a. Existing business contracts

To prevail on a claim for tortious interference with an existing contract, a party must demonstrate: (1) the existence of a contract, (2) about which the interferer knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) that causes injury.FN18

FN18.See *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del. Ch.1987); *CPM Indus., Inc. v. Fayda Chem. & Minerals, Inc.,* 1997 WL 762650, at *7 (Del. Ch. Nov. 26, 1997).

Griffin and Counterclaim Defendants argue that Counterclaim Plaintiffs have alleged neither a breach of any employment agreement nor damages stemming from the alleged tortious interference. I agree. Though a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief,"FN19 an allegation of a breach is necessary to show entitlement to relief for tortious interference with an existing contract.FN20 The only contracts addressed in the Counterclaim are the employment agreements that Jacobs and Dobrzynski had with the SPEs. The Counterclaim, however, alleges no breach of the employment agreements. Frankly, the facts presented to the Court call into question the viability of the employment agreements after Jacobs and Dobrzynski left Griffin. Counterclaim Plaintiffs only allege that Griffin and Counterclaim Defendants "intentionally interfered with employment rela-

tionships ... [and] fiduciary duties" not any employment agreements.FN21In their responsive brief, Counterclaim Plaintiffs argue that the employment agreements were breached because Griffin and Counterclaim Defendants' actions caused the SPEs to fail to pay Jacobs and Dobrzynski for their services, "a clear breach of contract." FN22This allegation, however, is made nowhere in the Counterclaim. "Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss."FN23Thus, I will not consider an allegation presented to the Court for the first time in a responsive brief, without further evidentiary support, when ruling on a motion to dismiss.FN24Accordingly, I find that Counterclaim Plaintiffs failed to plead any breach of the employment agreements.

FN19.Court of Chancery Rule 8(a)(1).

FN20.See *Goldman v. Pogo.com, Inc.,* 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002).

FN21. Countercl. ¶ 131.

FN22. Defs. and Countercl. Pls.' Answering Br. in Opp'n to the Countercl. Defs.' Mot. to Dismiss ("PAB") at 15.

FN23.In re *Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 68 (Del.1995).See also *Haber,* 465 A.2d at 357 ("In considering a motion to dismiss, only those matters referred to in the pleadings are to be considered by the Court.").

FN24. Additionally, I note that Counterclaim Plaintiffs made a conscious decision to stand on the allegations of their Counterclaim by answering Griffin and Counterclaim Defendants' motion to dismiss. Amendment of the Counterclaim at this point in time would be improper under Rule 15(aaa).

*5 Additionally, Counterclaim Plaintiffs pled no facts to support their claim that they were damaged

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

Page 6

as a result of a breach of the employment agreements. The only allegation of damages Counterclaim Plaintiffs make states that "[a]s a result of Entity's intentional interference with existing and prospective business relationships, Defendants have been damaged."[FN25] Conclusions of law or fact unsupported by factual allegations will not be assumed to be true.[FN26] Thus, because Counterclaim Plaintiffs failed to allege any breach of the employment agreements or support their conclusory allegation of resultant damages, I grant Griffin and Counterclaim Defendants' motion to dismiss the counterclaim for tortious interference with existing employment agreements.[FN27]

FN25. Counterci. ¶ 134.

FN26. *See Haber,* 465 A.2d at 357.

FN27. Additionally, Griffin and Counterclaim Defendants argued that dismissal is warranted because while competitors are justified and privileged to compete with each other if proper means are used. I have not relied on that argument because Counterclaim Plaintiffs have alleged facts that could support a finding that Griffin and Counterclaim Defendants' conduct was not justified. *See Bowl-Mor Co. v. Brunswick Corp.,* 297 A.2d 61, 64 (Del. Ch.1972); *Merck & Co. v. SmithKline Beecham Pharm. Co.,* 1999 WL 669354, at *52 (Del. Ch. Aug. 5, 1999). For example, Counterclaim Plaintiffs allege that Griffin and Counterclaim Defendants misrepresented "that [the SPEs] needed to immediately replace Dobrzynski and Jacobs in order to keep their SPE viable" and "that Dobrzynski and Jacobs were no longer available to serve as [the SPEs'] directors, officers and employees," and misrepresented "SMC's fees, professional abilities and business practices."Counterci. ¶¶ 128, 137. Such allegations, taken as true, call into question the nature of Griffin and Counterclaim Defendants' conduct and motive, and raise

concern for the interests of the SPEs.

b. Prospective business relationships

To prevail on a claim for tortious interference with prospective business relations, a party must demonstrate the: "(1) the existence of a valid business relation or expectancy, (2) the interferer's knowledge of the relationship or expectancy, (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted."[FN28]

FN28. *In re Frederick's of Hollywood, Inc.,* 1998 WL 398244, at *5 (Del. Ch. July 9, 1998); *CPM Indus.,* 1997 WL 762650, at *7.

Jacobs and Dobrzynski served as the Delaware Employee for numerous SPEs while employed at Griffin. Counterclaim Plaintiffs allege that Jacobs and Dobrzynski resigned from their positions at Griffin, Griffin and Counterclaim Defendants intentionally interfered with such employment relationships and caused Counterclaim Plaintiffs damage. In support of this allegation, Counterclaim Plaintiffs contend that Griffin and Counterclaim Defendants conducted a "calling campaign to as many of the SPEs that had employment contracts with Dobrzynski and Jacobs or for which they served as officers, directors, and/or employees as possible," and that during this calling campaign, Griffin and Counterclaim Defendants told the SPEs that "they needed to replace Dobrzynski and Jacobs in order to continue functioning ... refused to accurately inform, or misinformed, the SPEs where and how to contact Dobrzynski and Jacobs ... [and] misrepresented SMC's fees, professional abilities and business practices."[FN29] The pleadings are sufficient to support an inference that at least some of the SPEs in question chose to terminate their relationship with Jacobs and Dobrzynski and continue with Entity/Griffin based on the alleged misrepresentations. Therefore, Counterclaim Plaintiffs have alleged a termination of their prospective relation-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

ships with certain SPEs and resultant damage due to the conduct complained of, and I cannot find that Counterclaim Plaintiffs "would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[FN30]Thus, I deny Griffin and Counterclaim Defendants' motion to dismiss Counterclaim Plaintiffs' claim for tortious interference with prospective business relations.

FN29. Countercl. ¶ 128.

FN30.*VLIW Tech.,* 840 A.2d at 611.

c. Stewart's legal practice

*6 Griffin and Counterclaim Defendants also argue that Counterclaim Plaintiffs have failed to identify any improper actions they took to interfere with Stewart's legal practice that resulted in a breach of contract. I agree. The only references made to Stewart in the Counterclaim are paragraphs 103 and 133. Paragraph 133 states, "[u]pon information and belief, [Griffin] and Counterclaim Defendants have intentionally interfered with the legal practice of Defendant Stewart by attempting to undermine the attorney-client relationship Stewart has with many SPEs that have elected Entity/Griffin as its commercial domicile provider."Such a bald statement, without further factual allegations to support it, is merely conclusory and need not be accepted as true.FN31The Counterclaim provides no notice or identification of the actions alleged to have undermined or interfered with Stewart's attorney-client relationships. Nor does the Counterclaim allege that any contracts or business relations were breached or terminated. While paragraph 103 notes Stewart's discussions with Wachovia regarding its sale of Griffin, those discussions are not related to Stewart's attorney-client relationships with SPEs and, therefore, provide no support for the tortious interference allegation in paragraph 133.

FN31.*See Haber,* 465 A.2d at 357.

For these reasons, I grant Griffin and Counterclaim

Defendants' motion to dismiss the counterclaim for tortious interference with Stewart's attorney-client relations.

3. Common law and statutory unfair trade practices

Counterclaim Plaintiffs allege that Griffin and Counterclaim Defendants engaged in intentional deceptive and unfair trade practices as set forth in 6 *Del. C.* § 2532 and in common law. Griffin and Counterclaim Defendants respond that this claim should be dismissed because Counterclaim Plaintiffs do not have standing to sue under the Delaware Deceptive Trade Practices Act ("DTPA") and because the acts they challenge do not constitute prohibited acts under § 2532.

a. Standing

Griffin and Counterclaim Defendants argue that Counterclaim Plaintiffs cannot sue under the DTPA because they lack standing to seek injunctive relief. They argue that to have such standing Counterclaim Plaintiffs would have to have alleged that the harm they suffered is ongoing.

While it is true that one must have standing to seek an injunction to state a cause of action under the DTPA,[FN32] Counterclaim Plaintiffs meet that requirement. The Counterclaim states that Entity/Griffin "deployed a dedicated staff of ten or more to begin a calling campaign to as many of the SPEs that had employment contracts with Dobrzynski and Jacobs ... as possible" on April 19, 2004, and that "[t]hese calls [during which damaging misrepresentations were allegedly made] continued through at least May 17, 2004."[FN33]Although this allegation does not affirmatively state that the harm Counterclaim Plaintiffs suffered continues, it also does not state that such harm has been abated. At this stage, I must accept all well-pleaded facts in the Counterclaim as true and draw all reasonable inferences in favor of Counterclaim Plaintiffs. The ambiguity regarding the continuing nature of the harm alleged, coupled with Counterclaim Plaintiffs'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

request for injunctive relief, lead me to conclude that Counterclaim Plaintiffs have sufficiently pled a claim for injunctive relief and, thus, have standing to sue under the DTPA.

> FN32.*See Grand Ventures, Inc. v. Whaley,* 632 A.2d 63, 70 (Del.1993).

> FN33. Countercl. ¶ 128.

**\*7** Additionally, even if the alleged unfair trade practices were no longer occurring, the harm alleged by Counterclaim Plaintiffs was amenable to injunctive relief. As the court discussed in *Grand Ventures, Inc. v. Whaley,* the requirement that one must have standing to seek an injunction to state a cause of action under the DTPA,

does not exclude the possibility that a deceptive trade practice may cease, for whatever reason, before an injunction can issue, thus theoretically mooting such relief. Presumably, an injunction could still issue to prevent future wrongs even though damages may be the only meaningful remedy. Whatever the case, standing under the Act flows from the nature of the wrong and that it is, *or was,* amenable to injunctive relief because of unreasonable interference with another's business interests or relationships protected by the DTPA.FN34

> FN34.632 A.2d at 70 n. 2 (emphasis ad- ded).

Therefore, because Griffin and Counterclaim Defendants' alleged conduct at least *was* amenable to injunctive relief, Counterclaim Plaintiffs have standing under the DTPA.

### b. Prohibited acts under § 2532(a)

Section 2532 of the DTPA states, in pertinent part:

A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(8) Disparages the goods, services, or business of another by false or misleading representation of fact; [or]

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.FN35

> FN35.6 *Del. C.* § 2532(a).

"In order to prevail in an action under [§ 2532], a complainant need not prove competition between the parties or actual confusion or misunderstanding."FN36 Additionally, the DTPA does not "affect unfair trade practices otherwise actionable at common law or under other statutes of [Delaware]."FN37

> FN36.6 *Del. C.* § 2532(b).

> FN37.6 *Del. C.* § 2532(c).

The Counterclaim alleges that, among other actions, Griffin and Counterclaim Defendants: "misrepresented, and caused their employees to misrepresent that nothing would change when [Entity] acquired Griffin despite [Entity]'s intention to move offices, add officers, require the re-execution of all client contracts, change the accounting service provider, and change the payroll

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

Page 9

service provider;" "misrepresented the costs of do-ing business with Griffin by not disclosing a 'hidden charge' to make up any employment tax paid;""misrepresented the cost of doing business with SMC to SPEs considering switching to SMC;""misrepresented to third parties that they had authority to act on behalf of former clients when they had no such authority;" and "misrepresented to SPEs that Dobrzynski and Jacobs had resigned from the SPEs and were not willing to serve as their directors, officers and employees."[FN38]

> FN38. Countercl. ¶ 137.

**\*8** Though Griffin and Counterclaim Defendants claim that these acts do not constitute prohibited acts under § 2532, for purposes of this motion, I cannot conclude that such a legal conclusion neces-sarily follows from the allegations in the Counter-claim. Those allegations depict statements made by Griffin and Counterclaim Defendants that disparage the services of SMC, misrepresent characteristics of Entity/Griffin services, and create a likelihood of confusion regarding Entity/Griffin's association with Jacobs and Dobrzynski. A motion to dismiss under Rule 12(b)(6) will be granted only where "it appears with reasonable certainty" that the plaintiff cannot prevail on any set of facts that can be in-ferred from the pleadings.[FN39]The factual allega-tions made by Counterclaim Plaintiffs in paragraph 137 alone, if proven true, provide a set of facts upon which they conceivably might prevail. There-fore, I deny Griffin and Counterclaim Defendants' motion to dismiss Counterclaim Plaintiffs' claim for unfair trade practices under 6 *Del. C.* § 2532 and common law.

> FN39.*See, e.g., McMullin,* 765 A.2d at 916;*Rabkin,* 498 A.2d at 1104.

#### d. Claims against Campbell and Eppes in their per-sonal capacities

Griffin and Counterclaim Defendants argue that to the extent Counterclaim Plaintiffs assert claims for tortious interference and unfair trade practices

against Campbell and Eppes, they appear to do so only in their capacity as officers of Entity. In the past, Delaware courts have found corporate officers liable for tortious conduct and statutory violations despite the fact that their actions were taken in some official corporate capacity.[FN40]The Counter-claim alleges various actions taken by Counter-claim Defendants, which by definition includes Campbell and Eppes, that, if true, could constitute tortious interference with Counterclaim Plaintiffs' prospective business relationships and unfair trade practices under common law and 6 *Del. C.* § 2532. As such, I cannot find that Counterclaim Plaintiffs would not be entitled to recover against Campbell and Eppes individually under any reasonably con-ceivable set of circumstances susceptible of proof.FN41Therefore, I deny Griffin and Counter-claim Defendants' motion to dismiss the counter-claims against Campbell and Eppes.

> FN40.*See State ex rel. Brady v. Preferred Florist Network, Inc.,* 791 A.2d 8, 21-22 (Del. Ch.2001).*See also St. James Recre-ation, LLC v. Rieger Opportunity Partners, LLC,* 2003 WL 22659875, at \*6 (Del. Ch. Nov. 5, 2003).

> FN41.*See VLIW Tech.,* 840 A.2d at 611.

#### 4. Breach of the Confidentiality Agreement

Counterclaim Plaintiffs allege that "Griffin [as as-signee of all of Wachovia's rights and obligations regarding the Confidentiality Agreement] breached the confidentiality agreement by acting in bad faith."[FN42]The bad faith action that Counterclaim Plaintiffs allege occurred was Wachovia intention-ally deceiving SMC "by misrepresenting to SMC that they were seeking bids to sell Griffin when they already had selected the purchaser, [Entity], prior to executing the confidentiality agreement" or by "mislead[ing] the bidders in January by delaying and misrepresenting the progress of the due dili-gence phase of the process."[FN43]

> FN42. Countercl. ¶ 141.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

FN43.*Id.*

In order to survive a motion to dismiss for failure to state a breach of contract claim a party must demonstrate, among other elements, a "breach of an obligation imposed by [the] contract."[FN44] Even if Counterclaim Plaintiffs intended their breach of contract claim to allege a breach of the implied covenant of good faith and fair dealing, they still must "identify a specific implied contractual obligation" that was breached in order to state a claim.[FN45] While "bad faith" actions may constitute a breach of contract, the facts that Counterclaim Plaintiffs allege constitute bad faith relate to the creation of the contract. Specifically, Counterclaim Plaintiffs describe the breach of the Confidentiality Agreement as "making a contract that was a ruse," i.e. they allege that they were induced to enter into the contract based on fraudulent representations, not a breach of an obligation imposed by the contract.[FN46] Additionally, though Counterclaim Plaintiffs allege that Wachovia misled the bidders in January by misrepresenting the status of the sale, there is no provision in the Confidentiality Agreement that obligates Wachovia to disclose the status of the sale to SMC. Rather, the Confidentiality Agreement only states that SMC "may receive certain confidential information concerning [Griffin] or Wachovia."[FN47] Moreover, the Counterclaim provides no notice or identification of the resultant damage from this allegedly misleading statement regarding the status of the sale.

FN44.*VLIW Tech.,* 840 A.2d at 612.

FN45. See Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 872 A.2d 611, 630 (Del. Ch.2005).

FN46. DAB at 18. In fact, Counterclaim Plaintiffs admit that their claim for fraudulent misrepresentation "centers on the same bad faith conduct on which the breach of contract claim was based."*Id.*

FN47. Am. Compl. Exh. A.

**\*9** Therefore, for the reasons discussed above, I grant Griffin and Counterclaim Defendants' motion to dismiss Counterclaim Plaintiffs' claim for breach of the Confidentiality Agreement for failure to state a claim under Rule 12(b)(6).

### 5. Indemnification

Jacobs and Dobrzynski claim that they are "entitled to indemnification from Griffin for all or part of what Plaintiff may recover from Dobrzynski and Jacobs"[FN48] because "agents of companies may be entitled to full indemnification for any liability resulting from acts performed on behalf of the company."[FN49] Griffin and Counterclaim Defendants contend that their suit against Counterclaim Plaintiffs was brought precisely because Jacobs and Dobrzynski took certain actions after they were no longer agents of, or acting on behalf of, Griffin. Additionally, Griffin and Counterclaim Defendants argue that Counterclaim Plaintiffs have not identified any contract or statute under which they would be entitled to indemnification from Griffin.[FN50] In their responsive brief, Counterclaim Plaintiffs assert that there may be an implied contract under which Jacobs and Dobrzynski would have the right to be indemnified and that they need additional discovery. However, no allegation regarding the existence of such a contract, express or implied, appears anywhere in the Counterclaim. Similarly, the Counterclaim points to no Griffin bylaw under which indemnification would be available.[FN51] Though Counterclaim Plaintiffs could have amended their Counterclaim in the face of Griffin and Counterclaim Defendants' motion to dismiss to clarify the basis for their indemnification claim, they chose not to do so.

FN48. Countercl. ¶ 151.

FN49.*Id.* ¶ 150.

FN50. Indemnification is generally available under contract or statute in Delaware. *See Cochran v. Stifel Fin. Corp.,* 2000 WL

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 11
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

286722 (Del. Ch. Mar. 8, 2000), *rev'd on other grounds,* 809 A.2d 555 (Del.2002).

FN51.“In considering a motion to dismiss, only those matters referred to in the pleadings are to be considered by the Court.”*Haber,* 465 A.2d at 357.

Therefore, I find that Counterclaim Plaintiffs have failed to plead any basis for their claim for indemnification and grant the motion to dismiss that claim under Rule 12(b)(6).[FN52]

FN52. I note, however, that this dismissal is not intended to affect any right to indemnification that Jacobs and Dobrzynski may have against Griffin with regard to claims outside the scope of the Amended Complaint that may be brought against them in the future.

B. Dismissal for Failure to Plead Fraud with Particularity as Required by Rule 9(b)

1. Fraudulent misrepresentation

Counterclaim Plaintiffs allege that “Griffin, as assignee of all of Wachovia's rights and obligations regarding the confidentiality agreement” knowingly made the false representation “that it was soliciting bids to sell its business” though “it had intended all along to sell to [Entity].”[FN53] Counterclaim Plaintiffs allege that, as a result of this misrepresentation, they were fraudulently induced to sign the Confidentiality Agreement. In the alternative, they claim that “once Wachovia determined to sell to [Entity], it failed to exercise good faith and intentionally misrepresented the status of the Sale.”[FN54]Because of their reliance on these misrepresentations, Counterclaim Plaintiffs seek to void the Confidentiality Agreement.

FN53. Countercl. ¶¶ 144, 146.

FN54.*Id.* ¶ 146.

Griffin and Counterclaim Defendants argue that this pleading does not satisfy Court of Chancery Rule 9(b)'s requirement that “circumstances constituting fraud shall be stated with particularity.”The circumstances that must be stated with particularity under Rule 9(b) are time, place, content of the false representation, identity of the person making the representation, and what she intended to obtain thereby.[FN55]In this case, Counterclaim Plaintiffs assert that during the purported bidding process for Griffin, Wachovia misrepresented the fact that it was soliciting bids to sell Griffin when, in fact, it had already decided to sell to Entity. They allege Wachovia made that misrepresentation in an effort to induce SMC to enter into the Confidentiality Agreement that contained a provision that prevented SMC from soliciting any of Griffin's employees for two years and effectively “tie[d] the hands of all of Griffin's competitors.”[FN56]I find these allegations sufficient to meet the Counterclaim Plaintiffs' obligation to plead fraud with particularity under Rule 9(b). Thus, Griffin and Counterclaim Defendants' motion to dismiss the counterclaim for fraudulent misrepresentation under Rule 9(b) is denied.

FN55.*See Metro Communication Corp. BVI v. Advanced Mobilcomm Tech. Inc.,* 854 A.2d 121, 144 (Del. Ch.2004); *H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 145 (Del. Ch.2003).

FN56. Countercl. ¶ 146.

**\*10** I also do not find Counterclaim Plaintiffs' fraud allegations conclusory. In support of their claim that the bidding process for Griffin was a sham, they allege that the material they received in response to signing the Confidentiality Agreement and engaging in the bidding process “provided minimal overview information to SMC .... [and] essentially no confidential information.”[FN57]Counterclaim Plaintiffs further allege that “SMC proposed to pay at least 1 million dollars more than [Entity] agreed to pay [to purchase Griffin,]” yet Wachovia never responded to their bid.[FN58]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))

Page 12

FN57.*Id.* ¶ 104.

FN58.*Id.* ¶ 105.

Griffin and Counterclaim Defendants also argue that they are not responsible for Wachovia's alleged misrepresentations before the execution of the Confidentiality Agreement. Counterclaim Defendants respond that Griffin is the "assignee of all of Wachovia's rights and obligations regarding the confidentiality agreement,"[FN59] including their fraudulent misrepresentation claim against Wachovia. Griffin and Counterclaim Defendants deny that the assignment includes liability for Wachovia's alleged fraud. The letter assignment between Wachovia and Griffin was not made part of the pleadings. In fact, it was submitted by the nonmoving party, Counterclaim Plaintiffs, and only after argument on Griffin and Counterclaim Defendants' motion to dismiss. Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss.[FN60] Therefore, I have not considered the letter assignment for purposes of this motion.

FN59.*Id.* ¶¶ 102, 144.

FN60.*See In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 69; *Haber,* 465 A.2d at 357.

Counterclaim Plaintiffs allege that Griffin is assignee of "all of Wachovia's rights and obligations regarding the confidentiality agreement"[FN61] and argue that such obligations include defense of claims for fraudulent representations regarding the Confidentiality Agreement. Giving Counterclaim Plaintiffs the benefit of all reasonable inferences that can be drawn from its pleading, and without further factual development and analysis of the letter assignment, I cannot conclude that they would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[FN62] Therefore, I also deny Griffin and Counterclaim Defendants' motion to dismiss the counterclaim for fraudulent misrepresentation under Rule 12(b)(6).

FN61. Countercl. ¶¶ 102, 144.

FN62. Moreover, fraud in the inducement is a defense against an assignee attempting to enforce a contract between its assignor and an obligor. *See* Restatement (Second) of Contracts § 164 (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient") and § 366 ("By an assignment the assignee acquires a right against the obligor only to the extent that the obligor is under a duty to the assignor; and if the right of the assignor would be voidable by the obligor or unenforceable against him if no assignment had been made, the right of the assignee is subject to the infirmity."). Griffin stated a claim for breach of the Confidentiality Agreement in the Amended Complaint. Though Counterclaim Plaintiffs asserted fraudulent misrepresentation as a counterclaim, it appears to be more appropriately framed as an affirmative defense in this situation. When a party has mistakenly designated a defense as a counterclaim, Court of Chancery Rule 8(c) allows the Court to treat the pleading as if there had been a proper designation. Although I am somewhat skeptical about the likelihood of success on the merits, I conclude that the assertion of fraudulent misrepresentation is sufficient as either a counterclaim or an affirmative defense to withstand the pending motion to dismiss.

### III. CONCLUSION

For the reasons stated above, the Court grants Griffin and Counterclaim Defendants' motion to dismiss Counterclaim Plaintiffs' claims for tortious interference with existing business contracts and Stewart's attorney-client relations, breach of the Confidentiality Agreement, and indemnification.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.))**

Page 13

The Court denies Griffin and Counterclaim Defendants' motion to dismiss Counterclaim Plaintiffs' claim for tortious interference with prospective business relations, unfair trade practices under 6 *Del. C.* § 2532 and common law, and fraudulent misrepresentation. I also deny the motion to dismiss as to the claims against Campbell and Eppes.

IT IS SO ORDERED.

Del.Ch.,2005.
Griffin Corporate Services, LLC v. Jacobs
Not Reported in A.2d, 2005 WL 2000775 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Candice Toll Aaron, hereby certify that on this 17th day of June, 2008, I caused

to be electronically filed a true and correct copy of the foregoing *Defendants Saul*

*Ewing, LLP, Michael R. Robinson and Frank Love's Opening Brief In Support Of*

*Their Motion To Dismiss* with the Clerk of Court using CM/ECF which will send

notification of such filing.  A copy of the document was served on the following persons

by U.S. Mail:

Mr. James Coppedge
c/o Coppedge Real Estate, LLC
P.O. Box 4482
Philadelphia, PA  19140

Mr. James Coppedge
c/o Coppedge Real Estate, LLC
3742 N. 18th Street, Apt. 1-A
Philadelphia, PA  19140

SAUL EWING LLP

Candice Toll Aaron (DE Bar No. 4465)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899-1266
Telephone:    (302) 421-6800
Facsimile:    (302) 421-6813
Email: caaron@saul.com

Dated:  June 17, 2008